# EXHIBIT A

1:16-cv-00418

3/11/2016 5:06:48 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-16-001117
Victoria Chambers

CAUSE NO. D-1-GN-16-001117

| | | |
|---|---|---|
| **GIBRALTAR CABLE BARRIER SYSTEMS, LP, GIBRALTAR MATERIAL DISTRIBUTION, LP, NEUSCH INNOVATIONS, LP, FOUNDATION FENCE, INC., and WILLIAM NEUSCH** **Plaintiffs,** | § | **IN THE DISTRICT COURT OF** |
| **v.** | § | **TRAVIS COUNTY, TEXAS** |
| **STEPHEN NEUSCH, NEU SECURITY SERVICES, LLC, and BLACK SECURITY PRODUCTS, LLC** **Defendants.** | § | **419th JUDICIAL DISTRICT** |

Unofficial copy Travis County District Clerk Velva L. Price

**PLAINTIFFS' ORIGINAL PETITION AND APPLICATION FOR APPOINTMENT OF A RECEIVER AND TEMPORARY INJUNCTION**

TO THE HONORABLE COURT:

Plaintiffs Gibraltar Cable Barrier Systems, LP, Gibraltar Material Distribution, LP, Neusch Innovations, LP, Foundation Fence, Inc., and William Neusch file this Original Petition and Application for Appointment of a Receiver and Temporary Injunction against Defendants Stephen Neusch, NEU Security Services, LLC, and Black Security Products, LLC. In support thereof, Plaintiffs would respectfully show the Court as follows:

## I. DISCOVERY CONTROL PLAN

1. Discovery is to be conducted under Level 3 of the Texas Rules of Civil Procedure and in accordance with a scheduling order issued by the Court. Tex. R. Civ. P. 190.4.

## II. PARTIES

***The Plaintiffs***

2. Plaintiff Gibraltar Cable Barrier Systems, LP is a Texas limited partnership having its principal place of business at 4303 Innovation Loop, Marble Falls, Texas 78654.

3. Plaintiff Gibraltar Material Distribution, LP is a Texas limited partnership having its principal place of business at 4303 Innovation Loop, Marble Falls, Texas 78654.

4. Plaintiff Foundation Fence, Inc. is a Texas Corporation having its principal place of business at 4303 Innovation Loop, Marble Falls, Texas 78654.

5. Plaintiff Neusch Innovations, LP is a Texas limited partnership having its principal place of business at 4303 Innovation Loop, Marble Falls, Texas 78654.

6. Plaintiffs Gibraltar Cable Barrier Systems, LP, Gibraltar Material Distribution, LP, Neusch Innovations, LP, and Foundation Fence, Inc. are collectively referred to herein as "Gibraltar." Gibraltar is in the business of manufacturing, distributing, and installing security barriers such as those protecting courthouses and military installations.

7. The Gibraltar companies are owned and controlled by Plaintiff William H. Neusch, the sole inventor of the Gibraltar security barrier systems covered by domestic and international patents.

***The Defendants***

8. Defendant NEU Security Services, LLC ("NSS"), formerly NEU Fence, LLC, is a Texas limited liability company having its principal place of business at 706 West Ben White Blvd., Suite 220B, Austin, Texas 78704. Defendant NEU Security Services, LLC may be served through its registered agent, Stephen Neusch, at his residence, 4400 Silent Trail, Austin, Texas 78746.

9. Defendant Black Security products, LLC ("BSP") is Texas limited liability company having its principal place of business and registered office at 4400 Silent Trail, Austin, Texas 78746 that may be served through its registered agent, Steven Neusch, at its registered office.

Unofficial copy - Travis Co. District Clerk Velva L. Price

10. Defendant Stephen Neusch is a natural person residing in Travis County, Texas and may be served with process at his residence, 4400 Silent Trail, Austin, Texas 78746. Stephen Neusch formed NSS in 2008 and formed BSP in 2014. Both NSS and BSP are contractors in the business of installing security barriers.

## III. JURISDICTION AND VENUE

11. This Court has jurisdiction over the parties and subject matter of this litigation. The damages sought are within the jurisdictional limits of this Court. Reserving all rights to amend, Plaintiffs seek monetary relief in an amount exceeding $1,000,000, injunctive relief, and such other and further relief to which they might show themselves entitled.

12. Venue is proper in Travis County, Texas, because Defendant Stephen Neusch resides in Travis County, and Defendants NSS and BSP maintain principal offices in Travis County. TEX. CIV. PRAC. & REM. CODE §§ 15.002; 64.071; and 65.023.

## IV. FACTUAL BACKGROUND

***<u>Gibraltar's Innovative Security Products</u>***

13. Gibraltar is a world leader in the security barrier business. Gibraltar's product portfolio includes (i) cable barriers that provide highway safety, (ii) anti-ram vehicle barriers that protect critical infrastructure such as embassies, airports, and military bases, and (iii) security fencing used to protect facilities. Examples of Gibraltar products are pictured below.

Unofficial Copy - Travis Co. District Clerk Velva L. Price



Gibraltar Highway Cable Barrier



Gibraltar Palisade Security Fence



Gibraltar G-Force Brace and Beam Anti-Ram Fence



Gibraltar Anti-Ram Bollard



Gibraltar Active Wedge Barrier

14. Gibraltar designs, develops, and manufactures its innovative products in Marble Falls, Texas, and has provided them around the world. Gibraltar has been awarded patents in the United States and internationally for technical innovations that have saved lives and ensured the safety of workers around the globe.

15. The effectiveness of Gibraltar's products is validated through crash-rating certifications that Gibraltar earned through years of product development and extensive testing under ASTM guidelines. An example of a significant (and life-saving) application of Gibraltar's

cable barrier system is the medians of U.S. highways. Referring to the cable barrier installation along I-20 in Louisiana, Michael Reichardt, Louisiana State Police, stated, "There hasn't been a fatality crash from a car crossing the median over there since the cables have been put up, so that's a good thing."

16. Gibraltar's products are among a select few that have been certified by the U.S. Department of State for use in protecting government installations such as embassies, military bases, and other key infrastructure and buildings. To qualify for such government installations, Gibraltar's products have passed stringent requirements promulgated by the U.S. Department of Defense. These certifications are required before security barrier systems may be specified for such important projects.

***Gibraltar is a Family Business***

17. Plaintiff William Neusch has been in the security fence business since 1984. In 2005, Mr. Neusch expanded into the highway safety barrier market, and in 2007 developed an innovative anti-ram vehicle barrier. He built Gibraltar from scratch. Mr. Neusch's experience and integrity has earned Gibraltar a sterling reputation in the industry, and its products are known for quality innovation. Mr. Neusch continues to run Gibraltar's day-to-day operations.

18. Gibraltar has been headquartered in Burnet County since Mr. Neusch founded the company. It currently employs over 35 people and manufactures Gibraltar products at its Marble Falls facility. Mr. Neusch's eldest son, Defendant Stephen Neusch, has worked in the family company off and on since high school and most recently in 2008.

***Stephen Neusch Starts NSS***

19. As Gibraltar's manufacturing capabilities grew, so did Stephen Neusch's interest in the contracting and installation side of the industry. In 2008, Stephen launched NEU Fence

Unofficial copy- Travis Co. District Clerk Velva L. Price

LLC, which changed names in 2010 to NEU Security Services, LLC ("NSS"). Mr. Neusch's other son, Paul, joined Stephen at NSS.

20. Through Gibraltar, William Neusch provided bonding and product rights to Gibraltar products in support of Stephen and NSS. Once NSS (NEU Fence) was launched, Gibraltar was to focus on manufacturing and developing new products, while NSS was to focus on the sales and contracting side of the Gibraltar barrier products. However, NSS lacked the wherewithal to obtain bonds necessary to bid on government projects, a mainstay in the business. So to further help his son, Mr. Neusch and Gibraltar lent their sterling reputation, financial credit, and proven commercial capacity to ***guarantee*** payment and performance bonds issued by Liberty Mutual to NSS. *See* EXHIBIT A (Gibraltar Indemnity Agreement, dated March 24, 2008); EXHIBIT B (Gibraltar Indemnity Agreement, dated June 17, 2009); and EXHIBIT C (Amendment #1 to Gibraltar Indemnity Agreement, dated January 23, 2012). This was critical to NSS's ability to bid on government jobs and large, bonded private sector contracts.

21. The Gibraltar Indemnity Agreements convey to Gibraltar and Mr. Neusch a security interest in all machinery, supplies, equipment, plant, tools and materials on the site of NSS's bonded job, and in the event of default by NSS, the right to all bonded job receivables and to take over the NSS bonded jobs. *See* EXHIBITS A, B, AND C. The Gibraltar Indemnity Agreements also provide assignment to Gibraltar and Mr. Neusch of all rights in and to the bonded jobs in the event a receiver is appointed.

22. In April 2010, in further support of NSS's business, Gibraltar granted NSS the exclusive right to distribute its products in the United States and internationally for a select few

Unofficial Copy - Travis Co. District Clerk Velva L. Price

products. In 2013, this arrangement was replaced with a royalty-based license agreement under which NSS would pay Gibraltar royalties on Gibraltar products and technology sold by NSS.[1]

23. In short, Gibraltar supplied its products, expertise, contacts, reputation, and financial backing to NSS and, as a result, NSS was able to secure valuable contracts.

***<u>NSS's Business Declines as Stephen's Behavior Becomes Erratic</u>***

Unofficial copy - Travis Co. District Clerk Velva L. Price

24. As early as 2010, NSS bid and won contracts for installation of Gibraltar barriers worth millions of dollars, but it failed to pay Gibraltar for product received and never paid Gibraltar a penny of the $300,000 in contractual royalties that accrued beginning in 2013.

25. During this time, NSS utilized the bonding capacity provided by Mr. Neusch and Gibraltar to bid on bonded jobs, and NSS grew quickly. Gibraltar invoiced NSS over one million dollars in bonding fees that NSS never paid. Finally, in March 2013, Mr. Neusch informed Stephen that he and Gibraltar would cease approving new bonds for NSS on July 31, 2013. Mr. Neusch was unaware of NSS's mounting problems at the time. Gibraltar terminated its indemnitor liability by written notice to Liberty Mutual dated November 22, 2013. *See* EXHIBIT D.

26. That same month, Mr. Neusch and Gibraltar learned for the first time that there could be problems with NSS completing the bonded jobs. Gibraltar and Mr. Neusch were invited to a meeting at NSS's offices with Liberty Mutual, the bond issuer. Mr. Neusch learned that Liberty Mutual had hired a consultant to investigate complaints on three bonded projects and had already conducted on-site meetings with NSS. Stephen never informed Mr. Neusch or Gibraltar about any such problems or meetings.

[1] In 2011, Gibraltar entered into a licensing agreement with Betafence, a Belgian company, for international sales and manufacturing of Gibraltar products.

27. At the meeting, Stephen assured Liberty Mutual, Gibraltar and Mr. Neusch that NSS was able to complete the bonded jobs. From November 2013 to November 2014, Mr. Neusch and Gibraltar had regular meetings with NSS to monitor the status of bonded jobs. Stephen defiantly insisted that Gibraltar's worries were overblown and led Gibraltar to believe NSS could complete the bonded work. At the time, Mr. Neusch did not contemplate the level of malfeasance he later discovered. He thought NSS had grown too big too fast and NSS's cash-flow problems were a result.

28. Gibraltar began advancing money to NSS to keep bonded jobs progressing toward completion, and by November 2014, Plaintiff William Neusch realized he had to act to protect Gibraltar's and his own financial interests in light of potential indemnitor liability. NSS vendors refused to deal directly with Stephen or NSS because NSS failed to pay them, so Gibraltar purchased materials from third parties on a pass-through basis. Over time, Gibraltar supplied millions of dollars of products, services, and equipment to NSS.

29. The total balance of these unpaid accounts receivables due from NSS now exceeds $3.7 million, and that amount does not include almost $6 million in funds advanced by Gibraltar by agreement with NSS and recorded on Gibraltar's books as a short term loan. In addition, Gibraltar has spent over $1 million to complete NSS projects that Gibraltar had to take over. These projects are ongoing with additional expenses being incurred by Gibraltar.

Unofficial Copy - Travis Co. District Clerk Velva L. Price

***Neu Security Services Is Unable to Complete Bonded Jobs***

30. In 2015, Stephen's concerned family watched as his behavior became even more erratic. He failed to show up at NSS's office, the business suffered employee turnover and cash flow issues, and NSS was unable to complete many of the projects on which Gibraltar served as indemnitor to the surety bond issuer. Gibraltar had to get directly involved in funding and performing NSS's bonded projects in order to minimize its exposure as the indemnitor.

31. In mid-2015, NSS was locked out of its office warehouse location at 8206 Cross Park Drive in Austin, Texas. Gibraltar learned about the lockout when it searched for documents it needed that were at NSS and learned they were locked in NSS's old office. NSS also left behind computers, office equipment, and document files. The landlord agreed to give Gibraltar a six-hour window to retrieve the assets NSS had abandoned.

32. Despite NSS's failure to pay Gibraltar for inventory and royalties due, Gibraltar continued to supply products to NSS so that bonded jobs could be completed, and so that Gibraltar and Mr. Neusch could avoid the financially devastating consequences arising from their indemnitor obligations.

33. Unbeknownst to Gibraltar or Plaintiff William Neusch until 2015, Stephen also had formed Black Security Products, LLC ("BSP") in June 2014 and caused NSS to fraudulently convey assets to BSP in hinder or delay paying creditors. The new entity also offered Stephen a chance to evade the negative reputation NSS had gained. Although BSP had no association with Gibraltar, Plaintiffs have since learned that BSP holds itself out as a supplier of Gibraltar products and trades on Gibraltar's reputation. Both NSS and BSP have forfeited their charters.

***<u>NSS Submits Fraudulent Invoice to Collect Payment From Stratcom</u>***

34. In May 2014, Stephen Neusch fabricated an invoice from Gibraltar to NSS for products purportedly supplied to a United States Strategic Command (STRATCOM) project. *See* EXHIBIT E. The invoice fraudulently inflated the amount and cost of material required for the job and falsely indicated that the Gibraltar products were in a bonded warehouse while, in fact, they had never even been purchased or delivered. NSS presented this fraudulent invoice to STRATCOM for payment of $717,088.16, and on information and belief, STRATCOM paid NSS the full amount.

Unofficial Copy - Travis Co. District Clerk Velva L. Price

35. The invoice itself is notable for several reasons. It appeared to be on Gibraltar letterhead, included the Gibraltar name and logo, and was in the form of Gibraltar's standard invoice. Under the Gibraltar logo, however, Stephen Neusch added "Gibraltar Products manufactured by Black Security Products." But BSP did not manufacture Gibraltar products, nor did it even have a right to supply or install Gibraltar products.

36. Additionally, Stephen Neusch forged the signature of Kevin Rae as Gibraltar's Sales Manager on the invoice. But Mr. Rae died almost two years earlier, in December 2012.

37. Not long after submitting the fraudulent invoice to STRATCOM, an auditor began requesting information from NSS about the materials. NSS created and sent to Gibraltar a backdated purchase order for approximately $500,000 in materials for the STRATCOM job. Gibraltar rejected the backdated purchase order. To support their misrepresentation to Kiewet-Phelps, the primary contractor on the STRATCOM project, that the Gibraltar materials were in a bonded warehouse, NSS and Stephen provided photos showing materials-on-hand (not the order NSS told Kiewit-Phelps it had waiting in a bonded warehouse) in Gibraltar's yard.

38. Defendants never disclosed the existence of this invoice, or STRATCOM's payment on it, to Gibraltar or Plaintiff William Neusch. Gibraltar first learned of the fraudulent invoice in January 2016.

Unofficial copy - Travis Co. District Clerk Velva L. Price

***<u>Gibraltar Takes Over NSS's Bonded Jobs (the "MOU")</u>***

39. Throughout this time, Plaintiff William Neusch and his family tried to reach Stephen and salvage their relationship and the business. At times it seemed possible, but Stephen's repeated efforts to cover up his malfeasance exposed his family and Gibraltar to more liability.

40. It all finally collapsed in early 2015 with NSS unable to make payroll. Stephen was habitually absent from work, apparently due to his obsession with online gaming and his recent opening of a tattoo parlor.

41. In February 2015, Gibraltar and Stephen Neusch entered into a Memorandum of Understanding & Agreement ("MOU") regarding NSS's unfinished certain bonded projects. *See* EXHIBIT F. The "Bonded Projects" are known as: Ft. Sam Houston, Utah Data Center, VA Bay Pines, Fort Sam Houston ACP, Kings Bay Security Enclave, Stratcom Offutt AFB, Denver VA Hospital, Miami FBI Building, and Fort Carson.

42. NSS voluntarily defaulted on the Fort Carson, Denver VA Hospital, and VA Bay Pines projects. EXHIBIT H.

43. By the terms of the MOU, NSS and Stephen Neusch acknowledged, finally, that NSS was financially unable to perform or complete the projects, that certain subcontractors and suppliers had not been paid and, but for Gibraltar's willingness to fund completion and eventually take over the bonded projects, they would not be completed.

44. The MOU established a Zero Balance Account into which all Bonded Contract Funds (*i.e.*, payments on the bonded projects) would be deposited and all advances by Gibraltar would be made. *See* Lilley Aff. The MOU controlled NSS's access to the Zero Balance Account and strictly prohibited NSS from redirecting or withdrawing funds from the account without Plaintiffs' prior consent.

45. Gibraltar entered into various agreements with the owners or prime contractors on some of the Bonded Projects to get them completed and to reduce Gibraltar's exposure on the indemnity agreements.

Unofficial Copy - Travis Co. District Clerk Velva L. Price

46. Not surprisingly, Stephen's brother, Paul Neusch, left NSS in December 2015 and came on board at Gibraltar after watching Stephen's erratic behavior and inattention to the business irretrievably doom NSS. Paul is now a Gibraltar employee and is working to complete the bonded jobs Gibraltar was forced to take over from NSS.

***Gibraltar Sells its Cable Barrier Technology to Betafence and Terminates NSS***

47. Around the same time Gibraltar entered into the MOU with NSS, Gibraltar sold its cable-based barrier system technology to Betafence Corporate Services NV, a Belgian company that had successfully distributed Gibraltar products outside the United States since 2011.

48. The sale conveyed to Betafence certain cable-based barrier patents and intangibles. . Mr. Neusch discussed the Betafence deal with Stephen Neusch and informed him of Betafence's requirement that Gibraltar and its licensee cease selling the Gibraltar cable-based products, which he acknowledged in a termination agreement.

49. On February 11, 2015, Stephen Neusch agreed to and acknowledged in writing a Notice of Termination of NSS's licensing rights with respect to all Gibraltar products. *See* EXHIBIT G. The agreed Notice states that Gibraltar is "terminat[ing] any and all licensing or other contractual rights which NSS may have to use Gibraltar products," and requires NSS to "immediately cease efforts to market [Gibraltar] products as a licensee and make arrangements to destroy or return any confidential or proprietary drawings, specifications, or manufacturing information."

50. NSS also agreed not to bid any new jobs or in any way represent NSS as a licensee of Gibraltar for any projects or sales opportunities, and to "refrain from utilizing the business methods, any intellectual property, any approvals and/or any certificates of Gibraltar for any reason whatsoever."

Unofficial Copy - Travis Co. District Clerk Velva L. Price

***NSS and BSP Continue to Hold Themselves Out As Gibraltar Affiliates***

51. Despite the Gibraltar/NSS termination, and despite acknowledging default under the indemnity agreements in the MOU, Stephen Neusch and his two entities, NSS and BSP have continued to represent themselves as distributors of Gibraltar products.

52. The BSP and NSS websites (www.neusecurity.com) displays photos and technical drawings of Gibraltar products as NSS's own products. An example is shown below:




Unofficial Copy Travis Co. District Clerk Velva L. Price

53. NSS's website also features Gibraltar's certifications by the U.S. Department of State and Gibraltar's ASTM testing results. Exemplary excerpts are shown below:

United States Department of State

Washington, D.C. 20520

AUG 22 2008

Gibraltar
320 Southland Drive
Burnet, Texas 78611

Attention: Mr. Bill Neusch

Dear Mr. Neusch,

Based on a request from your company, a technical representative of the Department of State (DOS) recently reviewed the vehicle crash test data from a DOS approved test facility. Upon review of the crash test data provided by the test facility it has been determined that your company's anti-ram vehicle barrier meets the DOS certification standards for vehicle barriers. This testing and analysis was conducted under the current provisions of SD-STD-02.01, Revision A, *Test Method for Vehicle Crash Testing of Perimeter Barriers and Gates*, dated March 2003.

Company/Manufacturer: Gibraltar
Test Date: April 16, 2008
Test Facility: KARCO Engineering

Unofficial copy- Travis Co. District Clerk Velva L. Price

KARCO Engineering

KARCO Engineering, LLC.
AUTOMOTIVE RESEARCH CENTER
9270 Holly Road
Adelanto, CA 92301
Tel: (760) 246-1672
Fax: (760) 246-8112
info@karco.com

Gibraltar Cable Barrier Systems, L.P.
320 Southland Drive
Burnet, TX 78611

Attention: Mr. Bill Neusch

Date: April 23, 2010

Mr. Neusch,

Based upon the testing performed on Tuesday, April 6, 2010 at KARCO Engineering, LLC., the as-tested configuration, impacted between the terminal post and the first line post of a four (4) post total installation consisting of one (1) terminal post and three (3) line posts, of the Gibraltar M50 P2 Cable Crash Fence has received an impact rating of P2 at the M50 test level, based on the ASTM F 2656-07 standard test method. The M50 test level is rated using a 6800 kg test vehicle traveling at a nominal velocity of 80.5 km/h. The P2 penetration rating is given when penetration beyond the protected side of the barrier is between 1.01 m and 7.00 m at the lower leading edge of the test vehicle's cargo bed.

***NSS and BSP Persistently Violated the MOU and Continue to Interfere with Gibraltar's Efforts to Complete the Bonded Projects***

54. Despite the terms of the Gibraltar Indemnity Agreements and the MOU, Defendants directed payments from the Zero Balance Account to a different NSS/BSP bank account to fund non-bonded jobs.

55. In breach of the MOU, Defendants have misused Gibraltar-issued debit cards that were provided for the sole purpose of paying vendors for expenses incurred in connection with the completion of bonded jobs.

56. Defendants have directed field crews and superintendent to leave bonded job sites to work on non-bonded NSS/BSP jobs. Defendants caused these employees to submit time records that reflected work on bonded jobs that were, in turn, submitted to Gibraltar for payment. Gibraltar learned that the crews had not been working on bonded jobs. In fact, they were working for NSS/BSP on other projects. These employees were paid by Gibraltar based upon representations by NSS/BSP that the work was on the bonded jobs Gibraltar had taken over from Defendants.

57. Contrary to the terms of the agreed Termination Notice, Defendants continue bidding on non-bonded projects and specifying Gibraltar products or products that embody Gibraltar technology, including cable-based barrier technology now owned by Betafence.

***Defendants Used Fraudulently Obtained Gibraltar Funds to Develop and Test Cable-Based Systems Now Being Marketed by Defendants***

58. The primary other project that Defendants funded with funds and resources fraudulently obtained from Gibraltar was development and testing of a new cable-based barrier system.

59. Defendants' new system is based on technology originally developed by Gibraltar, was developed with Gibraltar funds, tested by workers being paid by Gibraltar, and is

Unofficial copy Travis Co. District Clerk Velva L. Price

being marketed in violation of the parties' non-compete agreement and the terms of the NSS Termination Notice.

## V. CAUSES OF ACTION

**COUNT ONE: Breach of the 2015 Memorandum of Understanding & Agreement**

60. All preceding paragraphs are incorporated here by reference as fully set out in support of this count.

61. The Gibraltar Family of Companies (referred to in the contract as "Indemnitors") and Neu Security Services, LLC (referred to as the "Principal") entered into a valid and enforceable contract on the February 24, 2015, titled Memorandum of Understanding & Agreement ("MOU"). A true and correct copy of the MOU is attached as Exhibit F.

62. By the terms of the MOU, NSS admitted that it could not complete Bonded Contracts with various third parties for projects generally known as Ft. Sam Houston, Utah Data Center, VA Bay Pines, Fort Sam Houston ACP, Kings Bay Security Enclave, STRATCOM Offutt AFB, Denver VA Hospital, Miami FBI Building, and Ft. Carson. The MOU effected a bailout of NSS by Gibraltar whereby Gibraltar would pay NSS subcontractors and suppliers of labor and materials with respect to the Bonded Contracts and projects.

63. NSS agreed to establish a Zero Balance Account where all Bonded Contract Funds collected would be deposited and all monies Gibraltar agreed to advance would be kept. NSS agreed not to redirect any Bonded Contract Funds or use any Zero Balance Account funds for any purpose other than work under the Bonded Contract.

64. All monies advanced to, loaned to or otherwise used to fund the Principal or the Zero Balance Account constituted trust funds under the MOU.

65. Plaintiffs performed, tendered performance of, or were excused from performing all of their contractual obligations under the MOU.

Unofficial Copy - Travis Co. District Clerk Velva L. Price

66. NSS breached the MOU by committing the aforementioned acts and omissions including misusing Bonded Contract Funds and/or funds advanced by Plaintiffs in the Zero-Balance Account; redirecting advanced funds by using debit cards issued to Foundation Fence for purposes other than for completion of Bonded Projects.

67. Defendants' breach caused Plaintiffs financial injury. Plaintiffs seek all actual, direct, indirect, special and consequential damages resulting from NSS's breaches, as well as reasonable and necessary attorney's fees as provided by law.

**COUNT TWO: Breach of 2015 NSS Termination Agreement.**

68. All preceding paragraphs are incorporated here by reference as fully set out in support of this count.

69. By the terms of the February 4, 2015 NSS Termination Notice (Exhibit G), which NSS and Stephen Neusch in his personal capacity acknowledged and agreed, NSS and Stephen Neusch promised to cease holding NSS out as a Gibraltar distributor or licensee. Defendants also agreed not to contest termination of any contractual or implied rights to license Gibraltar products and to take immediate steps to destroy or return any Gibraltar confidential or proprietary information.

70. Plaintiffs performed, tendered performance of, or were excused from performing their contractual obligations under the NSS Termination Agreement.

71. In consideration of Defendants' promises under the Termination Agreement, Gibraltar agreed to waive all unpaid accrued royalties (totaling $300,000) that Defendants owed Gibraltar.

Unofficial Copy - Travis Co. District Clerk Velva L. Price

72. By the aforementioned acts and omissions, including misrepresenting to potential customers that NSS or BSP sells, distributes, manufactures, and installs Gibraltar products, breached the Termination Agreement, causing Plaintiffs financial injury.

73. In a violation of the Termination Agreement, Stephen Neusch, through Black Security Products, submitted a submittal package to Purgatory Fence Company on December 2, 2015, specifying Gibraltar products, attaching Gibraltar's certifications by the U.S. Dept. of State and Department of Defense, and including Gibraltar technical specifications and drawings.

74. Plaintiffs seek all actual, direct, indirect, special, and consequential damages resulting from this breach, as well as reasonable and necessary attorney's fees as provided by law.

**COUNT THREE: Default under the Gibraltar Indemnity Agreements**

75. All preceding paragraphs are incorporated here by reference as fully set out in support of this count.

76. Defendants admitted by the terms of the MOU breach and/or default of the Gibraltar Indemnity Agreements. EXHIBITS A, B, AND C. For example, Defendants specifically admitted to failing to pay obligations incurred in connection with Bonded Projects, abandoned Bonded Projects, and admitted they could not finish the Bonded Projects unless Gibraltar stepped in, which Gibraltar did. By virtue of the payments made on Defendants' behalf to complete performance, Plaintiffs are equitably entitled to step into the shoes of the surety and assert those rights against Defendants.

77. Gibraltar seeks a declaration as Indemnitor of its entitlement to exercise all rights, remedies, and options available to the surety under the Indemnity Agreements.

Unofficial Copy - Travis Co. District Clerk Velva L. Price

78. Gibraltar further seeks all actual, direct, indirect, special and consequential damages resulting from Defendants' breach and default including reasonable and necessary attorney's fees as provided by law and the Indemnity Agreements.

**COUNT FOUR: Request For Acccounting**

79. All preceding paragraphs are incorporated here by reference as fully set out in support of this count.

80. Defendants have misappropriated and misapplied funds and Plaintiffs request that the Court order and accounting through a Court-appointed auditor or Reciever.

**COUNT FIVE: Suit on Sworn Account**

81. All preceding paragraphs are incorporated here by reference as fully set out in support of this count.

82. As shown by the attached Affidavit by Gibraltar CFO Jim Bryer, Gibraltar has kept a systematic record of all material and labor provided to Defendants.

83. All just and lawful offsets, payments, and credits have been allowed, and Defendants are liable on the account in the amount of $ 3,735,403.17.

**COUNT SIX: Breach of Fiduciary Duty**

84. All preceding paragraphs are incorporated here by reference as fully set out in support of this count.

85. The familiar and close business and personal relationship creates a fiduciary duty as a matter of law between Plaintiff William Neusch and Defendant Stephen Neusch.

86. Gibraltar entered into the February 2015 Memorandum of Understanding & Agreement with NSS by which NSS agreed to "collaborate with Indemnitors and its agents" and abide by the terms of the MOU in its use and access of the Zero Balance Account funds.

Unofficial Copy - Travis Co. District Clerk Velva L. Price

87. NSS agreed, "In the event that Indemnitors agree to fund the Zero Balance Account, provide financial assistance to Principal in any manner or method, said action shall be in the sole judgment, option and discretion of Indemnitors and in the best interests of the Indemnitors only and not the Principal or any other person or entity."

88. In reliance of NSS's promises and obligations and the fiduciary nature of their relationship, Mr. Neusch and Gibraltar funded the Zero Balance Account and provided financial assistance to NSS only to be defrauded.

89. The circumstances preceding and surrounding the MOU and the relationship between Gibraltar and Willam Neusch, on one hand, and Defendants on the other hand created a fiduciary relationship under which Stephen Neusch, NSS, and BSP owe duties to Plaintiffs.

90. Defendants breached their fiduciary duties by redirecting Bonded Contract Funds, misusing Plaintiffs' advanced funds for non-bonded projects, and intentionally or knowingly causing Gibraltar to pay work crews for time spent on non-bonded projects by submitting to Gibraltar employee pay records for reimbursement when they had worked on non-bonded and were paid for bonded.

Unofficial Copy - Travis Co. District Clerk Velva L. Price

**COUNT SEVEN: Fraud and Constructive Fraud**

91. All preceding paragraphs are incorporated here by reference as fully set out in support of this count.

92. Defendants knowingly and intentionally made material misrepresentations of fact to Kiewet-Phelps and concealed material facts from Plaintiffs regarding supply of and payment for Gibraltar products on the STRATCOM Bonded Project.

93. Defendants submitted to STRATCOM a falsified invoice for payment of $717,088.16 in Gibraltar products that Defendants misrepresented to STRATCOM as having

been manufactured and delivered by Gibraltar. Defendants fraudulently concealed this misrepresentation from Gibraltar and misrepresented the circumstances of their "Purchase Order" to STRATCOM in an ongoing effort to conceal the fraudulently obtained payment.

94. To compound the felony, Defendants sold and delivered a portion of the materials (valued at approximately $90,000) paid for by STRATCOM to a third party, Elk Horn Fence.

95. Defendants committed these fraudulent acts knowing Gibraltar was responsible for financial consequences and would rely on the misrepresentations made to STRATCOM.

96. Plaintiffs relied upon Defendants' material misrepresentations to their harm and detriment and seek from Defendants all actual damages resulting from the common law fraud of Defendant, as well as exemplary damages.

Unofficial Copy - Travis Co. District Clerk Velva L. Price

**COUNT EIGHT: Violation of Texas Construction Trust Fund Act**

97. All preceding paragraphs are incorporated here by reference as fully set out in support of this count.

98. Defendants received or had control or direction of construction trust funds advanced by Plaintiffs and/or deposited in the Zero Balance Account set up under the MOU. Consequently, Defendants are trustees of said funds. *See* Tex. Prop. Code § 162.002.

99. Plaintiffs furnished labor and materials for construction of security barrier improvements on real property in Texas, the Texas Bonded Projects. Plaintiffs are beneficiaries of said funds.

100. Defendants misapplied these trust funds by intentionally, knowingly, and with the fraudulent intent retaining, using, disbursing, and diverting trust funds without first fully paying all current or past due obligations incurred by the Defendants to the Plaintiff as a beneficiary of the trust funds.

101. Defendants' conduct is a violation of the Texas Construction Trust Fund Act.

102. Plaintiffs seek all actual damages resulting from the common law fraud of Defendant, as well as exemplary damages and attorneys' fees.

**ADDITIONAL GROUNDS FOR INJUNCTIVE RELIEF: Fraudulent Transfer Act, Chapter 24 of the Texas Business and Commerce Code and Attachment under § 61.001 of the Texas Civiil Practice & Remedies Code**

Unofficial Copy - Travis Co. District Clerk Velva L. Price

103. All Defendants are insolvent. Stephen Neusch has used the fraudulently obtained proceeds to capitalize new businesses without giving reasonable equivalent value for the purpose of hindering, delaying aor defrauding his creditors. Legal bases exist for the Court to void all such transfers and issue a writ of attachment against all remaining assets of Defendants or those in privity with them.

104. In accordance with § 24.008 of the Texas Business and Commerce Code, the Court should:

(a) Void all such transfer;

(b) Issue an injunction;

(c) Issue a writ of attachment on all property and proceeds; and

(d) Appoint a Receiver.

105. In accordance with § 61.001 of the Texas Civil Practice and Remedies Code, a write of attachment is available to Plaintiffs because:

(a) Defendants are justly indebted to Plaintiffs;

(b) Attachment is not sought for the purpose of injurying or harassing Defendants;

(c) Plaintiffs will probably lose their debt unless the writ issues; and

(d) Specific grounds for the writ exist because Defendants have shown a pattern of hiding, disposing, or transferring property for the purpose of

evading and defrauding creditors; and Defendants owe Plaintiffs for property obtained by Defendants under false pretenses and perpetration of fraud.

## VI. NEED FOR TEMPORARY INJUNCTION AND RECEIVER APPOINTMENT

106. A temporary injunction is needed to preserve the status quo pending a trial on the merits. Tex. Civ. Prac. & Rem. Code Ann. § 65.011. Both NSS and BSP have forfeited their charters.

107. No adequate remedy at law exists for the harm suffered by Plaintiffs arising from the acts and omissions of Defendants. Defendants' fraudulent business practices, pattern of dishonoring agreements between the parties, interference with Plaintiffs' efforts to complete Bonded Projects, and mispresentations to the industry of an affiliation with Plaintiffs present imminent and irreparable harm to Plaintiffs' business reputation and Gibraltar's ability to mitigate potential liability under the Gibraltar Indemnity Agreements. Defendants are financially unable to respond in damage.

108. Defendants admitted their failure to perform their obligations under the Bonded Contracts and continue interfering with Gibraltar's efforts to cure Defendants' default.

109. Texas Civ. Prac & Rem. C. § 64.001 authorizes the appointment of a receiver in this particular situation. Plaintiffs request an order appointing a Receiver for Defendant with the following powers:

(a) To obtain books, records, funds, and materials from Defendant related to the projects made the subject of this suit;

(b) To take control of all remaining funds and bank accounts of Defendants;

(c) Conduct an accounting;

(d) Have Defendants cease violating terms of the contracts and misrepresenting its affiliation with Gibraltar;

Unofficial copy - Travis Co. District Clerk Velva L. Price

(e) To take control of NSS and BSP and prevent them from marketing Gibraltar products; and

(f) To take control of all BSP and NSS business operations.

110. Appointment of a receiver to take control of the Defendant companies and stop the illegal and improper conduct is preferable, but in the alternative Plaintiffs request a temporary injunction order be issued to accomplish the objectives listed above and continue in force until a trial on the merits.

111. Further, such injunction should enjoin Defendants and Defendant's agents, servants, employees, officers or directors from secreting, destroying, or disposing of any documents or records referring or relating to the subject of this suit or from transferring, secreting, or spending any monies received by Defendant.

Unofficial copy Travis Co. District Clerk Velva L. Price

## VII. JURY DEMAND

Plaintiffs demand a trial by jury.

## PRAYER

Wherefore, Plaintiffs respectfully prays that Defendants be cited to appear and answer herein and that Defendants be ordered to appear and show cause why the Court should not appoint a receiver or issue a temporary injunction as requested herein, and that upon a final hearing of the cause, judgment be entered in favor of Plaintiffs and against Defendants, granting permanent injunctive relief in favor of Plaintiffs, for damages both actual and exemplary together with pre-judgment interest at the maximum rate allowed by law, post-judgment interest at the legal rate, attorneys fees, costs of court, and such other and further relief to which Plaintiff may be entitled at law or equity.

Respectfully Submitted,

**TAYLOR DUNHAM AND RODRIGUEZ LLP**
301 Congress Avenue, Suite 1050
Austin, Texas 78701
(512) 473-2257 Telephone
(512) 478-4409 Telecopier

By: ______________________
Donald R. Taylor
State Bar No. 19688800
dtaylor@taylordunham.com
Cabrach J. Connor
State Bar No. 24036390
cconnor@taylordunham.com

Unofficial copy - Travis Co. District Clerk Velva Price

**VERIFICATION**

**STATE OF TEXAS** §
§
**BURNET COUNTY** §

Before me, the undersigned notary, on this day personally appeared William Neusch, the affiant, a person whose identity is known to me. After I administered an oath to affiant, affiant testified:

"My name is William Neusch. I am capable of making this verification. I have read Plaintiffs' Original Petition and Application for Appointment of a Receiver and Temporary Injunction and the facts stated in it are within my personal knowledge and are true and correct."

William Neusch

SUBSCRIBED AND SWORN TO BEFORE ME on this, the 11th day of March, 2016.

Notary Public, State of Texas

PAUL HERMAN NEUSCH
Notary Public, State of Texas
My Commission Expires
April 19, 2017

My Commission Expires: April 19, 2017

Unofficial copy Travis Co. District Clerk Velva L. Price

**STATE OF TEXAS** §
§
**COUNTY OF BURNET** §

Unofficial Copy Travis Co. District Clerk Velva L. Price

**AFFIDAVIT OF JIM BRYER**

On this day Jim Bryer appeared before me, the undersigned Notary Public, and after I administered an oath to Jim Bryer, upon his oath he said:

1. "My name is Jim Bryer. I have never been convicted of a felony and the facts stated in this affidavit are within my personal knowledge and are true and correct. If called to testify about these facts, I will state as follows.

2. I serve as Chief Financial Officer of the Gibraltar Family of Companies (Gibraltar), which includes Foundation Fence, Inc.; Gibraltar Material Distribution, LP; Gibraltar Cable Barrier Systems, LP; and, Neusch Innovations, LP. I have been employed in this capacity by Gibraltar since October 2009.

3. I am licensed as an attorney in Texas (1992, currently inactive status) and as a Certified Public Accountant (1994, Texas). I attended the University of Texas in Austin, receiving a BBA Finance in 1988 and an MBA and JD in 1992.

4. In my capacity as CFO of Gibraltar I have been involved in discussions with Stephen Neusch / Neu Security Services (NSS) and Liberty Mutual regarding Bill Neusch's and Foundation Fence's obligations as an indemnitor on Surety bonds issued by Liberty Mutual on NSS's behalf. Due to NSS's inability to fund timely completion of bonded projects which created significant financial risk exposure to Bill Neusch and Foundation Fence, NSS and Gibraltar entered into a Memo of Understanding in February of 2015 which established an agreed mechanism and process for Gibraltar to fund the completion of projects on which it was ultimately the indemnitor. A true and correct copy of the MOU is attached as Exhibit F.

5. The essence of the MOU is that funds provided by Gibraltar would be used exclusively for completion of "bonded" jobs and not for any "non-bonded" jobs thatNSS was performing, and for which Bill Neusch/Gibraltar/Foundation Fence had no financial obligation.

6. All payments received by NSS on the "bonded" jobs would be applied exclusively towards repaying the funds advanced by Gibraltar under this arrangement. It was not expected by either party that the receipts on these bonded projects would fully repay the advances made by Gibraltar. However, there was a good faith expectation that completion of these projects and minimization of financial losses was the goal of both parties and that the differentiation of "bonded" and "non-bonded" jobs would be honored.

7. Soon after the MOU was signed, NSS violated its terms by using funds advanced by Gibraltar for purposes other than "bonded" jobs, by not forwarding all receipts to Gibraltar on such bonded jobs, and by failing to use good faith and best efforts in the completion of the "bonded" jobs. For example, I learned that crews were redirected from bonded jobs to work on non-bonded jobs at the behest of NSS.

8. In another specific violation, credit cards provided by Foundation Fence to certain NSS employees at the bonded job sites were routinely used for expenses other than expenses related to the bonded jobs. This was a practice which continued despite repeated demands by me to NSS to stop, for which Foundation Fence had no recourse but to terminate the card accounts for certain NSS users. NSS payables unrelated to "bonded" jobs were submitted to Gibraltar for funding and screened out upon review by Gibraltar. These rejected items were not funded by Gibraltar.

9. A key portion of what Gibraltar funded was NSS payroll for its employees working on bonded jobs. NSS submitted payroll detail suggesting certain employees were working on bonded jobs when they were in fact redirected to other non-bonded sites and projects without notice to Gibraltar, such that Gibraltar was unknowingly funding work performed on non-bonded jobs. Additionally, the bonded project that such employees were reported to be working was subject to liquidated damages. NSS was not using its best efforts in good faith to complete the bonded jobs and in failing to do so subjected Gibraltar to additional liability.

10. Payments made to NSS on bonded jobs were diverted by NSS to other projects and entities.

11. An accounting of such advances and repayments is attached as Ex. I. Prior to and pursuant to this agreement, $12,983,440.30 has been advanced by Gibraltar on bonded jobs, with $7,237,597.47 in payments applied, leaving a balance owed of $5,745,842.92. Additionally, there is a balance of $90,947.60 owed for amounts related to "unbonded" jobs. These amounts only relate to the funds advanced by Gibraltar under this agreement and do not include amounts invoiced by Gibraltar or

Unofficial copy Travis Co. District Clerk Velva L. Price

Foundation Fence to NSS for materials and services provided, nor do they include expenses incurred by Gibraltar or Foundation Fence in taking over a number of these jobs after NSS default.

FURTHER AFFIANT SAYETH NAUGHT.

Signed this 11th day of March, 2016, in Burnet County, Texas.

Jim Bryer

SUBSCRIBED AND SWORN TO BEFORE ME on the 11 day of March, 2016, to certify which witness my hand and official seal.

PAUL HERMAN NEUSCH
Notary Public, State of Texas
My Commission Expires
April 19, 2017

Notary Public in and for the State of Texas

My Commission Expires: April 19, 2017

Unofficial copy - Travis Co. District Clerk Velva L. Price

# GIBRALTAR FAMILY OF COMPANIES
## NSS - Accounts Receivable
### March 7, 2016

| Date | Invoice # | Company | Invoice Amount | Applied Payments | Balance Due | Running Balance |
|---|---|---|---|---|---|---|
| 11/14/13 | Ransen Freight | Gibraltar Material Distribution | 209.56 | | 209.56 | 209.56 |
| 12/31/13 | 1213 NSS Delta Steel | Gibraltar Material Distribution | 152,619.76 | | 152,619.76 | 152,829.32 |
| 1/31/14 | 0114 NSS Delta Steel | Gibraltar Material Distribution | 123,278.11 | | 123,278.11 | 276,107.43 |
| 2/28/14 | 0214 NSS Delta Steel | Gibraltar Material Distribution | 112,106.04 | | 112,106.04 | 388,213.47 |
| 3/12/14 | 0314 South Atlantic | Gibraltar Material Distribution | 38,227.50 | | 38,227.50 | 426,440.97 |
| 4/30/14 | 0414 Hornsby Steel | Gibraltar Material Distribution | 44,620.00 | | 44,620.00 | 471,060.97 |
| 10/31/14 | Kings Bay | Gibraltar Cable Barrier System | 67,301.12 | | 67,301.12 | 538,362.09 |
| 10/31/14 | Kings Bay | Gibraltar Material Distribution | 2,905.14 | | 2,905.14 | 541,267.23 |
| 1/31/15 | 0115 Engineering | Gibraltar Material Distribution | 1,800.00 | | 1,800.00 | 543,067.23 |
| 12/31/15 | Bryan TX Payroll | Foundation Fence | 11,130.48 | | 11,130.48 | 554,197.71 |
| 12/31/15 | Hill AFB Payroll | Foundation Fence | 18,454.10 | | 18,454.10 | 572,651.81 |
| 12/31/15 | Exxon Payroll | Foundation Fence | 4,514.45 | | 4,514.45 | 577,166.26 |
| 9/30/14 | 0914 Surety | Foundation Fence | 2,166.00 | | 2,166.00 | 579,332.26 |
| 10/31/14 | 1014 Surety | Foundation Fence | 24,006.59 | | 24,006.59 | 603,338.85 |
| 11/30/14 | 1114 Surety | Foundation Fence | 11,527.60 | | 11,527.60 | 614,866.45 |
| 12/31/14 | 1214 Surety | Foundation Fence | 4,744.50 | | 4,744.50 | 619,610.95 |
| 1/31/15 | 0115 Surety | Foundation Fence | 5,851.40 | | 5,851.40 | 625,462.35 |
| 2/28/15 | 0215 Surety | Foundation Fence | 2,574.38 | | 2,574.38 | 628,036.73 |
| 3/31/15 | 0315 Surety | Foundation Fence | 28,010.05 | | 28,010.05 | 656,046.78 |
| 4/30/15 | 0415 Surety | Foundation Fence | 20,221.26 | | 20,221.26 | 676,268.04 |
| 5/31/15 | 0515 Surety | Foundation Fence | 10,118.89 | | 10,118.89 | 686,386.93 |
| 6/30/15 | 0615 Surety | Foundation Fence | 31,236.42 | | 31,236.42 | 717,623.35 |
| 7/31/15 | 0715 Surety | Foundation Fence | 43,416.84 | | 43,416.84 | 761,040.19 |
| 8/31/15 | 0815 Surety | Foundation Fence | 33,739.75 | | 33,739.75 | 794,779.94 |
| 9/30/15 | 0915 Surety | Foundation Fence | 23,949.60 | | 23,949.60 | 818,729.54 |
| 10/31/15 | 1015 Surety | Foundation Fence | 1,665.00 | | 1,665.00 | 820,394.54 |
| 11/30/15 | 1115 Surety | Foundation Fence | 18,557.74 | | 18,557.74 | 838,952.28 |
| 7/31/11 | BOND 022023728 | Foundation Fence | 28,110.84 | | 28,110.84 | 867,063.12 |
| 7/31/11 | BOND 022023731 | Foundation Fence | 15,590.56 | | 15,590.56 | 882,653.68 |
| 7/31/11 | BOND 022023733 | Foundation Fence | 18,282.80 | | 18,282.80 | 900,936.48 |
| 7/31/11 | BOND 022023734 | Foundation Fence | 135,268.80 | | 135,268.80 | 1,036,205.28 |
| 7/31/11 | BOND 022023737 | Foundation Fence | 15,040.86 | | 15,040.86 | 1,051,246.14 |
| 7/31/11 | PROJECT AD0006511P | Foundation Fence | 36,671.75 | | 36,671.75 | 1,087,917.89 |
| 7/31/11 | UTAH DATA CENTER | Foundation Fence | 61,837.42 | | 61,837.42 | 1,149,755.31 |
| 7/31/11 | JOB 228/201110M | Foundation Fence | 8,059.72 | | 8,059.72 | 1,157,815.03 |
| 5/1/12 | BOND US NAVY | Foundation Fence | 160,370.00 | | 160,370.00 | 1,318,185.03 |
| 5/1/12 | BOND 113068 | Foundation Fence | 2,360.00 | | 2,360.00 | 1,320,545.03 |

Unofficial copy Travis Co. District Clerk Velva L. Price

# GIBRALTAR FAMILY OF COMPANIES
## NSS - Accounts Receivable
### March 7, 2016

Unofficial copy - Travis Co. District Clerk Velva L. Price

| Date | Invoice # | Company | Invoice Amount | Applied Payments | Balance Due | Running Balance |
|---|---|---|---|---|---|---|
| 5/1/12 | BOND - NM11005 | Foundation Fence | 5,763.18 | | 5,763.18 | 1,326,308.21 |
| 5/1/12 | BOND 22023745 | Foundation Fence | 9,245.84 | | 9,245.84 | 1,335,554.05 |
| 5/1/12 | BOND - SAN DIEGO FBI | Foundation Fence | 19,713.14 | | 19,713.14 | 1,355,267.19 |
| 5/1/12 | BOND 22023742 | Foundation Fence | 18,500.00 | | 18,500.00 | 1,373,767.19 |
| 6/5/12 | BOND ITSI | Foundation Fence | 17,537.50 | | 17,537.50 | 1,391,304.69 |
| 7/12/12 | BOND - 26 FED-0026 | Foundation Fence | 8,112.96 | | 8,112.96 | 1,399,417.65 |
| 10/5/12 | WELDER - OCT2012 | Foundation Fence | 1,700.00 | | 1,700.00 | 1,401,117.65 |
| 11/15/12 | HUNTING LEASE-2012 | Foundation Fence | 6,500.00 | | 6,500.00 | 1,407,617.65 |
| 12/1/12 | PROJ AD006511P-2 | Foundation Fence | 37,384.25 | | 37,384.25 | 1,445,001.90 |
| 12/1/12 | PROJECT SC-905-066 | Foundation Fence | 17,515.98 | | 17,515.98 | 1,462,517.88 |
| 1/23/13 | BOND - KIEWITPHELPS | Foundation Fence | 26,392.88 | | 26,392.88 | 1,488,910.76 |
| 4/3/13 | BOND - KIEWITT 15387 | Foundation Fence | 43,333.10 | | 43,333.10 | 1,532,243.86 |
| 7/15/13 | GL1213 Recon | Foundation Fence | 106,453.97 | | 106,453.97 | 1,638,697.83 |
| 9/30/13 | Bond-Hensel Phelps | Foundation Fence | 20,558.70 | | 20,558.70 | 1,659,256.53 |
| 9/30/13 | Bond-Patrick AFB | Foundation Fence | 2,162.32 | | 2,162.32 | 1,661,418.85 |
| 9/30/13 | Bond-Ft Carson, CO | Foundation Fence | 281,600.00 | | 281,600.00 | 1,943,018.85 |
| 11/1/13 | Document - 8484211 | Foundation Fence | 235.99 | | 235.99 | 1,943,254.84 |
| 11/1/13 | Document - 8429455 | Foundation Fence | 91.96 | | 91.96 | 1,943,346.80 |
| 11/30/13 | GL1213 Recon CM | Foundation Fence | (29,908.80) | | (29,908.80) | 1,913,438.00 |
| 2/17/12 | G20255 | Gibraltar Cable Barrier System | 14,100.00 | | 14,100.00 | 1,927,538.00 |
| 7/31/12 | G20290 | Gibraltar Cable Barrier System | 13,256.80 | | 13,256.80 | 1,940,794.80 |
| 2/15/13 | G20318 | Gibraltar Cable Barrier System | 3,730.75 | | 3,730.75 | 1,944,525.55 |
| 11/1/13 | Utilities- 320 South | Gibraltar Cable Barrier System | 1,595.21 | | 1,595.21 | 1,946,120.76 |
| 2/20/11 | DOCUMATION8780204 | Gibraltar Material Distribution | 235.99 | | 235.99 | 1,946,356.75 |
| 8/31/11 | GM1225-2 | Gibraltar Material Distribution | 7,500.00 | | 7,500.00 | 1,953,856.75 |
| 11/11/11 | GM1236-1 | Gibraltar Material Distribution | 42,000.00 | | 42,000.00 | 1,995,856.75 |
| 1/1/12 | GM1237-1 REINVOICE | Gibraltar Material Distribution | 16,308.00 | | 16,308.00 | 2,012,164.75 |
| 1/13/12 | GM1239 | Gibraltar Material Distribution | 6,540.23 | | 6,540.23 | 2,018,704.98 |
| 12/27/12 | GM1263 | Gibraltar Material Distribution | 26,111.88 | | 26,111.88 | 2,044,816.86 |
| 1/18/13 | GM1259-2 | Gibraltar Material Distribution | 7,799.12 | | 7,799.12 | 2,052,615.98 |
| 1/22/13 | GM1259-2 | Gibraltar Material Distribution | 246,404.38 | | 246,404.38 | 2,299,020.36 |
| 1/29/13 | GM1255 | Gibraltar Material Distribution | 2,500.00 | | 2,500.00 | 2,301,520.36 |
| 3/28/13 | GM1260 | Gibraltar Material Distribution | 85,400.00 | | 85,400.00 | 2,386,920.36 |
| 5/2/13 | GM1271 | Gibraltar Material Distribution | 3,000.00 | | 3,000.00 | 2,389,920.36 |
| 5/20/13 | GM1270B | Gibraltar Material Distribution | 45,080.00 | | 45,080.00 | 2,435,000.36 |
| 5/20/13 | GM1270C | Gibraltar Material Distribution | 45,721.42 | | 45,721.42 | 2,480,721.78 |
| 5/31/13 | GM1269 | Gibraltar Material Distribution | 90,000.00 | | 90,000.00 | 2,570,721.78 |

# GIBRALTAR FAMILY OF COMPANIES
## NSS - Accounts Receivable
## March 7, 2016

Unofficial copy - Travis County District Clerk Velva L. Price

| Date | Invoice # | Company | Invoice Amount | Applied Payments | Balance Due | Running Balance |
|---|---|---|---|---|---|---|
| 6/7/13 | GM1265-2 | Gibraltar Material Distribution | 4,095.30 | | 4,095.30 | 2,574,817.08 |
| 7/22/13 | GM1273-A | Gibraltar Material Distribution | 39,676.29 | | 39,676.29 | 2,614,493.37 |
| 8/1/13 | GM1264-4 | Gibraltar Material Distribution | 950.00 | | 950.00 | 2,615,443.37 |
| 9/4/13 | GM1273-B | Gibraltar Material Distribution | 90,900.00 | | 90,900.00 | 2,706,343.37 |
| 10/17/13 | GM1273-C | Gibraltar Material Distribution | 5,717.78 | | 5,717.78 | 2,712,061.15 |
| 10/17/13 | GM1273-A-CM (Pending) | Gibraltar Material Distribution | (580.33) | | (580.33) | 2,711,480.82 |
| 10/17/13 | Inventory 001 | Gibraltar Material Distribution | 529.00 | | 529.00 | 2,712,009.82 |
| 10/17/13 | Inventory 002 | Gibraltar Material Distribution | 7,875.50 | | 7,875.50 | 2,719,885.32 |
| 11/1/13 | Document - 462722 | Gibraltar Material Distribution | 1,381.72 | | 1,381.72 | 2,721,267.04 |
| 11/7/13 | Inventory 003 | Gibraltar Material Distribution | 13,288.08 | | 13,288.08 | 2,734,555.12 |
| 11/22/13 | Inventory 004 | Gibraltar Material Distribution | 6,263.76 | | 6,263.76 | 2,740,818.88 |
| 2/11/14 | Inventory 1401 | Gibraltar Material Distribution | 8,438.84 | | 8,438.84 | 2,749,257.72 |
| 3/4/14 | Inventory 1402 | Gibraltar Material Distribution | 150.00 | | 150.00 | 2,749,407.72 |
| 3/6/14 | Inventory 1403 | Gibraltar Material Distribution | 3,758.00 | | 3,758.00 | 2,753,165.72 |
| 3/31/14 | 1404 | Gibraltar Material Distribution | 1,011.68 | | 1,011.68 | 2,754,177.40 |
| 4/10/14 | 1405 | Gibraltar Material Distribution | 1,517.22 | | 1,517.22 | 2,755,694.62 |
| 4/21/14 | 1406 | Gibraltar Material Distribution | 1,291.16 | | 1,291.16 | 2,756,985.78 |
| 5/5/14 | 1407 | Gibraltar Material Distribution | 210.00 | | 210.00 | 2,757,195.78 |
| 7/23/14 | 1408 | Gibraltar Material Distribution | 1,041.95 | | 1,041.95 | 2,758,237.73 |
| 7/31/14 | 1409 | Gibraltar Material Distribution | 118,079.22 | | 118,079.22 | 2,876,316.95 |
| 9/24/14 | 1410-1 | Gibraltar Material Distribution | 7,833.08 | | 7,833.08 | 2,884,150.03 |
| 9/24/14 | 1411-1 | Gibraltar Material Distribution | 1,040.28 | | 1,040.28 | 2,885,190.31 |
| 10/28/14 | 1413-1 | Gibraltar Material Distribution | 39,591.90 | | 39,591.90 | 2,924,782.21 |
| 11/1/14 | 1410-2 | Gibraltar Material Distribution | 31,412.68 | | 31,412.68 | 2,956,194.89 |
| 11/19/14 | 1413-2 | Gibraltar Material Distribution | 8,435.03 | | 8,435.03 | 2,964,629.92 |
| 11/20/14 | GM1412-1 | Gibraltar Material Distribution | 21,462.92 | | 21,462.92 | 2,986,092.84 |
| 11/30/14 | 1410-CM | Gibraltar Material Distribution | (1,819.17) | | (1,819.17) | 2,984,273.67 |
| 3/1/15 | GM1415-1 | Gibraltar Material Distribution | 73,971.49 | | 73,971.49 | 3,058,245.16 |
| 6/17/15 | GM1415-2 | Gibraltar Material Distribution | 2,529.25 | | 2,529.25 | 3,060,774.41 |
| 6/17/15 | GM1414-1 | Gibraltar Material Distribution | 6,923.15 | | 6,923.15 | 3,067,697.56 |
| 7/14/15 | GM1417-1 | Gibraltar Material Distribution | 52,153.80 | | 52,153.80 | 3,119,851.36 |
| 7/17/15 | GM1419 | Gibraltar Material Distribution | 32,216.28 | | 32,216.28 | 3,152,067.64 |
| 8/17/15 | GM1419-2 | Gibraltar Material Distribution | 502.16 | | 502.16 | 3,152,569.80 |
| 8/17/15 | GM1419-3 | Gibraltar Material Distribution | 7,930.00 | | 7,930.00 | 3,160,499.80 |
| 9/25/15 | GM1417-2 | Gibraltar Material Distribution | 11,900.44 | | 11,900.44 | 3,172,400.24 |
| 9/25/15 | GM1410-3 | Gibraltar Material Distribution | 3,770.82 | | 3,770.82 | 3,176,171.06 |
| 11/1/15 | GM1415-5 (B) | Gibraltar Material Distribution | 460,900.71 | | 460,900.71 | 3,637,071.77 |

**GIBRALTAR FAMILY OF COMPANIES**
**NSS - Accounts Receivable**
**March 7, 2016**

| Date | Invoice # | Company | Invoice Amount | Applied Payments | Balance Due | Running Balance |
|---|---|---|---|---|---|---|
| 11/24/15 | GM1415-3 | Gibraltar Material Distribution | 137.22 | | 137.22 | 3,637,208.99 |
| 11/24/15 | GM1415-4 | Gibraltar Material Distribution | 6,956.44 | | 6,956.44 | 3,644,165.43 |
| 11/24/15 | GM1410-4 | Gibraltar Material Distribution | 2,785.00 | | 2,785.00 | 3,646,950.43 |
| 11/24/15 | GM1410-5 | Gibraltar Material Distribution | 701.36 | | 701.36 | 3,647,651.79 |
| 11/24/15 | GM1419-4 | Gibraltar Material Distribution | 780.00 | | 780.00 | 3,648,431.79 |
| 11/24/15 | GM1419-5 | Gibraltar Material Distribution | 604.50 | | 604.50 | 3,649,036.29 |
| 11/24/15 | GM1419-6 | Gibraltar Material Distribution | 33.00 | | 33.00 | 3,649,069.29 |
| 12/1/15 | 1215 El Go Team | Gibraltar Material Distribution | 86,302.00 | | 86,302.00 | 3,735,371.29 |
| 12/16/15 | GM1410-6 | Gibraltar Material Distribution | 31.88 | | 31.88 | 3,735,403.17 |
| | | **Totals** | **3,735,403.17** | **-** | **3,735,403.17** | |

| | |
|---|---|
| Sub-Total Due To Gibraltar Cable Barrier Systems | 99,983.88 |
| Sub-Total Due To Gibraltar Material Distribution | 2,265,048.52 |
| Sub-Total Due To Foundation Fence | 1,370,370.77 |
| | - |

Unofficial copy - Travis Co. District Clerk Velva L. Price

**STATE OF TEXAS** §
§
**COUNTY OF BURNET** §

Unofficial Copy - Travis Co. District Clerk Velva L. Price

**AFFIDAVIT OF DONNA LILLEY**

On this day Donna Lilley appeared before me, the undersigned Notary Public, and after I administered an oath to Donna Lilley, upon her oath she said:

1. "My name is Donna Lilley. I am competent to make this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct. If called to testify in court, these are the facts I could and would state.

2. I am employed as the Controller for the Gibraltar Family of Companies (Gibraltar), which includes Foundation Fence, Inc.; Gibraltar Material Distribution, LP; Gibraltar Cable Barrier Systems, LP; and, Neusch Innovations, LP.

3. I received a degree in accounting from the University of Texas at Arlington and I became licensed as a Certified Public Accountant in September of 2002.

4. I am familiar with the books and records of Foundation Fence, Inc. and Gibraltar, and it is my responsibility to maintain them.

5. I am aware of the surety relationship under which Foundation Fence and Gibraltar began advancing funds and materials to finish the jobs initially undertaken by Neu Security Services, LLC. I understand Foundation Fence acted as a guarantor or surety for NSS on bonded jobs that

required performance bonds in favor of project owner in order to secure performance of the contracted work and provide insurance against performance failure.

6. On jobs where we advanced materials or funds on NSS projects, I noted on our company books and records these expenditures as "bonded jobs." The purpose of this category was to keep track of all the amounts owed by NSS to Gibraltar or Foundation Fence that were used to complete these jobs.

7. I am familiar with the Memorandum of Understanding, which is attached hereto as Exhibit F, and I was in charge of the accounting with respect to the Zero Balance Account set up by the agreement.

8. I calculated the net balance owed on the Zero Balance Account, after applying all payments, credits, and offsets, to be $5,836,790.52.

9. It was also my duty to process the payroll for crews that had been NSS employees and were working on the bonded jobs Gibraltar and Foundation Fence took over. At no time was I directed to pay these crews for non-bonded work. Neither Gibraltar nor Foundation Fence, Inc. had any obligation, nor was it in their financial interest to make payroll expense for labor that was expended on non-bonded NSS jobs. Foundation Fence was advancing payroll on the bonded jobs because it had the ultimate liability back to the bonding company to complete and pay for the completion of the projects.

10. It came to my attention that Jeremy Bland, a former site supervisor at NEU Security was receiving payment for labor expended on several non-bonded jobs. He admitted this to me on December 18, 2015.

11. In addition to payroll and supply of Gibraltar materials, Gibraltar and Foundation Fence provided debit cards to NSS in order for NSS to purchase necessities to complete the bonded

Unofficial Copy - Travis Co. District Clerk Velva L. Price

work upon which Foundation Fence and Gibraltar had open liability. Clear instruction to NSS was given that the debit cards were not to be used for any other purpose. Each NSS employee who received a Foundation Fence debit card signed an acknowledgment letter that stated receipts were to be turned into me on a weekly basis. Receipts were rarely turned into me and therefore made reconciliation of the charges difficult. I reviewed the charges on a weekly basis, and I found many questionable charges that did not appear to be incurred in connection with the bonded jobs.

12. I prepared Exhibit I, which is a total accounting of the debit card charges incurred by Gibraltar and Foundation Fence in connection with completion of the bonded jobs. For purposes of preparing this document, I assumed all charges by NSS were legitimate.

FURTHER AFFIANT SAYETH NAUGHT.

Signed this 11 day of March, 2016 in Burnet County, Texas.

Donna Lilley

SUBSCRIBED AND SWORN TO BEFORE ME on the 11 day of March, 2016, to certify which witness my hand and official seal.

PAUL HERMAN NEUSCH
Notary Public, State of Texas
My Commission Expires
April 19, 2017

Notary Public in and for the State of Texas

My Commission Expires: April 19, 2017

Official Copy - Travis Co. District Clerk Velva L. Price

**STATE OF TEXAS** §
§
**COUNTY OF BURNET** §

Unofficial Copy - Travis Co. District Clerk Velva L. Price

**AFFIDAVIT OF PAUL NEUSCH**

Before me, the undersigned Notary Public, on this date Paul Neusch appeared and after I administered an oath to Paul Neusch, upon his oath he said:

1. "My name is Paul Neusch. I am over 21 years of age and competent to make this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct, and I would testify in court as stated here.

2. Bill Neusch is my father, and Stephen Neusch is my older brother. I worked for my brother's company, NEU Security Services, for approximately five years until December of 2015.

3. My primary job at NSS was Project Manager on the bonded jobs and, as such, I had personal knowledge of the work and progress on those jobs.

4. Starting in about April of 2015, I became aware that NSS was financially impaired and the company would be unable to complete bonded jobs that were underway. NSS had no credit and vendors would not work for NEU Security Services because NSS was in arrears with its payables. It became very difficult to get any jobs done.

5. At that time, the bonded projects underway included: VA Bay Pins, Fort Sam Houston ACP, Stratcom Offutt AFB, Denver VA Hospital, and Ft. Carson.

6. I was aware at the time that my father's companies, Foundation Fence, Inc.; Gibraltar Material Distribution, LP; Gibraltar Cable Barrier Systems, LP; and Neusch Innovations, LP ("Gibraltar") had agreed to guarantee as surety the performance by NSS. So I knew that Gibraltar was financially responsible for the completion of the bonded jobs.

7. I was also aware of the Memorandum of Understanding that was entered into between Gibraltar and NSS. I understood that under the MOU, Gibraltar and Foundation Fence would advance funds to NSS or vendors to ensure the bonded jobs would be completed in order to protect themselves from the financial exposure on the performance bonds.

8. Also during this time, Gibraltar and Foundation Fence took over the management and employment of installation crews working on bonded jobs. I remained an employee of NSS.

9. After Gibraltar and Foundation Fence took over the bonded jobs, I observed installation crews that were working on bonded jobs and being paid by with bonded job money from Gibraltar and Foundation Fence being directed by Stephen Neusch and James Cox, the NSS supervisor on location, to leave the bonded job site and work on other non-bonded jobs.

10. During this period of time, Stephen Neusch was very inattentive to the business and became obsessed with online "gaming." When he would come to the office, he would spend most of his day playing online games and admitted to me that he was spending a $1,000 a week on these games.

11. For most of the year 2015, my brother became more and more distracted. He disassociated from NSS and its business. He opened a tattoo parlor in Austin, Texas and continued to spend most of his time gaming online.

Unofficial Copy - Travis Co. District Clerk Velva L. Price

FURTHER AFFIANT SAYETH NAUGHT.

Signed this 11 day of March, 2016, in Burnet County, Texas.

Paul Neusch

SUBSCRIBED AND SWORN TO BEFORE ME on the 11TH day of March, 2016, to certify which witness my hand and official seal.

JENNIFER FERNANDEZ
Notary ID # 13047410-0
My Commission Expires
December 18, 2019

Notary Public in and for the State of Texas

My Commission Expires: 12/18/2019

Unofficial copy - Travis Co. District Clerk Velva L. Price

Liberty Mutual.

# General Agreement of Indemnity

This General Agreement of Indemnity (hereinafter the "Agreement") is made and entered into by the following individuals, partnerships, corporations, and/or other business entities, as applicable, Foundation Fence, Inc.; Gibraltar Cable Barrier Systems, LP; Gibraltar Cable Barrier Systems, GP LLC; Gibraltar Material Distribution, LP; Gibraltar Material Distribution GP, LLC; Sentinel International, Inc.; Neusch Innovations, LP; Neusch Innovations GP, LLC; William H. Neusch; Agnes Neusch (individually and collectively hereinafter called the "Indemnitor(s)") jointly and severally, in favor of Liberty Mutual Insurance Company, Employers Insurance Company of Wausau (formerly "EMPLOYERS INSURANCE OF WAUSAU A Mutual Company"), Peerless Insurance Company, and any other company that is part of or added to the Liberty Mutual Group, severally not jointly, and for which Liberty Mutual Surety underwrites surety business (individually and collectively hereinafter called the "Surety") with respect to any surety bond, undertaking, recognizance, instrument of guarantee or other surety obligations (hereinafter called the "Bond(s)") requested from and/or issued by the Surety before or after the date of this Agreement, for i) Foundation Fence, Inc.; Gibraltar Cable Barrier Systems, LP; Gibraltar Cable Barrier Systems, GP LLC; Gibraltar Material Distribution, LP; Gibraltar Material Distribution GP, LLC; Sentinel International, Inc.; Neusch Innovations, LP; Neusch Innovations GP, LLC; William H. Neusch; Agnes Neusch; and any Indemnitor added hereto by Amendment; ii) any of the Indemnitors or Principals' subsidiaries or affiliates, whether present or future, and whether directly or indirectly held; and iii) any other entity or person in response to a request from any Indemnitor or Principal named herein, and, as to all of the foregoing, whether they act alone or in joint venture with others and whether or not said others are named herein (individually and collectively hereinafter called the "Principal(s)").

**WITNESSETH**

WHEREAS, the Indemnitors and Principals, in the performance of contracts and the fulfillment of obligations generally, whether in their own names solely or as co-adventurers with others, may desire, request, or be required to give or procure certain Bonds, and/or to renew, continue, extend or substitute, from time to time, the same or new Bonds with the same or different penalties, and/or conditions, as may be desired, requested or required, in the renewal, continuation, extension and/or substitution thereof; or the Indemnitors or Principals may request the Surety to refrain from canceling the Bonds; and

WHEREAS, at the request of the Indemnitors and with both the express understanding that this Agreement be given and in reliance upon this Agreement, the Surety has heretofore or has presently been requested to and/or has executed or has procured to be executed, and, from time to time hereafter, may be requested to and/or may execute or may procure to be executed, the Bonds on behalf of the Principals; and

WHEREAS, the Indemnitors have a substantial, material and beneficial interest in the obtaining of the Bonds or in the Surety's refraining from canceling any or all Bonds.

NOW, THEREFORE, in consideration of the premises and intending to be legally bound hereby, the Indemnitors and Principals for themselves, their heirs, executors, administrators, successors and assigns, jointly and severally, hereby covenant and agree with the Surety, its successors and assigns, as follows:

FIRST: **PREMIUMS** - The Indemnitors and Principals will pay to the Surety, promptly upon demand, all premiums, costs and charges of the Surety for any Bonds requested from and/or issued by the Surety in accordance with its rate filings, its manual of rates as determined by the Surety, or as otherwise determined by the Surety, and where such premium, costs and charges are annual, continue to pay the same until the Indemnitors or Principals shall deliver evidence satisfactory to the Surety of its discharge or release from the Bonds and all liability by reason thereof.

SECOND: **INDEMNITY** – The Indemnitors shall exonerate, hold harmless, indemnify, and keep indemnified the Surety from and against any and all liability for losses, fees, costs and expenses of whatsoever kind or nature including, but not limited to, pre- and post-judgment interest at the maximum rate permitted by law accruing from the date of a breach of this Agreement or a breach of any other written agreements between or for the benefit of the Surety and the Indemnitor(s) and/or Principal(s) (hereinafter referred to as "Other Agreements"), court costs, counsel fees, accounting, engineering and any other outside consulting fees and from and against any and all such losses, fees, costs and expenses which the Surety may sustain or incur: (1) by reason of being requested to execute or procure the execution of any Bond; or (2) by having executed or procured the execution of any Bond; or (3) by reason of the failure of the Indemnitors or Principals to perform or comply with any of the covenants and conditions of this Agreement or Other Agreements; or (4) in enforcing any of the covenants and conditions of this Agreement or Other Agreements. Payment by reason of the aforesaid causes shall be made to the Surety by the Indemnitors and/or Principals promptly, upon demand by the Surety, whether or not the Surety shall have made any payment therefor and, at the Surety's sole option, irrespective of any deposit of collateral. If the Surety determines, in its sole judgment, that potential liability exists for losses and/or fees, costs and expenses for which the Indemnitors and Principals will be obliged to indemnify the Surety under the terms of this Agreement or Other Agreements, the Indemnitors and/or Principals shall deposit with the Surety, promptly upon demand, a sum of money equal to an amount determined by the Surety or collateral security of a type and value satisfactory to the Surety, to cover that liability, whether or not the Surety has: (a) established or increased any reserve; (b) made any payments; or (c) received any notice of any claims therefor. At the Surety's sole option, such collateral shall be in addition to and not in lieu of any other collateral that has been previously provided to the Surety. The Surety shall have the right to use any collateral, or any part thereof, in payment or settlement of any such liabilities for which the Indemnitors and Principals would be obliged to indemnify the Surety under the terms of this Agreement or Other Agreements. In the event of any payment by the Surety, the Indemnitors and Principals further agree that in any accounting between the Surety and the Principals, or between the Surety and the Indemnitors, or either or both of them, the Surety shall be entitled to charge for any and all disbursements made by it in good faith in and about the matters herein contemplated by this Agreement or Other Agreements under the belief that it is, or was, or might be liable for the sums and amounts so disbursed or that it was necessary or expedient to make such disbursements, whether or not such liability, necessity or expediency existed; and that the vouchers or other evidence of any such payments made by the Surety shall be prima facie evidence of the fact and amount of the liability to the Surety. Surety shall have no obligation to invest or provide a return on any collateral provided to it under this Agreement.

THIRD: **ASSIGNMENT** - The Indemnitors hereby consenting do assign, transfer, pledge and convey to the Surety and agree to use their best efforts to cause the Principals to assign, transfer, pledge and convey to the Surety as collateral security for the full performance of the covenants and agreements herein contained, contained in Other Agreements and for the payment of any other indebtedness or liability of the Indemnitors and/or Principals to the Surety, whether heretofore or hereafter incurred, the assignment in the case of each contract being effective as of the date of the Bond covering such contract, the following: (a) all the right, title and interest of the Indemnitors and/or Principals in, and growing in any manner out of, all contracts referred to in the Bonds, or in, or growing in any manner out of the Bonds; (b) all the right, title and interest of the Indemnitors and/or Principals in



EXHIBIT A

and to all machinery, supplies, equipment, plant, tools and materials which are now, or may hereafter be, about or upon the site or sites of any and all contractual work referred to in the Bonds or elsewhere, including materials purchased for or chargeable to any and all contracts referred to in the Bonds, materials which may be in the process of construction, in storage at the site or elsewhere, or in transportation to any and all sites; (c) all the right, title and interest of the Indemnitors and/or Principals in and to all subcontracts let or to be let in connection with any and all contracts referred to in the Bonds, and in and to all surety bonds supporting such subcontracts; (d) all actions, causes of actions, claims and demands whatsoever which the Indemnitors and/or Principals may have or acquire against any subcontractor, laborer or materialman, or any person furnishing or agreeing to furnish or supply labor, material, supplies, machinery, tools, or other equipment in connection with or on account of any and all contracts referred to in the Bonds; and against any surety or sureties of any subcontractor, laborer or materialman; and (e) any and all percentages retained and any and all sums that may be due or hereafter become due on account of any and all contracts referred to in the Bonds and all other contracts whether bonded or not in which the Indemnitors or Principals have an interest; (f) all licenses, patents, copyrights and trade secrets; (g) all warehouse receipts, bills of lading and general intangibles; (h) all tax refunds and claims for tax refunds; and (i) all limited partnership and general partnership interests; but only in the event of: (1) any abandonment, forfeiture or breach of any contract referred to in the Bonds or of any breach of any Bond; or (2) a default in discharging any other indebtedness or liabilities incurred in connection therewith, when due; or (3) any breach of the covenants and conditions of this Agreement or Other Agreements, including but not limited to the failure to obtain from the Surety written approval of a Change in Control; or (4) an assignment by any Indemnitor or Principal for the benefit of creditors, or of the appointment or any application for the appointment, of a receiver or trustee for any Indemnitor or Principal whether insolvent or not; or (5) any proceeding which deprives the Indemnitor or Principal of the use of any of the machinery, supplies, equipment, plant, tools or material referred to in section (b) of this paragraph; or (6) any Indemnitor or Principal's death, absconding, disappearance, incompetence, insolvency, conviction of a felony, or imprisonment, if the Indemnitor or Principal be an individual. Principal(s) shall further obtain, maintain and assign all proceeds from insurance coverage as may be required by the Surety from insurance companies acceptable to Surety, including, as may be applicable, coverage for acts of terrorism. Failure to obtain or maintain insurance coverages so required by Surety shall be a breach of this Agreement and shall permit Surety to demand cash collateral from Principal(s) in an amount up to and including the full penal sum of any outstanding Bond(s).

FOURTH: **UNIFORM COMMERCIAL CODE** - This Agreement shall constitute a Security Agreement to the Surety and also a Financing Statement, both in accordance with the provisions of the Uniform Commercial Code of every jurisdiction wherein such Code is in effect and may be so used by the Surety without in any way abrogating, restricting or limiting the rights of the Surety under this Agreement or under law, or in equity. A carbon, photographic or other reproduction of this Agreement may be filed as a Financing Statement.

FIFTH: **TAKEOVER** - In the event of any of the following: breach, default, or termination asserted by the obligee in any Bond; any Principal's abandonment of the work or forfeiture of any contract covered by any Bond, any Principal's failure to pay obligations incurred in connection therewith; or if the Principal is an individual, in the event of the Principal's death, absconding, disappearance, incompetence, insolvency, conviction of a felony, or imprisonment; the bankruptcy of any Principal; the appointment of a receiver or trustee for any Principal or for the property of any Principal; an assignment for the benefit of creditors of any Principal; if any action is taken by or against any Principal under or by virtue of the Federal Bankruptcy Code; should reorganization or arrangement proceedings be filed by or against any Principal under said Code; and/or if any action is taken by or against any Principal under the insolvency laws of any state, possession or territory of the United States, then the Surety shall have the right, at its option and in its sole discretion and is hereby authorized, with or without exercising any other right or option conferred upon it by law or under the terms of this Agreement, to take possession of any part or all of the work under any contract or contracts covered by the Bonds, and the Indemnitors hereby agree to use their best efforts to cause the Principal to permit the Surety to take possession of any part or all of the work under any contract or contracts covered by the Bonds, at the expense of the Indemnitors and Principals, to complete or arrange for the completion of the same, and the Indemnitors and Principals shall promptly, upon demand, pay to the Surety all losses, fees, costs and expenses so incurred.

SIXTH: **CHANGES** - The Surety is authorized and empowered, without notice to or knowledge of the Indemnitors or Principals, to assent to any change whatsoever in the Bonds, and/or any contracts referred to in the Bonds, and/or in the general conditions, plans and/or specifications accompanying said contracts, including, but not limited to, any change in the time for the completion of said contracts and to payments or advances thereunder before the same may be due, and to assent to or take any assignment or assignments, to execute or consent to the execution of any continuations, extensions or renewals of the Bonds and to execute any substitute or substitutes therefor, with the same or different conditions, provisions and obligees and with the same or larger or smaller penalties, it being expressly understood and agreed that the Indemnitors shall remain bound under the terms of this Agreement even though any such assent by the Surety does or might substantially increase the liability of said Indemnitors. Indemnitors further represent and warrant to surety that they are currently informed and remain informed and apprised of Principal's or Principals' business activities, ventures and financial affairs, including but not limited to the type, size (single job and/or aggregate program), location and status of projects and contracts performed by Principal(s) and secured by Bond(s) executed, provided or procured by Surety. Surety has no obligation to inform the Indemnitors of any change in any aspect of Principal(s)' business activities or financial affairs.

SEVENTH: **ADVANCES** - The Surety is authorized and empowered, in its sole discretion and without any obligation to do so, to guarantee loans, to advance or lend to an Indemnitor or Principal any money, which the Surety may see fit, for the purpose of any contracts referred to in, or guaranteed by the Bonds, or pursuant to any Other Agreements, and all money so expended, lent, advanced, or loans guaranteed from time to time to or on behalf of any such Indemnitor or Principal in connection therewith, including costs of investigation, administration, and/or in the completion of any contract by the Surety, and any and all other costs and expenses incurred by the Surety in relation thereto, unless repaid with interest at the maximum rate permitted by law by any Indemnitor or Principal to the Surety when due, shall be presumed to be a loss by the Surety for which the Indemnitors and Principals shall be responsible notwithstanding that said money or any part thereof should not be so used by any such Indemnitor or Principal.

EIGHTH: **BOOKS AND RECORDS** – Principal(s) and Indemnitor(s) shall provide to Surety within 120 days of their fiscal year end, financial statements prepared in accordance with Generally Accepted Accounting Principles, and reports prepared by reputable accounting firms prepared in accordance with the AICPA's Statements on Standards for Accounting and Review Services ("SARS"). If Principal(s) and/or Indemnitor(s) have reports prepared by reputable accounting firms in accordance with the AICPA's Statements on Auditing Standards in the ordinary course of their financial reporting, then such reports shall be supplied instead of the reports in accordance with SARS. Principal(s) and Indemnitor(s) shall also provide any management letters received from their accountants within 30 days of receipt. In addition to the foregoing, at any time, and until such time as the liability of the Surety under any and all Bonds is terminated, or the Surety is fully reimbursed all amounts due to it under this Agreement or Other Agreements, the Surety shall have the right of reasonable access to the books, records and/or accounts of the Indemnitors and Principals for the purpose of inspection, copying or reproduction; and any financial institution, depository, materialman, supply house or other person, firm or corporation is hereby specifically authorized by each Indemnitor and Principal to furnish the Surety, at the Surety's request, any information requested including but not limited to, financial and credit reports relating to the financial condition of the Indemnitors and/or Principals, and as to any bonded or non-bonded contract performed, in progress or awarded, the status of the work, the condition of the performance of such contracts and payments of accounts. The Indemnitors and Principals agree to provide any additional releases, requests, waivers or any other documents required in order



**EXHIBIT A**

to allow the Surety access to the requested information. Failure to provide the information required in this paragraph shall be a breach of this Agreement, and shall entitle Surety to demand, in its sole discretion, cash collateral up to the penal sum of any outstanding Bond(s).

NINTH: **DECLINE EXECUTION** – The Surety, at its sole discretion, may decline to execute, renew or extend any Bond, including final bonds, and may cancel any Bond unless the Bond states otherwise, and the Indemnitors and Principals agree to make no claim to the contrary. If the Surety shall execute a Bid or Proposal Bond, it shall have the right to decline to execute any other Bonds that may be required in connection with any award that may be made under the proposal for which the Bid or Proposal Bond is given, and such declination shall not diminish or alter the liability that may arise by reason of having executed the Bid or Proposal Bond. The Indemnitors and Principals acknowledge that the Surety makes no representation as to the validity or acceptability of any Bond to any person, firm or entity of whatever sort or kind under any contract, and agree that they shall have no claim against the Surety arising out of or in any manner relating to the failure or refusal of any person, firm or entity of whatever sort or kind to award any contract to the Principals, or to accept any Bond executed and delivered by the Surety, or that the Surety has been requested to execute and delivery.

TENTH: **NOTICE OF EXECUTION** - The Indemnitors and Principals hereby waive notice of the execution of any Bond, the acceptance of this Agreement or Other Agreements, and of any change in surety credit or other fact that might materially alter the Indemnitors and Principals' obligations hereunder, and the Indemnitors and Principals hereby waive all notice of any default, or any other act or acts giving rise to any claim under any Bond, as well as notice of any and all liability of the Surety under any Bond, and any and all liability on their part hereunder, to the end and effect that, the Indemnitors and Principals shall be and continue to be liable hereunder, notwithstanding any notice of any kind to which they might have been or be entitled, and notwithstanding any defenses they might otherwise have been entitled to make as a result of lack of notice.

ELEVENTH: **TRUST FUND** – To the extent permitted under applicable law, the Indemnitors and Principals covenant and agree that all of their interest, title and rights in any contract or undertaking referred to in any Bond, or in, or growing in any manner out of any Bond, including but not limited to payments for or on account of any contract, shall be held as a trust fund and/or as a constructive or equitable trust in which the Surety has an interest, and shall inure to the benefit of the Surety for any liability or loss it may have or sustain under any Bond including but not limited to the payment of obligations incurred in the performance of any contract and for labor, materials, and services furnished in the prosecution of the work provided in any contract or any authorized extension or modification thereof; and, further, it is expressly understood and declared that all monies due and to become due under any contract covered by any Bond are trust funds, whether in the possession of the Indemnitors or Principals or otherwise, for the benefit of and for payment of all such obligations in connection with any such contract for which the Surety would be liable under any Bond; said trust also inures to the benefit of the Surety for any liability or loss it may have or sustain under any Bond, under this Agreement, or under any Other Agreements, and this Agreement constitutes notice of such trust.

TWELFTH: **HOMESTEAD** – To the extent permitted by applicable law, the Indemnitors and Principals hereby waive, so far as their respective obligations under this Agreement are concerned, all rights to claim any of their property including their respective homesteads, as exempt from levy, execution, sale or other legal process under the laws of any state, territory or possession.

THIRTEENTH: **SETTLEMENTS** - The Surety shall have the right, at its option and sole discretion, to adjust, settle or compromise any claim, demand, suit or judgment upon any Bond, unless any Indemnitor or Principal, providing a reasonable legal basis therefor, shall request the Surety to litigate such claim or demand, or to defend such suit, or to appeal from such judgment, and shall deposit with the Surety, at the time of such request, cash or collateral satisfactory to the Surety in kind and amount to be used in paying any judgment or judgments rendered or that may be rendered, with interest, costs, expenses and attorneys' fees, including those of the Surety.

FOURTEENTH: **SURETIES** - In the event the Surety procures the execution of any Bond by other sureties, or executes any Bond with co-sureties, or reinsures any portion of any Bond with reinsuring sureties, then all the terms and conditions of this Agreement shall inure also to the benefit of such other sureties, co-sureties and reinsuring sureties, their successors and assigns, as their interests may appear.

FIFTEENTH: **SUITS** - Separate suits may be brought hereunder as causes of action accrue, and the bringing of suit or the recovery of judgment upon any cause of action shall not prejudice or bar the bringing of other suits upon other causes of action, whether theretofore or thereafter arising.

SIXTEENTH: **OTHER INDEMNITY** - The addition to this Agreement of any Indemnitor, including any entities acquired after the date of execution of this Agreement, may be effected by written amendment executed by such Indemnitor only, notwithstanding any language herein to the contrary. The Indemnitors and Principals shall continue to remain bound under the terms of the Agreement, Other Agreements, and any other agreements containing indemnity obligations, even though the Surety may from time to time heretofore or hereafter, with or without notice to or knowledge of the Indemnitors and Principals, accept, release, or reduce any indemnity obligations or collateral of current or future Indemnitors and Principals for any reason. The Indemnitors and Principals expressly waive notice from the Surety of any such action and, furthermore, it is explicitly understood and agreed by the Indemnitors and Principals that any and all other rights which the Surety may have or acquire against the Indemnitors and Principals and/or others under any such agreements or additional agreements or collateral shall be in addition to, and not in lieu of, the rights afforded the Surety under this Agreement. No Indemnitor shall make any defense to the enforcement of this Agreement based on the execution of Other Agreements or related to the addition or the release of any Indemnitor, and each Indemnitor explicitly confirms its joint and several liability for Bonds issued by the Surety as provided in this Agreement. Principals and Indemnitors also waive and subordinate all rights of indemnity, subrogation and contribution against each other until all obligations to the Surety under the agreement, at law or in equity, have been satisfied in full.

SEVENTEENTH: **INVALIDITY** – Invalidity of any provision of this Agreement by reason of the laws of any jurisdiction shall not render the other provisions hereof invalid. In case any of the parties set forth in this Agreement fail to execute the same, or in case the execution hereof by any of the parties be defective or invalid for any reason, including lack of authority to bind any party, such failure, defect or invalidity shall not in any manner affect the validity of this Agreement or the liability hereunder of any of the parties executing the same, but each and every party so executing shall be and remain fully bound and liable hereunder to the same extent as if such failure, defect or invalidity had not existed. Each party agrees to execute promptly any documentation necessary to cure any such failure, defect or invalidity. It is understood and agreed by the Indemnitors and Principals that the rights, powers, and remedies given the Surety under this Agreement shall be and are in addition to, and not in lieu of, any and all other rights, powers, and remedies which the Surety may have or acquire against the Indemnitors and Principals or others whether by the terms of any other agreement or by operation of law or otherwise.

EIGHTEENTH: **ATTORNEY-IN-FACT** - The Indemnitors and Principals hereby irrevocably nominate, constitute, appoint and designate the Surety as their attorney-in-fact with the full right and authority, but not the obligation, to exercise all the rights of the Indemnitors and Principals assigned, transferred and set over to the Surety in this Agreement, with full power and authority to execute on behalf of and sign the name of any Indemnitor and/or Principal to any voucher, financing statement, release, satisfaction, check, bill of sale of all or any property by this Agreement assigned to the Surety, or other documents or papers



**EXHIBIT A**

deemed necessary and proper by the Surety in order to give full effect not only to the intent and meaning of the within assignments, but also to the full protection intended to be herein given to the Surety under all other provisions of this Agreement. The Indemnitors and Principals hereby ratify and confirm all acts and actions taken and done by the Surety as such attorney-in-fact and agree to protect and hold harmless the Surety for acts herein granted as attorney-in-fact.

NINETEENTH: **TERMINATION** – Any Indemnitor may terminate its liability under this Agreement upon twenty days' written notice sent by registered and certified mail or courier requiring proof of delivery signature to the Surety, in care of Liberty Mutual Surety, Interchange Corporate Center, 450 Plymouth Road, Suite 400, Plymouth Meeting, PA 19462-1644, but any such notice of termination shall not operate to modify, bar, or discharge Indemnitors or Principals as to any Bonds (a) that may have been executed or authorized prior to the expiration of the notice period; (b) which may be executed after the expiration of the notice period in fulfillment of any commitment given by the Surety prior to the expiration of such notice period; (c) executed in connection with any project as to which any bid bond was executed or authorized prior to the expiration of such notice period; and/or (d) which are renewed, extended, substituted or modified after the expiration of such notice period. Such termination of liability as to any Indemnitor or Principal in no way affects the obligation of any other Indemnitor or Principal who has not given notice as herein provided.

TWENTIETH: **AMENDMENTS** – This Agreement may not be changed or modified orally. No change or modification shall be effective unless made by written amendment executed to form a part hereof.

TWENTY-FIRST: **JURISDICTION** - As to any legal action or proceeding related to this Agreement, the Indemnitors and Principals consent to the general jurisdiction of any local, state or Federal court of the United States or its territories having proper subject matter jurisdiction or in any court of the United States or its territories in which any claim may be brought against the Surety under any Bonds, and waive any claim or defense in any such action or proceeding based on any alleged lack of personal jurisdiction, improper venue, forum non conveniens or any similar basis. Indemnitors and Principals further waive personal service or any and all process.

TWENTY-SECOND: **CURRENCY EXCHANGE** – Should the Surety, when making any payment or incurring any expense directly or indirectly related to Bonds expend funds in currencies other than U.S. Dollars, the Indemnitors shall either reimburse the Surety in U.S. Dollars equal to the amount expended by the Surety at the time the foreign currency was purchased or shall defray the cost of any exchange variation, thereby indemnifying the Surety for any decrease in the valuation of the currency purchased.

TWENTY-THIRD: **CHANGE IN CONTROL** - The Indemnitors agree to provide the Surety with, at least, forty five (45) days prior written notice of a Change in Control (defined below) and to designate the name and address of the Indemnitor with whom the Surety should correspond with respect to this paragraph, which Indemnitor, all Indemnitors agree is designated to act on behalf of them pursuant to this paragraph. Upon receipt of such notice, the Surety shall advise the Indemnitor designated above, in writing, of its election to (i) approve such Change in Control or (ii) demand that the Indemnitors' procure the discharge of the Surety from any Bonds and all liability by reason thereof. If the Indemnitors fail to give the Surety timely notice of a Change in Control or if the Surety does not approve the Change in Control and if such discharge is not procured to the sole satisfaction of the Surety then, immediately, upon the Surety's written demand, the Indemnitors shall deposit a sum of money or collateral, of a type and value satisfactory to the Surety, equal to the aggregate penal sum of the then outstanding Bonds, as determined by the Surety in its sole discretion. The Surety shall send its written demand to the Indemnitor designated above by overnight courier or by registered or certified mail. The Indemnitors hereby acknowledge that if they or any one of them breaches the obligations set forth in this paragraph, the Surety will not have an adequate remedy at law, will suffer irreparable harm and shall be entitled to injunctive relief, enforcing the terms of this paragraph, as well as a final decree, order or judgment granting Surety specific performance of the terms of this Agreement.

"Change in Control' shall mean: (a) the transfer, merger or consolidation (in one transaction or a series of transactions) of all or substantially all of the assets of any non-individual Principal or Indemnitor; (b) the acquisition (in one transaction or a series of transactions) by any person or group, directly or indirectly, of fifty (50%) percent or more of the beneficial ownership or control of any Principal or Indemnitor; or (c) the acquisition by any Principal or Indemnitor, directly or indirectly, of fifty (50%) percent or more of the beneficial ownership or control in any joint venture, subsidiary, division, affiliate, limited partnership, limited liability partnership, limited liability company or other entity through the issuance of ten (10%) percent or more of the voting power of the total outstanding voting stock of any Principal or Indemnitor.

TWENTY-FOURTH: **DOMESTIC PRINCIPAL DOING FOREIGN CONTRACTS/GOVERNING LAW** - The Indemnitors and Principals hereby agree that as to any legal action or proceeding related to any Bond(s) issued in connection with contracts to be performed outside the United States and its territories, this Agreement shall be governed by and construed in accordance with the laws of the State of New York (without giving effect to the conflict of laws principles thereof), except to the extent superseded by Federal law.

TWENTY-FIFTH: **TEXAS DIVIDENDS** – The Principal shall be entitled to participate in a distribution of the surplus of the surety, as determined by its Board of Directors from time to time, after approval in accordance with the provisions of the Texas Insurance Code of 1951, as amended.

DATED as of this 24th day of March 20 08.

*By signing below, each individual executing this Agreement on behalf of a business entity, and each business entity executing this Agreement on behalf of another business entity, represents and warrants that he, she or it is* ***duly authorized*** *by Indemnitor to bind Indemnitor to all of the terms and conditions of this Agreement:*

Unofficial Copy Travis County District Clerk Velva L. Price

ATTEST OR WITNESS:

By: [signature]
Michael D. Center
Secretary

BY:

Foundation Fence, Inc.
T.I.N. 55-0849954
320 Southland Rd., Burnet, TX 78611

By: William H. Neusch (Seal)
William H. Neusch
President



EXHIBIT A

**Sentinel International, Inc.**
**T.I.N. 20-5796844**
**320 Southland Dr., Burnet, TX 78611**

By: _______________________ (Seal)
William H. Neusch
President

By: _______________________
Michael D. Center
Secretary

**Gibraltar Cable Barrier Systems, GP LLC**
**T.I.N. 20-5261384**
**320 Southland Rd., Burnet, TX 78611**

By: _______________________ (Seal)
William H. Neusch
President & Sole Manager

By: _______________________
Michael D. Center
Secretary

**Gibraltar Material Distribution GP, LLC**
**T.I.N. 20-5261687**
**320 Southland Rd., Burnet, TX 78611**

By: _______________________ (Seal)
William H. Neusch
President

By: _______________________
Michael D. Center
Secretary

**Neusch Innovations GP, LLC**
**T.I.N. 20-526[illegible]12**
**320 Southland Drive, Burnet, TX 78611**

By: _______________________ (Seal)
William H. Neusch
President & Sole Manager

By: _______________________
Michael D. Center
Secretary

**Gibraltar Cable Barrier Systems, LP**
**T.I.N. 20-5261529**
**320 Southland Rd., burnet, TX 78611**

By: _______________________
William H. Neusch, General Partner
President

By: _______________________
Michael D. Center
Secretary

**Gibraltar Material Distribution, LP**
**T.I.N. 20-5261729**
**320 Southland Rd., Burnet, TX 78611**

By: _______________________
William H. Neusch, General Partner
President

By: _______________________
Michael D. Center
Secretary

**Neusch Innovations, LP**
**T.I.N. 20-5261845**
**320 Southland Dr., Burnet, TX 78611**

By: _______________________
William H. Neusch, General Partner
President

By: _______________________
Michael D. Center
Secretary

**William H. Neusch**
**S.S.N. 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**
**202 Bridge St., Marble Falls, TX 78654**
**512-693-0302**

Unofficial Copy - Travis Co. District Clerk Velva L. Price



**EXHIBIT A**

By: ______________________
Witness

By: ______________________
William H. Neusch
Agnes Neusch
S.S.N. 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
202 Bridge St., Marble Falls, TX 78654
512-693-0302

By: ______________________
Witness

By: ______________________
Agnes Neusch

**CORPORATE ACKNOWLEDGMENT - Foundation Fence, Inc.**

STATE of Texas
ss.
County of Burnet

On this 24th day of March, 20 08, before me personally appeared William H. Neusch and Michael D. Center, known by me to be the President and Secretary of the corporation described in and which executed the foregoing General Agreement of Indemnity; and who being by me duly sworn, depose and say that that they know the seal of said corporation; that the seal affixed to said Agreement is such corporate seal; that it was so affixed by the order of the Board of Directors of said corporation, and that they signed their names thereto by like order.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my OFFICIAL SEAL the day and year first above written.

VALERIE BARBAREE
MY COMMISSION EXPIRES
September 25, 2009

(NOTARY SEAL)

______________________ (Signature of Notary Public)
Notary Public, residing at Burnet, Texas
My commission expires 9/25/09

**CORPORATE ACKNOWLEDGMENT - Sentinel International, Inc.**

STATE of Texas
ss.
County of Burnet

On this 24th day of March, 20 08, before me personally appeared William H. Neusch and Michael D. Center, known by me to be the President and Secretary of the corporation described in and which executed the foregoing General Agreement of Indemnity; and who being by me duly sworn, depose and say that that they know the seal of said corporation; that the seal affixed to said Agreement is such corporate seal; that it was so affixed by the order of the Board of Directors of said corporation, and that they signed their names thereto by like order.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my OFFICIAL SEAL the day and year first above written.

VALERIE BARBAREE
MY COMMISSION EXPIRES
September 25, 2009

(NOTARY SEAL)

______________________ (Signature of Notary Public)
Notary Public, residing at Burnet, TX
My commission expires 9/25/09

**LIMITED LIABILITY COMPANY ACKNOWLEDGMENT**

STATE of Texas
ss.
County of Burnet

On this 24th day of March, 20 08, before me personally appeared William H. Neusch, known by me to be the person who is identified in and who executed the foregoing General Agreement of Indemnity, and who being by me duly sworn, deposes and says that (s)he is the Manager of Gibraltar Cable Barrier Systems, GP LLC, a limited liability company; that (s)he is duly authorized to execute said Agreement; and that (s)he executed said Agreement as the act and deed of said limited liability company.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my OFFICIAL SEAL the day and year first above written.

VALERIE BARBAREE
MY COMMISSION EXPIRES
September 25, 2009

(NOTARY SEAL)

______________________ (Signature of Notary Public)
Notary Public, residing at Burnet, TX
My commission expires 9/25/09

**LIMITED LIABILITY COMPANY ACKNOWLEDGMENT**

STATE of Texas
ss.
County of Burnet

On this 24th day of March, 20 08, before me personally appeared William. H. Neusch, known by me to be the person who is identified in and who executed the foregoing General Agreement of Indemnity, and who being by me duly sworn,

Unofficial copy - Travis Co. District Clerk Velva L. Price



**EXHIBIT A**

deposes and says that (s)he is the Manager of Gibraltar Material Distribution GP, LLC, a limited liability company; that (s)he is duly authorized to execute said Agreement; and that (s)he executed said Agreement as the act and deed of said limited liability company.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my OFFICIAL SEAL the day and year first above written.

VALERIE BARBAREE
MY COMMISSION EXPIRES
September 25, 2009

(NOTARY SEAL)

(Signature of Notary Public)
Notary Public, residing at Burnet, TX
My commission expires 9/25/09

## LIMITED LIABILITY COMPANY ACKNOWLEDGMENT

STATE of Texas
ss.
County of Burnet

On this 24th day of March, 2008, before me personally appeared William H. Neusch, known by me to be the person who is identified in and who executed the foregoing General Agreement of Indemnity, and who being by me duly sworn, deposes and says that (s)he is the Manager of Neusch Innovations GP, LLC, a limited liability company; that (s)he is duly authorized to execute said Agreement; and that (s)he executed said Agreement as the act and deed of said limited liability company.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my OFFICIAL SEAL the day and year first above written.

VALERIE BARBAREE
MY COMMISSION EXPIRES
September 25, 2009

(NOTARY SEAL)

(Signature of Notary Public)
Notary Public, residing at Burnet, TX
My commission expires 9/25/09

## LIMITED PARTNERSHIP ACKNOWLEDGMENT

STATE of Texas
ss.
County of Burnet

On this 24th day of March, 2008, before me personally appeared William H. Neusch, known by me to be the person who is identified in and who executed the foregoing General Agreement of Indemnity, and who being by me duly sworn, deposes and says that (s)he is the General Partner of Gibraltar Cable Barrier Systems, LP, a limited partnership, and that (s)he is duly authorized to execute said Agreement, and that (s)he executed said Agreement as the act and deed of the said limited partnership.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my OFFICIAL SEAL the day and year first above written.

VALERIE BARBAREE
MY COMMISSION EXPIRES
September 25, 2009

(NOTARY SEAL)

(Signature of Notary Public)
Notary Public, residing at Burnet, TX
My commission expires 9/25/09

Unofficial copy Travis County District Clerk Velva L. Price

## LIMITED PARTNERSHIP ACKNOWLEDGMENT

STATE of Texas
ss.
County of Burnet

On this 24th day of March, 2008, before me personally appeared William H. Neusch, known by me to be the person who is identified in and who executed the foregoing General Agreement of Indemnity, and who being by me duly sworn, deposes and says that (s)he is the General Partner of Gibraltar Material Distribution, LP, a limited partnership, and that (s)he is duly authorized to execute said Agreement, and that (s)he executed said Agreement as the act and deed of the said limited partnership.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my OFFICIAL SEAL the day and year first above written.

VALERIE BARBAREE
MY COMMISSION EXPIRES
September 25, 2009

(NOTARY SEAL)

(Signature of Notary Public)
Notary Public, residing at Burnet, TX
My commission expires 9/25/09



**EXHIBIT A**

## LIMITED PARTNERSHIP ACKNOWLEDGMENT

STATE of Texas
ss.
County of Burnet

On this 24th day of March, 2008, before me personally appeared William H. Neusch, known by me to be the person who is identified in and who executed the foregoing General Agreement of Indemnity, and who being by me duly sworn, deposes and says that (s)he is the General Partner of Neusch Innovations, LP, a limited partnership, and that (s)he is duly authorized to execute said Agreement, and that (s)he executed said Agreement as the act and deed of the said limited partnership.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my OFFICIAL SEAL the day and year first above written.

VALERIE BARBAREE
MY COMMISSION EXPIRES
September 25, 2009

(NOTARY SEAL)

(Signature of Notary Public)
Notary Public, residing at Burnet, TX
My commission expires 9/25/09

## INDIVIDUAL ACKNOWLEDGMENT

STATE of Texas
ss.
County of Burnet

On this 24th day of March, 2008, before me personally appeared William H. Neusch, known by me to be the person who is identified in and who executed the foregoing General Agreement of Indemnity, and who being by me duly sworn, deposes and says that (s)he executed said Agreement.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my OFFICIAL SEAL the day and year first above written.

VALERIE BARBAREE
MY COMMISSION EXPIRES
September 25, 2009

(NOTARY SEAL)

(Signature of Notary Public)
Notary Public, residing at Burnet, TX
My commission expires 9/25/09

## INDIVIDUAL ACKNOWLEDGMENT

STATE of Texas
ss.
County of Burnet

On this 24th day of March, 2008 before me personally appeared Agnes Neusch, known by me to be the person who is identified in and who executed the foregoing General Agreement of Indemnity, and who being by me duly sworn, deposes and says that (s)he executed said Agreement.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my OFFICIAL SEAL the day and year first above written.

VALERIE BARBAREE
MY COMMISSION EXPIRES
September 25, 2009

(NOTARY SEAL)

(Signature of Notary Public)
Notary Public, residing at Burnet, TX
My commission expires 9/25/09

Unofficial copy Travis Co. District Clerk Velva L. Price



**EXHIBIT A**

## CORPORATE RESOLUTIONS

As authorized by the corporation by-laws, by duly authorized meeting with quorum present or otherwise, the Board of Directors of **Foundation Fence, Inc.** (hereinafter called the "Corporation"), on the 24TH day of March 2008, approved the following Preamble was approved and adopted the following Resolutions:

"WHEREAS, the Corporation has agreed to enter into a certain General Agreement of Indemnity in favor of Liberty Mutual Insurance Company, Employers Insurance Company of Wausau (formerly EMPLOYERS INSURANCE OF WAUSAU A Mutual Company), Peerless Insurance Company and/or any other company that is part of or added to the Liberty Mutual Group, severally not jointly, for which Liberty Mutual Surety underwrites surety business (any one or more individually and collectively hereinafter called the "Surety");

WHEREAS, the Corporation has a financial, material, and beneficial interest in the transaction in which (i) **Foundation Fence, Inc.; Gibraltar Cable Barrier Systems, LP; Gibraltar Cable Barrier Systems, GP LLC; Gibraltar Material Distribution, LP; Gibraltar Material Distribution GP, LLC; Sentinel International, Inc.; Neusch Innovations, LP; Neusch Innovations GP, LLC; William H. Neusch; Agnes Neusch**; ii) any of the Indemnitors or Principals' subsidiaries or affiliates, whether present or future, and whether directly or indirectly held; and iii) any other entity or person in response to a request from any Indemnitor or Principal named herein, and, as to all of the foregoing, whether they act alone or in joint venture with others whether or not said others are named herein (individually and collectively hereinafter called the "Principal(s)") have applied or will apply to the Surety for any surety bonds, undertakings, recognizances, instruments of guarantee or other surety obligation or whatever nature or kind (hereinafter called "Bond(s)"); and

WHEREAS, the Surety has executed or is willing to consider the execution of the Bonds, as Surety, upon being furnished with the written indemnity of the Corporation.

NOW THEREFORE BE IT:

RESOLVED, that the officers authorized to execute documents on behalf of the Corporation are authorized and empowered, at any time prior or subsequent to the Surety's execution of any Bonds, to execute any indemnity agreement(s) that the Surety requires or may require as consideration for the Surety's execution of Bonds, of whatever kind or nature, on behalf of the Principal

RESOLVED FURTHER, that said officers are authorized and empowered, at any time prior to or subsequent to the Surety's execution of any Bonds, to execute any and all amendments to any and all indemnity agreement(s); and to execute any other or further agreements relating to any such Bonds or to any collateral that may have been deposited with the Surety in connection therewith; and to take any and all other actions that may be requested or required by the Surety, in connection with any such Bonds;

RESOLVED FURTHER, that said officers are authorized and empowered to affix the corporate seal to any and all indemnity agreement(s), to any and all amendments to said indemnity agreement(s), and to any other or further agreement(s); and

RESOLVED FURTHER, that any and all actions heretofore taken by any representative of the Corporation in order to carry into effect the purposes of the foregoing resolutions, including the execution and delivery of any indemnity agreement(s) are hereby approved, ratified and confirmed."

I, Michael D. Center, Secretary of the Corporation, have compared the foregoing Preamble and Resolutions with the original thereof as recorded in the Minute Book of the Corporation; and do certify that the same are correct and true transcripts therefrom, and constitutes the whole of said Preamble and Resolutions.

The officers authorized to execute documents on behalf of this Corporation include:

William H. Neusch

Michael D. Center

______

______

Given under my hand and the seal of the Corporation, in the City of Burnet State of TX this 24TH day of March 2008.

______________________________(Seal)

Michael D. Center, Secretary

Unofficial copy - Travis Co. District Clerk Velva L. Price

**STATEMENT OF LIMITED PARTNERSHIP
AND REPRESENTATION BY GENERAL PARTNERS**

__Neusch Innovations, LP__ (hereinafter called the "Limited Partnership") and all of its General Partners hereby represent and warrant that:

1. The Limited Partnership has agreed to enter into a certain General Agreement of Indemnity in favor of Liberty Mutual Insurance Company, Employers Insurance Company of Wausau (formerly EMPLOYERS INSURANCE OF WAUSAU A Mutual Company), Peerless Insurance Company and/or any other company that is part of or added to the Liberty Mutual Group, severally not jointly, for which Liberty Mutual Surety underwrites surety business (individually and collectively hereinafter called the "Surety");

2. The Limited Partnership has a financial, material and beneficial interest in transactions in which (i) **Foundation Fence, Inc.; Gibraltar Cable Barrier Systems, LP; Gibraltar Cable Barrier Systems, GP, LLC; Gibraltar Material Distribution, LP; Gibraltar Material Distribution GP, LLC; Sentinel International, Inc.; Neusch Innovations, LP; Neusch Innovations GP, LLC; William H. Neusch; Agnes Neusch**; ii) any the Indemnitors or Principals' subsidiaries or affiliates, whether present or future, and whether directly or indirectly held; and iii) any other entity or person in response to a request from any Indemnitor or Principal named herein, and, as to all of the foregoing, whether they act alone or in joint venture with others whether or not said others are named herein (individually and collectively hereinafter called the "Principal(s)") have applied or will apply to the Surety for any surety bond, undertaking, recognizance, instrument of guarantee or other surety obligation of whatever nature or kind (hereinafter called the "Bond(s)");

3. The Surety has executed or is willing to consider the execution of such Bonds, as surety, upon being furnished with the written indemnity of the Limited Partnership;

4. The General Partner(s) authorized to execute documents on behalf of the Limited Partnership are authorized and empowered, at any time prior or subsequent to the Surety's execution of any Bonds, to execute any indemnity agreement(s) that the Surety requires or may require as consideration for the Surety's execution of Bonds on behalf of the Principals;

5. Said General Partner(s) are authorized and empowered, at any time prior to or subsequent to the Surety's execution of any Bonds, to execute any and all amendments to any and all indemnity agreement(s); and to execute any other or further agreements relating to such Bonds or any collateral that may have been deposited with the Surety in connection therewith; and to take any and all other actions that may be requested or required by the Surety in connection with any such Bonds;

6. Any and all actions heretofore taken by any representative of the Limited Partnership in order to carry into effect the purposes reflected in this Statement and Representation, including the execution and delivery of any indemnity agreement(s) are hereby ratified and confirmed;

7. The Limited Partnership is authorized, under its Partnership Agreement and any other partnership documents and under applicable law, to execute any indemnity agreement(s) in favor of Surety;

8. The names of those General Partner(s) authorized to execute documents on behalf of the Limited Partnership are: William H. Neusch

We, the undersigned, constituting all of the General Partners of the Limited Partnership, make these representations and warranties effective as of the date listed below.

Dated this 24TH day of MARCH 2008

**BY THE GENERAL PARTNERS OF __Neusch Innovations, LP__:**

By: William H. Neusch
William H. Neusch, General Partner

By: ______________________
General Partner

Unofficial Copy - Travis Co. District Clerk Velva L. Price



**EXHIBIT A**

Unofficial copy - Travis Co. District Clerk Velva L. Price

Liberty Mutual.

# General Agreement of Indemnity

This General Agreement of Indemnity (hereinafter the "Agreement") is made and entered into by the following individuals, partnerships, corporations, and/or other business entities, as applicable, Neu Fence, LLC;Foundation Fence, Inc. (individually and collectively hereinafter called the "Indemnitor(s)") jointly and severally, in favor of Liberty Mutual Insurance Company, Employers Insurance Company of Wausau (formerly "EMPLOYERS INSURANCE OF WAUSAU A Mutual Company"), Peerless Insurance Company, and any other company that is part of or added to the Liberty Mutual Group, severally not jointly, and for which Liberty Mutual Surety underwrites surety business (individually and collectively hereinafter called the "Surety") with respect to any surety bond, undertaking, recognizance, instrument of guarantee or other surety obligations (hereinafter called the "Bond(s)") requested from and/or issued by the Surety before or after the date of this Agreement, for i) Neu Fence, LLC;Foundation Fence, Inc.; and any Indemnitor added hereto by Amendment; ii) any of the Indemnitors or Principals' subsidiaries or affiliates, whether present or future, and whether directly or indirectly held; and iii) any other entity or person in response to a request from any Indemnitor or Principal named herein, and, as to all of the foregoing, whether they act alone or in joint venture with others and whether or not said others are named herein (individually and collectively hereinafter called the "Principal(s)").

**WITNESSETH**

WHEREAS, the Indemnitors and Principals, in the performance of contracts and the fulfillment of obligations generally, whether in their own names solely or as co-adventurers with others, may desire, request, or be required to give or procure certain Bonds, and/or to renew, continue, extend or substitute, from time to time, the same or new Bonds with the same or different penalties, and/or conditions, as may be desired, requested or required, in the renewal, continuation, extension and/or substitution thereof; or the Indemnitors or Principals may request the Surety to refrain from canceling the Bonds; and

WHEREAS, at the request of the Indemnitors and with both the express understanding that this Agreement be given and in reliance upon this Agreement, the Surety has heretofore or has presently been requested to and/or has executed or has procured to be executed, and, from time to time hereafter, may be requested to and/or may execute or may procure to be executed, the Bonds on behalf of the Principals; and

WHEREAS, the Indemnitors have a substantial, material and beneficial interest in the obtaining of the Bonds or in the Surety's refraining from canceling any or all Bonds.

NOW, THEREFORE, in consideration of the premises, and intending to be legally bound hereby, the Indemnitors and Principals for themselves, their heirs, executors, administrators, successors and assigns, jointly and severally, hereby covenant and agree with the Surety, its successors and assigns, as follows:

FIRST: **PREMIUMS** - The Indemnitors and Principals will pay to the Surety, promptly upon demand, all premiums, costs and charges of the Surety for any Bonds requested from and/or issued by the Surety in accordance with its rate filings, its manual of rates as determined by the Surety, or as otherwise determined by the Surety, and where such premium, costs and charges are annual, continue to pay the same until the Indemnitors or Principals shall deliver evidence satisfactory to the Surety of its discharge or release from the Bonds and all liability by reason thereof.

SECOND: **INDEMNITY** – The Indemnitors shall exonerate, hold harmless, indemnify, and keep indemnified the Surety from and against any and all liability for losses, fees, costs and expenses of whatsoever kind or nature including, but not limited to, pre- and post-judgment interest at the maximum rate permitted by law accruing from the date of a breach of this Agreement or a breach of any other written agreements between or for the benefit of the Surety and the Indemnitor(s) and/or Principal(s) (hereinafter referred to as "Other Agreements"), court costs, counsel fees, accounting, engineering and any other outside consulting fees and from and against any and all such losses, fees, costs and expenses which the Surety may sustain or incur: (1) by reason of being requested to execute or procure the execution of any Bond; or (2) by having executed or procured the execution of any Bond; or (3) by reason of the failure of the Indemnitors or Principals to perform or comply with any of the covenants and conditions of this Agreement or Other Agreements; or (4) in enforcing any of the covenants and conditions of this Agreement or Other Agreements. Payment by reason of the aforesaid causes shall be made to the Surety by the Indemnitors and/or Principals promptly, upon demand by the Surety, whether or not the Surety shall have made any payment therefor and, at the Surety's sole option, irrespective of any deposit of collateral. If the Surety determines, in its sole judgment, that potential liability exists for losses and/or fees, costs and expenses for which the Indemnitors and Principals will be obliged to indemnify the Surety under the terms of this Agreement or Other Agreements, the Indemnitors and/or Principals shall deposit with the Surety, promptly upon demand, a sum of money equal to an amount determined by the Surety or collateral security of a type and value satisfactory to the Surety, to cover that liability, whether or not the Surety has: (a) established or increased any reserve; (b) made any payments; or (c) received any notice of any claims therefor. At the Surety's sole option, such collateral shall be in addition to and not in lieu of any other collateral that has been previously provided to the Surety. The Surety shall have the right to use any collateral, or any part thereof, in payment or settlement of any such liabilities for which the Indemnitors and Principals would be obliged to indemnify the Surety under the terms of this Agreement or Other Agreements. In the event of any payment by the Surety, the Indemnitors and Principals further agree that in any accounting between the Surety and the Principals, or between the Surety and the Indemnitors, or either or both of them, the Surety shall be entitled to charge for any and all disbursements made by it in good faith in and about the matters herein contemplated by this Agreement or Other Agreements under the belief that it is, or was, or might be liable for the sums and amounts so disbursed or that it was necessary or expedient to make such disbursements, whether or not such liability, necessity or expediency existed; and that the vouchers or other evidence of any such payments made by the Surety shall be prima facie evidence of the fact and amount of the liability to the Surety. Surety shall have no obligation to invest or provide a return on any collateral provided to it under this Agreement.

THIRD: **ASSIGNMENT** - The Indemnitors hereby consenting do assign, transfer, pledge and convey to the Surety and agree to use their best efforts to cause the Principals to assign, transfer, pledge and convey to the Surety as collateral security for the full performance of the covenants and agreements herein contained, contained in Other Agreements and for the payment of any other indebtedness or liability of the Indemnitors and/or Principals to the Surety, whether heretofore or hereafter incurred, the assignment in the case of each contract being effective as of the date of the Bond covering such contract, the following: (a) all the right, title and interest of the Indemnitors and/or Principals in, and growing in any manner out of, all contracts referred to in the Bonds, or in, or growing in any manner out of the Bonds; (b) all the right, title and interest of the Indemnitors and/or Principals in and to all machinery, supplies, equipment, plant, tools and materials which are now, or may hereafter be, about or upon the site or sites of any and all contractual work referred to in the Bonds or elsewhere, including materials purchased for or chargeable to any and all contracts referred to in the Bonds, materials which may be in the process of construction, in storage at the site or

Unofficial Copy Travis County District Clerk Velva L. Price



EXHIBIT B

elsewhere, or in transportation to any and all sites; (c) all the right, title and interest of the Indemnitors and/or Principals in and to all subcontracts let or to be let in connection with any and all contracts referred to in the Bonds, and in and to all surety bonds supporting such subcontracts; (d) all actions, causes of actions, claims and demands whatsoever which the Indemnitors and/or Principals may have or acquire against any subcontractor, laborer or materialman, or any person furnishing or agreeing to furnish or supply labor, material, supplies, machinery, tools, or other equipment in connection with or on account of any and all contracts referred to in the Bonds; and against any surety or sureties of any subcontractor, laborer or materialman; and (e) any and all percentages retained and any and all sums that may be due or hereafter become due on account of any and all contracts referred to in the Bonds and all other contracts whether bonded or not in which the Indemnitors or Principals have an interest; (f) all licenses, patents, copyrights and trade secrets; (g) all warehouse receipts, bills of lading and general intangibles; (h) all tax refunds and claims for tax refunds; and (i) all limited partnership and general partnership interests; but only in the event of: (1) any abandonment, forfeiture or breach of any contract referred to in the Bonds or of any breach of any Bond; or (2) a default in discharging any other indebtedness or liabilities incurred in connection therewith, when due; or (3) any breach of the covenants and conditions of this Agreement or Other Agreements, including but not limited to the failure to obtain from the Surety written approval of a Change in Control; or (4) an assignment by any Indemnitor or Principal for the benefit of creditors, or of the appointment or any application for the appointment, of a receiver or trustee for any Indemnitor or Principal whether insolvent or not; or (5) any proceeding which deprives the Indemnitor or Principal of the use of any of the machinery, supplies, equipment, plant, tools or material referred to in section (b) of this paragraph; or (6) any Indemnitor or Principal's death, absconding, disappearance, incompetence, insolvency, conviction of a felony, or imprisonment, if the Indemnitor or Principal be an individual. Principal(s) shall further obtain, maintain and assign all proceeds from insurance coverage as may be required by the Surety from insurance companies acceptable to Surety, including, as may be applicable, coverage for acts of terrorism. Failure to obtain or maintain insurance coverages so required by Surety shall be a breach of this Agreement and shall permit Surety to demand cash collateral from Principal(s) in an amount up to and including the full penal sum of any outstanding Bond(s).

FOURTH: **UNIFORM COMMERCIAL CODE** - This Agreement shall constitute a Security Agreement to the Surety and also a Financing Statement, both in accordance with the provisions of the Uniform Commercial Code of every jurisdiction wherein such Code is in effect and may be so used by the Surety without in any way abrogating, restricting or limiting the rights of the Surety under this Agreement or under law, or in equity. A carbon, photographic or other reproduction of this Agreement may be filed as a Financing Statement.

FIFTH: **TAKEOVER** - In the event of any of the following: breach, default, or termination asserted by the obligee in any Bond; any Principal's abandonment of the work or forfeiture of any contract covered by any Bond, any Principal's failure to pay obligations incurred in connection therewith; or if the Principal is an individual, in the event of the Principal's death, absconding, disappearance, incompetence, insolvency, conviction of a felony, or imprisonment; the bankruptcy of any Principal; the appointment of a receiver or trustee for any Principal or for the property of any Principal; an assignment for the benefit of creditors of any Principal; if any action is taken by or against any Principal under or by virtue of the Federal Bankruptcy Code; should reorganization or arrangement proceedings be filed by or against any Principal under said Code; and/or if any action is taken by or against any Principal under the insolvency laws of any state, possession or territory of the United States, then the Surety shall have the right, at its option and in its sole discretion and is hereby authorized, with or without exercising any other right or option conferred upon it by law or under the terms of this Agreement, to take possession of any part or all of the work under any contract or contracts covered by the Bonds, and the Indemnitors hereby agree to use their best efforts to cause the Principal to permit the Surety to take possession of any part or all of the work under any contract or contracts covered by the Bonds, at the expense of the Indemnitors and Principals, to complete or arrange for the completion of the same, and the Indemnitors and Principals shall promptly, upon demand, pay to the Surety all losses, fees, costs and expenses so incurred.

SIXTH: **CHANGES** - The Surety is authorized and empowered, without notice to or knowledge of the Indemnitors or Principals, to assent to any change whatsoever in the Bonds, and/or any contracts referred to in the Bonds, and/or in the general conditions, plans and/or specifications accompanying said contracts, including, but not limited to, any change in the time for the completion of said contracts and to payments or advances thereunder before the same may be due, and to assent to or take any assignment or assignments, to execute or consent to the execution of any continuations, extensions or renewals of the Bonds and to execute any substitute or substitutes therefor, with the same or different conditions, provisions and obligees and with the same or larger or smaller penalties, it being expressly understood and agreed that the Indemnitors shall remain bound under the terms of this Agreement even though any such assent by the Surety does or might substantially increase the liability of said Indemnitors. Indemnitors further represent and warrant to Surety that they are currently informed and remain informed and apprised of Principal's or Principals' business activities, ventures and financial affairs, including but not limited to the type, size (single job and/or aggregate program), location and status of projects and contracts performed by Principal(s) and secured by Bond(s) executed, provided or procured by Surety. Surety has no obligation to inform the Indemnitors of any change in any aspect of Principal(s)' business activities or financial affairs.

SEVENTH: **ADVANCES** - The Surety is authorized and empowered, in its sole discretion and without any obligation to do so, to guarantee loans, to advance or lend to any Indemnitor or Principal any money, which the Surety may see fit, for the purpose of any contracts referred to in, or guaranteed by the Bonds, or pursuant to any Other Agreements, and all money so expended, lent, advanced, or loans guaranteed from time to time to or on behalf of any such Indemnitor or Principal in connection therewith, including costs of investigation, administration, and/or in the completion of any contract by the Surety, and any and all other costs and expenses incurred by the Surety in relation thereto, unless repaid with interest at the maximum rate permitted by law by any Indemnitor or Principal to the Surety when due, shall be presumed to be a loss by the Surety for which the Indemnitors and Principals shall be responsible notwithstanding that said money or any part thereof should not be so used by any such Indemnitor or Principal.

EIGHTH: **BOOKS AND RECORDS** – Principal(s) and Indemnitor(s) shall provide to Surety within 120 days of their fiscal year end, financial statements prepared in accordance with Generally Accepted Accounting Principles, and reports prepared by reputable accounting firms prepared in accordance with the AICPA's Statements on Standards for Accounting and Review Services ("SARS"). If Principal(s) and/or Indemnitor(s) have reports prepared by reputable accounting firms in accordance with the AICPA's Statements on Auditing Standards in the ordinary course of their financial reporting, then such reports shall be supplied instead of the reports in accordance with SARS. Principal(s) and Indemnitor(s) shall also provide any management letters received from their accountants within 30 days of receipt. In addition to the foregoing, at any time, and until such time as the liability of the Surety under any and all Bonds is terminated, or the Surety is fully reimbursed all amounts due to it under this Agreement or Other Agreements, the Surety shall have the right of reasonable access to the books, records and/or accounts of the Indemnitors and Principals for the purpose of inspection, copying or reproduction; and any financial institution, depository, materialman, supply house or other person, firm or corporation is hereby specifically authorized by each Indemnitor and Principal to furnish the Surety, at the Surety's request, any information requested including but not limited to, financial and credit reports relating to the financial condition of the Indemnitors and/or Principals, and as to any bonded or non-bonded contract performed, in progress or awarded, the status of the work, the condition of the performance of such contracts and payments of accounts. The Indemnitors and Principals agree to provide any additional releases, requests, waivers or any other documents required in order to allow the Surety access to the requested information. Failure to provide the information required in this paragraph shall be a breach of this Agreement, and shall entitle Surety to demand, in its sole discretion, cash collateral up to the penal sum of any outstanding Bond(s).

Unofficial Copy Travis County District Clerk

NINTH: **DECLINE EXECUTION** – The Surety, at its sole discretion, may decline to execute, renew or extend any Bond, including final bonds, and may cancel any Bond unless the Bond states otherwise, and the Indemnitors and Principals agree to make no claim to the contrary. If the Surety shall execute a Bid or Proposal Bond, it shall have the right to decline to execute any other Bonds that may be required in connection with any award that may be made under the proposal for which the Bid or Proposal Bond is given, and such declination shall not diminish or alter the liability that may arise by reason of having executed the Bid or Proposal Bond. The Indemnitors and Principals acknowledge that the Surety makes no representation as to the validity or acceptability of any Bond to any person, firm or entity of whatever sort or kind under any contract, and agree that they shall have no claim against the Surety arising out of or in any manner relating to the failure or refusal of any person, firm or entity of whatever sort or kind to award any contract to the Principals, or to accept any Bond executed and delivered by the Surety, or that the Surety has been requested to execute and delivery.

TENTH: **NOTICE OF EXECUTION** - The Indemnitors and Principals hereby waive notice of the execution of any Bond, the acceptance of this Agreement or Other Agreements, and of any change in surety credit or other fact that might materially alter the Indemnitors and Principals' obligations hereunder, and the Indemnitors and Principals hereby waive all notice of any default, or any other act or acts giving rise to any claim under any Bond, as well as notice of any and all liability of the Surety under any Bond, and any and all liability on their part hereunder, to the end and effect that, the Indemnitors and Principals shall be and continue to be liable hereunder, notwithstanding any notice of any kind to which they might have been or be entitled, and notwithstanding any defenses they might otherwise have been entitled to make as a result of lack of notice.

ELEVENTH: **TRUST FUND** – To the extent permitted under applicable law, the Indemnitors and Principals covenant and agree that all of their interest, title and rights in any contract or undertaking referred to in any Bond, or in or growing in any manner out of any Bond, including but not limited to payments for or on account of any contract, shall be held as a trust fund and/or as a constructive or equitable trust in which the Surety has an interest, and shall inure to the benefit of the Surety for any liability or loss it may have or sustain under any Bond including but not limited to the payment of obligations incurred in the performance of any contract and for labor, materials, and services furnished in the prosecution of the work provided in any contract or any authorized extension or modification thereof; and, further, it is expressly understood and declared that all monies due and to become due under any contract covered by any Bond are trust funds, whether in the possession of the Indemnitors or Principals or otherwise, for the benefit of and for payment of all such obligations in connection with any such contract for which the Surety would be liable under any Bond; said trust also inures to the benefit of the Surety for any liability or loss it may have or sustain under any Bond, under this Agreement, or under any Other Agreements, and this Agreement constitutes notice of such trust.

TWELFTH: **HOMESTEAD** – To the extent permitted by applicable law, the Indemnitors and Principals hereby waive, so far as their respective obligations under this Agreement are concerned, all rights to claim any of their property including their respective homesteads, as exempt from levy, execution, sale or other legal process under the laws of any state, territory or possession.

THIRTEENTH: **SETTLEMENTS** - The Surety shall have the right, at its option and sole discretion, to adjust, settle or compromise any claim, demand, suit or judgment upon any Bond, unless any Indemnitor or Principal, providing a reasonable legal basis therefor, shall request the Surety to litigate such claim or demand, or to defend such suit, or to appeal from such judgment, and shall deposit with the Surety, at the time of such request, cash or collateral satisfactory to the Surety in kind and amount to be used in paying any judgment or judgments rendered or that may be rendered, with interest, costs, expenses and attorneys' fees, including those of the Surety.

FOURTEENTH: **SURETIES** - In the event the Surety procures the execution of any Bond by other sureties, or executes any Bond with co-sureties, or reinsures any portion of any Bond with reinsuring sureties, then all the terms and conditions of this Agreement shall inure also to the benefit of such other sureties, co-sureties and reinsuring sureties, their successors and assigns, as their interests may appear.

FIFTEENTH: **SUITS** - Separate suits may be brought hereunder as causes of action accrue, and the bringing of suit or the recovery of judgment upon any cause of action shall not prejudice or bar the bringing of other suits upon other causes of action, whether theretofore or thereafter arising.

SIXTEENTH: **OTHER INDEMNITY** - The addition to this Agreement of any Indemnitor, including any entities acquired after the date of execution of this Agreement, may be effected by written amendment executed by such Indemnitor only, notwithstanding any language herein to the contrary. The Indemnitors and Principals shall continue to remain bound under the terms of the Agreement, Other Agreements, and any other agreements containing indemnity obligations, even though the Surety may from time to time heretofore or hereafter, with or without notice to or knowledge of the Indemnitors and Principals, accept, release, or reduce any indemnity obligations or collateral of current or future Indemnitors and Principals for any reason. The Indemnitors and Principals expressly waive notice from the Surety of any such action and, furthermore, it is explicitly understood and agreed by the Indemnitors and Principals that any and all other rights which the Surety may have or acquire against the Indemnitors and Principals and/or others under any such agreements or additional agreements or collateral shall be in addition to, and not in lieu of, the rights afforded the Surety under this Agreement. No Indemnitor shall make any defense to the enforcement of this Agreement based on the execution of Other Agreements or related to the addition or the release of any Indemnitor, and each Indemnitor explicitly confirms its joint and several liability for Bonds issued by the Surety as provided in this Agreement. Principals and Indemnitors also waive and subordinate all rights of indemnity, subrogation and contribution against each other until all obligations to the Surety under the agreement, at law or in equity, have been satisfied in full.

SEVENTEENTH: **INVALIDITY** – Invalidity of any provision of this Agreement by reason of the laws of any jurisdiction shall not render the other provisions hereof invalid. In case any of the parties set forth in this Agreement fail to execute the same, or in case the execution hereof by any of the parties be defective or invalid for any reason, including lack of authority to bind any party, such failure, defect or invalidity shall not in any manner affect the validity of this Agreement or the liability hereunder of any of the parties executing the same, but each and every party so executing shall be and remain fully bound and liable hereunder to the same extent as if such failure, defect or invalidity had not existed. Each party agrees to execute promptly any documentation necessary to cure any such failure, defect or invalidity. It is understood and agreed by the Indemnitors and Principals that the rights, powers, and remedies given the Surety under this Agreement shall be and are in addition to, and not in lieu of, any and all other rights, powers, and remedies which the Surety may have or acquire against the Indemnitors and Principals or others whether by the terms of any other agreement or by operation of law or otherwise.

EIGHTEENTH: **ATTORNEY-IN-FACT** - The Indemnitors and Principals hereby irrevocably nominate, constitute, appoint and designate the Surety as their attorney-in-fact with the full right and authority, but not the obligation, to exercise all the rights of the Indemnitors and Principals assigned, transferred and set over to the Surety in this Agreement, with full power and authority to execute on behalf of and sign the name of any Indemnitor and/or Principal to any voucher, financing statement, release, satisfaction, check, bill of sale of all or any property by this Agreement assigned to the Surety, or other documents or papers deemed necessary and proper by the Surety in order to give full effect not only to the intent and meaning of the within assignments, but also to the full protection intended to be herein given to the Surety under all other provisions of this Agreement.



**EXHIBIT B**

The Indemnitors and Principals hereby ratify and confirm all acts and actions taken and done by the Surety as such attorney-in-fact and agree to protect and hold harmless the Surety for acts herein granted as attorney-in-fact.

NINETEENTH: **TERMINATION** – Any Indemnitor may terminate its liability under this Agreement upon twenty days' written notice sent by registered and certified mail or courier requiring proof of delivery signature to the Surety, in care of Liberty Mutual Surety, Interchange Corporate Center, 450 Plymouth Road, Suite 400, Plymouth Meeting, PA 19462-1644, but any such notice of termination shall not operate to modify, bar, or discharge Indemnitors or Principals as to any Bonds (a) that may have been executed or authorized prior to the expiration of the notice period; (b) which may be executed after the expiration of the notice period in fulfillment of any commitment given by the Surety prior to the expiration of such notice period; (c) executed in connection with any project as to which any bid bond was executed or authorized prior to the expiration of such notice period; and/or (d) which are renewed, extended, substituted or modified after the expiration of such notice period. Such termination of liability as to any Indemnitor or Principal in no way affects the obligation of any other Indemnitor or Principal who has not given notice as herein provided.

TWENTIETH: **AMENDMENTS** – This Agreement may not be changed or modified orally. No change or modification shall be effective unless made by written amendment executed to form a part hereof.

TWENTY-FIRST: **JURISDICTION** - As to any legal action or proceeding related to this Agreement, the Indemnitors and Principals consent to the general jurisdiction of any local, state or Federal court of the United States or its territories having proper subject matter jurisdiction or in any court of the United States or its territories in which any claim may be brought against the Surety under any Bonds, and waive any claim or defense in any such action or proceeding based on any alleged lack of personal jurisdiction, improper venue, forum non conveniens or any similar basis. Indemnitors and Principals further waive personal service or any and all process.

TWENTY-SECOND: **CURRENCY EXCHANGE** – Should the Surety, when making any payment or incurring any expense directly or indirectly related to Bonds expend funds in currencies other than U.S. Dollars, then Indemnitors shall either reimburse the Surety in U.S. Dollars equal to the amount expended by the Surety at the time the foreign currency was purchased or shall defray the cost of any exchange variation, thereby indemnifying the Surety for any decrease in the valuation of the currency purchased.

TWENTY-THIRD: **CHANGE IN CONTROL** - The Indemnitors agree to provide the Surety with, at least, forty five (45) days prior written notice of a Change in Control (defined below) and to designate the name and address of the Indemnitor with whom the Surety should correspond with respect to this paragraph, which Indemnitor, all Indemnitors agree is designated to act on behalf of them pursuant to this paragraph. Upon receipt of such notice, the Surety shall advise the Indemnitor designated above, in writing, of its election to (i) approve such Change in Control or (ii) demand that the Indemnitors' procure the discharge of the Surety from any Bonds and all liability by reason thereof. If the Indemnitors fail to give the Surety timely notice of a Change in Control or if the Surety does not approve the Change in Control and if such discharge is not procured to the sole satisfaction of the Surety then, immediately, upon the Surety's written demand, the Indemnitors shall deposit a sum of money or collateral, of a type and value satisfactory to the Surety, equal to the aggregate penal sum of the then outstanding Bonds, as determined by the Surety in its sole discretion. The Surety shall send its written demand to the Indemnitor designated above by overnight courier or by registered or certified mail. The Indemnitors hereby acknowledge that if they or any one of them breaches the obligations set forth in this paragraph, the Surety will not have an adequate remedy at law, will suffer irreparable harm and shall be entitled to injunctive relief, enforcing the terms of this paragraph, as well as a final decree, order or judgment granting Surety specific performance of the terms of this Agreement.

"Change in Control' shall mean: (a) the transfer, merger or consolidation (in one transaction or a series of transactions) of all or substantially all of the assets of any non-individual Principal or Indemnitor; (b) the acquisition (in one transaction or a series of transactions) by any person or group, directly or indirectly, of fifty (50%) percent or more of the beneficial ownership or control of any Principal or Indemnitor; or (c) the acquisition by any Principal or Indemnitor, directly or indirectly, of fifty (50%) percent or more of the beneficial ownership or control in any joint venture, subsidiary, division, affiliate, limited partnership, limited liability partnership, limited liability company or other entity through the issuance of ten (10%) percent or more of the voting power of the total outstanding voting stock of any Principal or Indemnitor.

TWENTY-FOURTH: **DOMESTIC PRINCIPAL DOING FOREIGN CONTRACTS/GOVERNING LAW** - The Indemnitors and Principals hereby agree that as to any legal action or proceeding related to any Bond(s) issued in connection with contracts to be performed outside the United States and its territories, this Agreement shall be governed by and construed in accordance with the laws of the State of New York (without giving effect to the conflict of laws principles thereof), except to the extent superseded by Federal law.

TWENTY-FIFTH: **TEXAS DIVIDENDS** – The Principal shall be entitled to participate in a distribution of the surplus of the surety, as determined by its Board of Directors from time to time, after approval in accordance with the provisions of the Texas Insurance Code of 1951, as amended.

DATED as of this 17th day of June, 20 09 .

*By signing below, each individual executing this Agreement on behalf of a business entity, and each business entity executing this Agreement on behalf of another business entity, represents and warrants that he, she or it is* ***duly authorized*** *by Indemnitor to bind Indemnitor to all of the terms and conditions of this Agreement:*

**ATTEST OR WITNESS:**

By: [signature]
~~Secretary~~ Witness

**BY:**

**Neu Fence, LLC**
**T.I.N. 26-2704516**
**320 Southland Rd, Burnet, TX 78611**

By: [signature] (Seal)
Stephen Neusch
President & Sole Manager

Unofficial Copy Office of Dana DeBeauvoir Travis County Clerk

Foundation Fence, Inc.
T.I.N. 55-0849954
320 Southland Rd. Burnet, TX 78611

By: Agnes Neusch
~~Mike Center~~ Agnes Neusch
Secretary

By: William H Neusch (Seal)

William H. Neusch
President

**CORPORATE ACKNOWLEDGMENT**

STATE of Texas
ss.
County of Burnet

On this 17th day of June, 2009, before me personally appeared William H. Neusch and Agnes Neusch, known by me to be the President and Secretary of the corporation described in and which executed the foregoing General Agreement of Indemnity; and who being by me duly sworn, depose and say that that they know the seal of said corporation; that the seal affixed to said Agreement is such corporate seal; that it was so affixed by the order of the Board of Directors of said corporation, and that they signed their names thereto by like order.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my OFFICIAL SEAL the day and year first above written.

VALERIE BARBAREE
MY COMMISSION EXPIRES
September 25, 2009

(NOTARY SEAL)

Valerie Barbaree
(Signature of Notary Public)
Notary Public, residing at Burnet, Texas
My commission expires 9/25/09

**LIMITED LIABILITY COMPANY ACKNOWLEDGMENT**

STATE of Texas
ss.
County of Burnet

On this 17th day of June, 2009, before me personally appeared Stephen Neusch ______, known by me to be the person who is identified in and who executed the foregoing General Agreement of Indemnity, and who being by me duly sworn, deposes and says that (s)he is the Manager of New Fence, LLC, a limited liability company; that (s)he is duly authorized to execute said Agreement; and that (s)he executed said Agreement as the act and deed of said limited liability company.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my OFFICIAL SEAL the day and year first above written.

VALERIE BARBAREE
MY COMMISSION EXPIRES
September 25, 2009

(NOTARY SEAL)

Valerie Barbaree
(Signature of Notary Public)
Notary Public, residing at Burnet, TX
My commission expires 9/25/09

Unofficial copy - Travis Co. District Clerk Velva L. Price



EXHIBIT B

**LIMITED LIABILITY COMPANY RESOLUTIONS**

At a meeting of the Members of **Neu Fence, LLC** (hereinafter called the "Company"), duly called and held on the 17th day of June, 2009, or as otherwise duly authorized, the following Preamble was approved and Resolutions were adopted:

"WHEREAS, the Company has agreed to enter into a certain General Agreement of Indemnity in favor of Liberty Mutual Insurance Company, Employers Insurance Company of Wausau (formerly EMPLOYERS INSURANCE OF WAUSAU A Mutual Company), Peerless Insurance Company and/or any other company that is part of or added to the Liberty Mutual Group, severally not jointly, for which Liberty Mutual Surety underwrites surety business (individually and collectively hereinafter called the "Surety");

WHEREAS, the Company has a financial, material and beneficial interest in transactions in which (i) **Neu Fence, LLC;Foundation Fence, Inc.** ; ii) any of the Indemnitors or Principals' subsidiaries or affiliates, whether present or future, and whether directly or indirectly held; and iii) any other entity or person in response to a request from any Indemnitor or Principal named herein, and, as to all of the foregoing, whether they act alone or in joint venture with others whether or not said others are named herein (individually and collectively hereinafter called "Principal(s)") have applied or will apply to the Surety for surety bonds, undertakings, recognizances, instruments of guarantee or other surety obligation or whatever nature or kind (hereinafter called the "Bond(s)"); and

WHEREAS, the Surety has executed or is willing to consider the execution of the Bonds, as surety, upon being furnished with the written indemnity of the Company.

NOW THEREFORE BE IT:

RESOLVED, that the Managers authorized to execute documents on behalf of the Company are hereby authorized and empowered, at any time prior or subsequent to the Surety's execution of any Bonds, to execute any indemnity agreement(s) that the Surety requires or may require as consideration for the Surety's execution of Bonds, of whatever kind or nature, on behalf of the Principals;

RESOLVED FURTHER, that the said Managers are authorized and empowered, at any time prior to or subsequent to the Surety's execution of any Bonds, to execute any and all amendments to any and all indemnity agreements; and to execute any other or further agreements relating to any such Bonds or undertakings or to any collateral that may have been deposited with the Surety in connection therewith; and to take any and all other actions that may be requested or required by the Surety, in connections with any such Bonds or undertakings; and

RESOLVED FURTHER, that any and all actions heretofore taken by any representative of the Company in order to carry into effect the purposes of the foregoing resolutions, including the execution and delivery of any indemnity agreement(s) are hereby approved, ratified and confirmed."

We, the undersigned, constituting all of the Members of the Company, agree to and execute these Resolutions effective as of the date listed below.

The titles and/or names of those Managers and/or Members authorized to execute documents on behalf of this Company are:

Stephen Neusch, President & Sole Manager

Dated this 17 day of June, 2009.

| MEMBER: | MEMBERSHIP INTEREST |
|---|---|
| By: [signature] Stephen Neusch | 100 |
| By: ____ Member | ____ |
| By: ____ Member | ____ |
| By: ____ Member | ____ |
| By: ____ Member | ____ |

Unofficial Copy - Travis Co. District Clerk Velva L. Price



**EXHIBIT B**

## CORPORATE RESOLUTIONS

As authorized by the corporation by-laws, by duly authorized meeting with quorum present or otherwise, the Board of Directors of **Foundation Fence, Inc.** (hereinafter called the "Corporation"), on the 17th day of June, 2009, approved the following Preamble was approved and adopted the following Resolutions:

"WHEREAS, the Corporation has agreed to enter into a certain General Agreement of Indemnity in favor of Liberty Mutual Insurance Company, Employers Insurance Company of Wausau (formerly EMPLOYERS INSURANCE OF WAUSAU A Mutual Company), Peerless Insurance Company and/or any other company that is part of or added to the Liberty Mutual Group, severally not jointly, for which Liberty Mutual Surety underwrites surety business (any one or more individually and collectively hereinafter called the "Surety");

WHEREAS, the Corporation has a financial, material, and beneficial interest in the transaction in which (i) **Foundation Fence, Inc.; Neu Fence, LLC**; ii) any of the Indemnitors or Principals' subsidiaries or affiliates, whether present or future, and whether directly or indirectly held; and iii) any other entity or person in response to a request from any Indemnitor or Principal named herein, and, as to all of the foregoing, whether they act alone or in joint venture with others whether or not said others are named herein (individually and collectively hereinafter called the "Principal(s)") have applied or will apply to the Surety for any surety bonds, undertakings, recognizances, instruments of guarantee or other surety obligation or whatever nature or kind (hereinafter called "Bond(s)"); and

WHEREAS, the Surety has executed or is willing to consider the execution of the Bonds, as Surety, upon being furnished with the written indemnity of the Corporation.

NOW THEREFORE BE IT:

RESOLVED, that the officers authorized to execute documents on behalf of the Corporation are authorized and empowered, at any time prior or subsequent to the Surety's execution of any Bonds, to execute any indemnity agreement(s) that the Surety requires or may require as consideration for the Surety's execution of Bonds, of whatever kind or nature, on behalf of the Principal

RESOLVED FURTHER, that said officers are authorized and empowered, at any time prior to or subsequent to the Surety's execution of any Bonds, to execute any and all amendments to any and all indemnity agreement(s); and to execute any other or further agreements relating to any such Bonds or to any collateral that may have been deposited with the Surety in connection therewith; and to take any and all other actions that may be requested or required by the Surety, in connection with any such Bonds;

RESOLVED FURTHER, that said officers are authorized and empowered to affix the corporate seal to any and all indemnity agreement(s), to any and all amendments to said indemnity agreement(s), and to any other or further agreement(s); and

RESOLVED FURTHER, that any and all actions heretofore taken by any representative of the Corporation in order to carry into effect the purposes of the foregoing resolutions, including the execution and delivery of any indemnity agreement(s) are hereby approved, ratified and confirmed."

I, Michael D. Center, Secretary of the Corporation, have compared the foregoing Preamble and Resolutions with the original thereof as recorded in the Minute Book of the Corporation; and do certify that the same are correct and true transcripts therefrom, and constitutes the whole of said Preamble and Resolutions.

The officers authorized to execute documents on behalf of this Corporation include:

William H. Neusch
~~Michael D. Center~~ Agnes Neusch

Given under my hand and the seal of the Corporation, in the City of Burnet State of TX, this 17th day of June, 2009.

Agnes Neusch (Seal)

~~Michael D. Center~~, Secretary
Agnes Neusch

Unofficial copy - Travis Co. District Clerk Velva L. Price



**EXHIBIT B**

## AMENDMENT #1 TO THE GENERAL AGREEMENT OF INDEMNITY

This Amendment shall be attached to and form part of the General Agreement of Indemnity made and entered into by Neu Fence, LLC(name changed to Neu Security Service, LLC effective 6/10/2010) in favor of the Surety, dated the 17th day ofJune, 2009 and as may have been amended from time to time, (hereinafter "Agreement"). It is hereby agreed that:

1. All capitalized terms not defined in this Amendment shall have the meaning given them in the Agreement.
2. This Amendment shall take effect and form part of the Agreement immediately upon execution.
3. The following individual(s) and/or business entities shall be added to the Agreement as Indemnitor(s) and Principal(s) and shall be bound by all of its terms for all Bonds issued pursuant to the Agreement, whether such Bonds were issued before or after the execution of this Amendment or before or after the date of the Agreement.

   Gibralter Cable Barrier Systems, LP
   Gibralter Cable Barrier Systems, LLC
   Gibralter Material Distributions, LP
   Gibralter Material Distributions, LLC

4. Pursuant to Paragraph SIXTEENTH of the Agreement, the addition to the Agreement of the Indemnitor(s) named in Paragraph 3 above shall be effected by written amendment executed by such Indemnitor only.

IN WITNESS WHEREOF, we have signed and sealed this 23rd day of June 2012.

By affixing their signatures hereto, each Indemnitor signing on behalf of a business entity warrants that each is duly authorized by Indemnitor to bind Indemnitor hereto.

WITNESS/ATTEST:

By: [signature]
Name: Jim Bryer
Title: CFO

Gibraltar Cable Barrier Systems, LP (seal)
(Full Name of Indemnitor)

4303 Innovation Loop, Marble Falls, TX 78654
(Address of Indemnitor)
Tax ID or Social Security Number 20-5261529

By: [signature]
William H. Neusch

Its
President

WITNESS/ATTEST:

By: [signature]
Name: Jim Bryer
Title: CFO

Gibraltar Cable Barrier Systems, LLC (seal)
(Full Name of Indemnitor)

4303 Innovation Loop, Marble Falls, TX 78654
(Address of Indemnitor)
Tax ID or Social Security Number 20-5265261384

By: [signature]
William H. Neusch

Its
President and Sole Manager

Unofficial copy - Travis Co. District Clerk Velva L. Price



**EXHIBIT C**

WITNESS/ATTEST:

Gibraltar Material Distributions, LP (seal)
(Full Name of Indemnitor)

4303 Innovation Loop, Marble Falls, TX 78654
(Address of Indemnitor)
Tax ID or Social Security Number 20-5261729

By: [signature]
Name: Jim Bryer
Title: CFO

By: [signature]
William H. Neusch

Its
President

WITNESS/ATTEST:

Gibraltar Material Distributions, LLC (seal)
(Full Name of Indemnitor)

4303 Innovation Loop, Marble Falls, TX 78654
(Address of Indemnitor)
Tax ID or Social Security Number 20-5261687

By: [signature]
Name: Jim Bryer
Title: CFO

By: [signature]
William H. Neusch

Its
President and Sole Manager

Unofficial Copy - Travis Co. District Clerk Velva L. Price

## LIMITED LIABILITY COMPANY ACKNOWLEDGMENT

STATE of Texas
ss.
County of Burnet

On this 23rd day of January, 2012, before me personally appeared William H. Neusch, known by me to be the person who is identified in and who executed the foregoing General Agreement of Indemnity, and who being by me duly sworn, deposes and says that (s)he is the Manager of Gibraltar Cable Barrier Systems, LLC, a limited liability company; that (s)he is duly authorized to execute said Agreement; and that (s)he executed said Agreement as the act and deed of said limited liability company.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my OFFICIAL SEAL the day and year first above written.

VALERIE BARBAREE
Notary Public, State of Texas
My Commission Expires
September 25, 2013

(NOTARY SEAL)

[signature]
(Signature of Notary Public)
Notary Public, residing at Burnet, TX
My commission expires 9/25/13

## LIMITED LIABILITY COMPANY ACKNOWLEDGMENT

STATE of Texas
ss.
County of Burnet

On this 23rd day of January, 2012, before me personally appeared William H. Neusch known by me to be the person who is identified in and who executed the foregoing General Agreement of Indemnity, and who being by me duly sworn, deposes and says that (s)he is the Manager of Gibraltar Material Distributions, LLC, a limited liability company; that (s)he is duly authorized to execute said Agreement; and that (s)he executed said Agreement as the act and deed of said limited liability company.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my OFFICIAL SEAL the day and year first above written.

VALERIE BARBAREE
Notary Public, State of Texas
My Commission Expires
September 25, 2013

(NOTARY SEAL)

[signature]
(Signature of Notary Public)
Notary Public, residing at Burnet, TX
My commission expires 9/25/13



**EXHIBIT C**

LIMITED PARTNERSHIP ACKNOWLEDGMENT

STATE of Texas
ss.
County of Burnet

On this 23rd day of January, 2012 before me personally appeared William H. Neusch, known by me to be the person who is identified in and who executed the foregoing General Agreement of Indemnity, and who being by me duly sworn, deposes and says that (s)he is the General Partner of Gibraltar Cable Barrier Systems, LP, a limited partnership, and that (s)he is duly authorized to execute said Agreement, and that (s)he executed said Agreement as the act and deed of the said limited partnership.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my OFFICIAL SEAL the day and year first above written.

VALERIE BARBAREE
Notary Public, State of Texas
My Commission Expires
September 25, 2013

(NOTARY SEAL)

(Signature of Notary Public)

Notary Public, residing at Burnet, TX

My commission expires 9/25/13

Unofficial copy - Travis Co. District Clerk Velva L. Price



EXHIBIT C

Liberty Mutual
SURETY

**Nicole J. Kosits**
Senior Paralegal

Interchange Corporate Center
450 Plymouth Road, Suite 400
Plymouth Meeting, PA 19462
Nicole.Kosits@libertymutual.com
Phone: 610.832.8272
Fax: 610.940.8712

November 22, 2013

Foundation Fence, Inc.
4606 Innovation Loop
Marble Falls, TX 78654
Attn: Bill Neusch

Re: Indemnity Termination

Dear Mr. Neusch:

Liberty Mutual Insurance Company hereby acknowledges receipt of your letter dated August 2, 2013, requesting Foundation Fence, Inc.'s release from obligations under the General Agreement of Indemnity executed by Neu Fence, LLC (a/k/a Neu Security Service, LLC), *et al.*, and dated June 17, 2009 in favor of, *inter alia*, Liberty Mutual Insurance Company (the "Indemnity Agreement").

The Indemnity Agreement contains the following terms:

NINETEENTH: **TERMINATION** – Any Indemnitor may terminate its liability under this Agreement upon twenty days' written notice sent by registered and certified mail or courier requiring proof of delivery signature to the Surety, in care of Liberty Mutual Surety, Interchange Corporate Center, 450 Plymouth Road, Suite 400, Plymouth Meeting, PA 19462-1644, but any such notice of termination shall not operate to modify, bar, or discharge Indemnitors or Principals as to any Bonds (a) that may have been executed or authorized prior to the expiration of the notice period; (b) which may be executed after the expiration of the notice period in fulfillment of any commitment given by the Surety prior to the expiration of such notice period; (c) executed in connection with any project as to which any bid bond was executed or authorized prior to the expiration of such notice period; and/or (d) which are renewed, extended, substituted or modified after the expiration of such notice period. Such termination of liability as to any Indemnitor or Principal in no way affects the obligation of any other Indemnitor or Principal who has not given notice as herein provided.

Liberty Mutual Insurance Company accepts the letter as the required notice. As such, Foundation Fence, Inc.'s obligations for Bonds written after August 22, 2013, shall be limited to only those Bonds set forth in (a) through (d) above. Please note that Foundation Fence, Inc.'s indemnity remains in full force and effect with respect to all other Bonds written prior to August 22, 2013. This release shall have no effect whatsoever on the continuing obligations of remaining Indemnitors and their obligations continue in full force and effect.

Please contact the undersigned with any questions.

Sincerely,

Nicole J. Kosits
Senior Paralegal

**Member of Liberty Mutual Group**

**EXHIBIT D**

Unofficial copy Travis County District Clerk Velva L. Price

Liberty Mutual.
SURETY

**Nicole J. Kosits**
Senior Paralegal

Interchange Corporate Center
450 Plymouth Road, Suite 400
Plymouth Meeting, PA 19462
Nicole.Kosits@libertymutual.com
Phone: 610.832.8272
Fax: 610.940.0112

November 22, 2013

Gibraltar Cable Barrier Systems, LP
4606 Innovation Loop
Marble Falls, TX 78654
Attn: Bill Neusch

Re: Indemnity Termination

Dear Mr. Neusch:

Liberty Mutual Insurance Company hereby acknowledges receipt of your letter dated August 2, 2013, requesting Gibraltar Cable Barrier Systems, LP's release from obligations under the General Agreement of Indemnity executed by Neu Fence, LLC (a/k/a Neu Security Service, LLC), *et al.*, and dated June 17, 2009 in favor of, *inter alia*, Liberty Mutual Insurance Company (the "Indemnity Agreement").

The Indemnity Agreement contains the following terms:

NINETEENTH: **TERMINATION** – Any Indemnitor may terminate its liability under this Agreement upon twenty days' written notice sent by registered and certified mail or courier requiring proof of delivery signature to the Surety, in care of Liberty Mutual Surety, Interchange Corporate Center, 450 Plymouth Road, Suite 400, Plymouth Meeting, PA 19462-1644, but any such notice of termination shall not operate to modify, bar, or discharge Indemnitors or Principals as to any Bonds (a) that may have been executed or authorized prior to the expiration of the notice period; (b) which may be executed after the expiration of the notice period in fulfillment of any commitment given by the Surety prior to the expiration of such notice period; (c) executed in connection with any project as to which any bid bond was executed or authorized prior to the expiration of such notice period; and/or (d) which are renewed, extended, substituted or modified after the expiration of such notice period. Such termination of liability as to any Indemnitor or Principal in no way affects the obligation of any other Indemnitor or Principal who has not given notice as herein provided.

Liberty Mutual Insurance Company accepts the letter as the required notice. As such, Gibraltar Cable Barrier Systems, LP's obligation for Bonds written after August 22, 2013, shall be limited to only those Bonds set forth in (a) through (d) above. Please note that Gibraltar Cable Barrier Systems, LP's indemnity remains in full force and effect with respect to all other bonds written prior to August 22, 2013. This release shall have no effect whatsoever on the continuing obligations of remaining Indemnitors and their obligations continue in full force and effect.

Please contact the undersigned with any questions.

Sincerely,

Nicole J. Kosits

Nicole J. Kosits
Senior Paralegal

**Member of Liberty Mutual Group**

Unofficial copy Travis County District Clerk Velva L. Price

**EXHIBIT D**

Liberty Mutual.
SURETY

**Nicole J. Kosits**
Senior Paralegal

Interchange Corporate Center
450 Plymouth Road, Suite 400
Plymouth Meeting, PA 19462
Nicole.Kosits@libertymutual.com
Phone: 610.832.8272
Fax: 610.940.2112

Unofficial copy Travis County District Clerk Velva L. Price

November 22, 2013

Gibraltar Cable Barrier Systems, LLC
4606 Innovation Loop
Marble Falls, TX 78654
Attn: Bill Neusch

Re: Indemnity Termination

Dear Mr. Neusch:

Liberty Mutual Insurance Company hereby acknowledges receipt of your letter dated August 2, 2013, requesting Gibraltar Cable Barrier Systems, LLC's release from obligations under the General Agreement of Indemnity executed by Neu Fence, LLC (a/k/a Neu Security Service, LLC), *et al.*, and dated June 17, 2009 in favor of, *inter alia*, Liberty Mutual Insurance Company (the "Indemnity Agreement").

The Indemnity Agreement contains the following terms:

NINETEENTH: **TERMINATION** – Any Indemnitor may terminate its liability under this Agreement upon twenty days' written notice sent by registered and certified mail or courier requiring proof of delivery signature to the Surety, in care of Liberty Mutual Surety, Interchange Corporate Center, 450 Plymouth Road, Suite 400, Plymouth Meeting, PA 19462-1644, but any such notice of termination shall not operate to modify, bar, or discharge Indemnitors or Principals as to any Bonds (a) that may have been executed or authorized prior to the expiration of the notice period; (b) which may be executed after the expiration of the notice period in fulfillment of any commitment given by the Surety prior to the expiration of such notice period; (c) executed in connection with any project as to which any bid bond was executed or authorized prior to the expiration of such notice period; and/or (d) which are renewed, extended, substituted or modified after the expiration of such notice period. Such termination of liability as to any Indemnitor or Principal in no way affects the obligation of any other Indemnitor or Principal who has not given notice as herein provided.

Liberty Mutual Insurance Company accepts the letter as the required notice. As such, Gibraltar Cable Barrier Systems, LLC's obligations for Bonds written after August 22, 2013, shall be limited to only those Bonds set forth in (a) through (d) above. Please note that Gibraltar Cable Barrier Systems, LLC's indemnity remains in full force and effect with respect to all other bonds written prior to August 22, 2013. This release shall have no effect whatsoever on the continuing obligations of remaining Indemnitors and their obligations continue in full force and effect.

Please contact the undersigned with any questions.

Sincerely,

Nicole J. Kos

Nicole J. Kosits
Senior Paralegal

**Member of Liberty Mutual Group**

**EXHIBIT D**

Liberty Mutual.
SURETY

**Nicole J. Kosits**
Senior Paralegal

Interchange Corporate Center
450 Plymouth Road, Suite 400
Plymouth Meeting, PA 19462
Nicole.Kosits@libertymutual.com
Phone: 610.832.8272
Fax: 610.940.2112

November 22, 2013

Gibraltar Material Distributions, LP
4606 Innovation Loop
Marble Falls, TX 78654
Attn: Bill Neusch

Re: Indemnity Termination

Dear Mr. Neusch:

Liberty Mutual Insurance Company hereby acknowledges receipt of your letter dated August 2, 2013, requesting Gibraltar Material Distributions, LP's release from obligations under the General Agreement of Indemnity executed by Neu Fence, LLC (a/k/a Neu Security Service, LLC), *et al.*, and dated June 17, 2009 in favor of, *inter alia*, Liberty Mutual Insurance Company (the "Indemnity Agreement").

The Indemnity Agreement contains the following terms:

NINETEENTH: **TERMINATION** – Any Indemnitor may terminate its liability under this Agreement upon twenty days' written notice sent by registered and certified mail or courier requiring proof of delivery signature to the Surety, in care of Liberty Mutual Surety, Interchange Corporate Center, 450 Plymouth Road, Suite 400, Plymouth Meeting, PA 19462-1644, but any such notice of termination shall not operate to modify, bar, or discharge Indemnitors or Principals as to any Bonds (a) that may have been executed or authorized prior to the expiration of the notice period; (b) which may be executed after the expiration of the notice period in fulfillment of any commitment given by the Surety prior to the expiration of such notice period; (c) executed in connection with any project as to which any bid bond was executed or authorized prior to the expiration of such notice period; and/or (d) which are renewed, extended, substituted or modified after the expiration of such notice period. Such termination of liability as to any Indemnitor or Principal in no way affects the obligation of any other Indemnitor or Principal who has not given notice as herein provided.

Liberty Mutual Insurance Company accepts the letter as the required notice. As such, Gibraltar Material Distributions, LP's obligations for Bonds written after August 22, 2013, shall be limited to only those Bonds set forth in (a) through (d) above. Please note that Gibraltar Material Distributions, LP's indemnity remains in full force and effect with respect to all other bonds written prior to August 22, 2013. This release shall have no effect whatsoever on the continuing obligations of remaining Indemnitors and their obligations continue in full force and effect.

Please contact the undersigned with any questions.

Sincerely,

Nicole J. Kosits
Senior Paralegal

**Member of Liberty Mutual Group**

Unofficial copy Travis County District Clerk Velva L. Price

**EXHIBIT D**

Liberty Mutual.
SURETY

**Nicole J. Kosits**
Senior Paralegal

Interchange Corporate Center
450 Plymouth Road, Suite 400
Plymouth Meeting, PA 19462
Nicole.Kosits@libertymutual.com
Phone: 610.832.8270
Fax: 610.940.7112

November 22, 2013

Gibraltar Material Distributions, LLC
4606 Innovation Loop
Marble Falls, TX 78654
Attn: Bill Neusch

Re: Indemnity Termination

Dear Mr. Neusch:

Liberty Mutual Insurance Company hereby acknowledges receipt of your letter dated August 2, 2013, requesting Gibraltar Material Distributions, LLC's release from obligations under the General Agreement of Indemnity executed by Neu Fence, LLC (a/k/a Neu Security Service, LLC), *et al.*, and dated June 17, 2009 in favor of, *inter alia*, Liberty Mutual Insurance Company (the "Indemnity Agreement").

The Indemnity Agreement contains the following terms:

NINETEENTH: **TERMINATION** – Any Indemnitor may terminate its liability under this Agreement upon twenty days' written notice sent by registered and certified mail or courier requiring proof of delivery signature to the Surety, in care of Liberty Mutual Surety, Interchange Corporate Center, 450 Plymouth Road, Suite 400, Plymouth Meeting, PA 19462-1644, but any such notice of termination shall not operate to modify, bar, or discharge Indemnitors or Principals as to any Bonds (a) that may have been executed or authorized prior to the expiration of the notice period; (b) which may be executed after the expiration of the notice period in fulfillment of any commitment given by the Surety prior to the expiration of such notice period; (c) executed in connection with any project as to which any bid bond was executed or authorized prior to the expiration of such notice period; and/or (d) which are renewed, extended, substituted or modified after the expiration of such notice period. Such termination of liability as to any Indemnitor or Principal in no way affects the obligation of any other Indemnitor or Principal who has not given notice as herein provided.

Liberty Mutual Insurance Company accepts the letter as the required notice. As such, Gibraltar Material Distributions, LLC's obligations for Bonds written after August 22, 2013, shall be limited to only those Bonds set forth in (a) through (d) above. Please note that Gibraltar Material Distributions, LLC's indemnity remains in full force and effect with respect to all other bonds written prior to August 22, 2013. This release shall have no effect whatsoever on the continuing obligations of remaining Indemnitors and their obligations continue in full force and effect.

Please contact the undersigned with any questions.

Sincerely,

Nicole J. Kosits

Nicole J. Kosits
Senior Paralegal

**Member of Liberty Mutual Group**

Unofficial copy Travis County District Clerk Velva L. Price

**EXHIBIT D**

Liberty Mutual.
SURETY

**Nicole J. Kosits**
Senior Paralegal

Interchange Corporate Center
450 Plymouth Road, Suite 400
Plymouth Meeting, PA 19462
Nicole.Kosits@libertymutual.com
Phone: 610.832.8272
Fax: 610.940.9112

November 22, 2013

Neu Fence, LLC
(a/k/a Neu Security Service, LLC)
400 W. 15th Street #712
Austin, TX 78701
Attn: Stephen Neusch

Re: Indemnity Termination

Dear Mr. Neusch:

By letter dated August 2, 2013, Foundation Fence, Inc., Gibraltar Cable Barrier Systems, LP, Gibraltar Cable Barrier Systems, LLC, Gibraltar Material Distributions, LP, and Gibraltar Material Distributions, LLC requested that Liberty Mutual Insurance Company ("Liberty") terminate their indemnity obligations pursuant to Paragraph NINETEENTH of the General Agreement of Indemnity executed by Neu Fence, LLC (a/ka/a Neu Security Service, LLC), *et al.*, in favor of Liberty on June 17, 2009 (hereinafter "The Agreement"). Under Paragraph NINETEENTH of the Agreement, any Indemnitor may terminate its liability upon twenty days' written notice.

Please be advised that Liberty agrees to terminate the indemnity of Foundation Fence, Inc., Gibraltar Cable Barrier Systems, LP, Gibraltar Cable Barrier Systems, LLC, Gibraltar Material Distributions, LP, and Gibraltar Material Distributions, LLC effective August 22, 2013. As a result, Foundation Fence, Inc., Gibraltar Cable Barrier Systems, LP, Gibraltar Cable Barrier Systems, LLC, Gibraltar Material Distributions, LP, and Gibraltar Material Distributions, LLC will have no indemnity obligations with respect to Bonds executed subsequent to the termination effective date. However, Foundation Fence, Inc., Gibraltar Cable Barrier Systems, LP, Gibraltar Cable Barrier Systems, LLC, Gibraltar Material Distributions, LP, and Gibraltar Material Distributions, LLC shall continue to be liable for all other Bonds that may have been executed or authorized prior to the termination effective date, including any renewals or extensions thereof.

In addition, please be aware that the above-referenced termination shall have no effect on the obligations of any Indemnitor who has not provided notice under Paragraph NINETEENTH and their indemnity obligations shall continue in full force and effect per all the terms and conditions of the Agreement.

Please contact the undersigned with any questions.

Sincerely,

Nicole J. Kosits
Senior Paralegal

Unofficial Copy Travis Co. District Clerk Velva L. Price

GIBRALTAR

Gibraltar Products manufactured by BLACK SECURITY Products

| INVOICE #: 07112 | |
|---|---|
| PROPOSAL DATE: | 5/13/2014 |
| PROJECT NAME/DESCRIPTION: | STRATCOM |
| CUSTOMER: | NSS |
| F.O.B.: | Bonded Warehouse |

# INVOICE

| ITEM | DESCRIPTION | QTY | | UNIT PRICE | LINE TOTAL |
|---|---|---|---|---|---|
| | MATERIAL | | | | |
| 1 | K-12 Terminal Post | 14 | ea | $ 4,431.25 | $ 62,037.50 |
| 2 | K-12 Corner Post | 17 | ea | $ 5,952.00 | $ 101,184.00 |
| 3 | K-12 / P-1 Crash Line Post | 150 | ea | $ 1,713.75 | $ 257,062.50 |
| 4 | K-12 Spacer Plate | 150 | ea | $ 36.23 | $ 5,433.75 |
| 5 | K-12 / P-1 Intermediate Post w/ Spacer Plate | 150 | ea | $ 67.56 | $ 10,134.38 |
| 6 | K-12 Cable (Stranded) [ 1-1/8" x 3 ] | 4,210 | ft | $ 33.64 | $ 141,613.88 |
| 7 | K-4 Terminal Post | 1 | ea | $ 956.76 | $ 956.76 |
| 8 | K-4 Corner Post | | ea | $ - | $ - |
| 9 | K-4 / P-1 Crash Line Post | 17 | ea | $ 285.33 | $ 4,850.53 |
| 10 | K-4 Spacer Plate (bolt on) | - | ea | $ - | $ - |
| 11 | K-4 / P-1 Intermediate Post w/ Spacer Plate | 20 | ea | $ 52.84 | $ 1,056.75 |
| 12 | K-4 Cable (Stranded) [ 3/4" x 3 ] | 525 | ft | $ 3.83 | $ 2,008.13 |
| 13 | Shallow Foundation K12 Static Bollards | 7 | ea | $ 2,625.00 | $ 18,375.00 |
| 14 | Standard Foundation K12 Static Bollards | 64 | ea | $ 1,062.50 | $ 68,000.00 |
| 15 | SS Sleeves for bollards for K12 Bollards | 71 | ea | $ 625.00 | $ 44,375.00 |
| | | | | TOTAL AMOUNT DUE | $ 717,088.16 |

1. Payment Terms are Net 30; No Retention.
2. Please remit payment to Black Security Products
3. Cost for shipping will be invoiced when shipped.
4. Please mail payment to: 8206 Cross Park Drive, Austin, TX 78754
5. Due to the current market, fuel surcharges may apply.
6. This invoice does not include sales or use tax. For sales outside Texas, our customers are responsible for self-assessment and remittance of the appropriate sales and/or use taxes for their state.

**ACCEPTED BY:**
The prices, specifications, and conditions as presented are satisfactory and are hereby accepted.
Buyer: ____________
Signature: ____________
Date: ____________

Best Regards,

K. Rae — Died 2/2012

Kevin Rae
Sales Manager

Unofficial copy Travis Co. District Clerk Velva L. Price

**EXHIBIT E**

# MEMORANDUM OF UNDERSTANDING & AGREEMENT

This Memorandum of Understanding and Agreement ("Agreement") is made and entered into this by and among Neu Security Services, LLC (hereinafter referred to as "Principal"), and The Gibraltar Family of Companies (hereinafter collectively referred to as "Indemnitors").

## RECITALS

WHEREAS, on various prior dates Principal and Indemnitors executed one or more Agreements of Indemnity with Liberty Mutual Insurance Company and its affiliated companies;

WHEREAS, Principal has entered into various construction contracts (collectively, the "Bonded Contracts") with various entities (collectively, the "Obligees") for the construction of various projects generally known as: Ft Sam Houston, Utah Data Center, VA Bay Pines, Fort Sam Houston ACP, Kings Bay Security Enclave, Stratcom Offutt AFB, Denver VA Hospital, Miami FBI Building, Ft Carson (collectively, the "Bonded Projects");

WHEREAS, as required of Principal by statute and/or by the Bonded Contracts, and induced by and in reliance upon the execution of the Agreement of Indemnity by Principal and Indemnitors, Liberty Mutual Insurance Company as surety executed with and/or on behalf of Principal certain Performance Bonds, Labor and Material Payment Bonds and other bonds, surety agreements, instruments of guarantee and undertakings (collectively, the "Bonds");

WHEREAS, the Bonded Contracts are in various stages of completion, and Principal acknowledges and admits that: (a) the Principal is financially unable to perform or complete the performance of the Bonded Contracts; (b) certain subcontractors and suppliers of labor and/or materials with respect to the Bonded Contracts and the Bonded Projects have not been paid; (c) Principal has requested the financial assistance from Indemnitors as a result of (a) and (b) above; and (d) but for the willingness of Indemnitors to enter into this Agreement, Principal is unable to complete the performance of the Bonded Contracts and pay its subcontractors and suppliers of labor and/or materials with respect to the Bonded Contracts and the Bonded Projects;

WHEREAS, Principal acknowledges that this Agreement is a financial accommodation extended by Indemnitors to Principal and that Principal will benefit directly from same;

WHEREAS, in consideration for the execution of this Agreement, Principal shall perform its obligations and duties under the terms and conditions of this Agreement and will collaborate with Indemnitors and its agents to achieve the spirit and intent of this Agreement;

WHEREAS, in order to specifically perform the obligations and duties owed to the Obligees on the various bonds and the Bonded Contracts and to induce Indemnitors to provide the financial accommodations described in this Agreement, Principal is willing to execute this Agreement.

Unofficial Copy Travis County District Clerk Velva L. Price

## AGREEMENT

NOW, THEREFORE, for and in consideration of these premises as well as other good and valuable considerations, the receipt and sufficiency of which is hereby acknowledged, it is hereby mutually understood and agreed by Principal and Indemnitors (collectively, the "Parties") as follows:



EXHIBIT F

## I. Establishment of the Zero Balance Account

1. Principal shall open or and establish a bank account (the "Zero Balance Account with ______________________ (the "Bank") in its name. Or alternatively, will dedicate an existing one for the exclusive purposes of this Agreement.

2. For purposes of this Agreement, "Bonded Contract Funds" shall mean any and all monies paid to, to be paid to and/or received by Principal pursuant to, arising out of, relating to or in connection with the Bonded Contracts, including but not limited to monies earned and paid, monies earned and unpaid and/or monies to be earned, progress payments, payments of retained percentages and final payments due or to become due to Principal of every kind or nature under the Bonded Contracts, including payments for all extra work and/or change orders, claims for increased or additional compensation, requests for equitable adjustments, bonuses, waivers or reductions in assessed liquidated damages and/or damages of any other kind or nature which may be received by Principal from the Bonded Contracts.

3. Principal shall furnish to Indemnitors copies of all of the payment applications, payment requisitions and/or payment billings submitted to the Obligees on the Bonded Contracts for the payment of the Bonded Contract Funds at or about the same time Principal submits such requests for payment.

4. Principal, agrees to deposit or cause to be deposited in the Zero Balance Account all Bonded Contract Funds collected by Principal and keep on deposit all monies which Indemnitors may, in its sole discretion and/or in accordance with the terms and conditions of this Agreement agree to advance or loan to Principal. The Bonded Contract Funds shall not be deposited in any other account of the Principal or any other person or entity without the consent of Indemnitors. In addition, Principal agrees to provide the various bond obligees instructions to direct deposit all Bonded Contract Funds into the Zero Balance Account. Principal further agrees not to re-direct or revoke instructions given to the various bond Obligees or otherwise change direct deposit information for the Bonded Contract Funds without the in-advance consent of Indemnitors. Principal acknowledges and agree that Bonded Contract Funds may however be transferred into the Control Account, described below, owned and controlled by Indemnitors.

5. The Bonded Contract Funds and any other funds or monies deposited in the Zero Balance Account are hereby irrevocably segregated, earmarked and set aside solely and only for the purposes set forth in this Agreement and shall be applied in accordance with the terms and provisions of this Agreement. Principal hereby covenants and agrees that it will not knowingly permit any funds in the Zero Balance Account, whether represented by checks, cashier's checks, withdrawals, vouchers, orders, money orders or otherwise, to be used for any purpose other than as more particularly set forth in this Agreement.

6. Principal hereby authorizes and grants Indemnitors and its designated agents full, complete and unfettered access to the Zero Balance Account, including on-line/internet access banking. Principal agrees not to change the user identification information, login, or the passwords without first alerting Indemnitors of the need for doing same. Principal agrees to provide any newor revised user identification, login and password information to Indemnitors immediately after any such change. Principal expressly authorizes in-advance the right and authority of Indemnitors to transfer monies from and into the Zero Balance Account without any notice of any kind to Principal. Principal will confirm such Indemnitors' authorizations with respect to the Zero Balance Account with the Bank and any public authorities upon inquiry. Principal agrees that it will not close the Zero



Unofficial Copy Travis Co. District Clerk Velva L. Price

**EXHIBIT F**

Balance Account nor permit it to be closed without the in-advance consent of Indemnitors.

7. None of the Bonded Contract Funds or any other funds or monies deposited in the Zero Balance Account shall be subject to any right of set-off by the Bank as a result of any transactions involving the Bank, and Principal, nor be assigned or diverted from the uses or purposes set forth in this Agreement. Principal agrees to remain as the sole account holder and agrees to enter into no agreement with the Bank that involves the extension of credit or the lending of monies to Principal. Principal agrees not to pledge the Zero Balance Account as collateral or security to any person or entity. Principal further agrees not to associate or tie any debit card or credit card with the account or issue counter-checks on the account without the consent of Indemnitors. Principal also agrees not to initiate or authorize any ACH debits or transfers from the Zero Balance Account, request any wire transfers from the Zero Balance Account or initiate any account-to-account internal bank transfers from the Zero Balance Account without the in-advance consent of Indemnitors. All management and use of the Zero Balance account is exclusively assigned to Indemnitors. All activity by Principal with respect to the Zero Balance Account is here agreed to be restricted to informational retrieval only unless consented to in advance by Indemnitors.

**II. Establishment of the Control Account**

1. Indemnitors shall open and establish a bank account (the "Control Account") with the same bank the Zero Balance Account is established with. Such account will be in a name of Indemnitors choosing and shall be for its exclusive use and benefit.

2. The Control Account will be utilized by Indemnitors to move/transfer The Bonded Contract Funds deposited into the Zero Balance Account out of the Zero Balance Account for safekeeping. The Control Account may also be utilized to move /transfer funds into the Zero Balance Account as needed for the purposes of this Agreement.

3. Principal will have no access to the Control Account.

**III. Use of the Bonded Contract Funds and other funds from the Zero Balance Account**

1. The Bonded Contract Funds and any other funds or monies contained in the Zero Balance Account shall be used solely for the payment of labor and material costs, including amounts due to subcontractors and suppliers and for rental of equipment from others which is actually used in the prosecution of the work under the Bonded Contracts, incurred by Principal, and Principal's subcontractors and suppliers, which are necessary to complete the performance of the work under the Bonded Contracts. It is specifically understood and agreed by Principal that the Bonded Contract Funds and any other funds or monies contained in the Zero Balance Account shall not be used to pay the obligations of Principal on contracts not identified above as Bonded Contracts nor for Principal's overhead, tax obligations, general operating or administrative expenses.

2. Except as otherwise agreed to in writing between the Parties, Indemnitors are not obligated to pay or cause to be paid any of Principal's overhead and general operating and administrative expenses or taxes. Indemnitors, at its sole option and discretion, may consent to the use of funds from the Zero Balance Account to pay a portion of Principal's overhead and general operating and administrative expenses. Principal acknowledges, agrees and consents that Indemnitors reserve the right to reject the payment of any bill(s) requested by Principal to be paid.

3. On a regular or as needed basis, Principal shall provide Indemnitors with a budget/forecast of Principal's anticipated revenues from the Bonded Contracts and its estimated payables projection by bonded project for expenses for labor, materials, subcontractor payments and



**EXHIBIT F**

Unofficial Copy Travis Co. District Clerk Velva L. Price

any other payments needed or desired that Principal anticipates will be requested from the Zero Balance Account.

4. Absent other mutually agreeable arrangements which must be reduced to a written document between and among the Parties, the procedure for the payment of Principal's bills on the Bonded Contracts, including its direct payroll, shall be as follows:

a. On a weekly basis or as otherwise agreed, Principal shall provide to Indemnitors the following information:

(I) A summary sheet listing all of the invoices to be paid, broken down by Bonded Contract, showing the person to be paid, the amount to be paid, the date of the check, the check number and the total payments to all payees. Principal shall designate on the summary sheet those invoices it believes should receive priority for payment in the event that the Bonded Contract Funds in the Zero Balance Account are insufficient to pay all of the invoices submitted for payment. The Principal shall sign off its approval of the summary sheet and the payments described therein;

(ii) A copy of each invoice to be paid, showing the Bonded Contract for which the invoice was incurred, along with a copy of all necessary supporting documentation for the invoice;

(iii) A check drawn to the appropriate payee, said check clearly indicating the specific invoices being paid and the Bonded Contracts for which the invoices are being paid, and signed in accordance with the provisions of the Zero Balance Account Agreement;

(iv) If requested, a partial waiver and release in a form acceptable to the Indemnitors in the amount of the check, which must be signed by the payee and returned; and

(v) A stamped envelope addressed to the payee of the check drawn to pay the invoice.

b. Principal will represent and warrant that all invoices shown on the summary sheet and all checks drawn to the appropriate payees presented to Indemnitors are for the purposes authorized by this Agreement, and that the amount of any such invoice and/or check is currently due and owing to the payee named therein.

c. Indemnitors or its agent shall review all of the invoices and back-up information provided above and provide his or her approval on the summary sheet for all of the invoices that the agreed are to be paid. Indemnitors shall not be obligated to pay or approve the payment of invoices according to the priorities designated by Principal on the summary sheet.

d. In the event that there are sufficient Bonded Contract Funds in the Zero Balance Account to cover those payments which have been approved, Indemnitors shall take all actions necessary to mail the checks, and the partial waiver and release forms if required, to the named payees in the above described stamped and addressed envelopes. Any check(s) not approved for payment shall be voided.

e. In the event that the Bonded Contract Funds in the Zero Balance Account are insufficient to cover those payments which have been requested by Principal and approved, Indemnitors may, in its sole option and discretion, advance or loan monies to Principal or otherwise provide or deposit monies in the Zero Balance Account. Any such advances to, loans to or funding into the Zero Balance Account shall be at Principal's written request and signed by a representative of Principal. All of the monies advanced to, loaned to or otherwise used to fund the Principal or the Zero Balance Account shall constitute and be deemed trust funds in accordance with the terms of this Agreement.

Unofficial Copy Travis D. District Clerk Velva L. Price



EXHIBIT F

**IV. Additional Consideration for Agreement**

In material inducement for and in consideration for the execution of this Agreement, Principal for itself and for its successors, assigns and personal representatives, does hereby release and discharge Indemnitors and its representatives, officers, directors, agents, servants, employees, attorneys, consultants and successors and assigns of and from any and all actions, causes of actions, suits, demands, damages and/or claims of every kind or nature, whether at law, under statute or in equity, whether in contract or in tort, presently known or unknown, which Principal ever had, now has or which hereinafter can or may have against Indemnitors upon or by reason of any matter, action, inaction, omission, cause or thing whatsoever from the inception of Principal to the date of this Agreement. Further, Principal covenants not to sue Indemnitors for any action, inaction or omission related to or stemming from this Agreement. Principal also agrees not to seek contribution from nor designate or name Indemnitors as a responsible third party in any action or proceeding in which Principal is a party or may be a party in the future.

**V. Termination**

Indemnitors shall have the right, at any time in its sole option and discretion, to terminate this Agreement, whether or not the Principal is in default under the terms of any of the Bonded Contracts, the Bonds, or this Agreement. Principal will not have the right to terminate this agreement without the consent of Indemnitors.

**VI. Miscellaneous Provisions**

1. This Agreement shall be construed and governed by the laws of the State of Texas and shall inure to the benefit of and shall bind the respective heirs, personal representatives, assignees and successors in interests of the Parties hereto.

2. Principal hereby acknowledges and agrees that Indemnitors have no obligation to fund the Zero Balance Account, or duty to provide financial assistance to Principal in any manner. The Principal specifically acknowledges and agrees that its execution of this agreement has not been induced by or made in reliance upon any oral or written representations by Indemnitors or its agents, employees, attorneys or consultants that Indemnitors will fund the Zero Balance Account or provide any financial assistance to Principal. In the event that Indemnitors agree to fund the Zero Balance Account, provide financial assistance to Principal in any manner or method, said action shall be in the sole judgment, option and discretion of Indemnitors and in the best interests of the Indemnitors only and not the Principal or any other person or entity.

3. Principal shall maintain accurate books, records and accounts showing clearly, among other things, the itemized receipts and disbursements allocable to the Bonded Contracts. The books, records and accounts shall be available for examination by Indemnitors and its representatives at the Principal's principal office at all times during regular business hours. Indemnitors are entitled to receive copies of all bank account records of any and all of the Principal's accounts, including but not limited to the Zero Balance Account.

4. Principal hereby authorizes Indemnitors and its representative(s), including its attorneys, accountants, consultants or employees, to visit at anytime the job sites of the Bonded Contracts, to obtain at anytime access to all job records and Principal's personnel to determine the status of the progress and performance of the work on the Bonded Contracts as well as the Bonded Projects, and to obtain at anytime any and all other information and documentation with respect to the Bonded Contracts deemed necessary in the sole discretion of Indemnitors and/or its representative(s).



Unofficial copy Travis Co. District Clerk Velva L. Price

**EXHIBIT F**

5. The Principal agrees to use its best efforts to complete the Bonded Contracts on a timely basis.

6. It is further agreed that this Agreement is solely for the benefit of the Parties hereto, except as otherwise provided herein and shall not create any rights in any person not a party hereto, or in any way increase the rights of third persons, or increase the obligations of the Parties hereto to any third person.

7. Principal shall provide notice to Indemnitors of any significant developments or events impacting the Principal in the performance of the work and the payment of the bills on the Bonded Contracts and the Bonded Projects, including any significant developments or events that may affect the obligations of the Indemnitors under the Bonds. Principal shall provide Indemnitors with notice of all litigation against the Principal and/or its surety. Principal shall provide its full and complete cooperation to Indemnitors in the event of any present and/or future litigation involving the Bonded Contracts and the Bonds. Principal shall not commence any dispute resolution proceedings, litigation or arbitration proceedings with any person or entity related to or in connection with the Bonded Contracts or Bonded projects without the in-advance consent of Indemnitors.

8. It is agreed and understood by the Parties that there have been no oral or other agreements of any kind whatsoever as a condition precedent or to induce the execution and delivery of this Agreement by any party hereto. It is further agreed that no change, addition or amendment shall be made herein or to any of the terms, covenants or conditions hereto except by writing, signed by the Parties to this Agreement. No waiver of any of Indemnitors's rights, powers and/or remedies shall be effective unless such waiver is in writing and signed by Indemnitors.

9. It is further understood and agreed by the Parties that this Agreement shall be construed without any regard to any presumption or other rule requiring construction against the party causing this Agreement to be drafted.

10. This Agreement may be executed by the Parties independently in one or more counterparts, all of which together shall constitute and be deemed to be one valid and effective Agreement.

11. The Recitals to this Agreement are incorporated into this Agreement and form a part of the terms and conditions of this Agreement.

12. The Parties represent and warrant to each other that they, along with their selected, independent counsel, have fully participated in the negotiating and drafting of this Agreement, that they have read and reviewed this Agreement and discussed the terms and conditions with their selected, independent counsel, and that as a result of their review and consultation with counsel, they understand the meaning, terms, conditions and ramifications of this Agreement and that they are entering into this Agreement freely and voluntarily without any duress, compulsion, economic or otherwise.

Unofficial copy - Travis Co. District Clerk Velva L. Price

[Remainder of page intentionally left blank.]



EXHIBIT F

IN WITNESS WHEREOF, the parties have executed this Agreement on the date below indicated and each of the undersigned personally represent and warrant that they have the full right, power and authority to execute this Agreement on behalf of the respective Parties and have executed this Agreement to be effective as of the last date the same is executed.

**NEU SECURITY SERVICES, LLC**

By: ______________________

Its: Stephen Walsh, President

Date: 2/24/2015

**THE GIBRALTAR FAMILY OF COMPANIES**

By: ______________________

Its: Presidents

Date: 2-24-15

Unofficial copy - Travis Co. District Clerk Velva L. Price



EXHIBIT F

# GIBRALTAR FAMILY OF COMPANIES
## NSS - Short Term Loan Recap
## February 24, 2016

| Date | Description | Company | Bonded Amount | Un-Bonded Amount | Applied Payments | Balance Due | Running Balance |
|---|---|---|---|---|---|---|---|
| 4/1/15 | Neu Security Services - Payroll | Foundation Fence | 84,303.25 | 11,625.10 | (84,303.25) | 11,625.10 | 11,625.10 |
| 4/8/15 | Neu Security Services - Payroll | Foundation Fence | 78,817.10 | 10,275.38 | (78,817.10) | 10,275.38 | 21,900.48 |
| 4/16/15 | Neu Security Services - Payroll | Foundation Fence | 73,214.30 | 14,914.37 | (73,214.30) | 14,914.37 | 36,814.85 |
| 4/23/15 | Neu Security Services - Payroll | Foundation Fence | 73,144.42 | 12,611.39 | (73,144.42) | 12,611.39 | 49,426.24 |
| 5/8/15 | Neu Security Services - Non Bonded Payroll | Foundation Fence | | 4,495.77 | | 4,495.77 | 53,922.01 |
| 5/21/15 | Neu Security Services - Payroll | Foundation Fence | | 3,907.93 | | 3,907.93 | 57,829.94 |
| 6/18/15 | Neu Security Services - Payroll | Foundation Fence | 62,919.14 | 909.37 | (62,919.14) | 909.37 | 58,739.31 |
| 9/1/15 | Neu Security Services - Non Bonded Payroll | Foundation Fence | | 31,303.00 | | 31,303.00 | 90,042.31 |
| 10/8/15 | Neu Security Services - Payroll | Foundation Fence | 32,025.24 | | (26,507.61) | 5,517.63 | 95,559.94 |
| 12/2/15 | Neu Security Services - Payroll | Foundation Fence | 18,520.49 | | (4,225.43) | 14,295.06 | 109,855.00 |
| 12/9/15 | Neu Security Services - Payroll | Foundation Fence | 33,625.95 | | | 33,625.95 | 143,480.95 |
| 9/1/15 | Neu Security Services - Debit Cards | Foundation Fence | 58,092.55 | | (31,106.61) | 26,985.94 | 170,466.89 |
| 10/1/15 | Neu Security Services - Debit Cards | Foundation Fence | 53,826.82 | | | 53,826.82 | 224,293.71 |
| 11/1/15 | Neu Security Services - Debit Cards | Foundation Fence | 30,708.20 | | | 30,708.20 | 255,001.91 |
| 12/1/15 | Neu Security Services - Debit Cards | Foundation Fence | 4,569.75 | | | 4,569.75 | 259,571.66 |
| 10/15/15 | Neu Security Services - CNA Insurance | Foundation Fence | 33,279.64 | | | 33,279.64 | 292,851.30 |
| 2/19/15 | Neu Security Services - Kings Bay | Foundation Fence | 12,232.05 | | | 12,232.05 | 305,083.35 |
| 2/26/15 | Neu Security Services - Kings Bay | Gibraltar Material Distribution | 38,000.00 | | | 38,000.00 | 343,083.35 |
| 2/27/15 | Neu Security Services - Kings Bay | Foundation Fence | 220,504.45 | | | 220,504.45 | 563,587.80 |
| 2/27/15 | Neu Security Services - Miami FBI Building | Foundation Fence | 29,847.36 | | | 29,847.36 | 593,435.16 |
| 3/2/15 | Neu Security Services - Kings Bay | Foundation Fence | 11,807.37 | | | 11,807.37 | 605,242.53 |
| 3/5/15 | Neu Security Services - Kings Bay | Foundation Fence | 3,821.97 | | | 3,821.97 | 609,064.50 |
| 3/5/15 | Neu Security Services - Kings Bay | Foundation Fence | 10,918.12 | | | 10,918.12 | 619,982.62 |
| 3/9/15 | Neu Security Services - Kings Bay | Foundation Fence | 13,572.00 | | | 13,572.00 | 633,554.62 |
| 3/12/15 | Neu Security Services - Ft Carson | Foundation Fence | 195,249.92 | | (25,624.46) | 169,625.46 | 803,180.08 |
| 3/13/15 | Neu Security Services - Ft Carson | Foundation Fence | 254,577.35 | | | 254,577.35 | 1,057,757.43 |
| 3/15/15 | Neu Security Services - Kings Bay | Foundation Fence | 4,509.78 | | | 4,509.78 | 1,062,267.21 |
| 3/18/15 | Neu Security Services - Miami FBI Building | Foundation Fence | 17,337.81 | | | 17,337.81 | 1,079,605.02 |
| 3/23/15 | Neu Security Services - Ft Carson | Foundation Fence | 15,000.00 | | | 15,000.00 | 1,094,605.02 |
| 3/26/15 | Neu Security Services - Ft Carson | Foundation Fence | 27,156.00 | | | 27,156.00 | 1,121,761.02 |
| 3/27/15 | El-Go Team - Denver VA Hospital | Foundation Fence | 301,420.00 | | (284,939.21) | 16,480.79 | 1,138,241.81 |
| 3/30/15 | Neu Security Services - Ft Carson | Foundation Fence | 116,208.98 | | | 116,208.98 | 1,254,450.79 |
| 3/31/15 | Neu Security Services - Kings Bay | Foundation Fence | 11,836.20 | | | 11,836.20 | 1,266,286.99 |
| 4/7/15 | Neu Security Services - Ft Carson | Foundation Fence | 44,011.03 | | | 44,011.03 | 1,310,298.02 |
| 4/7/15 | Shook Hardy & Bacon - Kings Bay | Foundation Fence | 140,000.00 | | | 140,000.00 | 1,450,298.02 |
| 4/8/15 | Neu Security Services - Ft Sam ACP | Foundation Fence | 12,086.63 | | | 12,086.63 | 1,462,384.65 |
| 4/8/15 | Neu Security Services - Miami FBI Building | Foundation Fence | 29,180.44 | | | 29,180.44 | 1,491,565.09 |
| 4/8/15 | Neu Security Services - Kings Bay | Foundation Fence | 7,341.18 | | | 7,341.18 | 1,498,906.27 |
| 4/16/15 | Neu Security Services - St Elizabeth | Foundation Fence | 58,272.18 | | | 58,272.18 | 1,557,178.45 |
| 4/30/15 | Neu Security Services - Ft Sam Houston | Foundation Fence | 467.58 | | | 467.58 | 1,557,646.03 |
| 5/1/15 | Neu Security Services - Ft Carson | Foundation Fence | 463,624.87 | | | 463,624.87 | 2,021,270.90 |

G:\Accounting\NSS\Short Term Loans\NSS Short Term Loans Running Balance\ST Loans

Unofficial copy Travis Co. District Clerk Velva L. Price

**EXHIBIT F**

**GIBRALTAR FAMILY OF COMPANIES**
**NSS - Short Term Loan Recap**
**February 24, 2016**

| Date | Description | Company | Bonded Amount | Un-Bonded Amount | Applied Payments | Balance Due | Running Balance |
|---|---|---|---|---|---|---|---|
| 5/4/15 | Neu Security Services - Kings Bay | Foundation Fence | 7,224.97 | | | 7,224.97 | 2,028,495.87 |
| 5/4/15 | Neu Security Services - Ft Sam Houston | Foundation Fence | 226.48 | | | 226.48 | 2,028,722.35 |
| 5/12/15 | Neu Security Services - Miami FBI Building | Foundation Fence | 68,122.55 | | | 68,122.55 | 2,096,844.90 |
| 5/14/15 | Neu Security Services - Kings Bay (Argos CC) | Foundation Fence | 2,487.50 | | | 2,487.50 | 2,099,332.40 |
| 5/19/15 | Neu Security Services - Ft Carson | Foundation Fence | 76,121.00 | | | 76,121.00 | 2,175,453.40 |
| 5/21/15 | Neu Security Services - Ft Carson | Foundation Fence | 43,119.63 | | | 43,119.63 | 2,218,573.03 |
| 5/26/15 | Neu Security Services - Ft Carson | Foundation Fence | 622,006.70 | | | 622,006.70 | 2,840,579.73 |
| 5/27/15 | Neu Security Services - Exxon (Hilti CC) | Foundation Fence | | 905.29 | | 905.29 | 2,841,485.02 |
| 5/28/15 | Neu Security Services - Kings Bay (Argos CC) | Foundation Fence | 588.77 | | | 588.77 | 2,842,073.79 |
| 5/28/15 | Neu Security Services - Kings Bay | Foundation Fence | 5,272.70 | | | 5,272.70 | 2,847,346.49 |
| 5/28/15 | Neu Security Services - Ft Carson | Foundation Fence | 18,075.75 | | | 18,075.75 | 2,865,422.24 |
| 6/1/15 | Neu Security Services - St Elizabeth | Foundation Fence | 420,000.00 | | | 420,000.00 | 3,285,422.24 |
| 6/4/15 | Neu Security Services - Ft Carson | Foundation Fence | 10,560.00 | | | 10,560.00 | 3,295,982.24 |
| 6/4/15 | Neu Security Services - Denver VA Hospital | Foundation Fence | 43,482.78 | | | 43,482.78 | 3,339,465.02 |
| 6/5/15 | Neu Security Services - Ft Carson | Foundation Fence | 14,400.00 | | | 14,400.00 | 3,353,865.02 |
| 6/9/15 | Neu Security Services - VA Pine Bay | Foundation Fence | 842.35 | | | 842.35 | 3,354,707.37 |
| 6/9/15 | Neu Security Services - Ft Sam Houston | Foundation Fence | 153.02 | | | 153.02 | 3,354,860.39 |
| 6/9/15 | Neu Security Services - Kings Bay | Foundation Fence | 46,009.65 | | | 46,009.65 | 3,400,870.04 |
| 6/9/15 | Neu Security Services - Miami FBI Building | Foundation Fence | 38.03 | | | 38.03 | 3,400,908.07 |
| 6/9/15 | Neu Security Services - Ft Carson | Foundation Fence | 162,124.40 | | | 162,124.40 | 3,563,032.47 |
| 6/26/15 | Neu Security Services - Ft Sam Houston | Foundation Fence | 113.76 | | | 113.76 | 3,563,146.23 |
| 6/26/15 | Neu Security Services - Kings Bay | Foundation Fence | 2,850.46 | | | 2,850.46 | 3,565,996.69 |
| 7/1/15 | Neu Security Services - Ft Carson | Foundation Fence | 334,823.13 | | | 334,823.13 | 3,900,819.82 |
| 7/7/15 | Neu Security Services - Ft Carson | Foundation Fence | 284,243.10 | | | 284,243.10 | 4,185,062.92 |
| 7/10/15 | Neu Security Services - Ft Sam Houston | Foundation Fence | 7,374.50 | | | 7,374.50 | 4,192,437.42 |
| 7/10/15 | Neu Security Services - Ft Carson | Foundation Fence | 82,721.55 | | | 82,721.55 | 4,275,158.97 |
| 7/21/15 | Neu Security Services - Denver VA Hospital | Foundation Fence | 22,204.10 | | | 22,204.10 | 4,297,363.07 |
| 7/21/15 | Neu Security Services - Miami FBI Building | Foundation Fence | 7,419.02 | | | 7,419.02 | 4,304,782.09 |
| 7/30/15 | Neu Security Services - Ft Carson | Foundation Fence | 6,645.00 | | | 6,645.00 | 4,311,427.09 |
| 7/31/15 | Neu Security Services - Kings Bay | Foundation Fence | 4,715.85 | | | 4,715.85 | 4,316,142.94 |
| 7/31/15 | Neu Security Services - Denver VA Hospital | Foundation Fence | 7,386.32 | | | 7,386.32 | 4,323,529.26 |
| 7/31/15 | Neu Security Services - Ft Carson | Foundation Fence | 27,570.03 | | | 27,570.03 | 4,351,099.29 |
| 8/7/15 | Neu Security Services - VA Pine Bay | Foundation Fence | 78,908.69 | | | 78,908.69 | 4,430,007.98 |
| 8/7/15 | Neu Security Services - Ft Carson | Foundation Fence | 5,332.41 | | | 5,332.41 | 4,435,340.39 |
| 8/11/15 | Neu Security Services - St Elizabeth | Foundation Fence | 2,600.00 | | | 2,600.00 | 4,437,940.39 |
| 8/11/15 | Neu Security Services - Ft Carson | Foundation Fence | 4,638.00 | | | 4,638.00 | 4,442,578.39 |
| 8/21/15 | Neu Security Services - Ft Carson | Foundation Fence | 226,896.56 | | | 226,896.56 | 4,669,474.95 |
| 8/21/15 | Neu Security Services - Ft Carson | Foundation Fence | 519,023.31 | | | 519,023.31 | 5,188,498.26 |
| 8/26/15 | Neu Security Services - VA Pine Bay | Foundation Fence | 2,550.60 | | | 2,550.60 | 5,191,048.86 |
| 8/26/15 | Neu Security Services - Ft Carson | Foundation Fence | 5,250.00 | | | 5,250.00 | 5,196,298.86 |
| 8/26/15 | Neu Security Services - Kings Bay | Foundation Fence | 1,450.35 | | | 1,450.35 | 5,197,749.21 |

Unofficial copy Travis Co. District Clerk Velva L. Price

**EXHIBIT F**

# GIBRALTAR FAMILY OF COMPANIES
## NSS - Short Term Loan Recap
## February 24, 2016

| Date | Description | Company | Bonded Amount | Un-Bonded Amount | Applied Payments | Balance Due | Running Balance |
|---|---|---|---|---|---|---|---|
| 8/26/15 | Neu Security Services - Ft Carson | Foundation Fence | 110,370.00 | | | 110,370.00 | 5,308,119.21 |
| 8/27/15 | Neu Security Services - Miami FBI Building | Foundation Fence | 1,181.00 | | | 1,181.00 | 5,309,300.21 |
| 8/28/15 | Neu Security Services - St Elizabeth | Foundation Fence | 6,187.50 | | | 6,187.50 | 5,315,487.71 |
| 9/2/15 | Neu Security Services - Ft Carson | Foundation Fence | 29,695.72 | | | 29,695.72 | 5,345,183.43 |
| 9/21/15 | Neu Security Services - Denver VA Hospital | Foundation Fence | 4,074.19 | | | 4,074.19 | 5,349,257.62 |
| 9/21/15 | Neu Security Services - Ft Carson | Foundation Fence | 14,942.82 | | | 14,942.82 | 5,364,200.44 |
| 9/23/15 | Neu Security Services - Ft Carson | Foundation Fence | 28,915.00 | | | 28,915.00 | 5,393,115.44 |
| 9/23/15 | Neu Security Services - Ft Carson | Foundation Fence | 7,478.56 | | | 7,478.56 | 5,400,594.00 |
| 9/24/15 | Neu Security Services - Ft Carson | Foundation Fence | 23,965.80 | | | 23,965.80 | 5,424,559.80 |
| 10/1/15 | Neu Security Services - Ft Carson | Foundation Fence | 123,068.00 | | | 123,068.00 | 5,547,627.80 |
| 10/6/15 | Neu Security Services - Denver VA Hospital | Foundation Fence | 6,299.08 | | | 6,299.08 | 5,553,926.88 |
| 10/8/15 | Neu Security Services - Ft Carson | Foundation Fence | 23,579.25 | | | 23,579.25 | 5,577,506.13 |
| 10/14/15 | Neu Security Services - Ft Carson | Foundation Fence | 88,482.91 | | | 88,482.91 | 5,665,989.04 |
| 10/22/15 | Neu Security Services - Ft Carson | Foundation Fence | 28,579.30 | | | 28,579.30 | 5,694,568.34 |
| 10/23/15 | Neu Security Services - Ft Sam Houston | Foundation Fence | 9,867.00 | | | 9,867.00 | 5,704,435.34 |
| 10/28/15 | Neu Security Services - Delta Scientific | Foundation Fence | 105,555.89 | | | 105,555.89 | 5,809,991.23 |
| 11/6/15 | Neu Security Services - VA Pine Bay | Foundation Fence | 3,500.00 | | | 3,500.00 | 5,813,491.23 |
| 11/11/15 | Neu Security Services - Ft Sam Houston | Foundation Fence | 8,077.00 | | | 8,077.00 | 5,821,568.23 |
| 11/17/15 | Neu Security Services - VA Pine Bay | Foundation Fence | 2,500.00 | | | 2,500.00 | 5,824,068.23 |
| 11/23/15 | Neu Security Services - VA Pine Bay | Foundation Fence | 1,050.00 | | | 1,050.00 | 5,825,118.23 |
| 12/7/15 | Neu Security Services - Denver VA Hospital | Foundation Fence | 255.00 | | | 255.00 | 5,825,373.23 |
| 12/7/15 | Neu Security Services - Ft Carson | Foundation Fence | 830.00 | | | 830.00 | 5,826,203.23 |
| 12/8/15 | Neu Security Services - Ft Carson | Foundation Fence | 10,587.29 | | | 10,587.29 | 5,836,790.52 |
| | | Totals | 6,490,644.45 | 90,947.60 | (744,801.53) | 5,836,790.52 | |

| | |
|---|---|
| Sub-Total Due To Gibraltar Cable Barrier Systems | - |
| Sub-Total Due To Gibraltar Material Distribution | 38,000.01 |
| Sub-Total Due To Foundation Fence | 5,798,790.52 |
| | (0.00) |

Unofficial copy Travis Co. District Clerk Velva L. Price

G:\Accounting\NSS\Short Term Loans\NSS Short Term Loans Running Balance\ST Loans

**EXHIBIT F**

**Schedule 3.12.1**

**NSS Termination Notice**

GIBRALTAR

February 4, 2015

Mr. Stephen Neusch
Neu Security Services

Re: Notice of Termination of all licensing rights, express or implied

Dear Stephen,

As you are aware, Gibraltar Materials and Betafence have signed an LOI and agreed for Betafence to purchase all rights to all cable based Gibraltar Materials products. Gibraltar Materials and Neu Security Services have been operating and conducting business since mid 2013 in the spirit of an agreement which has never been executed. This agreement proposed to grant NSS exclusive rights to manufacture, distribute, sell and install Gibraltar products in the United States.

By this notice, Gibraltar immediately terminates any and all licensing or other contractual rights which NSS may have to so use Gibraltar products under this proposed agreement or implied by any course of dealing. Please immediately cease efforts to market these products as a licensee and make arrangements to destroy or return any confidential or proprietary drawings, specifications, or manufacturing information. Additionally, refrain from utilizing the business methods, any intellectual property, any approvals and/or any certificates of Gibraltar for any reason whatsoever. Termination provisions 14.1, 14.2, and 14.3 of the proposed Agreement have established a common expectation of NSS' responsibility with respect to the handling of this information subsequent to termination. Please comply with the language of those subsections.

Consistent with the termination language contained in section 12.4 of the proposed agreement, commercial reasonableness dictates that NSS be allowed to complete any jobs which it has already bid prior to this date, on the terms which were understood at the time those projects bid. However, do not bid any new jobs or in any way represent NSS as a Licensee of Gibraltar for any projects or sales opportunities after today's date, including any opportunities which may already be in progress but not yet priced. For all future projects, if NSS chooses to utilize Gibraltar Materials cable based products, these must be acquired from Betafence, on terms to be negotiated between NSS and Betafence.

Please acknowledge that you have received this Notice of Termination and that NSS agrees to immediately comply and waive all claims, contractual or implied, to manufacture or sell Gibraltar products as a licensee.

Thank you for your cooperation.

Sincerely,

William H. Neusch
William H. Neusch
President / Owner

I have received this notice on behalf of NSS and agree not to contest the termination by Gibraltar of any contractual or implied rights to license Gibraltar products. NSS hereby waives any and all claims to any right to manufacture or sell these products and will take immediate steps to destroy or return any confidential or proprietary information which is the property of Gibraltar.

Stephen Neusch, President NSS
And Personally

2/11/2015
Date

Unofficial Copy Travis Co. District Clerk Velva L. Price

**EXHIBIT G**

Unofficial Copy Travis Co. District Clerk Velva L. Price

# AGREEMENT

made and entered into by and between:

**GIBRALTAR MATERIAL DISTRIBUTION LP**
("Gibraltar")

And

**NSS**
("NSS")

## 1 DEFINITIONS

1.1 In this Agreement, unless the context requires otherwise, the words and expressions set out below shall have the meanings assigned to them and cognate expressions shall have a corresponding meaning, namely:

1.1.1 "Agreement" shall mean the agreement as set out herein;

1.1.2 "Associated Companies" shall mean subsidiaries, minority interest companies, partnerships and trusts which are related to a contracting party;

1.1.3 "BetaFence" shall mean Betafence NV, a company incorporated under the laws of Belgium, having it registered office at Deerlijstraat 58A, 8550 Zwevegem, Belgium and registered under company number 0478.276.316 and its Associated Companies.

1.1.4 "NSS" shall mean NSS, a company incorporated under the laws of Texas, having its registered office at __________________________________ and its Associated Companies;

1.1.5 "Business Method" shall mean the detailed manufacturing drawings of the Exclusive Products by Gibraltar and recorded in the Quality Guidelines and includes any improvements or variations made to the Business Method;

1.1.6 "Certification" shall mean the crash rating certification granted to Gibraltar for crash tested Exclusive Products, and for all other Exclusive Products it shall mean the standard to which the product is engineered;

1.1.7 "Commencement Date" shall mean July 1, 2013 or such other date as agreed to in writing between the Parties;

1.1.8 "Ex Works" shall mean the selling price of the Exclusive Products to third parties;

1.1.9 "Exclusive Products" shall mean the products listed in Addendum A. In addition, new products may be added to this list from time to time, including any new products developed pursuant to Section 7.9 of this Agreement;

1.1.10 "Gibraltar" shall mean Gibraltar Material Distribution LP, a limited partnership formed under the laws of the State of Texas, having its registered office at 4303 Innovation Loop, Marble Falls, TX 78654 and its Associated Companies;

1.1.11 "Intellectual Property" shall mean the methodology and Know-How of Gibraltar in manufacturing the Exclusive Products and including the name Gibraltar;

1.1.12 "Know-How" shall mean and include all knowledge and information, both technical and otherwise, now known to and hereafter, during the currency of this Agreement, to become known to, Gibraltar relating:

1.1.12.1 to the Exclusive Products;

**EXHIBIT G**

1.1.12.2 all confidential, technical and commercial information relating to the Exclusive Products existing from time to time, including, without limitation, information contained in the Quality Guidelines or other documents. technical information includes all specifications, methods of production or manufacture developed by Gibraltar;

1.1.12.3 the promotion, marketing and sale of the Exclusive Products;

1.1.13 "Licensing Fee" shall be an upfront non-refundable fee paid by NSS to Gibraltar to secure the Exclusive right to manufacture and market the Exclusive Products in the Territory

1.1.14 "Parties" shall mean Gibraltar and NSS;

1.1.15 "Party" shall mean Gibraltar or NSS as the context may indicate;

1.1.16 "Quality Guidelines" shall mean the quality guidelines prepared by Gibraltar attached as Addendum D and as amended from time to time;

1.1.17 "Royalty Fee" shall mean the royalty fee calculation terms of clause 9;

1.1.18 "Territory" shall mean the areas described in clause 5;

1.1.19 "Year" shall mean a calendar year.

1.2 Expressions denoting the masculine gender shall include the feminine, natural persons shall include bodies corporate, the singular shall include the plural, and in each case the converse shall also apply.

## 2 INTRODUCTION

2.1 Gibraltar is a leader in the manufacture of crash rated fences in the United States of America and manufactures the Exclusive Products by using the Business Method in accordance with the Certification.

2.2 Gibraltar has, as a result of much research and development over many years, developed the Exclusive Products and has been granted the Certification.

2.3 NSS wishes to manufacture, sell and install the Exclusive Products in the Territory utilizing the Business Method and Certification.

2.4 Gibraltar has the right and is prepared to grant NSS the rights to manufacture and sell the Exclusive Products upon the terms and conditions set out herein.

## 3 GRANT OF RIGHTS

On and subject to the terms and conditions hereinafter set out, for the duration of this Agreement, Gibraltar grants to NSS the exclusive rights to:

3.1 manufacture, distribute, sell and install the Exclusive Products in the Territory; and

3.2 use the Certificates, approvals and Intellectual Property, in relation to the promotion, marketing and sale of the Exclusive Products within the Territory.

## 4 DURATION

This Agreement shall commence on the Commencement Date and shall not expire (unless terminated earlier pursuant to any terms and conditions of this Agreement).

Unofficial Copy-Travis Co. District Clerk Velva L. Price

## 5 THE TERRITORY

Addendum A sets forth the Territory within which NSS may manufacture, distribute, sell and install the Exclusive Products and use the certificates, approvals and Intellectual Property, in relation to the promotion, marketing and sale of the Exclusive Products. NSS has all CONUS (Continental United States) and OCONUS (outside Continental United States) territory not currently under contract with BetaFence. In the event the contract with BetaFence is canceled, modified, terminated or adjusted, Gibraltar shall notify NSS in writing within ___30___ days and NSS shall have the right to add, as additional territory, any territory not then under contract with BetaFence. At that time, an additional Minimum Royalty payment will be negotiated for additional territories. Gibraltar shall provide NSS ___30__ days following NSS's receipt of written notice before Gibraltar may grant others the right to manufacture and sell the Exclusive Products in the territory previously under contract with Beta Fence.

For reference, BetaFence Territory is currently defined geographically as worldwide with the exception of the United States and is limited to those products identified as BetaFence outside US in Addendum A.

Unofficial Copy - Travis Co. District Clerk Velva L. Price

## 6 EXCLUSIVITY

6.1 Throughout the duration of this Agreement, NSS shall use its best efforts to promote the manufacture and distribution of the Exclusive Products throughout the Territory.

6.2 NSS shall have the exclusive rights to manufacture, sell and install the Exclusive Products in the Territory for the period of the Agreement subject to NSS meeting its minimum quarterly Royalty obligations.

6.3 Gibraltar shall in good faith make NSS aware of any bidding opportunities of which it becomes aware in any of the markets referred to above.

## 7 OBLIGATIONS OF NSS

7.1 NSS undertakes to manufacture the Exclusive Products in terms of the Quality Guidelines. NSS may generally, at its discretion, sub-contract manufacturing of the Exclusive Products, subject to the following provisions:

7.1.1 NSS shall notify Gibraltar of its intent to utilize a sub-contracted manufacturer for any major components or full barrier systems (does not apply for minor non-proprietary parts or components),

7.1.2 NSS shall secure an executed Confidentiality and Non-Disclosure Agreement from its manufacturer protecting all Gibraltar proprietary information and drawings it discloses to manufacturer, and

7.1.3 NSS shall indemnify Gibraltar with respect to any costs incurred by Gibraltar in defending its proprietary information from infringement by such manufacturer

7.2 NSS shall retain all discretion over its marketing efforts within the Territory and shall have the right to determine which parts of the Territory are the highest priority for marketing and sales efforts.

7.2.1 NSS may sell the Exclusive Products to any customer within the Territory

7.2.2 Except as to Associated Companies, NSS may not sub-license its rights under this Agreement to manufacture or sell the Exclusive Products, without the express written agreement of Gibraltar. In all circumstances, any authority of NSS to enter agreements with respect to the Exclusive Products shall be limited in scope and duration to the rights granted NSS under this Agreement and shall not terminate, unless otherwise indicated in Section 12.4 of this Agreement.

7.3 NSS undertakes to do nothing that will affect the validity or will impinge upon the reputation of the Exclusive Products or the Certification thereof.

7.4 NSS shall not during the currency of this Agreement or any extension or renewal thereof:

7.4.1 without the prior written consent of Gibraltar, sell, offer for sale, supply or cause to be sold, or offered for sale, outside the Territory, any of the Exclusive Products to any person;

7.4.2 seek customers for any of the Exclusive Products outside the Territory;

7.4.3 sell any of the Exclusive Products to any third party within the Territory knowing that such third party intends to sell and/or export the Exclusive Products outside the Territory.

7.5 NSS shall have the sole right to determine the pricing of the Exclusive Products manufactured or distributed by NSS, subject to the following parameters:

7.5.1 NSS's pricing is not intended to keep the product out of a market or benefit a competitor.

7.5.2 Where exclusive products are bid with other products on projects involving on-site installation, the royalty percentage will be based on the cost of the material plus the total project profit percentage (as an average). For material only sales the royalty will be per line item of Exclusive Product.

7.6 NSS shall prepare its own marketing material and shall use the name Gibraltar in all such material when referencing the Exclusive Products. If this Agreement terminates, NSS would discontinue use of the Gibraltar name.

7.7 NSS shall comply with the Quality Guidelines in the manufacture, sourcing of components and installation of the Exclusive Products.

7.8 NSS shall provide Gibraltar with monthly project and activity reports. At a minimum, such information will include:

- known bid opportunities (including scope and potential value)

- post mortem summary of bids lost

- the status of all open jobs which have been secured (including shipping timeline and billing status), and

- royalty status for jobs invoiced.

Both parties will mutually agree a convenient form and layout for providing this information. is agreeable.

7.9 NSS shall bear 100% of the cost of testing new products (set up, travel, testing services, vehicle, removal) that it requests or requires incident to the Exclusive Products, or may share such costs with BetaFence if Betafence is agreeable. Such new products shall be developed by Gibraltar and owned by Gibraltar. This includes not only direct variations of existing products developed for specific job purposes, but also all new design gates,

Unofficial Copy - Travis County District Clerk Velva L. Price

barriers, fences, and bollards reasonably similar to and likely to compete with the Exclusive Products (referred to hereafter as "Similar to the Exclusive Products").

Gibraltar retains the discretion to decline to participate in the development of a new product, in which case NSS may request the consent of Gibraltar to allow NSS to pursue development on its own or through other channels, provided such new products are not mere variations of Exclusive Products, Similar products, or direct alternatives, thereof. NSS shall not proceed with the development of any such product without the written approval of Gibraltar. The granting or denying of such approval shall be solely in the discretion of Gibraltar.

New products specifically contemplated and covered by this provision include, but are not limited to a tested K8 fence, and a tested K4 fence. The parameters and costs of developing each new product under this Agreement shall be discussed and agreed before development and testing are started.

Royalties due on any new products developed shall be tracked separately and owed at the current Royalty rate in effect under this Agreement. Development and Testing expenses paid by NSS under this Section shall be credited as Royalties paid with respect to Royalties owed specifically on such new Product, but shall not reduce the Minimum Royalties due in section 9.3.

7.10 NSS shall not promote any products which compete with the Exclusive Products on any Anti-Terrorism / Force Protection barrier projects, nor shall it promote any products Similar to the Exclusive Products.

Similar to the Exclusive Products shall be defined to include any vehicular barrier fences that are cable based or post and rail based, including Bollard systems in which Bollards are connected to each other. For this purpose, concrete walls and individual standard bollards are not considered Similar to Exclusive Products.

NSS shall not use competing products on any contracts unless customer contract specifications do not allow the use of Gibraltar Exclusive Products. Any deviation to this provision must be approved in writing signed by both Parties.

## 8 OBLIGATIONS OF GIBRALTAR

8.1 Gibraltar shall be obliged, throughout the term of this Agreement, to enable NSS to immediately and thereafter as and when reasonably requested by NSS, make all of the Know-How available to NSS including any new developments or new Certification.

8.2 Gibraltar shall, at the request of NSS, make available to NSS, such promotional and supporting technical information (not included in the Know-How) including all the Certification and approvals as NSS may reasonably require including all technical drawings required to manufacture the Exclusive Products.

8.3 Gibraltar shall supply NSS with copies of all of its existing literature relating to the Exclusive Products.

8.4 Gibraltar shall not grant any third party any rights relating to the Exclusive Products or Intellectual Property that conflicts with the provisions of this Agreement it being recorded that this is an exclusive agreement for the Territory.

Unofficial Copy Travis County District Clerk Velva L. Price

**EXHIBIT G**

9 **LICENSING FEES AND ROYALTIES**

9.1 NSS shall pay a one time, non refundable Licensing Fee to Gibraltar in the amount of $500,000 to secure the rights to manufacture and market the Exclusive Products in the Territory on an exclusive basis. Such Licensing Fee represents a portion of the historical costs incurred by Gibraltar in developing and testing the Exclusive Products and its cost of forbearing all other market opportunities within the Territory for the duration of this Agreement. This amount shall be due and payable without penalty or interest at any time prior to December 31, 2014.

9.2 Within 15 days of execution of this Agreement, Gibraltar shall provide a detailed Inventory of Raw Materials and Finished Goods Materials related to the Exclusive Products in its possession and the book value of such inventory, which shall be attached to this Agreement as Addendum B. NSS agrees to purchase all of such inventory at Gibraltar's Book Value, not to exceed 105% of the market value of the product.

Payment for Inventory shall be made within 30 days of execution of this Agreement and prior to any inventory leaving Gibraltar possession. It is anticipated that NSS will take actual delivery of all identified Inventory and make arrangements to pick it up within 90 days. However, in the event that some of the inventory is not purchased within this 30 days, the amount owed for such inventory shall accrue interest at an annual rate of 10%

With respect to such remaining inventory, NSS will use this inventory before purchasing or manufacturing the product elsewhere on a job by job basis and will pay for such material at the time used.

NSS will purchase all Inventory no later than 18 months from the date of this contract.

9.3 Minimum Royalty Payments - In consideration for the rights granted to it by Gibraltar in terms hereof, NSS shall pay on the last business day of the first month of each calendar quarter a Minimum Royalty to Gibraltar, for the previous calendar quarter. These payments shall commence beginning October 31, 2013 (for the quarter July 1 – September 30, 2013) in the amount of $50,000 per quarter and shall increase to:

- $100,000 /quarter, effective with Minimum Royalty payment due April 30, 2014;
- $150,000 /quarter, effective with Minimum Royalty payment due April 30, 2015;;
- $200,000 /quarter, effective with Minimum Royalty payment due April 30, 2016;
- $250,000 /quarter, effective with Minimum Royalty payment due April 30, 2017;
- $300,000 /quarter, effective with Minimum Royalty payment due April 30, 2018;
- $200,000 /quarter, effective with Minimum Royalty payment due April 30, 2019;
- $200,000 /quarter, effective with Minimum Royalty payment due April 30, 2020;;
- $200,000 /quarter, effective with Minimum Royalty payment due April 30, 2021;
- $200,000 /quarter, effective with Minimum Royalty payment due April 30, 2022;
- $200,000 /quarter, effective with Minimum Royalty payment due April 30, 2023;
- $100,000 /quarter, effective with Minimum Royalty payment due April 30, 2024;
- $100,000 /quarter, effective with Minimum Royalty payment due April 30, 2025;;
- $100,000 /quarter, effective with Minimum Royalty payment due April 30, 2026;
- $100,000 /quarter, effective with Minimum Royalty payment due April 30, 2027;
- $100,000 /quarter, effective with Minimum Royalty payment due April 30, 2028.

Unofficial copy Travis County District Clerk Velva Price

NSS's obligation to pay such quarterly minimums shall be non-refundable. Payments of such minimum royalty due shall be of the essence of this contract and failure to make payments timely shall be deemed a material breach of this Agreement and a basis for termination, pursuant to Section 12 of this Agreement.

9.4 Actual Royalty - The minimum royalty provisions of Section 9.3 notwithstanding, NSS shall be obligated to pay to Gibraltar actual Royalties calculated at Base Royalty rate below multiplied by their Sales Revenue associated with the Ex Works sale of Gibraltar products, pursuant to provisions of Section 7.5. For products identified in Addendum A as "engineered", Royalty shall be one half of the Base Royalty rate. (This lower Royalty rate shall not apply to "engineered" variations of crash tested Products) This shall be calculated on the first day of each quarter based upon the Sales Revenue of Products shipped through the prior quarter.

For years 2013 – 2018, Base Royalty 15%, Excess Royalty 10%

For Years 2019 – 2023, Base Royalty 10%, Excess Royalty 5%

For years 2024 – 2028, Base Royalty 5%, Excess Royalty 5%

For years 2029 – 2033, Royalty 5%, no Minimum Royalty

Excess Royalty rate shall apply to Sales Revenue in a particular year in excess of the Minimum Sales Revenue implied by the Minimum Royalty payments. (See attached Royalty schedule in Addendum C for clarification, but the implied Minimum Sales revenue is simply annualized Minimum Royalty payments for a given year divided by the Base Royalty Rate for that year). Sales above this threshold will be subject to the lower Excess Royalty Rate, rather than the Base Royalty rate (for the last ten years of the Agreement, these rates are both the same).

9.5 To the extent that cumulative Minimum Royalty payments (and payments under sections 7.9 and 9.1 above) paid by NSS to Gibraltar exceed Actual Royalties due, no additional Royalty payments shall be due each quarter. However, when cumulative Actual Royalty due exceeds the cumulative Minimum Royalty, additional Royalty payments shall be due to bring total Royalty payments in line with Actual Royalties due.

Example – after 4 quarters, cumulative Minimum Royalty payments pursuant to the provisions above (excluding payments under sections 7.9 and 9.1 for this example) would be $300,000 ($50K + $50K + $100K + $100k). If total Ex Works sales revenue were $2 million x 15% Royalty = $300,000 of Actual Royalty, no additional Royalty Payments would be due.

To further this example, if quarter 5 included $4 million of additional Ex Works sales revenue, the cumulative Actual Royalty would then be $6 million x 15% = $900,000 compared to a cumulative Minimum Royalty of $400,000. In addition to the Minimum Quarterly Royalty payment of $100,000, NSS would also owe an additional $500,000 of Royalty attributable to the Actual Royalty calculation. This would bring total Royalty payments to $900,000, equal to Actual Royalty obligation.

Payments made for Actual Royalties in excess of Minimum Royalties shall carry forward against and offset future quarterly Minimum Royalty payments.

9.6 NSS shall keep and maintain all books and records necessary to enable the amount of Royalty to be clearly and easily calculated and shall permit, not more than once per year, auditors nominated by Gibraltar, at the expense of Gibraltar, to examine all such books and records at reasonable times.

## 10 EXISTING AGREEMENTS

10.1 Gibraltar has entered into a Licensing Agreement with BetaFence for all countries outside of the United States and its territories for those Exclusive Products identified in Addendum A as "US Only".

10.2 NSS acknowledges the existence of Gibraltar's agreement with BetaFence and agrees to respect and defer to BetaFence in Territories covered by that agreement.

10.3 NSS further agrees to indemnify Gibraltar for all costs or damages associated with claims by BetaFence related to a violation of BetaFence's licensing rights by NSS in BetaFence's licensed territories.

## 11 CONFIDENTIALITY

Except as necessary to enforce the terms of this Agreement or as may be required by law, NSS shall, during the currency of this agreement, for whatever reason it may be terminated, treat the Know-How and Business Method as strictly confidential and secret and shall not disclose it or any of it to any other person, firm or company, other than to its employees and then only to the extent necessary for the purposes of this Agreement. The provisions of this clause shall not apply to any information that:

11.1 has become public knowledge and/or which is obtainable from other sources,

11.2 is independently developed by NSS; or

11.3 The obligations of this section shall survive the termination of this Agreement.

## 12 BREACH

12.1 In the event of either of the Parties to this Agreement committing a material breach of any of the terms and conditions hereof and remaining in default for a period of 30 (thirty) days after receipt by it of written notice from the other Party calling for such breach to be remedied, the Party delivering such notice shall be entitled, without prejudice to any other rights it may have hereunder or in law, to terminate this Agreement by written notice to that effect given to the other Party.

12.2 Either Party may terminate this Agreement at any time by giving to the other ("the defaulting party") notice of such termination if:

12.2.1 the defaulting Party (or its successor in interest per Section 18.4) is, other than for the purposes of reconstruction or amalgamation, placed under voluntary or compulsory liquidation or under judicial management or under receivership or under the equivalent of any of the foregoing;

12.2.2 the defaulting Party (or its successor in interest per Section 18.4) makes any arrangement or composition with its creditors generally or ceases or threatens to cease to carry on business, and

12.2.3 NSS fails to pay the Minimum Quarterly Royalties due, or the Actual Royalties due to the extent they exceed the Minimum Royalties.

12.3 Any termination pursuant to the preceding provisions of this clause shall be without prejudice to any claim either Party may have in respect of any prior breach of the terms and conditions of this agreement by the other Party, and in the case of Gibraltar it shall be without prejudice to its rights to recover amounts payable in terms of this agreement which became payable prior to the effective date of such termination.

Unofficial Copy Travis Co. District Clerk Velva L. Price

12.4 In the event that this Agreement is terminated for any reason whatsoever, NSS shall be entitled to complete any projects which are in progress at the date of termination and/or sell any Exclusive Products in NSS's inventory that have been ordered and Gibraltar shall be entitled to Royalties in respect thereof.

## 13 FORCE MAJEURE

Notwithstanding anything to the contrary herein contained, in the event of a Party to this Agreement being prevented by any Act of God/ Force Majeure from fulfilling its obligations in terms hereof, the other Party shall not be entitled to exercise the rights of termination in terms of clause 12.1 above, nor shall it be entitled to recover any damages from such first-mentioned Party. Once any such factor ceases to exist, the terms and provisions of this Agreement shall again apply as between the Parties.

Force Majeure would be defined as including fire, flood, earthquake, storm, hurricane or other natural disaster, war, invasion, act of foreign enemies, hostilities (regardless of whether war is declared), civil war, rebellion, revolution, insurrection, military or usurped power or confiscation, terrorist activities, nationalization, government sanction, blockage, embargo, labor dispute, strike, lockout or interruption or failure of electricity service.

## 14 TERMINATION

On termination of this Agreement for any reason whatsoever:

14.1 NSS shall forthwith return to Gibraltar all drawings, documents and the like relating to the Licensed Products then in the possession of NSS; and

14.2 NSS shall not utilize the Business Method and/or Intellectual Property of Gibraltar for any reason whatsoever other than as is authorized in the terms of this Agreement.

14.3 NSS shall provide to Gibraltar a full detail listing of any inventory of Exclusive Products in its possession

14.4 Obligations not to compete – If this Agreement is terminated early under Section 12 or Paragraph 14.5, NSS shall be prohibited from promoting, selling, manufacturing, or installing any products which compete with the Exclusive Products in the Territory, or affected Regions, for a period of 18 months as long as Gibraltar agrees to sell NSS said products with a pricing advantage for the 18 months.

14.5 Notwithstanding anything to the contrary, NSS may terminate this Agreement, for any reason, after 120 days notice to Gibraltar. Minimum royalty payments due during such Notice Period shall be payable by NSS.

Unofficial Copy Travis County District Clerk Velva L. Price

## 15 GOVERNING LAW

This Agreement shall be construed in accordance with and shall be governed by the laws of Texas, United States of America. Both Parties consent to the jurisdiction of Texas courts as the exclusive jurisdiction for resolving any legal disputes which may arise.

## 16 NOTICES

16.1.1 Gibraltar:

Contact: ……Bill Neusch

EXHIBIT G

Email: ......BNeusch@Gibraltarus.com

Physical Address: ......4303 Innovation Loop

......Marble Falls, Texas 78654

................................................................

16.1.2 NSS:

Contact: ................................................................

Email: ................................................................

Physical Address: ................................................................

................................................................

................................................................

16.2 All notices to be given by the Parties to each other in terms hereof shall be given to the aforesaid addresses by certified mail or Fedex. Notice by e-mail shall suffice as written notice, if receipt of such e-mail is acknowledged by the recipient.

Unofficial Copy Travis Co. District Clerk Velva L. Price

## 17 WARRANTIES

17.1 Gibraltar warrants the Certificates and any renewals, if applicable, are valid and are able to be utilized by NSS.

17.2 Gibraltar warrants that as of the Commencement Date it is not aware of any rights of third parties that may prevent the manufacture and distribution of the Exclusive Products in the Territory.

17.3 Gibraltar, at its sole cost and expense shall, defend, indemnify and hold harmless NSS, its affiliates and any employee or agent thereof (each of the foregoing being referred to as the "Indemnified Party") against all liability to third parties (other than liability solely the fault of the Indemnified Party) arising from the violation or alleged violation of any third party's trade secrets, proprietary information, trade marks, copy rights or patent rights in connection with the licensing of the Exclusive Products under this Agreement. If NSS is notified of any possible third party breach, NSS must notify Gibraltar immediately and Gibraltar shall decide the validity of the third party claim. If claim is determined to have validity, Gibraltar may require NSS under this agreement to immediately cease the violation.

## 18 GENERAL

18.1 No alteration, cancellation, variation of, or addition hereto shall be of any force or effect unless reduced to writing and signed by the parties to this Agreement or their duly authorised representatives.

18.2 Subject only to clause 18.1 above, this document contains the entire Agreement between the Parties and neither Party shall be bound by any undertakings, representations or warranties not recorded herein.

18.3 No indulgence, leniency or extension of time which either Party ("the grantor") may grant or show to the other, shall in any way prejudice the grantor or preclude the grantor from exercising any of its/his rights in the future.

18.4 This Agreement shall bind the heirs, executors, administrators, legal representative, successors and assignees of both parties, However, neither Party may cede or assign its/his rights or delegate its/his obligations in terms of this Agreement without the prior written approval of the other Party, which shall not be unreasonably withheld. No approval shall be required, only Notice, to assign obligations or interests to Affiliated Entities (generally defined as entities under common control with the assigning Party)

18.5 Each Party warrants and undertakes to the other that it is not acting as undisclosed agent or nominee for any person in entering into this Agreement and is entering into this Agreement to secure the benefits of this Agreement for itself only and for no other person..

18.6 The headings appearing in this Agreement have been used for reference purposes only and shall not affect its interpretation.

18.7 Each Party shall bear its own costs of and incidental to the negotiation and preparation of this Agreement.

18.8 If any clause or term of this Agreement should be invalid, unenforceable or illegal, then the remaining terms and provisions of this Agreement shall be deemed to be severable therefrom and shall continue in full force and effect unless such invalidity, unenforceability or illegality goes to the root of this Agreement.

18.9 In the event either Party shall bring any action for relief against another, declaratory or otherwise, including arbitration, arising out of this Agreement, each party shall pay its own attorneys' fees and related costs (including any arbitration fees and costs) incurred in bring such suit and enforcing any judgment granted therein.

18.10 Nothing in this Agreement or any other document or agreement between the Parties shall constitute or be deemed to constitute a partnership or joint venture between the Parties. The relationship between Gibraltar and NSS shall be that of independent contractors with respect to each other, and not agents of each other. Neither Party has any express or implied right to enter into any contracts or binding commitments in the name of or on behalf of the other Party in any respect whatsoever, and no conduct of the Parties shall be deemed to infer such right.

18.11 Notwithstanding anything to the contents contained in this agreement no party shall be liable to the other for punitive, incidental, consequential or similar damages as a result of any breach of this agreement..

18.12 In the event that Gibraltar files any petition in bankruptcy or makes an assignment for the benefit of creditors or takes any similar action or becomes insolvent, then NSS shall have a right of first refusal to purchase all rights to the Exclusive Products from Gibraltar whether this is sold privately or through a court order.

Unofficial Copy Travis County District Clerk Velva L. Price

DATED AT ______________ ON THIS THE _______ DAY OF ____________________ 2013.

| Gibraltar | NSS |
|---|---|
| By:______________________________ | By:__________________________ |
| Signature:_________________________ | Signature:_________________________ |
| Date:_____/_______/2013 | Date:_____/_______/2013 |

EXHIBIT G

**ADDENDUM A**

## EXCLUSIVE PRODUCTS

| Product | | | |
|---|---|---|---|
| | | | |
| M50 | P1 | Fence | US Only (BetaFence outside US) |
| M50 | P2 | Fence | US Only (BetaFence outside US) |
| M50 | P3 | Fence | US Only (BetaFence outside US) |
| M50 | P4 | Fence | US Only (BetaFence outside US) |
| M40 | P1 | Fence | US Only (BetaFence outside US) |
| M40 | P2 | Fence | US Only (BetaFence outside US) |
| M40 | P3 | Fence | US Only (BetaFence outside US) |
| M40 | P4 | Fence | US Only (BetaFence outside US) |
| M30 | P1 | Fence | US Only (BetaFence outside US) |
| M30 | P2 | Fence | US Only (BetaFence outside US) |
| M30 | P3 | Fence | US Only (BetaFence outside US) |
| M30 | P4 | Fence | US Only (BetaFence outside US) |
| M50 | Slide | Gate (active and passive latch) | US Only (BetaFence outside US) |
| M40 | Slide | Gate (active and passive latch) | US Only (BetaFence outside US) |
| M30 | Slide | Gate (active and passive latch) | US Only (BetaFence outside US) |
| | | | |
| | | | |
| M50 | P1 | Wedge Barrier – 8' – 14.5' | Worldwide |
| M50 | P1 | Shallow Mount Bollard | Worldwide |
| M50 | P2 | Shallow Mount Bollard | Worldwide |
| M40 | P1 | Shallow Mount Bollard | Worldwide |
| M30 | P1 | Shallow Mount Bollard | Worldwide |
| M50 | P1 | Vertical Lift Barrier – 24' | Worldwide |
| M50 | P2 | Vertical Lift Barrier – 50' | Worldwide |
| M50 | P1 | Drop Arm - engineered | Worldwide |
| M40 | P1 | Drop Arm - engineered | Worldwide |
| M30 | P1 | Drop Arm - engineered | Worldwide |
| M50 | P2 | Soft Stop – 24' & 50' – in development | Worldwide |
| M40 | P2 | Soft Stop – 24' & 50' – in development | Worldwide |
| M30 | P2 | Soft Stop – 24' & 50' – in development | Worldwide |
| M50 | P1 Swing | Gate - engineered | Worldwide |
| M40 | P1 Swing | Gate - engineered | Worldwide |
| M30 | P1 Swing | Gate - engineered | Worldwide |
| | | | |
| | | | |

Unofficial Copy Travis County District Clerk

**EXHIBIT G**

ADDENDUM B

## CURRENT GIBRALTAR INVENTORY OF EXCLUSIVE PRODUCTS

DRAFT
Unofficial copy - Travis Co. District Clerk Velva L. Price

NSS
AGREEMENT WITH
GIBRALTAR Family of Companies

This Agreement is entered into, as of the Effective Date set forth below, between Gibraltar Materials Distribution, Inc., hereinafter referred to as Gibraltar, a Texas corporation and Neu Fence LLC,
Hereinafter referred to as (NSS Form of Company Name).
WHEREAS NSS wishes to purchase products from Gibraltar for the purposes of resale, and Gibraltar, a
Manufacturer desires to sell its products and services to customers through NSS.

THE PARTIES HERETO HEREBY AGREE AS FOLLOWS:

OBLIGATIONS.
NSS SHALL:

- Use its commercially reasonable efforts to develop and promote the sale of the Gibraltar products.
- Pursue promotions of Gibraltar products to customers, Contractors and Design teams.
- Direct all online promotional campaigns for Gibraltar at no additional cost to Gibraltar.
- Design advertising literature for Gibraltar to focus on the Security sector and the Design Build Government contractors.
- Promote Gibraltar's product lines on NSS web-site and marketing materials.
- Shall not promote any competitors products or provide any competitors products.
- Fully train all NSS employees on Gibraltar product lines for sales and installation purposes.
- Sale, Supply, and Install Gibraltar K-Rated products whenever possible.
- Will provide automation for all Gibraltar's products including but not limited to HPU's, hydraulic lines, valves, manifolds, gate operators, controls, wiring, and limit switches.
- Will not go into the barrier manufacturing business and give all manufacturing of new products to Gibraltar.
- Will market and sale all Gibraltar's K-Rated products to the industry.
- Will develop Specs Intact format specifications on all Gibraltar products and will develop CI format specs for all Gibraltar products.

Unofficial copy Travis Co District Clerk Velva L. Price

Gibraltar SHALL:

- Provide one full time employee to work under NSS direction to promote Gibraltar products. NSS will not use this person for any PM, or other installation related items and insure he only works on product marketing.
- Only provide pricing and only sale its K-Rated products to NSS for distribution.
- Maintain adequate inventory and make best efforts to meet delivery dates in order to provide the highest level of customer satisfaction.



EXHIBIT G

NSS

- Provide NSS with material that meets or exceeds industry standards and track any manufacturing defects to insure correct remedies.
- Not quote any General Contractors or Owners and turn leads over to NSS for pricing.
- Will turn over all advertising assets on the K-Rated products for NSS use.
- Develop a pricing structure that is fare and agreed upon by both parties.
- Give adequate notice of pricing changes and hold pricing on projects already quoted.
- Provide freight for all products.
- Provide legal help in disqualifying Ameristar's product from the market.

This agreement will be good for one year of the signed date and once the year is up the agreement will be changed, renewed, or terminated based on the mutual agreement between Stephen Neusch and Bill Neusch. If the agreement is terminated Gibraltar agrees to reimburse NSS 80% of the value for costs spent by NSS promoting Gibraltar's products. If the agreement is terminated Gibraltar will not provide pricing on any project NSS has already quoted.

Signed:

| | | | |
|---|---|---|---|
| Bill Neusch [signature] | 4/30/10 | Stephen Neusch [signature] | 4/30/10 |
| Bill Neusch | Date | Stephen Neusch | Date |

Unofficial Copy - Travis Co. District Clerk Velva L. Price



EXHIBIT G

NEU SECURITY SERVICES

November 4, 2015

Keith Kovach
Vice President
Archer Western / De Maria JV II
VA Bay Pines Mental Health Addition
10000 Bay Pines Blvd. – PO Box 4116
Bay Pines, FL 33744

Re: **Project: Neu Security Services - VA Pine Bay**
**Contract No. W9128F-13-C-0016**
**Bond No.: 22023742**
**Surety: Liberty Mutual Insurance Company**

Dear Mr. Kovach:

We regret to advise you that we are unable to complete the captioned contract for the above project. We, accordingly, hereby voluntarily and irrevocably acknowledge that we are in default on said contract and acknowledge that we are financially unable to pay our contract payables as they become due. We here waive any notice required under the contract documents and any opportunity to cure. Our surety will be in contact with you within a short period of time to discuss this matter and an orderly transition of our contractual obligations. You can count on our cooperation during this process.

Very truly yours,

By: ______________________
Stephen Neusch, President

cc: Gene Sawyer, Liberty Mutual

Unofficial copy - Travis Co. District Clerk Velva L. Price



EXHIBIT H

NEU
SECURITY SERVICES

November 4, 2015

Jon Conlon
KIWET-TURNER JOINT VENTURE
7200 S. Alton Way, SuiteA-300
Englewood, CO 80112

Re: **Project: Replacement Medical Facility**
**Colfax- Aurora, CO**
**13-004**
**Bond No.: 22023753**

Dear Mr. Conlon:

We regret to advise you that we are unable to complete the captioned contract for the above project. We, accordingly, hereby voluntarily and irrevocably acknowledge that we are in default on said contract and acknowledge that we are financially unable to pay our contract payables as they become due. We here waive any notice required under the contract documents and any opportunity to cure. Our surety, Liberty Mutual, will be in contact with you within a short period of time to discuss this matter and an orderly transition of our contractual obligations. You can count on our cooperation during this process.

Very truly yours,

By: ______________________

Stephen Neusch, President

cc: Gene Sawyer, Liberty Mutual

Unofficial copy - Travis Co. District Clerk Velva L. Price



EXHIBIT H

**GIBRALTAR FAMILY OF COMPANIES**
**NSS - Short Term Loan Recap**
**March 7, 2016**

| Date | Description | Company | Bonded Amount | Un-Bonded Amount | Applied Payments | Balance Due | Running Balance |
|---|---|---|---|---|---|---|---|
| 4/1/15 | Neu Security Services - Payroll | Foundation Fence | 84,303.25 | 11,625.10 | (84,303.25) | 11,625.10 | 11,625.10 |
| 4/8/15 | Neu Security Services - Payroll | Foundation Fence | 78,817.10 | 10,275.38 | (78,817.10) | 10,275.38 | 21,900.48 |
| 4/16/15 | Neu Security Services - Payroll | Foundation Fence | 73,214.30 | 14,914.37 | (73,214.30) | 14,914.37 | 36,814.85 |
| 4/23/15 | Neu Security Services - Payroll | Foundation Fence | 73,144.42 | 12,611.39 | (73,144.42) | 12,611.39 | 49,426.24 |
| 5/8/15 | Neu Security Services - Non Bonded Payroll | Foundation Fence | | 4,495.77 | | 4,495.77 | 53,922.01 |
| 5/21/15 | Neu Security Services - Payroll | Foundation Fence | | 3,907.93 | | 3,907.93 | 57,829.94 |
| 6/18/15 | Neu Security Services - Payroll | Foundation Fence | 62,919.14 | 909.37 | (62,919.14) | 909.37 | 58,739.31 |
| 9/1/15 | Neu Security Services - Non Bonded Payroll | Foundation Fence | | 31,303.00 | | 31,303.00 | 90,042.31 |
| 10/8/15 | Neu Security Services - Payroll | Foundation Fence | 32,025.24 | | (26,507.61) | 5,517.63 | 95,559.94 |
| 12/2/15 | Neu Security Services - Payroll | Foundation Fence | 18,520.49 | | (4,225.43) | 14,295.06 | 109,855.00 |
| 12/9/15 | Neu Security Services - Payroll | Foundation Fence | 33,625.95 | | | 33,625.95 | 143,480.95 |
| 9/1/15 | Neu Security Services - Debit Cards | Foundation Fence | 58,092.55 | | (31,106.61) | 26,985.94 | 170,466.89 |
| 10/1/15 | Neu Security Services - Debit Cards | Foundation Fence | 53,826.82 | | | 53,826.82 | 224,293.71 |
| 11/1/15 | Neu Security Services - Debit Cards | Foundation Fence | 30,708.20 | | | 30,708.20 | 255,001.91 |
| 12/1/15 | Neu Security Services - Debit Cards | Foundation Fence | 4,569.75 | | | 4,569.75 | 259,571.66 |
| 10/15/15 | Neu Security Services - CNA Insurance | Foundation Fence | 33,279.64 | | | 33,279.64 | 292,851.30 |
| 2/19/15 | Neu Security Services - Kings Bay | Foundation Fence | 12,232.05 | | | 12,232.05 | 305,083.35 |
| 2/26/15 | Neu Security Services - Kings Bay | Gibraltar Material Distribution | 38,000.00 | | | 38,000.00 | 343,083.35 |
| 2/27/15 | Neu Security Services - Kings Bay | Foundation Fence | 220,504.45 | | | 220,504.45 | 563,587.80 |
| 2/27/15 | Neu Security Services - Miami FBI Building | Foundation Fence | 29,847.36 | | | 29,847.36 | 593,435.16 |
| 3/2/15 | Neu Security Services - Kings Bay | Foundation Fence | 11,807.37 | | | 11,807.37 | 605,242.53 |
| 3/5/15 | Neu Security Services - Kings Bay | Foundation Fence | 3,821.97 | | | 3,821.97 | 609,064.50 |
| 3/5/15 | Neu Security Services - Kings Bay | Foundation Fence | 10,918.12 | | | 10,918.12 | 619,982.62 |
| 3/9/15 | Neu Security Services - Kings Bay | Foundation Fence | 13,572.00 | | | 13,572.00 | 633,554.62 |
| 3/12/15 | Neu Security Services - Ft Carson | Foundation Fence | 195,249.92 | | (25,624.46) | 169,625.46 | 803,180.08 |
| 3/13/15 | Neu Security Services - Ft Carson | Foundation Fence | 254,577.35 | | | 254,577.35 | 1,057,757.43 |
| 3/15/15 | Neu Security Services - Kings Bay | Foundation Fence | 4,509.78 | | | 4,509.78 | 1,062,267.21 |
| 3/18/15 | Neu Security Services - Miami FBI Building | Foundation Fence | 17,337.81 | | | 17,337.81 | 1,079,605.02 |
| 3/23/15 | Neu Security Services - Ft Carson | Foundation Fence | 15,000.00 | | | 15,000.00 | 1,094,605.02 |
| 3/26/15 | Neu Security Services - Ft Carson | Foundation Fence | 27,156.00 | | | 27,156.00 | 1,121,761.02 |
| 3/27/15 | El-Go Team - Denver VA Hospital | Foundation Fence | 301,420.00 | | (284,939.21) | 16,480.79 | 1,138,241.81 |
| 3/30/15 | Neu Security Services - Ft Carson | Foundation Fence | 116,208.98 | | | 116,208.98 | 1,254,450.79 |
| 3/31/15 | Neu Security Services - Kings Bay | Foundation Fence | 11,836.20 | | | 11,836.20 | 1,266,286.99 |
| 4/7/15 | Neu Security Services - Ft Carson | Foundation Fence | 44,011.03 | | | 44,011.03 | 1,310,298.02 |
| 4/7/15 | Shook Hardy & Bacon - Kings Bay | Foundation Fence | 140,000.00 | | | 140,000.00 | 1,450,298.02 |
| 4/8/15 | Neu Security Services - Ft Sam ACP | Foundation Fence | 12,086.63 | | | 12,086.63 | 1,462,384.65 |
| 4/8/15 | Neu Security Services - Miami FBI Building | Foundation Fence | 29,180.44 | | | 29,180.44 | 1,491,565.09 |
| 4/8/15 | Neu Security Services - Kings Bay | Foundation Fence | 7,341.18 | | | 7,341.18 | 1,498,906.27 |
| 4/16/15 | Neu Security Services - St Elizabeth | Foundation Fence | 58,272.18 | | | 58,272.18 | 1,557,178.45 |
| 4/30/15 | Neu Security Services - Ft Sam Houston | Foundation Fence | 467.58 | | | 467.58 | 1,557,646.03 |
| 5/1/15 | Neu Security Services - Ft Carson | Foundation Fence | 463,624.87 | | | 463,624.87 | 2,021,270.90 |
| 5/4/15 | Neu Security Services - Kings Bay | Foundation Fence | 7,224.97 | | | 7,224.97 | 2,028,495.87 |
| 5/4/15 | Neu Security Services - Ft Sam Houston | Foundation Fence | 226.48 | | | 226.48 | 2,028,722.35 |
| 5/12/15 | Neu Security Services - Miami FBI Building | Foundation Fence | 68,122.55 | | | 68,122.55 | 2,096,844.90 |
| 5/14/15 | Neu Security Services - Kings Bay (Argos CC) | Foundation Fence | 2,487.50 | | | 2,487.50 | 2,099,332.40 |
| 5/19/15 | Neu Security Services - Ft Carson | Foundation Fence | 76,121.00 | | | 76,121.00 | 2,175,453.40 |
| 5/21/15 | Neu Security Services - Ft Carson | Foundation Fence | 43,119.63 | | | 43,119.63 | 2,218,573.03 |
| 5/26/15 | Neu Security Services - Ft Carson | Foundation Fence | 622,006.70 | | | 622,006.70 | 2,840,579.73 |
| 5/27/15 | Neu Security Services - Exxon (Hilti CC) | Foundation Fence | | 905.29 | | 905.29 | 2,841,485.02 |
| 5/28/15 | Neu Security Services - Kings Bay (Argos CC) | Foundation Fence | 588.77 | | | 588.77 | 2,842,073.79 |

Unofficial copy Travis Co. District Clerk Velva L. Price

## GIBRALTAR FAMILY OF COMPANIES
NSS - Short Term Loan Recap
March 7, 2016

| Date | Description | Company | Bonded Amount | Un-Bonded Amount | Applied Payments | Balance Due | Running Balance |
|---|---|---|---|---|---|---|---|
| 5/28/15 | Neu Security Services - Kings Bay | Foundation Fence | 5,272.70 | | | 5,272.70 | 2,847,346.49 |
| 5/28/15 | Neu Security Services - Ft Carson | Foundation Fence | 18,075.75 | | | 18,075.75 | 2,865,422.24 |
| 6/1/15 | Neu Security Services - St Elizabeth | Foundation Fence | 420,000.00 | | | 420,000.00 | 3,285,422.24 |
| 6/4/15 | Neu Security Services - Ft Carson | Foundation Fence | 10,560.00 | | | 10,560.00 | 3,295,982.24 |
| 6/4/15 | Neu Security Services - Denver VA Hospital | Foundation Fence | 43,482.78 | | | 43,482.78 | 3,339,465.02 |
| 6/5/15 | Neu Security Services - Ft Carson | Foundation Fence | 14,400.00 | | | 14,400.00 | 3,353,865.02 |
| 6/9/15 | Neu Security Services - VA Pine Bay | Foundation Fence | 842.35 | | | 842.35 | 3,354,707.37 |
| 6/9/15 | Neu Security Services - Ft Sam Houston | Foundation Fence | 153.02 | | | 153.02 | 3,354,860.39 |
| 6/9/15 | Neu Security Services - Kings Bay | Foundation Fence | 46,009.65 | | | 46,009.65 | 3,400,870.04 |
| 6/9/15 | Neu Security Services - Miami FBI Building | Foundation Fence | 38.03 | | | 38.03 | 3,400,908.07 |
| 6/9/15 | Neu Security Services - Ft Carson | Foundation Fence | 162,124.40 | | | 162,124.40 | 3,563,032.47 |
| 6/26/15 | Neu Security Services - Ft Sam Houston | Foundation Fence | 113.76 | | | 113.76 | 3,563,146.23 |
| 6/26/15 | Neu Security Services - Kings Bay | Foundation Fence | 2,850.46 | | | 2,850.46 | 3,565,996.69 |
| 7/1/15 | Neu Security Services - Ft Carson | Foundation Fence | 334,823.13 | | | 334,823.13 | 3,900,819.82 |
| 7/7/15 | Neu Security Services - Ft Carson | Foundation Fence | 284,243.10 | | | 284,243.10 | 4,185,062.92 |
| 7/10/15 | Neu Security Services - Ft Sam Houston | Foundation Fence | 7,374.50 | | | 7,374.50 | 4,192,437.42 |
| 7/10/15 | Neu Security Services - Ft Carson | Foundation Fence | 82,721.55 | | | 82,721.55 | 4,275,158.97 |
| 7/21/15 | Neu Security Services - Denver VA Hospital | Foundation Fence | 22,204.10 | | | 22,204.10 | 4,297,363.07 |
| 7/21/15 | Neu Security Services - Miami FBI Building | Foundation Fence | 7,419.02 | | | 7,419.02 | 4,304,782.09 |
| 7/30/15 | Neu Security Services - Ft Carson | Foundation Fence | 6,645.00 | | | 6,645.00 | 4,311,427.09 |
| 7/31/15 | Neu Security Services - Kings Bay | Foundation Fence | 4,715.85 | | | 4,715.85 | 4,316,142.94 |
| 7/31/15 | Neu Security Services - Denver VA Hospital | Foundation Fence | 7,386.32 | | | 7,386.32 | 4,323,529.26 |
| 7/31/15 | Neu Security Services - Ft Carson | Foundation Fence | 27,570.03 | | | 27,570.03 | 4,351,099.29 |
| 8/7/15 | Neu Security Services - VA Pine Bay | Foundation Fence | 78,908.69 | | | 78,908.69 | 4,430,007.98 |
| 8/7/15 | Neu Security Services - Ft Carson | Foundation Fence | 5,332.41 | | | 5,332.41 | 4,435,340.39 |
| 8/11/15 | Neu Security Services - St Elizabeth | Foundation Fence | 2,600.00 | | | 2,600.00 | 4,437,940.39 |
| 8/11/15 | Neu Security Services - Ft Carson | Foundation Fence | 4,638.00 | | | 4,638.00 | 4,442,578.39 |
| 8/21/15 | Neu Security Services - Ft Carson | Foundation Fence | 226,896.56 | | | 226,896.56 | 4,669,474.95 |
| 8/21/15 | Neu Security Services - Ft Carson | Foundation Fence | 519,023.31 | | | 519,023.31 | 5,188,498.26 |
| 8/26/15 | Neu Security Services - VA Pine Bay | Foundation Fence | 2,550.60 | | | 2,550.60 | 5,191,048.86 |
| 8/26/15 | Neu Security Services - Ft Carson | Foundation Fence | 5,250.00 | | | 5,250.00 | 5,196,298.86 |
| 8/26/15 | Neu Security Services - Kings Bay | Foundation Fence | 1,450.35 | | | 1,450.35 | 5,197,749.21 |
| 8/26/15 | Neu Security Services - Ft Carson | Foundation Fence | 110,370.00 | | | 110,370.00 | 5,308,119.21 |
| 8/27/15 | Neu Security Services - Miami FBI Building | Foundation Fence | 1,181.00 | | | 1,181.00 | 5,309,300.21 |
| 8/28/15 | Neu Security Services - St Elizabeth | Foundation Fence | 6,187.50 | | | 6,187.50 | 5,315,487.71 |
| 9/2/15 | Neu Security Services - Ft Carson | Foundation Fence | 29,695.72 | | | 29,695.72 | 5,345,183.43 |
| 9/21/15 | Neu Security Services - Denver VA Hospital | Foundation Fence | 4,074.19 | | | 4,074.19 | 5,349,257.62 |
| 9/21/15 | Neu Security Services - Ft Carson | Foundation Fence | 14,942.82 | | | 14,942.82 | 5,364,200.44 |
| 9/23/15 | Neu Security Services - Ft Carson | Foundation Fence | 28,915.00 | | | 28,915.00 | 5,393,115.44 |
| 9/23/15 | Neu Security Services - Ft Carson | Foundation Fence | 7,478.56 | | | 7,478.56 | 5,400,594.00 |
| 9/24/15 | Neu Security Services - Ft Carson | Foundation Fence | 23,965.80 | | | 23,965.80 | 5,424,559.80 |
| 10/1/15 | Neu Security Services - Ft Carson | Foundation Fence | 123,068.00 | | | 123,068.00 | 5,547,627.80 |
| 10/6/15 | Neu Security Services - Denver VA Hospital | Foundation Fence | 6,299.08 | | | 6,299.08 | 5,553,926.88 |
| 10/8/15 | Neu Security Services - Ft Carson | Foundation Fence | 23,579.25 | | | 23,579.25 | 5,577,506.13 |
| 10/14/15 | Neu Security Services - Ft Carson | Foundation Fence | 88,482.91 | | | 88,482.91 | 5,665,989.04 |
| 10/22/15 | Neu Security Services - Ft Carson | Foundation Fence | 28,579.30 | | | 28,579.30 | 5,694,568.34 |
| 10/23/15 | Neu Security Services - Ft Sam Houston | Foundation Fence | 9,867.00 | | | 9,867.00 | 5,704,435.34 |
| 10/28/15 | Neu Security Services - Delta Scientific | Foundation Fence | 105,555.89 | | | 105,555.89 | 5,809,991.23 |
| 11/6/15 | Neu Security Services - VA Pine Bay | Foundation Fence | 3,500.00 | | | 3,500.00 | 5,813,491.23 |
| 11/11/15 | Neu Security Services - Ft Sam Houston | Foundation Fence | 8,077.00 | | | 8,077.00 | 5,821,568.23 |

Unofficial Copy Travis Co. District Clerk Velva L. Price

GIBRALTAR FAMILY OF COMPANIES
NSS - Short Term Loan Recap
March 7, 2016

| Date | Description | Company | Bonded Amount | Un-Bonded Amount | Applied Payments | Balance Due | Running Balance |
|---|---|---|---|---|---|---|---|
| 11/17/15 | Neu Security Services - VA Pine Bay | Foundation Fence | 2,500.00 | | | 2,500.00 | 5,824,068.23 |
| 11/23/15 | Neu Security Services - VA Pine Bay | Foundation Fence | 1,050.00 | | | 1,050.00 | 5,825,118.23 |
| 12/7/15 | Neu Security Services - Denver VA Hospital | Foundation Fence | 255.00 | | | 255.00 | 5,825,373.23 |
| 12/7/15 | Neu Security Services - Ft Carson | Foundation Fence | 830.00 | | | 830.00 | 5,826,203.23 |
| 12/8/15 | Neu Security Services - Ft Carson | Foundation Fence | 10,587.29 | | | 10,587.29 | 5,836,790.52 |
| | | Totals | 6,490,644.45 | 90,947.60 | (744,801.53) | 5,836,790.52 | |

| | |
|---|---|
| Sub-Total Due To Gibraltar Cable Barrier Systems | - |
| Sub-Total Due To Gibraltar Material Distribution | 38,000.01 |
| Sub-Total Due to Foundation Fence | 5,798,790.52 |
| | (0.00) |

Unofficial copy Travis Co. District Clerk Velva L. Price

## Paid in Full Line Items

| Date | Description | Company | Advanced Amount | | Applied Payments | Balance Due | Running Balance |
|---|---|---|---|---|---|---|---|
| 1/22/15 | Neu Security Services - Payroll | Gibraltar Material Distribution | 115,000.00 | | (115,000.00) | - | - |
| 2/5/15 | Neu Security Services - Payroll | Gibraltar Material Distribution | 105,000.00 | | (105,000.00) | - | - |
| 2/5/15 | Neu Security Services - Payroll | Gibraltar Material Distribution | 12,000.00 | | (12,000.00) | - | - |
| 2/12/15 | Neu Security Services - Payroll | Gibraltar Material Distribution | 109,000.00 | | (109,000.00) | - | - |
| 2/19/15 | Neu Security Services - Payroll | Gibraltar Material Distribution | 86,053.16 | | (86,053.16) | - | - |
| 2/26/15 | Neu Security Services - Payroll | Gibraltar Material Distribution | 76,265.21 | | (76,265.21) | - | - |
| 2/16/15 | Neu Security Services - GL Insurance | Foundation Fence | 13,571.83 | | (13,571.83) | - | - |
| 2/26/15 | Neu Security Services - GL Insurance (AR) | Foundation Fence | 123,862.34 | | (123,862.34) | - | - |
| 11/25/14 | Neu Security Services - Ft Carson | Gibraltar Material Distribution | 824,933.00 | | (824,933.00) | - | - |
| 3/12/15 | Neu Security Services - Credit Cards | Gibraltar Cable Barriers | 65,000.00 | | (65,000.00) | - | - |
| 4/2/15 | Neu Security Services - CNA Insurance | Gibraltar Material Distribution | 89,593.22 | | (89,593.22) | - | - |
| 4/8/15 | Neu Security Services - Credit Cards | Gibraltar Material Distribution | 62,000.00 | | (62,000.00) | - | - |
| 3/4/15 | Neu Security Services - Payroll | Gibraltar Material Distribution | 42,199.49 | | (42,199.49) | - | - |
| 3/12/15 | Neu Security Services - Payroll | Gibraltar Material Distribution | 73,049.49 | | (73,049.49) | - | - |
| 3/18/15 | Neu Security Services - Payroll | Gibraltar Material Distribution | 102,451.28 | | (102,451.28) | - | - |
| 3/17/15 | Neu Security Services - Credit Cards | Foundation Fence | 1,184.75 | | (1,184.75) | - | - |
| 3/18/15 | Neu Security Services - Credit Cards | Foundation Fence | 17,340.10 | | (17,340.10) | - | - |
| 3/6/15 | Neu Security Services - GMD Crash Test | Foundation Fence | 7,342.13 | | (7,342.13) | - | - |
| 3/17/15 | Neu Security Services - Other Expenses | Foundation Fence | 16,795.46 | | (16,795.46) | - | - |
| 4/16/15 | Neu Security Services - Other Expenses | Foundation Fence | 2,513.81 | | (2,513.81) | - | - |
| 3/17/15 | Neu Security Services - Payroll | Foundation Fence | 1,998.78 | | (1,998.78) | - | - |
| 3/26/15 | Neu Security Services - Payroll | Foundation Fence | 72,893.51 | | (72,893.51) | - | - |
| 4/1/15 | Neu Security Services - Payroll | Foundation Fence | 20,306.68 | | (20,306.68) | - | - |
| 4/30/15 | Neu Security Services - CNA Insurance | Gibraltar Material Distribution | 89,593.22 | | (89,593.22) | - | - |
| 4/17/15 | Neu Security Services - Ft Carson | Gibraltar Material Distribution | 5,000.00 | | (5,000.00) | - | - |
| 1/8/15 | Neu Security Services - Ft Carson | Gibraltar Material Distribution | 113,000.00 | | (113,000.00) | - | - |
| 4/29/15 | Neu Security Services - Payroll | Foundation Fence | 80,768.15 | | (80,768.15) | - | - |
| 11/24/14 | Neu Security Services - Ft Carson | Foundation Fence | 271,028.00 | | (271,028.00) | - | - |
| 5/8/15 | Neu Security Services - Payroll | Foundation Fence | 67,335.79 | | (67,335.79) | - | - |
| 5/14/15 | Neu Security Services - Payroll | Foundation Fence | 42,335.85 | | (42,335.85) | - | - |
| 4/8/15 | Neu Security Services - ST Loan | Gibraltar Material Distribution | | 50,000.00 | (50,000.00) | - | - |

**GIBRALTAR FAMILY OF COMPANIES**
**NSS - Short Term Loan Recap**
**March 7, 2016**

| Date | Description | Company | Bonded Amount | Un-Bonded Amount | Applied Payments | Balance Due | Running Balance |
|---|---|---|---|---|---|---|---|
| 1/16/15 | Neu Security Services - Ft Carson | Gibraltar Material Distribution | 99,401.00 | | (99,401.00) | - | - |
| 2/9/15 | Neu Security Services - Ft Carson | Gibraltar Material Distribution | 200,000.00 | | (200,000.00) | - | - |
| 5/21/15 | Neu Security Services - Payroll | Foundation Fence | 60,540.78 | | (60,540.78) | - | - |
| 5/28/15 | Neu Security Services - Payroll | Foundation Fence | 38,693.72 | | (38,693.72) | - | - |
| 6/4/15 | Neu Security Services - Payroll | Foundation Fence | 44,843.54 | | (44,843.54) | - | - |
| 6/10/15 | Neu Security Services - Payroll | Foundation Fence | 65,720.21 | | (65,720.21) | - | - |
| 5/5/15 | Neu Security Services - Credit Cards | Foundation Fence | 82,216.14 | | (82,216.14) | - | - |
| 5/8/15 | Neu Security Services - Cash Advances | Foundation Fence | 1,000.00 | | (1,000.00) | - | - |
| 5/8/15 | Neu Security Services - Cash Advances | Foundation Fence | 1,000.00 | | (1,000.00) | - | - |
| 5/8/15 | Neu Security Services - Cash Advances | Foundation Fence | 800.00 | | (800.00) | - | - |
| 5/8/15 | Neu Security Services - Cash Advances | Foundation Fence | 1,200.00 | | (1,200.00) | - | - |
| 5/31/15 | Neu Security Services - Debit Cards | Foundation Fence | 13,946.31 | | (13,946.31) | - | - |
| 6/4/15 | Neu Security Services - Flatiron Capital | Foundation Fence | 14,243.68 | | (14,243.68) | - | - |
| 6/10/15 | Neu Security Services - Blue Cross Blue Shield | Foundation Fence | 6,654.68 | | (6,654.68) | - | - |
| 1/8/15 | Neu Security Services - Ft Carson | Foundation Fence | 615,000.00 | | (615,000.00) | - | - |
| 6/25/15 | Neu Security Services - Payroll | Foundation Fence | 64,000.59 | | (64,000.59) | - | - |
| 7/1/15 | Neu Security Services - Payroll | Foundation Fence | 4,271.26 | | (4,271.26) | - | - |
| 7/2/15 | Neu Security Services - Payroll | Foundation Fence | 68,881.56 | | (68,881.56) | - | - |
| 7/9/15 | Neu Security Services - Payroll | Foundation Fence | 49,751.58 | | (49,751.58) | - | - |
| 7/15/15 | Neu Security Services - Payroll | Foundation Fence | 6,616.21 | | (6,616.21) | - | - |
| 7/16/15 | Neu Security Services - Payroll | Foundation Fence | 51,138.98 | | (51,138.98) | - | - |
| 7/23/15 | Neu Security Services - Payroll | Foundation Fence | 50,154.62 | | (50,154.62) | - | - |
| 7/30/15 | Neu Security Services - Payroll | Foundation Fence | 60,960.00 | | (60,960.00) | - | - |
| 6/16/15 | Neu Security Services - Credit Cards | Foundation Fence | 21,067.24 | | (21,067.24) | - | - |
| 6/30/15 | Neu Security Services - Debit Cards | Foundation Fence | 80,776.80 | | (80,776.80) | - | - |
| 7/31/15 | Neu Security Services - Debit Cards | Foundation Fence | 64,066.00 | | (64,066.00) | - | - |
| 7/21/15 | Neu Security Services - Blue Cross Blue Shield | Foundation Fence | 4,833.83 | | (4,833.83) | - | - |
| 2/16/15 | Neu Security Services - Ft Carson | Foundation Fence | 462,528.92 | | (462,528.92) | - | - |
| 8/6/15 | Neu Security Services - Payroll | Foundation Fence | 64,239.32 | | (64,239.32) | - | - |
| 8/13/15 | Neu Security Services - Payroll | Foundation Fence | 61,423.74 | | (61,423.74) | - | - |
| 8/20/15 | Neu Security Services - Payroll | Foundation Fence | 57,834.38 | | (57,834.38) | - | - |
| 8/11/15 | Neu Security Services - CNA Insurance | Foundation Fence | 38,139.65 | | (38,139.65) | - | - |
| 8/13/15 | Neu Security Services - CNA Insurance | Foundation Fence | 16,724.35 | | (16,724.35) | - | - |
| 8/18/15 | Neu Security Services - Flatiron Capital | Foundation Fence | 5,950.40 | | (5,950.40) | - | - |
| 8/14/15 | Neu Security Services - Forbearance | Foundation Fence | 150,000.00 | | (150,000.00) | - | - |
| 2/25/15 | Neu Security Services - Net Rentals | Foundation Fence | 96,173.40 | | (96,173.40) | - | - |
| 2/27/15 | Neu Security Services - Ft Carson | Foundation Fence | 98,412.30 | | (98,412.30) | - | - |
| 3/9/15 | Neu Security Services - Ft Carson | Foundation Fence | 17,238.00 | | (17,238.00) | - | - |
| 3/12/15 | Neu Security Services - Ft Carson | Foundation Fence | 237,851.62 | | (237,851.62) | - | - |
| 8/26/15 | Neu Security Services - Payroll | Foundation Fence | 55,565.44 | | (55,565.44) | - | - |
| 9/3/15 | Neu Security Services - Payroll | Foundation Fence | 39,522.70 | | (39,522.70) | - | - |
| 9/10/15 | Neu Security Services - Payroll | Foundation Fence | 40,559.36 | | (40,559.36) | - | - |
| 8/1/15 | Neu Security Services - Debit Cards | Foundation Fence | 98,651.43 | | (98,651.43) | - | - |
| 8/26/15 | Neu Security Services - Blue Cross Blue Shield | Foundation Fence | 2,364.86 | | (2,364.86) | - | - |
| 9/9/15 | Neu Security Services - CNA Insurance | Foundation Fence | 2,000.00 | | (2,000.00) | - | - |
| 2/27/15 | Neu Security Services - Utah Data Center | Foundation Fence | 19,186.80 | | (19,186.80) | - | - |
| 3/5/15 | Neu Security Services - Utah Data Center | Foundation Fence | 5,000.00 | | (5,000.00) | - | - |
| 5/8/15 | Neu Security Services - Utah Data Center | Foundation Fence | 13,715.00 | | (13,715.00) | - | - |
| 6/9/15 | Neu Security Services - Utah Data Center | Foundation Fence | 27,330.67 | | (27,330.67) | - | - |
| 8/7/15 | Neu Security Services - Utah Data Center | Foundation Fence | 14,637.00 | | (14,637.00) | - | - |

Unofficial Copy Travis Co. District Clerk Velva Price

**GIBRALTAR FAMILY OF COMPANIES**
**NSS - Short Term Loan Recap**
**March 7, 2016**

| Date | Description | Company | Bonded Amount | Un-Bonded Amount | Applied Payments | Balance Due | Running Balance |
|---|---|---|---|---|---|---|---|
| 9/11/15 | Neu Security Services - Utah Data Center | Foundation Fence | 21,947.66 | | (21,947.66) | - | - |
| 9/17/15 | Neu Security Services - Payroll | Foundation Fence | 36,008.10 | | (36,008.10) | - | - |
| 9/21/15 | Neu Security Services - Payroll Taxes | Foundation Fence | 20,363.31 | | (20,363.31) | - | - |
| 9/24/15 | Neu Security Services - Payroll | Foundation Fence | 48,059.78 | | (48,059.78) | - | - |
| 10/15/15 | Neu Security Services - Non Bonded Payroll | Foundation Fence | | 9,259.80 | (9,259.80) | - | - |
| 10/1/15 | Neu Security Services - Payroll | Foundation Fence | 38,477.20 | | (38,477.20) | - | - |
| 10/15/15 | Neu Security Services - Payroll | Foundation Fence | 40,570.61 | | (40,570.61) | - | - |
| 10/22/15 | Neu Security Services - Payroll | Foundation Fence | 33,645.41 | | (33,645.41) | - | - |
| 10/29/15 | Neu Security Services - Payroll | Foundation Fence | 22,937.08 | | (22,937.08) | - | - |
| 11/5/15 | Neu Security Services - Payroll | Foundation Fence | 30,319.31 | | (30,319.31) | - | - |
| 11/12/15 | Neu Security Services - Payroll | Foundation Fence | 30,882.40 | | (30,882.40) | - | - |
| 11/18/15 | Neu Security Services - Payroll | Foundation Fence | 29,999.46 | | (29,999.46) | - | - |
| 11/18/15 | Neu Security Services - Payroll | Foundation Fence | 7,403.61 | | (7,403.61) | - | - |
| 11/25/15 | Neu Security Services - Payroll | Foundation Fence | 25,938.69 | | (25,938.69) | - | - |
| | | **Totals Paid** | **6,492,795.94** | **59,259.80** | **(6,552,055.74)** | | |

Unofficial copy - Travis Co. District Clerk Velva Price

# CIVIL CASE INFORMATION SHEET

CAUSE NUMBER (FOR CLERK USE ONLY): D-1-GN-16-001117 COURT (FOR CLERK USE ONLY): 419th

MAY ENTER CAUSE # & COURT # IF ALREADY ASSIGNED (E.G., FAMILY MOTION, AMENDED PETITION)

STYLED Gibraltar Cable Barrier Systems, LP, et al. v. Stephen Neusch, et al.

A civil case information sheet must be completed and submitted when an original petition or application is filed to initiate a new civil, family law, probate, or mental health case or when a post-judgment petition for modification or motion for enforcement is filed in a family law case. The information should be the best available at the time of filing. This sheet, approved by the Texas Judicial Council, is intended to collect information that will be used for statistical purposes only. It neither replaces nor supplements the filings or service of pleading or other documents as required by law or rule. The sheet does not constitute a discovery request, response, or supplementation, and it is not admissible at trial.

**1. Contact information for person completing case information sheet:**

Name: Donald R. Taylor
Email: dtaylor@taylordunham.com
Address: 301 Congress Ave., Ste. 1050
Telephone: (512) 473-2257
City/State/Zip: Austin, TX 78701
Fax: (512) 478-4409
Signature: Donald R. Taylor by permission CJC
State Bar No: (TX) 19688800

**Names of parties in case:**

Plaintiff(s)/Petitioner(s):
Gibraltar Cable Barrier Systems, LP, Gibraltar Material Distribution, LP, Neusch Innovations, LP and Foundation Fence, Inc.; William Neusch

Defendant(s)/Respondent(s):
Stephen Neusch, NEU Security Services, LLC, Black Security Products, LLC

[Attach additional page as necessary to list all parties]

**Person or entity completing sheet is:**
☒ Attorney for Plaintiff/Petitioner
☐ *Pro Se* Plaintiff/Petitioner
☐ Title IV-D Agency
☐ Other: ____

Additional Parties in Child Support Case:
Custodial Parent: ____
Non-Custodial Parent: ____
Presumed Father: ____

**2. Indicate case type, or identify the most important issue in the case (*select only 1*):**

OPTION A: CK CASE TYPE (EXCEPT OTHER) FOR CLERK TO SELECT SUIT TYPE; SEE SEC. 3 NOTE BELOW

***Civil***

**Contract**
*Debt/Contract*
☐ Consumer/DTPA
☐ Debt/Contract
☐ Fraud/Misrepresentation
☒ Other Debt/Contract: ____
*Foreclosure*
☐ Home Equity—Expedited
☐ Other Foreclosure
☐ Franchise
☐ Insurance
☐ Landlord/Tenant
☐ Non-Competition
☐ Partnership
☐ Other Contract: ____

OPTION B: CK OTHER & ENTER 3-LETTER SUIT TYPE FOR CLERK TO USE WHEN DOCKETING

**Injury or Damage**
☐ Assault/Battery
☐ Construction
☐ Defamation
*Malpractice*
☐ Accounting
☐ Legal
☐ Medical
☐ Other Professional Liability: ____
☐ Motor Vehicle Accident
☐ Premises
*Product Liability*
☐ Asbestos/Silica
☐ Other Product Liability
List Product: ____
☐ Other Injury or Damage: ____

**Real Property**
☐ Eminent Domain/Condemnation
☐ Partition
☐ Quiet Title
☐ Trespass to Try Title
☐ Other Property: ____

**Related to Criminal Matters**
☐ Expunction
☐ Judgment Nisi
☐ Non-Disclosure
☐ Seizure/Forfeiture
☐ Writ of Habeas Corpus—Pre-indictment
☐ Other: ____

***Family Law***

**Marriage Relationship**
☐ Annulment
☐ Declare Marriage Void
*Divorce*
☐ With Children
☐ No Children

**Other Family Law**
☐ Enforce Foreign Judgment
☐ Habeas Corpus
☐ Name Change
☐ Protective Order
☐ Removal of Disabilities of Minority
☐ Other: ____

**Post-judgment Actions (non-Title IV-D)**
☐ Enforcement
☐ Modification—Custody
☐ Modification—Other

**Title IV-D**
☐ Enforcement/Modification
☐ Paternity
☐ Reciprocals (UIFSA)
☐ Support Order

**Parent-Child Relationship**
☐ Adoption/Adoption with Termination
☐ Child Protection
☐ Child Support
☐ Custody or Visitation
☐ Gestational Parenting
☐ Grandparent Access
☐ Parentage/Paternity
☐ Termination of Parental Rights
☐ Other Parent-Child: ____

**Employment**
☐ Discrimination
☐ Retaliation
☐ Termination
☐ Workers' Compensation
☐ Other Employment: ____

**Other Civil**
☐ Administrative Appeal
☐ Antitrust/Unfair Competition
☐ Code Violations
☐ Foreign Judgment
☐ Intellectual Property
☐ Lawyer Discipline
☐ Perpetuate Testimony
☐ Securities/Stock
☐ Tortious Interference
☐ Other: ____

**Tax**
☐ Tax Appraisal
☐ Tax Delinquency
☐ Other Tax

***Probate & Mental Health***
*Probate/Wills/Intestate Administration*
☐ Dependent Administration
☐ Independent Administration
☐ Other Estate Proceedings
☐ Guardianship—Adult
☐ Guardianship—Minor
☐ Mental Health
☐ Other: ____

**3. Indicate procedure or remedy, if applicable (*may select more than 1*):**

☐ Appeal from Municipal or Justice Court
☐ Arbitration-related
☐ Attachment
☐ **Bill of Review**
☐ Certiorari
☐ **Class Action**
☐ **Declaratory Judgment**
☐ **Garnishment**
☐ **Interpleader**
☐ **License**
☐ **Mandamus**
☐ Post-judgment
☐ Prejudgment Remedy
☐ **Protective Order**
☒ **Receiver**
☐ **Sequestration**
☒ Temporary Restraining Order/**Injunction**
☐ Turnover

OPTION C: SECTION 3 PROCEDURES/REMEDIES IN BOLD MAY BE USED AS CASE OR SUIT TYPES. YOU MAY SPECIFY THAT ONE OF THESE PROCEDURES/REMEDIES BE USED AS A SUIT TYPE BY CHECKING IT AND LEAVING THE CASE TYPE IN SECTION 2 BLANK. SELECTING A CASE TYPE IN SECTION 2 OVERRIDES ANY SELECTION IN SECTION 3.

Unofficial Copy - Travis County District Clerk Velva L. Price