```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE WESTERN DISTRICT OF TEXAS
 2                       AUSTIN DIVISION

 3  GIBRALTAR CABLE BARRIER SYSTEMS, LP,     ) AU:16-CV-00418-LY
    GIBRALTAR MATERIAL DISTRIBUTION, LP, NEUSCH )
 4  INNOVATIONS, LP, FOUNDATION FENCE, INC.,  )
    and WILLIAM H. NEUSCH,                    )
 5     Plaintiffs,                            )
                                             )
 6  v.                                        ) AUSTIN, TEXAS
                                             )
 7  STEPHEN NEUSCH, NEU SECURITY SERVICES, LLC, )
    and BLACK SECURITY PRODUCTS, LLC,         )
 8     Defendants,                            )
                                             )
 9  v.                                        )
                                             )
10  BETAFENCE USA, LLC and PAUL NEUSCH,       )
       Third-Party Defendants.               ) AUGUST 1, 2016

11          ************************************************
12          TRANSCRIPT OF MOTIONS HEARING (CONTINUED)
               BEFORE THE HONORABLE LEE YEAKEL
13          ************************************************

14  FOR THE PLAINTIFFS:      DONALD R. TAYLOR
                             NATALIE A. TAYLOR
15                           CABRACH J. CONNOR
                             TAYLOR DUNHAM AND RODRIGUEZ LLP
16                           301 CONGRESS AVENUE, SUITE 1050
                             AUSTIN, TEXAS 78701
17
    FOR THE DEFENDANTS:      CHARLES J. ROGERS
18                           CONLEY ROSE, P.C.
                             1001 MCKINNEY STREET, SUITE 1800
19                           HOUSTON, TEXAS 77002-6421

20                           DARLENE GHAVIMI
                             CONLEY ROSE P.C.
21                           13413 GALLERIA CIRCLE, SUITE 100
                             AUSTIN, TEXAS 78738
22
    COURT REPORTER:          ARLINDA RODRIGUEZ, CSR
23                           501 WEST 5TH STREET, SUITE 4152
                             AUSTIN, TEXAS 78701
24
    Proceedings recorded by computerized stenography, transcript
25  produced by computer.
```

**EXAMINATION INDEX**

TOM PENG
        DIRECT BY MS. TAYLOR   . . . . . . . . . . . . . .   12
        CROSS BY MS. GHAVIMI   . . . . . . . . . . . . . .   24

STEPHEN NEUSCH
        DIRECT BY MR. CONNOR   . . . . . . . . . . . . . .   27
        CROSS BY MS. GHAVIMI   . . . . . . . . . . . . . .   62
        REDIRECT BY MR. CONNOR . . . . . . . . . . . . . .   80

RONALD REYNOLDS
        DIRECT BY MR. TAYLOR   . . . . . . . . . . . . . .   91
        CROSS BY MS. GHAVIMI   . . . . . . . . . . . . . .  111

WILLIAM NEUSCH
        DIRECT BY MR. CONNOR   . . . . . . . . . . . . . .  114
        CROSS BY MR. ROGERS  . . . . . . . . . . . . . . .  124
        REDIRECT BY MR. CONNOR . . . . . . . . . . . . . . .180

STEPHEN NEUSCH
        DIRECT BY MS. GHAVIMI  . . . . . . . . . . . . . . .183
        CROSS BY MR. CONNOR  . . . . . . . . . . . . . . .  202
        REDIRECT BY MS. GHAVIMI  . . . . . . . . . . . . .  206
        RECROSS BY MR. CONNOR  . . . . . . . . . . . . . .  208

**EXHIBIT INDEX**

                                                      OFF/ADM
Plaintiff
 1-20                                                   5    5

 23-29                                                  5    5

 33-127                                                 5    5

Defendant
 13-52                                                  5    5

 54-67                                                  5    5

09:29:10  1      (Open Court)

09:29:10  2          THE COURT:  We are here today for the continuation of

09:29:15  3  the consideration of the motions in *Gibraltar Cable Barrier*

09:29:18  4  *Systems, LP*, and others *v. Stephen Neusch*, and others, Cause

09:29:23  5  Number 16-CV-418.  Let me get announcements by the parties as

09:29:29  6  to who is here today.  And I'll start with the plaintiff.

09:29:35  7          MR. TAYLOR:  Donald Taylor, Cab Connor, and Natalie

09:29:36  8  Taylor as attorneys for the plaintiffs, Your Honor.

09:29:38  9          THE COURT:  All right.  And for the defendants?

09:29:40  10          MS. GHAVIMI:  Darlene Ghavimi and Charles Rogers for

09:29:43  11  the defendants, Your Honor.  And we're with Stephen Neusch, my

09:29:47  12  client.

09:29:47  13          THE COURT:  All right.  Well, we have had other

09:29:50  14  hearings in this case and some meetings in chambers.  And what

09:29:54  15  I have scheduled for today is what, for want of a better word,

09:29:59  16  I'll call a wrap up of any evidence that anyone wants to

09:30:03  17  present on the particular motions that I have in front of me

09:30:08  18  which are the plaintiffs' motion for a preliminary injunction

09:30:15  19  and appointment of a receiver.

09:30:18  20          Is there anything we need to take up before we get

09:30:22  21  into presenting evidence in this case?

09:30:26  22          MR. TAYLOR:  Just we did get together on the

09:30:28  23  exhibits, Judge, so we've got just about all the exhibits

09:30:33  24  agreed to.  With respect to the Defendant's Exhibits 13 through

09:30:40  25  67, we agree to the admissibility of those exhibits, except for

| | | |
|---|---|---|
| 09:30:44 | 1 | Exhibit Number 53.  So for the court reporter's purposes, |
| 09:30:48 | 2 | that's Defendant's Exhibits 13 through 67 are agreed to, except |
| 09:30:52 | 3 | for Exhibit Number 53. |
| 09:30:55 | 4 | And with respect to Plaintiffs' exhibits, it's -- |
| 09:30:59 | 5 | agreed that Exhibits 1 through 127 are agreed to be admitted |
| 09:31:04 | 6 | except for 21, 22, 30, 31, and 32.  And a large portion of |
| 09:31:16 | 7 | those exhibits have already been admitted in the previous |
| 09:31:19 | 8 | hearings.  But I think that includes the entire range. |
| 09:31:21 | 9 | Your Honor, just preliminary, what we intend to do |
| 09:31:24 | 10 | today is focus on the things that -- that you indicated that |
| 09:31:27 | 11 | you wanted in chambers.  And we will be presenting evidence |
| 09:31:32 | 12 | with respect to the right to sell, market, and manufacturer the |
| 09:31:38 | 13 | four products that are in dispute.  We have a short -- we'll |
| 09:31:43 | 14 | kick this off with a short, I think, 16-minute deposition of |
| 09:31:47 | 15 | the testing facility.  And then we will, in addition, since we |
| 09:31:51 | 16 | were fortunate enough to have a supplemental report by |
| 09:31:56 | 17 | Mr. Reynolds, we're going to call him.  And we intend to really |
| 09:31:59 | 18 | just focus on the elements and cleaning up the evidence with |
| 09:32:04 | 19 | respect to these products and things that have happened since |
| 09:32:09 | 20 | the last hearing. |
| 09:32:09 | 21 | THE COURT:  All right.  And let me hear from the |
| 09:32:12 | 22 | defendant.  Initially, Mr. Rogers, do you agree with what |
| 09:32:19 | 23 | Mr. Taylor's statements were, the exhibits to which there is no |
| 09:32:23 | 24 | objection to admissibility? |
| 09:32:25 | 25 | MR. ROGERS:  Yes, Your Honor. |

| | | |
|---|---|---|
| 09:32:25 | 1 | THE COURT:  All right.  So listen to me carefully and |
| 09:32:28 | 2 | make sure I get this right. |
| 09:32:30 | 3 | Then Defendant's Exhibits 13 through 67, inclusive, |
| 09:32:37 | 4 | with the exception of Exhibit Number 53 are admitted, and |
| 09:32:45 | 5 | Plaintiffs' Exhibits 1 through 127, inclusive, with the |
| 09:32:50 | 6 | exception of Exhibits 21, 22, 30, 31, and 32 are admitted; is |
| 09:32:57 | 7 | that correct? |
| 09:32:59 | 8 | MR. ROGERS:  Yes. |
| 09:33:00 | 9 | MR. TAYLOR:  Yes, Your Honor. |
| 09:33:01 | 10 | THE COURT:  Then those are admitted. |
| 09:33:03 | 11 | Now proceed, Mr. Rogers. |
| 09:33:11 | 12 | MR. ROGERS:  Just one procedural matter before we get |
| 09:33:11 | 13 | to presentation of the evidence.  I received over the weekend, |
| 09:33:12 | 14 | I believe on Saturday, Document Number 59, which is -- |
| 09:33:17 | 15 | THE COURT:  Don't say Document Number 59, because |
| 09:33:20 | 16 | that would indicate it's different from either Plaintiffs' |
| 09:33:28 | 17 | exhibits or Defendants' exhibits. |
| 09:33:29 | 18 | MR. ROGERS:  Pacer docket number. |
| 09:33:31 | 19 | THE COURT:  Okay.  Pacer docket number.  All right. |
| 09:33:32 | 20 | MR. ROGERS:  So it was a filing, and it's entitled |
| 09:33:34 | 21 | Third-Party Defendant Betafence's Notice of Supporting Joinder |
| 09:33:38 | 22 | in Plaintiffs' Motion For Preliminary Injunction and Order |
| 09:33:41 | 23 | Appointing Receiver. |
| 09:33:42 | 24 | Betafence is a third-party defendant who has entered |
| 09:33:46 | 25 | an appearance in this case, but they have not filed any |

| | | |
|---|---|---|
| 09:33:49 | 1 | counterclaims.  And so, procedurally, it doesn't make any sense |
| 09:34:01 | 2 | for a party who doesn't have any pleadings to join in a motion. |
| 09:34:05 | 3 | They have a standing issue. |
| 09:34:08 | 4 | THE COURT:  Well, at the end of the day, I don't |
| 09:34:17 | 5 | think it matters a whole lot because I'm going to be |
| 09:34:20 | 6 | concentrating on the -- on the motions that I have in front of |
| 09:34:23 | 7 | me.  And, if I grant them, they're granted and, if I deny them, |
| 09:34:28 | 8 | they're denied, regardless of who is attempting to come in as a |
| 09:34:43 | 9 | third party.  I do agree that it would be somewhat out of |
| 09:34:44 | 10 | sequence to have a third party joinder before there's a third |
| 09:34:53 | 11 | party who has actually entered the case.  But I don't think |
| 09:35:01 | 12 | that's of a major concern here today. |
| 09:35:03 | 13 | MR. ROGERS:  I have one concern I'd like to raise and |
| 09:35:06 | 14 | I think the reason why they filed a motion -- they can tell us, |
| 09:35:08 | 15 | but it's not a motion.  I think the reason why they filed the |
| 09:35:12 | 16 | notice is because there's a standing issue for all of the |
| 09:35:14 | 17 | plaintiffs, and this may be an attempt to try to cure that |
| 09:35:21 | 18 | standing issue, by bringing in the party that they may assert |
| 09:35:24 | 19 | does have standing for the request for relief they're asking in |
| 09:35:27 | 20 | this preliminary injunction. |
| 09:35:28 | 21 | There's two issues that have come up since the last |
| 09:35:31 | 22 | hearing that we've had.  There's been allegations of patent |
| 09:35:39 | 23 | rights.  If you'll recall at the last hearing when we were |
| 09:35:41 | 24 | talking about scheduling this hearing and what you wanted to |
| 09:35:47 | 25 | hear from the parties included for their attempt to get a |

| | | |
|---|---|---|
| 09:35:50 | 1 | preliminary injunction against four disputed products, to |
| 09:35:54 | 2 | enjoin the defendants from selling four disputed products, |
| 09:36:00 | 3 | you wanted to know whether or not there was any patent coverage |
| 09:36:02 | 4 | for any of these products, and also who made the products |
| 09:36:05 | 5 | first.  And so through discovery in preparation for this |
| 09:36:08 | 6 | hearing, there's been allegations -- assertions of patent |
| 09:36:15 | 7 | rights from the plaintiffs.  And there's one patent and two |
| 09:36:19 | 8 | pending patent applications. |
| 09:36:21 | 9 | The problem is there's only one patent that they're |
| 09:36:24 | 10 | throwing around, and it's not owned by any of the plaintiffs. |
| 09:36:28 | 11 | It's owned by Betafence.  And I believe that's why they're |
| 09:36:32 | 12 | trying to a bring in Betafence to join in the motion, so they |
| 09:36:35 | 13 | can assert patent rights.  But the problem is, of course, that |
| 09:36:38 | 14 | Betafence not only hasn't asserted -- they haven't asserted any |
| 09:36:43 | 15 | counterclaims, but they certainly haven't asserted any patent |
| 09:36:45 | 16 | infringement counterclaims. |
| 09:36:47 | 17 | And -- but there's a bigger problem.  There's a |
| 09:36:54 | 18 | bigger problem.  There's something buried in the documents that |
| 09:36:56 | 19 | we found over the past few days that they haven't told you |
| 09:37:00 | 20 | about, and that has to do with a standing issue on the notice |
| 09:37:03 | 21 | of termination.  They call it a termination agreement.  That |
| 09:37:06 | 22 | agreement, which is the foundation for the request for |
| 09:37:09 | 23 | preliminary injunction, has been assigned to Betafence. |
| 09:37:15 | 24 | There's an assignment in the Betafence sale agreement where -- |
| 09:37:20 | 25 | where Gibraltar sold assets to Betafence.  They've assigned |

| | | |
|---|---|---|
| 09:37:30 | 1 | away all their rights. |
| 09:37:30 | 2 | The plaintiffs have no standing in this case to |
| 09:37:33 | 3 | request the relief that they're asking for to the extent |
| 09:37:35 | 4 | they're basing their request for relief on a breach of a notice |
| 09:37:38 | 5 | of termination agreement.  Betaface is the only party that has |
| 09:37:45 | 6 | that right, they're a third-party defendants, and have not |
| 09:37:47 | 7 | asserted any counterclaims in this case, certainly not for |
| 09:37:52 | 8 | breach of the termination notice agreement and certainly no |
| 09:37:54 | 9 | claims for patent infringement. |
| 09:37:56 | 10 | So we'll put on evidence of that.  But as a |
| 09:38:01 | 11 | procedural issue, I wanted to let you know what's going on |
| 09:38:04 | 12 | here. |
| 09:38:11 | 13 | THE COURT:  Well, number one, let me just say every |
| 09:38:15 | 14 | time I say something in the courtroom, I regret that I said it. |
| 09:38:19 | 15 | Okay?  That's just the nature of the beast.  I made a passing |
| 09:38:24 | 16 | inquiry about whether there was any patent coverage on the |
| 09:38:32 | 17 | products that were being argued about at a very early stage in |
| 09:38:36 | 18 | this game.  That was only because I wanted to know.  It did not |
| 09:38:40 | 19 | mean that I thought it was going to be an issue in this case. |
| 09:38:46 | 20 | So, initially, I don't want to hear a lot about patents today. |
| 09:38:50 | 21 | That is not something that I have concern about on whether I'm |
| 09:38:53 | 22 | going to grant the preliminary relief that is sought by the |
| 09:38:56 | 23 | plaintiffs. |
| 09:38:57 | 24 | I would have preferred, as I indicated early on, that |
| 09:39:04 | 25 | you would have spent more of your time trying to resolve this |

| | | |
|---|---|---|
| 09:39:07 | 1 | case or that the parties would have spent more of their time |
| 09:39:11 | 2 | trying to resolve this case than worrying about what I was |
| 09:39:15 | 3 | thinking about. |
| 09:39:17 | 4 | I just got back from our biannual judicial |
| 09:39:20 | 5 | conference, and one judge got up and talked about how the |
| 09:39:23 | 6 | lawyers always do a psychological evaluation of the judge |
| 09:39:27 | 7 | whenever you say something.  So this just confirms what the |
| 09:39:30 | 8 | judge's observations were about, well, let's psychologically |
| 09:39:36 | 9 | evaluate what the judge thought when he mentioned the word |
| 09:39:38 | 10 | "patent." |
| 09:39:39 | 11 | But that is not something that I'm going to hinge my |
| 09:39:43 | 12 | decision on, on what we have in front of us today.  So don't |
| 09:39:46 | 13 | spend a lot of time worrying about that.  I am concerned about |
| 09:39:55 | 14 | the merits of this.  I am concerned about what has been |
| 09:39:58 | 15 | covered.  I continually say, and I say again, knowing what I |
| 09:40:05 | 16 | know about this case, I think both sides -- and I'm referring |
| 09:40:09 | 17 | to the parties, not the lawyers -- are being unreasonable here. |
| 09:40:15 | 18 | I think this is a matter that should be resolved and it should |
| 09:40:19 | 19 | be resolved by the parties. |
| 09:40:27 | 20 | And I think this is a wonderful thing, that the |
| 09:40:31 | 21 | lawyers and the accountants are making as much money as they |
| 09:40:35 | 22 | are.  But what is happening is money is being spent that could |
| 09:40:38 | 23 | be better spent among the parties so they can get on about |
| 09:40:42 | 24 | their business of making money instead of spending time in the |
| 09:40:46 | 25 | courtroom. |

09:40:46  1          But, for whatever reason, the decision has been made

09:40:56  2  to continue to push with litigation, but I think that's the

09:40:58  3  wrong way to approach this case and I had thought it was the

09:41:02  4  wrong way to approach this case from the beginning.  But it

09:41:05  5  takes two sides to reach a resolution; and, clearly, one or

09:41:12  6  both sides is not particularly interested in resolving this

09:41:16  7  case.  So we will see.

09:41:20  8          What else before the plaintiff goes forward?

09:41:25  9          MR. ROGERS:  Nothing from the defendants, Your Honor.

09:41:26  10          THE COURT:  All right.  Mr. Taylor, are you ready?

09:41:28  11          MR. TAYLOR:  Yes.  We're ready, Your Honor.

09:41:31  12          Play the deposition of KARCO.

09:41:41  13          MS. GHAVIMI:  Your Honor, we objected to this

09:41:42  14  deposition as untimely because it was taken over the telephone

09:41:46  15  with less than seven days notice, and we were not --

09:41:49  16          THE COURT:  I can't hear you.

09:41:52  17          MS. GHAVIMI:  We were -- we objected to this

09:41:54  18  deposition as untimely because it was scheduled over the

09:41:58  19  telephone without prior request and negotiation with the

09:42:04  20  defendants.  Also we were not given enough time to -- to

09:42:08  21  schedule a flight out there and prepare to be present.  We also

09:42:12  22  were not able to -- we received the documents in response to

09:42:17  23  the subpoena the day before.  And also we were not given these

09:42:19  24  designations prior to -- prior to presentation today.

09:42:25  25          THE COURT:  Response?

| | | |
|---|---|---|
| 09:42:28 | 1 | MS. TAYLOR:  Your Honor, Defendants subpoenaed this |
| 09:42:31 | 2 | entity, KARCO, without talking to us about it first, and they |
| 09:42:38 | 3 | did a subpoena for documents.  What we did -- they didn't |
| 09:42:41 | 4 | include a business records affidavit.  What we did is request |
| 09:42:45 | 5 | notice of telephone deposition to ask questions about the |
| 09:42:48 | 6 | documents that Defendants subpoenaed. |
| 09:42:50 | 7 | They did not move to quash the deposition. |
| 09:42:54 | 8 | Ms. Ghavimi attended by telephone.  In fact, she sent her |
| 09:42:58 | 9 | exhibits to the court reporter two days before the deposition. |
| 09:43:01 | 10 | Everybody got the documents from KARCO at the same time, we all |
| 09:43:05 | 11 | had one day to review them, and we got to ask our questions |
| 09:43:09 | 12 | about the documents. |
| 09:43:09 | 13 | THE COURT:  Ms. Ghavimi, you can respond. |
| 09:43:12 | 14 | MS. GHAVIMI:  The purpose of -- of objecting to |
| 09:43:18 | 15 | notice is that we shouldn't have had to send our documents by |
| 09:43:21 | 16 | e-mail.  We should have had sufficient time to attend and |
| 09:43:25 | 17 | review the documents.  The reason we subpoenaed the documents |
| 09:43:29 | 18 | is because we requested the documents from KARCO and were |
| 09:43:33 | 19 | refused. |
| 09:43:34 | 20 | We were not given sufficient notice of a telephone |
| 09:43:38 | 21 | deposition.  We were never intending to take a deposition to |
| 09:43:45 | 22 | authenticate the documents.  We just requested the documents. |
| 09:43:50 | 23 | We were going to decide later if we intended to use them. |
| 09:43:56 | 24 | THE COURT:  Well, two things.  One, I'm going to |
| 09:43:57 | 25 | overrule the objection to the deposition.  I'm going to hear |

09:44:02  1  what is put in front of me, and then I will determine the

09:44:04  2  weight of it.  But before you play the deposition, I would like

09:44:07  3  some identification of the deposition.  It just started out.  I

09:44:10  4  have no idea who this person is or what I'm going to hear from

09:44:14  5  or anything like that.  So can I have some explanation of the

09:44:18  6  deposition.

09:44:20  7        MS. TAYLOR:  Yes, Your Honor.  This is Tom Peng of

09:44:23  8  KARCO Engineering.  He is the general manager of KARCO and the

09:44:28  9  designated corporate representative under our deposition

09:44:31  10  notice.  KARCO is the testing lab that performed the crash

09:44:40  11  tests and provided the certifications on the disputed products.

09:44:43  12        THE COURT:  All right.  You may proceed.

09:44:52  13    (Video played)

09:44:52  14                          **TOM PENG,**

09:44:52  15  testified as follows by deposition:

09:44:52  16                    **DIRECT EXAMINATION**

09:44:52  17  **BY MS. TAYLOR:**

09:44:53  18  Q.   Good afternoon.  Mr. Peng, can you please state your full

09:44:55  19  name for the record?

09:44:56  20  A.   My full name is Tom Peng.

09:44:59  21  Q.   And who is your employer?

09:45:04  22  A.   KARCO Engineering.

09:45:05  23  Q.   What is your title at KARCO?

09:45:07  24  A.   General manager.

09:45:08  25  Q.   If you can please briefly explain to the Court what KARCO

09:45:12  1  Engineering does and what your role is in the company.

09:45:15  2  A.   Yes.  KARCO Engineering is an automotive --

09:45:21  3       THE COURT:  Stop right there.

09:45:25  4    (Audio stopped)

09:45:25  5       THE COURT:  I'm having a hard time understanding.

09:45:27  6  What was the name of the company?

09:45:32  7       MS. TAYLOR:  KARCO Engineering, K-A-R-C-O.  And I

09:45:36  8  should probably also mention that there will be reference to

09:45:39  9  deposition exhibits.  Those will be K-1 through -24.  And they

09:45:45  10  correspond to Plaintiffs' 101 through 124.

09:45:48  11       THE COURT:  Well, you're going to need to make sure

09:45:50  12  when we close this hearing that the record is absolutely clear

09:45:54  13  what he's talking about.

09:45:55  14       MS. TAYLOR:  Okay.

09:45:57  15       THE COURT:  I think that may get it, but often when

09:45:59  16  the Circuit reviews the record, they don't pick up on it quite

09:46:09  17  as readily as we do.

09:46:09  18       MS. TAYLOR:  Yes, Your Honor.

09:46:09  19       THE COURT:  So I'll ask you to come back to that.

09:46:09  20       All right.  Now proceed.

09:46:09  21    (Audio played)

09:46:09  22  A.   -- test various products against different procedures.

09:46:13  23  And we follow those procedures per our ISO standard quality.

09:46:16  24  And we provide ratings for the products that we test.

09:46:20  25  Q.   Has KARCO performed crash tests and generated crash test

09:46:28   1   reports for Gibraltar and the Gibraltar family of companies?

09:46:31   2   A.   Yes, we have.

09:46:33   3   Q.   ... Exhibit K-1 aside.

09:46:35   4          Now, turning to Exhibits K-2 through -24, now, is --

09:46:40   5   I think you said you -- you've reviewed them generally?

09:46:44   6   A.   Yes.

09:46:46   7          Yeah.   Subpoena.

09:46:48   8   Q.   I guess more broadly, are these documents part of the

09:46:54   9   document production that KARCO made yesterday?

09:46:56  10   A.   Yes.

09:46:57  11   Q.   So you recognize these as KARCO documents?

09:47:01  12   A.   Yes.

09:47:01  13   Q.   Okay.   Can you please identify Exhibit K-2 for me.

09:47:07  14   A.   Sure.   This is a KARCO Engineering crash test report for

09:47:11  15   the Gibraltar Cable Barrier Systems M50 P2 cable crash fence.

09:47:18  16   K-2.

09:47:18  17   Q.   Okay.   Does the crash test report have an identification

09:47:27  18   number on it?

09:47:27  19   A.   Yes, it does.

09:47:28  20   Q.   Can you read that number, please.

09:47:30  21   A.   It's called out as the test report number, which is -- in

09:47:33  22   this one it's TR-P30050-01-NC.

09:47:47  23   Q.   And do all of KARCO's crash test reports have report ID

09:47:51  24   numbers on them like this one?

09:47:53  25   A.   Yes.

09:47:53  1  Q.   What does the suffix -NC stand for on -- inside the ID

09:47:59  2  number?

09:47:59  3  A.   Yeah.  So normal document control procedures, "NC" means

09:48:05  4  that it's the original, that there's no change.  So if there

09:48:09  5  are changes to this and how we track those changes, you

09:48:13  6  would -- it would go from an "NC" to an "A" to a "B" to a "C,"

09:48:17  7  and so forth.

09:48:19  8  Q.   So based on this report number, can you identify this as

09:48:23  9  the original crash test report for the NP50 P2 cable crash

09:48:29  10 fence?

09:48:29  11 A.   That is correct.

09:48:30  12 Q.   ... cover K-5, so can you please turn to Exhibit K-6 and

09:48:37  13 identify that document for me, please.  What type of document

09:48:43  14 is it?

09:48:43  15 A.   Yeah.  K-6 is a -- it's -- it's -- it's called an ISO

09:48:48  16 report change notice.

09:48:57  17 Q.   And what does KARCO do with these documents?  What do you

09:49:00  18 use it for?

09:49:01  19 A.   Yeah.  So as part of our quality system and maintaining

09:49:04  20 our records, we fill this out when there's a change to a

09:49:08  21 document.

09:49:09  22 Q.   Does KARCO fill it out when KARCO is making a change to a

09:49:20  23 document or somebody else is making a change?

09:49:23  24 A.   No.  When we're making a change.  So this would be like an

09:49:26  25 internal recordkeeping.

PENG – DIRECT                                                    16

09:49:28   1   Q.   So from this report can you tell -- does it indicate that
09:49:32   2   a change was requested and by whom and when?
09:49:37   3   A.   Yes.
09:49:37   4   Q.   Can you identify those things for me?
09:49:40   5   A.   Yeah.  I guess the when is 8/25/2011.  By who, it's
09:49:50   6   Michael McBride.
09:49:50   7   Q.   And what specifically did he request be changed?
09:49:58   8   A.   He requested the test report to be changed from Gibraltar
09:50:02   9   to NSS.
09:50:03   10   Q.   And do you know whether that change was in fact made by
09:50:09   11   KARCO?
09:50:11   12   A.   Did we execute the -- this change?
09:50:16   13   Q.   Yes.
09:50:16   14   A.   Yes.  I have it.
09:50:21   15   Q.   Okay.  Is K-8 a copy of the amended version of the crash
09:50:24   16   test report that was -- that we looked at as Exhibit K-2?
09:50:28   17   A.   That is correct.  He was no longer an employee here.
09:50:33   18   Q.   And can you please identify K-7 for me.
09:50:36   19   A.   Oh.  K-7 is an e-mail chain from Michael McBride to Kelsey
09:50:47   20   Chu.  Photos.
09:50:48   21   Q.   Okay.  Now, can you identify this date of Mr. Chu's e-mail
09:50:53   22   to Michael McBride?
09:50:55   23   A.   Yes.  That would be August 25th, 2011.
09:50:59   24   Q.   Is that the same date of the report change notice
09:51:04   25   identified in Exhibit K-6?

| | | |
|---|---|---|
| 09:51:06 | 1 | A.    That is correct. |
| 09:51:08 | 2 | Q.    So looking at K-8, can you explain to me what you can tell |
| 09:51:17 | 3 | from this crash test report? |
| 09:51:20 | 4 | A.    It's a KARCO test report issued to NEU Security Services |
| 09:51:30 | 5 | for the M50 P2 cable crash fence. |
| 09:51:34 | 6 | Q.    Okay.  And what about the test report number? |
| 09:51:40 | 7 | A.    Yeah.  The test report number is the same number as |
| 09:51:46 | 8 | before, except the "NC" has been changed to an "A." |
| 09:51:51 | 9 | Q.    What is the date of this new report? |
| 09:51:55 | 10 | A.    I'm sorry? |
| 09:51:56 | 11 | Q.    The date -- |
| 09:51:57 | 12 | A.    Oh, the date.  Sorry. |
| 09:51:58 | 13 | Q.    -- of the report? |
| 09:51:59 | 14 | A.    August 25th, 2011. |
| 09:52:02 | 15 | Q.    And is that the same day of Mr. Chu's e-mail and the |
| 09:52:07 | 16 | report change notice that we looked at in Exhibits K-6 and K-7? |
| 09:52:12 | 17 | A.    Yes, it is. |
| 09:52:13 | 18 | Q.    Have you had a chance to review this crash test report? |
| 09:52:21 | 19 | A.    Yes. |
| 09:52:21 | 20 | Q.    Well, let's look at it a little deeper.  Does the revised |
| 09:52:26 | 21 | report in Exhibit K-8 contain an explanation of the changes |
| 09:52:29 | 22 | that would have been made from the original version? |
| 09:52:32 | 23 | A.    Yes. |
| 09:52:34 | 24 | Q.    Can you direct the Court to that? |
| 09:52:36 | 25 | A.    Yes.  The third page in, there's a -- a page called |

09:52:47  1  Revision Control Log which lists the original test reports.

09:52:59  2  And when there's a -- that there was a change to "-A."  And the

09:53:05  3  description of that change is "changed product to NEU Security

09:53:07  4  Services from Gibraltar."

09:53:15  5  Q.   All right, Mr. Peng.  Just to summarize, looking at

09:53:23  6  Exhibits K-2 through K-8, K-2 relates to the Gibraltar M50 P2

09:53:32  7  cable crash fence.  And isn't it correct that, based on a phone

09:53:37  8  call that -- or not a phone call -- but based on some sort of

09:53:41  9  request from a Mr. Michael McBride, KARCO issued a report

09:53:47  10  change notice and amended the crash test report for the cable

09:53:51  11  crash fence to substitute in NEU Security Services' name for

09:53:58  12  Gibraltar's name; is that correct?

09:54:02  13          You can answer the question.

09:54:03  14  A.   That will -- that is correct.

09:54:04  15  Q.   And there was no actual new crash test that was performed;

09:54:08  16  is that correct?

09:54:09  17  A.   There is no new crash test that was performed.  That is

09:54:12  18  correct.

09:54:12  19  Q.   The same product and the same crash test, all that

09:54:16  20  happened was the report itself was amended to substitute NEU

09:54:19  21  Security's name for Gibraltar's name; is that right?

09:54:21  22  A.   That is correct.

09:54:24  23          That is correct.

09:54:25  24  Q.   And was this request made by NSS?

09:54:31  25  A.   From our change log, the request was made by

09:54:35   1   Michael McBride, an employee of NSS.

09:54:37   2   Q.   All right, Mr. Peng.  If you could please look at

09:54:44   3   Exhibit K-9?

09:54:53   4   A.   Yes.

09:54:53   5   Q.   Could you identify this document for me, please?

09:55:00   6   A.   This is the KARCO test report for the M50 P1 eight-foot

09:55:06   7   wedge.

09:55:06   8   Q.   Now, if you could please turn to Exhibit K-12 and identify

09:55:10   9   that document for me.

09:55:11   10   A.   It is a test report for Gibraltar M50 P1 six -- 14.6 wedge

09:55:28   11   barrier.  Sorry.  I didn't quite understand.

09:55:30   12   Q.   So we just went through Exhibit K-12 and Exhibit K-9 are

09:55:38   13   both crash test reports for Gibraltar wedge barriers.  One was

09:55:45   14   for an eight-foot wedge barrier, and the other one was for a

09:55:47   15   14 1/2-foot wedge barrier.

09:55:51   16          To your knowledge, sitting here today, have you found

09:55:53   17   in KARCO's records a crash test report for a NEU Security

09:55:56   18   Services wedge barrier?

09:56:00   19   A.   No.

09:56:01   20   Q.   All right.  If you could please turn to Exhibit K-15 and

09:56:09   21   identify that document for me.

09:56:16   22   A.   This is a crash test report for Gibraltar Cable Barrier

09:56:21   23   System K12 cable restraint barrier, 24 feet.

09:56:26   24   Q.   All right.  Could you please turn to exhibit K-18 and

09:56:36   25   K-19.

| 09:56:37 | 1 | A.    K-18 I have and K-19. |

Q.    Okay.  Can you identify these documents and tell me what they mean based on your knowledge of KARCO and its operations?

A.    K-18 is the report change notice where we document our revisions to our documents.  This one is for the report number TR-P301 -- let's see -- 15-01-NC.

Q.    Is that the document that we just reviewed marked as Exhibit K-15?

A.    Yes.  That is correct.

            ... to NSS.

Q.    If you turn to K-19, does it reflect the change that was requested by Mr. McBride on August 25th, 2011?

A.    Yes, it does.

            ... NEU Security Services.

Q.    And looking at the report number, can you tell whether this report was an original crash test report or an amended version of an old report?

A.    The test report number has an "A," so it would be a revision to the original report.  August 25th, 2011.

Q.    And can you please point the Court to a spot in the report itself where the changes are documented?

A.    Yes.  On the third page, the title of the page is Revision Control Log for TR-P31081-01, where it notes a revision "A" on 8/25/2011.  Under the description of the change, "change product to NEU Security Services from Gibraltar."

| | | |
|---|---|---|
| 09:58:54 | 1 | Q.   Okay.  If you could please turn to Exhibit K-20. |
| 09:58:58 | 2 | A.   Yes. |
| 09:59:03 | 3 | Q.   And identify that document for me, please. |
| 09:59:06 | 4 | A.   It is a crash test report for Gibraltar Cable Barrier |
| 09:59:09 | 5 | Systems' K12 cable restraint barrier, 50 feet. |
| 09:59:14 | 6 | Q.   All right.  Would you please look at Exhibit 20 -- K-23 |
| 09:59:18 | 7 | and K 24 and explain these documents -- and identify and |
| 09:59:22 | 8 | explain these documents for the Court. |
| 09:59:25 | 9 | A.   K-23 is the report change notice for report |
| 09:59:34 | 10 | TR-P30026-01-NC made by Michael McBride to change the name from |
| 09:59:49 | 11 | Gibraltar to NSS cable restraint barrier, 50 feet. |
| 09:59:57 | 12 | Q.   And does the Exhibit K-24 report reflect the change |
| 10:00:04 | 13 | reflected by Michael McBride on August 25th, 2011? |
| 10:00:09 | 14 | A.   Yes. |
| 10:00:09 | 15 | Q.   And where in the report can we confirm that? |
| 10:00:12 | 16 | A.   On the third page -- or yeah.  Actually, on this one it's |
| 10:00:16 | 17 | the second page.  The revision control log, revision A on |
| 10:00:27 | 18 | 8/25/2011, "change product to NEU Security Services from |
| 10:00:31 | 19 | Gibraltar." |
| 10:00:32 | 20 | Q.   Okay, Mr. Peng.  I want to see if we could summarize what |
| 10:00:39 | 21 | led there to being two sets of KARCO's test reports for the |
| 10:00:44 | 22 | exact same crash test and the exact same products, the original |
| 10:00:48 | 23 | set of reports having Gibraltar's name on them and the |
| 10:00:50 | 24 | subsequent set having NEU Security Services' name on them. |
| 10:00:54 | 25 | So, given your knowledge of KARCO's records and its |

10:00:59   1   business activities, can you please summarize for the Court in

10:01:02   2   your own words how it came to be that NEU Security's name ended

10:01:06   3   up on amended versions of crash test reports for the M50 P2

10:01:12   4   cable crash fence and the 24-foot and 50-foot cable restraint

10:01:17   5   barriers?

10:01:18   6   A.   I guess, you know, Bill and Stephen were working together,

10:01:34   7   and we conducted the crash tests on behalf of them.  And at one

10:01:39   8   point in time, NSS asked for a name change to the reports

10:01:47   9   that -- that we complied with.

10:01:51   10  Q.   Okay.  And, specifically, when you say that NSS asked

10:01:55   11  for -- requested that the change be made, you're taking that

10:02:01   12  information from the report change notices that we reviewed

10:02:04   13  today; is that correct?

10:02:05   14  A.   Yes.  That is correct.

10:02:06   15  Q.   And those changes are the ones that were requested by

10:02:08   16  Michael McBride on August 25th, 2011?

10:02:11   17  A.   That is correct.

10:02:12   18  Q.   And all those changes asked for were that Gibraltar's name

10:02:15   19  essentially be taken out of the report and -- out of the three

10:02:20   20  reports and substitute NSS's name in its place; is that right?

10:02:24   21  A.   That's correct.

10:02:24   22          ... its ownership of the product.

10:02:27   23  Q.   But the -- the fact that you guys, at Michael McBride's

10:02:32   24  request, put NEU Security's name on the top of these crash test

10:02:36   25  reports does not mean that KARCO thinks that NSS owns these

| | | |
|---|---|---|
| 10:02:41 | 1 | products, does it? |
| 10:02:41 | 2 | A.    No. |
| 10:02:55 | 3 | (Audio stopped) |
| 10:02:55 | 4 | MS. TAYLOR:  Do you want me to clarify for the Court |
| 10:02:57 | 5 | the exhibit numbers again? |
| 10:02:59 | 6 | THE COURT:  Yeah.  I think what you said was that |
| 10:03:02 | 7 | when Mr. Peng refers to an exhibit indicated for the deposition |
| 10:03:09 | 8 | as K-1 through K-24, inclusive, that relates to the exhibits |
| 10:03:16 | 9 | for this hearing, Plaintiffs' Exhibits 100 through 124, |
| 10:03:21 | 10 | inclusive. |
| 10:03:24 | 11 | MS. TAYLOR:  101 through 124. |
| 10:03:28 | 12 | THE COURT:  101 through 124. |
| 10:03:28 | 13 | MS. TAYLOR:  So K-1 matches to 101, K-2 matches to |
| 10:03:33 | 14 | 102. |
| 10:03:33 | 15 | THE COURT:  Okay.  Then I think we've got it. |
| 10:03:37 | 16 | MS. TAYLOR:  That's all we have for Mr. Peng. |
| 10:03:39 | 17 | THE COURT:  All right.  Ms. Ghavimi, do you want to |
| 10:03:41 | 18 | present any additional clips of Mr. Peng at this time? |
| 10:03:44 | 19 | MS. GHAVIMI:  Your Honor, we do not have clips.  I |
| 10:03:47 | 20 | can read into the record counter-designations, if that's |
| 10:03:50 | 21 | permissible. |
| 10:03:50 | 22 | THE COURT:  You may do that.  You may do that at this |
| 10:03:53 | 23 | time. |
| 10:03:54 | 24 | MS. GHAVIMI:  Okay.  The first -- |
| 10:03:54 | 25 | THE COURT:  Now, you're going to have to pull that |

| | | |
|---|---|---|
| 10:03:55 | 1 | microphone down, and you're going to have to speak into the |
| 10:03:58 | 2 | microphone so that the court reporter and I can hear you. |
| 10:04:02 | 3 | **CROSS-EXAMINATION** |
| 10:04:02 | 4 | **BY MS. GHAVIMI:** |
| 10:04:02 | 5 | Okay.  The first counter-designation I have is page |
| 10:04:08 | 6 | 42 -- actually, I apologize.  Go back.  Page 41, line 21.  The |
| 10:04:24 | 7 | question by my Ms. Taylor: |
| 10:04:25 | 8 | "Mr. Peng, are aware of whether Stephen Neusch or |
| 10:04:30 | 9 | anyone at NSS represented to KARCO that it now owned these |
| 10:04:34 | 10 | products or was the original designer of these products?" |
| 10:04:43 | 11 | I am skipping over intervening objections. |
| 10:04:45 | 12 | The next -- the answer. |
| 10:04:51 | 13 | MS. TAYLOR:  Objection.  You skipped the rest of my |
| 10:04:53 | 14 | question. |
| 10:04:54 | 15 | MS. GHAVIMI:  Okay.  The rest of the question is at |
| 10:04:56 | 16 | page 42, line 2:  "I asked whether -- whether you knew if you |
| 10:05:01 | 17 | have knowledge of whether Stephen Neusch or NEU Security |
| 10:05:04 | 18 | Services made a representation to anyone at KARCO about whether |
| 10:05:08 | 19 | they owned these products." |
| 10:05:12 | 20 | Line 9, "THE WITNESS:  Yeah.  I mean, I don't -- I |
| 10:05:19 | 21 | don't believe that anybody -- he did not make a representation |
| 10:05:22 | 22 | that he specifically owned or designed the products. |
| 10:05:27 | 23 | Line 13, question my Ms. Taylor: |
| 10:05:30 | 24 | "You don't know -- you probably don't know one way or |
| 10:05:33 | 25 | the other, do you?" |

10:05:38   1              Answer line 15: "No.  Yeah.  We don't know.  I mean,

10:05:43   2   we are -- we are just the test lab that -- you know, we get

10:05:46   3   requested to test and we don't get too involved with the design

10:05:51   4   or -- or I guess ownership of the products."

10:06:13   5              MS. GHAVIMI:  Next designation, page 59, line 6 by

10:06:21   6   Ms. Ghavimi:

10:06:23   7              "Okay.  Mr. Peng, I believe you said at the end of

10:06:25   8   your direct questioning that KARCO is just a -- an engineering

10:06:30   9   firm; is that correct -- do you recall that?"

10:06:35  10              Answer, line 10:  "Yes.  That we are a -- a test

10:06:38  11   lab."

10:06:40  12              Line 11, question by Ms. Ghavimi:  "And I believe you

10:06:43  13   also said that KARCO doesn't delve into who designs a product

10:06:48  14   and who owns a product.  Do you recall that?"

10:06:52  15              Line 14:  "A.  Yes, I do."

10:06:55  16              Line 15, question by Ms. Ghavimi:  "Okay.  So do you

10:06:59  17   ask your customers whether they own a product?"

10:07:04  18              Line 17:  Objection.

10:07:07  19              Line 18:  "THE WITNESS.  So when a customer

10:07:11  20   approaches us to test a product, we believe that they own the

10:07:15  21   product.  We don't -- we don't check into, like, patents or --

10:07:21  22   or something like that."

10:07:26  23              Line 22, question by Ms. Ghavimi:  "Do you just

10:07:29  24   simply take their word for it?"

10:07:31  25              Line 24:  Objection.

| 10:07:32 | 1 | Line 25:  "THE WITNESS:  So I guess in -- in the |

10:07:32    1            Line 25:  "THE WITNESS:  So I guess in -- in the

10:07:36    2    course of the business that we do, we -- we -- we test products

10:07:41    3    for third parties as well that don't own their products.  For

10:07:45    4    example, the majority of our business will test for the federal

10:07:49    5    government that tests for the automotive industry, like Mazda,

10:07:53    6    for example.  So we're testing for the federal government

10:07:56    7    and -- but we're testing Mazda's product.  So I guess the

10:08:01    8    federal government doesn't own the product, but we're testing

10:08:04    9    it on behalf of the federal government.  And so we do quite a

10:08:07   10    bit of testing that -- for either the manufacturers of the

10:08:13   11    product or a third party wishing to test a product."

10:08:23   12            Last designation, line 68 -- I'm sorry -- page 68,

10:08:27   13    line 21:

10:08:29   14            Question by Ms. Ghavimi:  "So if the crash test

10:08:32   15    states in there that NSS did the installation, you would

10:08:38   16    believe that to be a true statement?

10:08:41   17            Answer:  "I would."

10:08:42   18            MS. GHAVIMI:  Nothing further.

10:08:47   19            THE COURT:  Thank you.  Anything further from the

10:08:49   20    plaintiff?

10:08:50   21            MS. TAYLOR:  No, Your Honor.

10:08:51   22            THE COURT:  You may proceed with your next

10:08:53   23    evidentiary presentation.

10:08:55   24            MR. CONNOR:  Plaintiffs call Mr. Stephen Neusch.

10:08:58   25        (Witness sworn)

| | | |
|---|---|---|
| 10:09:36 | 1 | **STEPHEN NEUSCH,** |
| 10:09:36 | 2 | having been first duly sworn, testified as follows: |
| 10:09:36 | 3 | **DIRECT EXAMINATION** |
| 10:09:36 | 4 | **BY MR. CONNOR:** |
| 10:09:36 | 5 | Q.   Good morning, Mr. Neusch. |
| 10:09:38 | 6 | A.   Good morning. |
| 10:09:39 | 7 | Q.   The notebooks in front of you, there are four of them, |
| 10:09:45 | 8 | they've got tabs with numbers on them and behind each number is |
| 10:09:48 | 9 | a document.  I'm going to ask you to turn to a particular |
| 10:09:53 | 10 | exhibit number or tab number.  And if -- if we can do that |
| 10:09:59 | 11 | quickly through this, we'll get through this as efficiently as |
| 10:10:03 | 12 | possible. |
| 10:10:03 | 13 | A.   Sure. |
| 10:10:04 | 14 | Q.   Let's first start with tab 9, please.  That's going to be |
| 10:10:08 | 15 | in the -- there's four volumes there, so you'll have to look |
| 10:10:12 | 16 | and see which one is which. |
| 10:10:25 | 17 | Do you recognize those as defendants' interrogatory |
| 10:10:31 | 18 | responses? |
| 10:10:31 | 19 | A.   Yes. |
| 10:10:32 | 20 | Q.   You participated in preparing those? |
| 10:10:34 | 21 | A.   Yes. |
| 10:10:34 | 22 | Q.   And you reviewed them before they were served to the |
| 10:10:37 | 23 | plaintiffs in this case? |
| 10:10:38 | 24 | A.   Yes. |
| 10:10:38 | 25 | Q.   And they were correct? |

S. NEUSCH – DIRECT

```
10:10:41   1   A.   Yes.

10:10:41   2   Q.   Turn to interrogatory number 3.  That's going to be on the

10:10:46   3   fifth page, please.

10:10:49   4   A.   (Complies)

10:10:49   5   Q.   And what we're going to look at is the response.  And

10:10:52   6   under the heading --

10:10:53   7   A.   There's no page numbers.

10:10:55   8   Q.   That's right.  There aren't.  But just count to the fifth

10:10:58   9   page, if you would, Mr. Neusch, and we'll move as quickly as we

10:11:04  10   can.  There's a heading on that page that says Crash Test's DOD

10:11:11  11   List.  Do you see that?

10:11:12  12   A.   Yes.

10:11:13  13   Q.   And you see the first line that says:  Defendant NEU

10:11:16  14   Security Services LCC had crash tests performed for their M50

10:11:22  15   P1 K12 cable restraint barrier, and it goes on to list the

10:11:26  16   cable restraint barrier and the cable crash fences?

10:11:29  17   A.   Yes.

10:11:29  18   Q.   That's not true, is it, Mr. Neusch?

10:11:32  19   A.   No.  It's true.

10:11:33  20   Q.   We just heard Mr. Peng testify that those tests were

10:11:38  21   performed by Gibraltar and NSS called KARCO and had them change

10:11:45  22   the name on the report.  Did you hear Mr. Peng testify about

10:11:49  23   that?

10:11:57  24   A.   There was a lot of stuff that was testified to.

10:12:00  25           One, you-all keep saying Michael McBride is an NSS
```

S. NEUSCH – DIRECT

| | | |
|---|---|---|
| 10:12:02 | 1 | employee.  He was a Gibraltar employee.  Two, we did perform |
| 10:12:04 | 2 | the test, as we did the installation, we managed it, we |
| 10:12:08 | 3 | coordinated it.  We were the only ones on site.  Gibraltar |
| 10:12:12 | 4 | wasn't even there.  They weren't a representative for those |
| 10:12:15 | 5 | tests. |
| 10:12:15 | 6 | Q.   Mr. Neusch?  You heard Mr. Peng testify that -- |
| 10:12:17 | 7 | A.   He testified that he changed the name. |
| 10:12:18 | 8 | Q.   I'm sorry, Mr. Neusch.  Let me finish my question before |
| 10:12:21 | 9 | you answer. |
| 10:12:21 | 10 | A.   Okay. |
| 10:12:21 | 11 | Q.   You heard Mr. Peng testify that those tests were performed |
| 10:12:25 | 12 | for Gibraltar, did you not? |
| 10:12:27 | 13 | A.   And then he changed the name to NEU Security Services, the |
| 10:12:31 | 14 | proper designation. |
| 10:12:32 | 15 | Q.   And you directed Mr. McBride to contact KARCO to make that |
| 10:12:36 | 16 | change in the name only, didn't you? |
| 10:12:40 | 17 | A.   In the name only?  What does that mean? |
| 10:12:42 | 18 | Q.   From "Gibraltar" to "NEU Security Services."  You directed |
| 10:12:44 | 19 | Mr. McBride to make that change? |
| 10:12:48 | 20 | A.   I don't understand the question. |
| 10:12:50 | 21 | Q.   Did you or did you not -- |
| 10:12:51 | 22 | A.   Did I direct him?  I don't recall.  That was four years |
| 10:12:54 | 23 | ago, five years ago or so. |
| 10:12:56 | 24 | Q.   You don't recall whether you asked Mr. McBride -- |
| 10:12:59 | 25 | A.   Me personally?  No. |

S. NEUSCH – DIRECT

| | | |
|---|---|---|
| 10:13:00 | 1 | Q.   Let me finish my question, please, sir. |
| 10:13:03 | 2 | A.   Okay. |
| 10:13:03 | 3 | Q.   Do you recall directing Mr. McBride to contact KARCO |
| 10:13:08 | 4 | engineering and request they change the name on the test |
| 10:13:13 | 5 | reports for these products from "Gibraltar" to "NEU Security |
| 10:13:18 | 6 | Services"? |
| 10:13:20 | 7 | A.   I don't recall, no. |
| 10:13:21 | 8 | Q.   If you'll scroll down a little farther on that same |
| 10:13:29 | 9 | interrogatory response to the next page, do you see the heading |
| 10:13:33 | 10 | that says Dates First Manufactured/Sold? |
| 10:13:36 | 11 | A.   Where is this? |
| 10:13:37 | 12 | Q.   The next page halfway down under the heading that says |
| 10:13:42 | 13 | Dates First Manufactured/Sold? |
| 10:13:44 | 14 | A.   Yes. |
| 10:13:45 | 15 | Q.   Okay.  Four lines down, it says "Defendants."  And the |
| 10:13:52 | 16 | defendants in this case are NEU Security Services, you |
| 10:13:55 | 17 | personally, and Black Security Products, correct? |
| 10:13:59 | 18 | A.   Correct. |
| 10:13:59 | 19 | Q.   And it says in that sentence, "Defendants have been |
| 10:14:05 | 20 | selling wedge barriers since at least as early as 2010 and have |
| 10:14:09 | 21 | manufactured and sold, in whole or in part, M50 finger wedge |
| 10:14:16 | 22 | barriers since at least as early as December 26, 2012." |
| 10:14:20 | 23 | Did I read that correctly? |
| 10:14:22 | 24 | A.   Yes.  That's what it says. |
| 10:14:23 | 25 | Q.   That's not true, is it, sir? |

10:14:25  1   A.   Well, the December 26th, 2012 is the contract date for

10:14:29  2   Fort Sam Houston 1.  In preparation they put the wrong date in

10:14:33  3   there.  It's supposed to be Fort Sam Houston 2, which they have

10:14:35  4   the new date for.

10:14:36  5   Q.   BSP, or Black Security Products, Mr. Neusch, has never

10:14:41  6   manufactured a wedge barrier, has it?

10:14:43  7   A.   No, it hasn't.

10:14:44  8   Q.   NSS has never itself manufactured a wedge barrier –– NEU

10:14:50  9   Security Services has never manufactured a wedge barrier

10:14:55 10   itself.  True?

10:14:56 11   A.   No.  That's incorrect.

10:14:57 12   Q.   Has NEU Security Services ever manufactured a wedge

10:15:02 13   barrier without the authorization and involvement of Gibraltar?

10:15:08 14   A.   Well, first, NSS wouldn't need the authorization from

10:15:11 15   Gibraltar because we don't need authorization from Gibraltar to

10:15:15 16   manufacture our own products.  Secondly, we have manufactured

10:15:18 17   many wedge barriers.

10:15:20 18   Q.   I'm going to repeat my question, and tell me if this is

10:15:24 19   something that you can answer with a "yes" or "no."

10:15:27 20        Has NEU Security Services, Mr. Neusch, ever

10:15:31 21   manufactured itself, without the authorization and involvement

10:15:34 22   of Gibraltar, an M50 finger wedge barrier?

10:15:41 23   A.   You've asked multiple questions.  How can I give you a

10:15:45 24   "yes" or "no?"  You want to give me an actual question?

10:15:48 25        THE COURT:  No.  He gave you an actual question.  It

10:15:49  1  was understandable to the court.  Listen to his question and

10:15:52  2  answer the question.

10:15:53  3          THE WITNESS:  Okay.

10:15:55  4  A.  Well, you asked me two questions.  Can you repeat it?

10:16:00  5  Q.  What wedge barriers has NEU Security Services ever itself

10:16:07  6  manufactured without the involvement and authorization of

10:16:11  7  Gibraltar, Mr. Neusch?

10:16:13  8  A.  Well, we've never had the authorization of Gibraltar,

10:16:18  9  necessarily, but the wedge barrier that's in question, the

10:16:21  10  finger wedge barrier, we have manufactured.  And Gibraltar's

10:16:24  11  generally been involved because we were a partner with

10:16:26  12  Gibraltar this entire time, up until this last year.

10:16:29  13  Q.  Up until February of 2015, correct?

10:16:32  14  A.  That is correct.

10:16:33  15  Q.  Okay.  So I'm going to ask the same question one more

10:16:37  16  time, sir, if you can answer the question for me, because this

10:16:41  17  is -- you understand this is important -- the question of

10:16:44  18  whether manufacturing was ever done by NEU Security Services is

10:16:49  19  an important question before us today?

10:16:52  20  A.  Yes.

10:16:53  21          MS. GHAVIMI:  Objection, Your Honor.  Counsel is

10:16:55  22  testifying and his question has been asked and answered.

10:16:58  23          THE COURT:  No.  It has never been answered.  That

10:16:59  24  objection is overruled.  And if it has, I'm going to let him

10:17:03  25  answer it again because I didn't understand the answer.

10:17:09  1   Q.   (BY MR. CONNOR) Has NEU Security Services ever

10:17:13  2   manufactured itself an M50 finger wedge barrier without the

10:17:20  3   authorization or involvement of Gibraltar?

10:17:24  4   A.   We have manufactured a finger wedge barrier.  We have

10:17:28  5   manufactured it in involvement with Gibraltar because that's

10:17:32  6   how we worked.

10:17:32  7        So, for example, to explain this the best way I can,

10:17:36  8   NEU Security Services had the idea and the -- to make a wedge

10:17:41  9   barrier.  We approached Gibraltar to do the fabrication of the

10:17:46  10  steel.  NSS has always done the more critical side of the

10:17:50  11  manufacturing and the automated -- the automated side.  So a

10:17:54  12  wedge barrier is an AVP -- that stands for Active Vehicle

10:17:59  13  Barrier.  NEU Securities always did the active aspect of the

10:18:02  14  manufacturing.

10:18:03  15       So, for example, like your phone, Gibraltar did the

10:18:05  16  structure.  We did the actual computing part of it and we

10:18:08  17  actually had the design that we took to Gibraltar and said we

10:18:11  18  wanted a finger wedge.  Here's how we want it.  And all the

10:18:14  19  critical components that made that product what it is was NEU

10:18:17  20  Security's design.  And we brought it to Gibraltar, they did

10:18:20  21  the steel manufacturing, we did the automated manufacturing.

10:18:23  22  Q.   So there's a distinction that you're making between

10:18:26  23  manufacturing the product and manufacturing the ancillary

10:18:30  24  systems that go into the installation; is that correct?

10:18:33  25  A.   No.  What I'm saying is anyone that manufactures anything

10:18:37  1  outsources certain parts of the manufacturing or where they get

10:18:40  2  the parts.  No one does a complete system in-house and does

10:18:44  3  everything on their own.  Gibraltar currently doesn't either.

10:18:47  4  They employ currently some of my subcontractors that they found

10:18:49  5  through me to do their automation.  So the whole system as a

10:18:53  6  whole, you outsource the parts to the specialties that do that

10:18:55  7  part.  We outsource the fabrication of the steel, the welding.

10:18:59  8  They're a weld shop.  That's what they did.

10:19:02  9  Q.   So has NEU Securities Services ever manufactured the steel

10:19:10  10 portion -- the heavy, strong barrier portion of a wedge

10:19:17  11 barrier, an M50 wedge barrier -- finger wedge barrier?

10:19:22  12 A.   Well, there was --

10:19:22  13 Q.   Let me finish my question, please.

10:19:24  14 A.   I thought you were done.

10:19:29  15 Q.   I'm going to start over, okay, because I want you to

10:19:31  16 follow me.

10:19:32  17       Has NEU Security Services ever manufactured the steel

10:19:40  18 portion of an M50 finger wedge barrier?

10:19:44  19 A.   Well, there was a time where Gibraltar refused and stopped

10:19:49  20 manufacturing that portion, so we outsourced it to other

10:19:52  21 companies.

10:19:53  22 Q.   So NSS, or NEU Security Services, has never itself

10:19:59  23 manufactured an M50 finger wedge barrier, putting aside the

10:20:04  24 automation system?

10:20:05  25 A.   Well, the automation is most of the work.

S. NEUSCH – DIRECT

10:20:08  1  Q.   I'm sorry.  What did you say?

10:20:09  2  A.   The automation is most of the work, and Bill Neusch always

10:20:11  3  said he didn't want to do it because it was too complicated and

10:20:15  4  too much liability.  We've always done the automation side,

10:20:17  5  which to me you're making assumptions or you're making

10:20:20  6  statements that aren't correct.  The automation side of it, the

10:20:25  7  active part of the active vehicle barrier is what makes it

10:20:28  8  active.  That's the most complicated part of the manufacturing

10:20:33  9  process.

10:20:33  10         MR. CONNOR:  I'm going to object and move to strike

10:20:36  11  the nonresponsive portion of that testimony, Your Honor, and

10:20:37  12  I'd like to ask the question.

10:20:38  13         THE COURT:  Well, your objection is sustained, but

10:20:40  14  I'm not going to strike it.  I will consider it.  But you may

10:20:43  15  rephrase your question.

10:20:44  16         Mr. Neusch, let me remind you again, listen to his

10:20:47  17  question and answer his question.

10:20:50  18         THE WITNESS:  Yes, sir.

10:20:51  19         THE COURT:  If your lawyer wants to ask you for

10:20:53  20  further elaboration or additional statements, your lawyer will

10:20:56  21  have an opportunity when he is through to ask you additional

10:21:01  22  questions.  This will go a lot faster if you will listen and

10:21:04  23  answer his questions.

10:21:06  24         THE WITNESS:  Yes, sir.

10:21:08  25  Q.   (BY MR. CONNOR) Mr. Neusch, you understand that the

10:21:15   1   automation or control aspects of the four disputed products are

10:21:22   2   not at issue?

10:21:25   3   A.   No.  I don't understand that.

10:21:26   4   Q.   The -- do you understand the disputed products to be the

10:21:32   5   structural steel, as you've referred to it, component that is

10:21:38   6   the physical barrier?

10:21:39   7   A.   Absolutely not.  They're required by even the crash

10:21:43   8   testing that you-all put up on the screen to be automated

10:21:46   9   during the crash test.  It cannot be sold without it being

10:21:49  10   automated.  You cannot have an active vehicle barrier without

10:21:52  11   the active part of it.  For example, I mean, you have to

10:21:57  12   actually make it automate when you crash test it.  You can't

10:22:00  13   just go put the structure up there.  It's a requirement.  It's

10:22:03  14   the active part of the active vehicle barrier.

10:22:06  15   Q.   Perhaps we can cut to the quick here, Mr. Neusch.  Would

10:22:11  16   you be okay with the Court entering an order that would permit

10:22:18  17   you to make and distribute and sell the automation part of

10:22:25  18   these four disputed products, but not allow you to have

10:22:31  19   manufactured the finger wedge barrier steel portion, the cable

10:22:37  20   restraint barrier steel portion, and the crash fence steel

10:22:42  21   portion, those portions that Gibraltar manufactures?

10:22:45  22   A.   Sir, you're saying Gibraltar wouldn't do the automated

10:22:49  23   side when they sold it and they would have me do the automated

10:22:52  24   side from here on out?

10:22:53  25   Q.   I'm suggesting --

10:22:54  1   A.    Is that what you're suggesting?

10:22:56  2   Q.    I'm asking you:  Would you be okay with the Court entering

10:22:59  3   an order that prohibited NEU Security Services, you personally,

10:23:03  4   and Black Security Products from manufacturing or having

10:23:08  5   manufactured or offering to sell the steel portion of these

10:23:12  6   four disputed products, but allowing you to make, sell,

10:23:19  7   distribute, and install the automation?

10:23:23  8   A.    I can't answer that question because it's overly broad.

10:23:25  9   For example, not all these -- we're talking about four

10:23:29  10  different products.  One of them is not automated.  Secondly,

10:23:32  11  is this a proposal for settlement because are you saying we

10:23:35  12  would do the automation for Gibraltar?  Like I don't understand

10:23:39  13  if --

10:23:39  14  Q.    Let me put it to you --

10:23:40  15  A.    Obviously, the two -- the restraint barriers I think

10:23:43  16  Gibraltar has no part of it.  They shouldn't do anything.  I

10:23:46  17  could negotiate a settlement with them on the wedge barrier if

10:23:51  18  you like.

10:23:51  19  Q.    Can we look at these four disputed products, Mr. Neusch,

10:23:55  20  with a line down the middle, the structural portion and the

10:24:00  21  automation and control portion.  Does that make sense?

10:24:04  22  A.    Sure.

10:24:05  23  Q.    Would you be okay if the Court entered an order that

10:24:11  24  allowed you to do the control and automation portion of these

10:24:16  25  four products but did not permit you to do the structural

S. NEUSCH – DIRECT

10:24:23  1  portion?

10:24:25  2  A.   No.   Because these are four different products, and two of

10:24:30  3  the products Gibraltar has no rights to whatsoever because we

10:24:34  4  designed, did everything.   They've even given it up and said

10:24:39  5  they want no part of it.   There is -- you can't lump them all

10:24:42  6  together, and that's why I keep asking.

10:24:44  7  Q.   Which ones would you agree --

10:24:45  8  A.   So just to make it simple, no, I would not.

10:24:47  9  Q.   Which of the four products -- you know what they are,

10:24:50  10  right?

10:24:50  11  A.   Yes, I do.

10:24:51  12  Q.   Okay.   Which of the four disputed products would you be

10:24:55  13  willing to abide by a court order that prohibited you from

10:25:02  14  making, selling, having manufactured, distributing or selling

10:25:07  15  the structural portion of it?

10:25:10  16  A.   I would abide by any court order, but I believe these

10:25:15  17  products to be mine.

10:25:15  18  Q.   All four of them?

10:25:16  19  A.   That's correct.   I believe I have more rights to some than

10:25:19  20  others, but our contention is that Gibraltar's has overreached

10:25:24  21  and tried to steal these products and tried to make money off

10:25:26  22  of them selling them and obviously doing what they do.

10:25:29  23  Q.   So just to be clear, Mr. Neusch, it's your contention that

10:25:35  24  NEU Security Services and BSP and you personally should be

10:25:42  25  permitted to manufacture the steel portion of all four disputed

10:25:47  1  products?

10:25:48  2  A.   Well, I don't think me personally should even be in here

10:25:52  3  because I have no personal avenue to Gibraltar.  But the -- I

10:25:55  4  believe that, yes, NEU Security Services and BSP should.

10:25:59  5  That's correct.

10:26:00  6  Q.   Please turn to Exhibit 107, and keep that one open because

10:26:09  7  we're going to come right back to it.  It's going to be over to

10:26:23  8  your right in volume number 3.

10:26:24  9  A.   Are these copies of the same thing?

10:26:26 10  Q.   No they're not.  They're all different.

10:26:26 11  A.   It's the same numbers.

10:26:26 12  Q.   I'm sorry.  Volume 4.  Look for volume 4.

10:26:32 13          MR. CONNOR:  May I approach, Your Honor?

10:26:32 14          THE COURT:  Let me remind the lawyers you don't have

10:26:34 15  to ask to approach.  You may just approach the witness,

10:26:37 16  conclude your business with the witness, and then return to the

10:26:40 17  podium.

10:26:53 18  Q.   (BY MR. CONNOR) Please look at Exhibit Number 107.

10:26:56 19          I asked you a few minutes ago if you remembered -- or

10:27:00 20  you said you didn't remember, but I asked you if you directed

10:27:03 21  Mr. McBride to contact KARCO and have the name changed on those

10:27:07 22  crash reports.

10:27:09 23          Do you recognize this e-mail from Mr. McBride dated

10:27:14 24  August the 25th, 2011, the same day Mr. Peng testified they

10:27:19 25  received the instruction, the request to change the name?

10:27:22  1   A.   I'm reading it now.  Yes, sir.

10:27:24  2   Q.   Okay.  And what does it say there under the heading KARCO

10:27:28  3   Updated Test Results?  You see where it says, "Kelsey, I will

10:27:32  4   send to Stephen for his review"?

10:27:38  5   A.   Yes.

10:27:38  6   Q.   So there is Mr. McBride letting KARCO know that he was

10:27:42  7   going to clear this with you.

10:27:44  8   A.   Yes.  A Gibraltar employee saying he's going to clear it

10:27:48  9   with me.

10:27:49  10  Q.   You see Mr. McBride's e-mail there at very top?  What is

10:27:52  11  his e-mail address, Mr. Neusch?

10:27:54  12  A.   MichaelMcBride@NEUSecurity.com.  But he was a Gibraltar

10:28:01  13  employee, as I stated.

10:28:02  14  Q.   Let's go to Exhibit Number 90, the interrogatory response,

10:28:05  15  please.  You can close that one and we'll go back to where we

10:28:08  16  were.

10:28:16  17           Mr. Neusch, Black Security Products had no business

10:28:19  18  activity between June 14th -- I'm sorry -- June of 2014 and

10:28:24  19  July 2015, correct?

10:28:26  20  A.   What was those dates?

10:28:31  21  Q.   June 2014 --

10:28:33  22  A.   Okay.

10:28:34  23  Q.   -- when you founded Black Security Products --

10:28:36  24  A.   Got you.

10:28:36  25  Q.   -- and July of last year, 2015?

S. NEUSCH – DIRECT

10:28:40  1   A.   That's correct.  I believe BSP started doing stuff around

10:28:44  2   July of last year.

10:28:45  3   Q.   And with respect to the disputed products, no defendant

10:28:52  4   has made any of them since February of 2015, correct?

10:29:02  5   A.   I don't know when the last time we made one is.

10:29:08  6   Q.   I didn't ask you when the last time was.  I asked you to

10:29:11  7   confirm the truth of the statement, that no defendant has made

10:29:14  8   any disputed product since February of 2015.

10:29:19  9   A.   Okay.  I don't know.

10:29:20  10  Q.   Do you see that same page where we were under the headings

10:29:37  11  All Dates to Whom/Project?

10:29:40  12  A.   Yes.

10:29:40  13  Q.   Do you see the last sentence in that paragraph?  Follow

10:29:45  14  along with me, please.  "Defendants have not manufactured or

10:29:48  15  sold any of these products after February 4th, 2015."  Is that

10:29:55  16  statement still true?

10:30:00  17  A.   As far as I'm aware.  I know we have a pending sale for a

10:30:09  18  restraint barrier.  I don't know if it's been memorialized yet

10:30:12  19  or not.

10:30:12  20  Q.   For one of the disputed products, the restraint barrier?

10:30:15  21  A.   That's correct.

10:30:15  22  Q.   And who is that pending sale to?

10:30:17  23  A.   A contractor.

10:30:18  24  Q.   Do you know their name?

10:30:20  25  A.   I think it's Alamo One Fort Sam Houston.

10:30:23   1    Q.    Okay.  And when was that project bid?

10:30:26   2    A.    That project was bid a long time ago.

10:30:29   3    Q.    When?

10:30:31   4    A.    I don't know.  I would have to look at the paperwork.

10:30:34   5    Q.    Was it bid before the termination notice?

10:30:39   6    A.    I believe so, yeah.

10:30:44   7    Q.    The termination agreement that you signed was February

10:30:48   8    2015, right?

10:30:49   9    A.    Yes.

10:30:52   10   Q.    And you just confirmed that, since February of 2015, NSS

10:31:09   11   and BSP have not sold any disputed products.  Is that true?

10:31:17   12   A.    Have not sold?

10:31:19   13   Q.    Made, sold, offered for sale?

10:31:22   14   A.    I said, other than the restraint barrier, the restraint

10:31:25   15   barrier we may have -- I mean, I don't know if the contract has

10:31:29   16   been executed yet, but I know we have a contract in the works

10:31:33   17   for one.

10:31:34   18   Q.    So does that make the statement in your interrogatory

10:31:37   19   response, that defendants have not manufactured or sold any of

10:31:42   20   these products after February 4th, 2015 untrue?

10:31:49   21   A.    No.  As far as I'm aware, we have not executed a contract

10:31:53   22   on it, so currently we have no sales on the restraint barrier.

10:31:56   23   I'm just letting you know that I know we have one coming up.

10:31:59   24   Q.    You testified a minute ago that Black Security Products

10:32:10   25   didn't have any activity until July of 2015, right?

S. NEUSCH – DIRECT

| | | |
|---|---|---|
| 10:32:16 | 1 | A.    That's correct. |
| 10:32:17 | 2 | Q.    So they couldn't have made any of these products before |
| 10:32:20 | 3 | the termination notice, right? |
| 10:32:22 | 4 | A.    That's correct. |
| 10:32:23 | 5 | Q.    So has NSS ever manufactured any of the disputed products |
| 10:32:31 | 6 | prior to February the 4th, 2015 without the authorization or |
| 10:32:37 | 7 | involvement of Gibraltar? |
| 10:32:43 | 8 | A.    We have manufactured those products with the involvement |
| 10:32:46 | 9 | of Gibraltar.  We were partners with them prior to that date. |
| 10:32:50 | 10 | They have not done anything with the involvement of us. |
| 10:32:53 | 11 | Q.    And that was because there was an exclusive agreement in |
| 10:32:57 | 12 | place between Gibraltar and NSS that was terminated February of |
| 10:33:01 | 13 | 2015, correct? |
| 10:33:03 | 14 | A.    There was an exclusive agreement between NSS and |
| 10:33:07 | 15 | Gibraltar.  That's correct. |
| 10:33:08 | 16 | Q.    And it was terminated in February of 2015? |
| 10:33:12 | 17 | A.    Well, they tried to terminate it, but then they breached |
| 10:33:18 | 18 | that termination in the subsequent -- the prior contract. |
| 10:33:21 | 19 | Q.    Mr. Neusch, did you sign a termination agreement in |
| 10:33:25 | 20 | February of 2015? |
| 10:33:27 | 21 | A.    I did. |
| 10:33:28 | 22 | Q.    Turn to the next page, the response to interrogatory |
| 10:33:33 | 23 | number 4. |
| 10:33:35 | 24 | A.    Okay. |
| 10:33:35 | 25 | Q.    The second paragraph about halfway down, starts with a |

| | | |
|---|---|---|
| 10:33:40 | 1 | sentence that starts, "Defendants do not represent that their |
| 10:33:43 | 2 | products are manufactured by or affiliated with any party other |
| 10:33:49 | 3 | than Defendants."  That statement's not true, is it? |
| 10:33:56 | 4 | A.   Which one?  Read it again.  Which line? |
| 10:33:59 | 5 | Q.   "Defendants do not represent that their products are |
| 10:34:04 | 6 | manufactured by or affiliated with any party other than |
| 10:34:10 | 7 | Defendants." |
| 10:34:12 | 8 | A.   Not anymore, because our contract with Gibraltar was |
| 10:34:14 | 9 | terminated. |
| 10:34:15 | 10 | Q.   Okay.  That -- that wasn't true even before the |
| 10:34:20 | 11 | termination -- I'm sorry -- hasn't been true since the |
| 10:34:25 | 12 | termination, is it? |
| 10:34:26 | 13 | A.   It is true. |
| 10:34:27 | 14 | Q.   Turn to PX-15, please. |
| 10:34:37 | 15 | A.   To where? |
| 10:34:38 | 16 | Q.   Fifteen. |
| 10:34:55 | 17 | A.   Okay. |
| 10:34:56 | 18 | Q.   This is a Black Security submittal to -- on the Fort |
| 10:35:02 | 19 | Buchanan product to Purgatory Fence? |
| 10:35:04 | 20 | A.   Yes. |
| 10:35:04 | 21 | Q.   Dated December of 2015? |
| 10:35:09 | 22 | A.   That's correct. |
| 10:35:10 | 23 | Q.   I would like you to turn, please, to the third to last |
| 10:35:18 | 24 | page -- fourth to last page behind the tab that says -- behind |
| 10:35:23 | 25 | the pages that says Certification. |

| | | |
|---|---|---|
| 10:35:28 | 1 | A.    Okay. |
| 10:35:29 | 2 | Q.    And right behind that is a certification letter.  Do you |
| 10:35:32 | 3 | recognize that? |
| 10:35:33 | 4 | A.    I do. |
| 10:35:33 | 5 | Q.    And that's a certification letter to Gibraltar. |
| 10:35:37 | 6 | A.    No, it's not -- it is a Gibraltar certification letter. |
| 10:35:41 | 7 | That's correct. |
| 10:35:42 | 8 | Q.    Certifications are important in your business, are they |
| 10:35:49 | 9 | not? |
| 10:35:49 | 10 | A.    They are. |
| 10:35:49 | 11 | Q.    And a product that's been certified, it's been crash |
| 10:35:53 | 12 | tested as we heard Mr. Peng explain, and determined to meet |
| 10:35:57 | 13 | certain standards for performance makes those products |
| 10:36:03 | 14 | valuable.  Would you agree? |
| 10:36:05 | 15 | A.    Yes. |
| 10:36:05 | 16 | Q.    And the engineering and the testing and the manufacturing |
| 10:36:11 | 17 | that goes into those products to ensure that they meet those |
| 10:36:15 | 18 | standards and become a certified product, make those products |
| 10:36:19 | 19 | valuable.  Would you agree? |
| 10:36:22 | 20 | A.    There's a lot that makes products valuable.  But, yes, |
| 10:36:25 | 21 | that makes the products valuable. |
| 10:36:27 | 22 | Q.    It's very difficult, would you agree, to sell these |
| 10:36:32 | 23 | barrier products without a certification? |
| 10:36:40 | 24 | A.    A certification definitely helps in the sale of products. |
| 10:36:44 | 25 | That's correct.  But -- |

| | | |
|---|---|---|
| 10:36:45 | 1 | Q.   Now, Mr. Neusch.  If you'll turn now to -- |
| 10:36:47 | 2 | A.   No.  Hold on.  You showed a crash test certificate from |
| 10:36:52 | 3 | Gibraltar as part of a BSP submittal that was post the February |
| 10:36:56 | 4 | 2015 date, correct?  And Gibraltar doesn't own this |
| 10:37:00 | 5 | certification, Betaface does.  And when NSS was doing this |
| 10:37:04 | 6 | project, we had a quote from Betafence Fence, per my |
| 10:37:08 | 7 | termination agreement, to supply this product.  So this has |
| 10:37:10 | 8 | nothing to do with your client.  But they did get the contract |
| 10:37:13 | 9 | terminated and interfered in my contract and my business, |
| 10:37:17 | 10 | costing me money on this very contract. |
| 10:37:20 | 11 | Q.   Mr. Neusch, the question I asked you was whether the |
| 10:37:23 | 12 | statement in your interrogatory response, that Defendants' do a |
| 10:37:27 | 13 | not present their products as affiliated with anybody other |
| 10:37:33 | 14 | than Defendants, that statement, as we've just seen in the BSP, |
| 10:37:38 | 15 | the Black Security Products Purgatory Fence submittal is -- |
| 10:37:42 | 16 | A.   No.  You're lying. |
| 10:37:42 | 17 | Q.   I'm sorry, Mr. Neusch.  Please let me finish my |
| 10:37:45 | 18 | question -- |
| 10:37:45 | 19 | A.   Okay. |
| 10:37:45 | 20 | Q.   -- and then you can call me a liar. |
| 10:37:48 | 21 | A.   Okay. |
| 10:37:48 | 22 | Q.   The certification that's right there in the Black Security |
| 10:37:52 | 23 | Products submittal is in the name of Gibraltar, correct? |
| 10:37:58 | 24 | A.   Correct. |
| 10:37:58 | 25 | Q.   And you submitted that to Purgatory Fence in December of |

10:38:04    1    2015, correct?

10:38:06    2    A.    Correct.

10:38:07    3    Q.    Okay.  So it's not true that Defendants never affiliate

10:38:14    4    their products with anybody other than Defendants.  You

10:38:20    5    affiliated your product here with Gibraltar, didn't you?

10:38:22    6    A.    No.  There's -- okay.  First off, this is not one of the

10:38:26    7    four products in question.  So you're manipulating the

10:38:29    8    situation.  This is a completely separate product on this

10:38:31    9    project.

10:38:32   10          Second, BSP has never claimed this to be its product.

10:38:35   11    We were a contractor on this job, and we went to Betafence to

10:38:38   12    provide this gate.  Betafence bought this certification from

10:38:43   13    Gibraltar, and they're the ones that provided it -- that were

10:38:46   14    going to provide the product until Gibraltar got it terminated.

10:38:49   15    This is not -- nowhere has BSP represented that this is our

10:38:53   16    product.  This isn't our product.  This isn't one of the four

10:38:57   17    products that are in question.  So you're manipulating and

10:39:00   18    trying to commingle the products.

10:39:01   19    Q.    Please turn to Exhibit 125, sir.  That's the answer that

10:39:35   20    was filed on your behalf -- on the Defendants' behalf in this

10:39:37   21    case.  Do you recognize that?

10:39:39   22    A.    Yes.

10:39:39   23    Q.    Please turn to page 11, and I'm going to direct you to

10:39:48   24    paragraph 41?

10:39:49   25    A.    Okay.

10:39:50  1   Q.   It says there, "NSS has complied with the termination

10:39:55  2   agreement because NSS does not manufacture products, it has not

10:40:01  3   sold any products covered by the termination agreement."

10:40:08  4        Is that true, Mr. Neusch?

10:40:11  5   A.   It didn't sell any products covered by the termination

10:40:15  6   agreement that were bid past that point.  That's correct.

10:40:18  7   Q.   "NSS does not manufacture products."  That's what it says

10:40:24  8   here.

10:40:24  9   A.   Yes.  It was implying that it doesn't manufacture these

10:40:28  10  disputed products in violation of the termination agreement

10:40:31  11  after that date.

10:40:32  12  Q.   Does NSS manufacture products?

10:40:39  13  A.   NSS represented itself as a manufacturer of products

10:40:43  14  because we would manufacture the automated side and certain

10:40:47  15  portions and we outsource other portions.  That's correct.

10:40:49  16  Q.   So NSS does not manufacture the structural portion of any

10:40:54  17  product, correct?

10:40:56  18  A.   NSS outsources the welding.  That's correct.  We intended

10:40:59  19  to do the welding per my dad's discussion with me about getting

10:41:04  20  out of contracting and doing manufacturing.  So we bought

10:41:07  21  welding machines, got a fabrication shop, and did all that.

10:41:11  22  But he's since confiscated that.

10:41:13  23  Q.   You heard Mr. Peng talk about Gibraltar's cash tests on

10:41:18  24  the four disputed products.  You heard that?

10:41:21  25  A.   Yes.

10:41:21   1   Q.    Okay.   Turn to the next page.   I direct your attention to

10:41:26   2   the sentence at the top of page 12.   Are you there?

10:41:32   3   A.    Yes.

10:41:33   4   Q.    "And neither NSS or BSP has ever manufactured or even

10:41:39   5   intended to manufacture a Gibraltar crash test certified

10:41:45   6   product since the date the termination agreement was executed."

10:41:54   7   A.    That's correct.

10:41:55   8   Q.    Is that still true?

10:41:56   9   A.    Yes.

10:41:57  10   Q.    So you have no intent to manufacture any of the disputed

10:42:01  11   products?

10:42:02  12   A.    No.   We do.   Those aren't Gibraltar products.   How can you

10:42:05  13   not understand that?   We've never claimed that those are

10:42:08  14   Gibraltar products.   Those aren't even covered in the

10:42:10  15   termination letter.

10:42:11  16   Q.    The four products that Mr. Peng testified that KARCO crash

10:42:16  17   tested for Gibraltar -- generated crash test reports and

10:42:21  18   certifications for the products, you're saying those are not

10:42:27  19   Gibraltar crash tested -- crash test certified products?

10:42:32  20   A.    The restraint barrier he corrected the test report to be

10:42:35  21   NEU Security Services, so I don't need to use a Gibraltar

10:42:39  22   certification or anything else.   NEU Security Services

10:42:42  23   designed, developed, and made those products.   We believe those

10:42:45  24   to be ours.   Those are also not covered by the termination

10:42:48  25   agreement.   This was in reference to the termination agreement.

| | | |
|---|---|---|
| 10:42:54 | 1 | Read it.  It says "termination agreement" right there. |
| 10:42:56 | 2 | Q.   It also says that NEU Security Services and Black Security |
| 10:42:59 | 3 | Products do not intend to manufacture any Gibraltar crash test |
| 10:43:08 | 4 | certified product.  It doesn't say anything about whether you |
| 10:43:12 | 5 | believe those products are not owned by Gibraltar.  It -- it |
| 10:43:17 | 6 | says those products -- and those are the same products we heard |
| 10:43:21 | 7 | Mr. Peng testify about this morning? |
| 10:43:23 | 8 | A.   We do not intend to utilize any Gibraltar certifications. |
| 10:43:27 | 9 | That is correct. |
| 10:43:27 | 10 | Q.   The question was a little different, though, Mr. Neusch. |
| 10:43:33 | 11 | I appreciate that you're now agreeing that you won't use |
| 10:43:37 | 12 | Gibraltar certifications.  But is it accurate to say -- |
| 10:43:42 | 13 | A.   I've always agreed to that. |
| 10:43:44 | 14 | Q.   -- that Gibraltar -- |
| 10:43:45 | 15 |          I'm sorry.  What did you say? |
| 10:43:46 | 16 | A.   I have always agreed to that. |
| 10:43:47 | 17 | Q.   Okay.  Well, let's see if we can reach another agreement |
| 10:43:52 | 18 | then. |
| 10:43:52 | 19 | A.   Okay. |
| 10:43:52 | 20 | Q.   Okay.  We're going to talk about the structural portion of |
| 10:43:56 | 21 | the four disputed products. |
| 10:43:58 | 22 | A.   Well, you're talking about an aspect that makes up an |
| 10:44:01 | 23 | overall product.  I don't see -- |
| 10:44:01 | 24 | Q.   And I'm only talking about the structural aspect? |
| 10:44:04 | 25 | A.   Then it's not a full product, so ... |

S. NEUSCH – DIRECT

10:44:06  1   Q.   Okay.  Well, perhaps this will be easier than expected.

10:44:11  2   Is it true, as you said in your pleading here, that NEU

10:44:16  3   Security Services and Black Security Products are not going to

10:44:23  4   manufacture the structural portion of the four disputed

10:44:27  5   products?

10:44:28  6   A.   We will outsource those as we always have.

10:44:31  7   Q.   So you're going to hire somebody else to do it?

10:44:34  8   A.   To do the steel portion.  We do not weld.  We do not put

10:44:37  9   stick to steel.

10:44:38  10  Q.   Okay.  So you intend to manufacture through a third party

10:44:44  11  the four disputed products -- the structural portion of those

10:44:47  12  products?

10:44:48  13  A.   That's correct.

10:44:49  14  Q.   Okay.  And perhaps we should clarify for the sake of the

10:44:57  15  record whether NEU Security Services or Black Security Products

10:45:02  16  has done that since the termination agreement?

10:45:07  17  A.   Has done what?

10:45:08  18  Q.   Had manufactured through a third party any of the

10:45:12  19  structural portion of those four disputed products.  Has that

10:45:16  20  happened, Mr. Neusch?

10:45:17  21  A.   Of the four disputed products?  No.

10:45:19  22  Q.   You mentioned a minute ago about having a product crash

10:45:27  23  test certified for NSS.

10:45:31  24          THE COURT:  Before we move into that, we'll take a

10:45:34  25  15-minute recess at this point and be back at 11 o'clock.

| | | |
|---|---|---|
| 10:45:37 | 1 | (Recess) |
| 11:01:43 | 2 | (Open Court) |
| 11:01:43 | 3 | THE COURT:  Mr. Connor, you may continue your direct |
| 11:01:45 | 4 | examination of Mr. Neusch. |
| 11:01:48 | 5 | MR. CONNOR:  Thank you, Your Honor. |
| 11:01:50 | 6 | Q.   Mr. Neusch, on the top of page 13, paragraph 45 of |
| 11:01:54 | 7 | Plaintiffs' Exhibit 125 it says, "After signing the termination |
| 11:02:00 | 8 | agreement, NSS designed and certified its own K12 cable-based |
| 11:02:04 | 9 | fence."  Is that true? |
| 11:02:08 | 10 | A.   Well, no.  It was BSP, so that was a typo.  But also they |
| 11:02:14 | 11 | don't use the designation K12 anymore.  It's M50. |
| 11:02:19 | 12 | Q.   I'm sorry.  It's M50? |
| 11:02:21 | 13 | A.   Yes. |
| 11:02:21 | 14 | Q.   And you're saying it's not NSS, that's wrong also, because |
| 11:02:25 | 15 | it's BSP, Black Security Products? |
| 11:02:29 | 16 | A.   That's correct. |
| 11:02:30 | 17 | Q.   And that was after the termination agreement was signed in |
| 11:02:34 | 18 | February of 2015? |
| 11:02:38 | 19 | A.   That's correct. |
| 11:02:38 | 20 | Q.   And when did that design take place? |
| 11:02:42 | 21 | A.   Oh, I don't recall the dates of the design, but it was not |
| 11:02:46 | 22 | too much prior to the crash test. |
| 11:02:48 | 23 | Q.   Okay.  And the crash test was done in about September of |
| 11:02:52 | 24 | 2005 at TTI in College Station, wasn't it? |
| 11:02:56 | 25 | A.   No. |

| | | |
|---|---|---|
| 11:02:57 | 1 | Q.   Where was it done? |
| 11:02:58 | 2 | A.   It was 2015, not 2005. |
| 11:03:00 | 3 | Q.   I'm sorry.  I misspoke. |
| 11:03:02 | 4 | A.   Yeah. |
| 11:03:03 | 5 | Q.   Thank you.  September of 2015? |
| 11:03:04 | 6 | A.   That's correct. |
| 11:03:05 | 7 | Q.   In College Station? |
| 11:03:07 | 8 | A.   Yes. |
| 11:03:07 | 9 | Q.   At Texas A&M Transportation Institute? |
| 11:03:10 | 10 | A.   That's correct. |
| 11:03:11 | 11 | Q.   And they do the same kind of a work that KARCO Engineering |
| 11:03:14 | 12 | does in California, don't they? |
| 11:03:15 | 13 | A.   That's correct. |
| 11:03:16 | 14 | Q.   Okay.  Who owns the M50 cable-based fence that you crash |
| 11:03:25 | 15 | tested in College Station in September of 2015? |
| 11:03:29 | 16 | A.   BSP. |
| 11:03:33 | 17 | Q.   Black Security Products? |
| 11:03:35 | 18 | A.   That's correct. |
| 11:03:36 | 19 | Q.   And did Black Security Products pay for the crash testing |
| 11:03:39 | 20 | at TTI? |
| 11:03:40 | 21 | A.   They did. |
| 11:03:41 | 22 | Q.   And has Black Security Products licensed that product to |
| 11:03:47 | 23 | any third party? |
| 11:03:48 | 24 | A.   No. |
| 11:03:49 | 25 | Q.   Has it sold that product to any third party? |

S. NEUSCH – DIRECT                                                54

| | | |
|---|---|---|
| 11:03:53 | 1 | A.   Yes. |
| 11:03:54 | 2 | Q.   And does it have a certification? |
| 11:03:56 | 3 | A.   Yes. |
| 11:03:57 | 4 | Q.   What's the rating? |
| 11:03:58 | 5 | A.   M50 P2. |
| 11:04:00 | 6 | Q.   And who paid for that crash testing?  Was it Black |
| 11:04:03 | 7 | Security Products? |
| 11:04:05 | 8 | A.   Yes. |
| 11:04:06 | 9 | Q.   Okay.  Would it surprise you to know that we looked for |
| 11:04:11 | 10 | charges on the Black Security Products QuickBooks that were |
| 11:04:18 | 11 | incurred in connection with that crash testing, that design, |
| 11:04:21 | 12 | that product at TTI, and found nothing? |
| 11:04:25 | 13 | A.   Okay. |
| 11:04:26 | 14 | Q.   That surprise you? |
| 11:04:28 | 15 | A.   Well, BSP's books haven't been reconciled, but if you look |
| 11:04:33 | 16 | at the bank account and the checks written, we wrote the check |
| 11:04:36 | 17 | to TTI. |
| 11:04:37 | 18 | Q.   For how much? |
| 11:04:38 | 19 | A.   I think it was like $24,000. |
| 11:04:40 | 20 | Q.   So Black Security Products wrote a check to TTI in 2015 |
| 11:04:46 | 21 | for $24,000 to test a new product? |
| 11:04:48 | 22 | A.   I don't have the information in front of me, but it was |
| 11:04:51 | 23 | somewhere around there, yes. |
| 11:04:52 | 24 | Q.   And with that certification would you say that that |
| 11:04:56 | 25 | product is valuable like these others that we've been talking |

S. NEUSCH – DIRECT

| | | |
|---|---|---|
| 11:04:59 | 1 | about? |
| 11:04:59 | 2 | A.   That's correct. |
| 11:05:00 | 3 | Q.   Okay.  So does the value of that product, is it |
| 11:05:07 | 4 | represented on the financial books and records of Black |
| 11:05:09 | 5 | Security Products? |
| 11:05:11 | 6 | A.   No.  The financial books and records of Black Security |
| 11:05:13 | 7 | Products, there hasn't been much time spent on them because –– |
| 11:05:18 | 8 | but we don't have it shown as R & D or anything.  We haven't |
| 11:05:22 | 9 | set up the software to show those cost codes and things. |
| 11:05:27 | 10 | Q.   Turn back to Exhibit Number 90, please?  Are you there? |
| 11:05:42 | 11 | It's the one we were looking at before, Exhibit Number 90. |
| 11:05:46 | 12 | A.   Yes. |
| 11:05:46 | 13 | Q.   And if you would turn to the page that has the heading |
| 11:05:49 | 14 | Response to Interrogatory Number 6. |
| 11:05:59 | 15 |       See it? |
| 11:06:00 | 16 | A.   Yes. |
| 11:06:07 | 17 | Q.   I'm going to direct you down to the third paragraph.  It |
| 11:06:12 | 18 | starts, "Upon information and belief, Defendants do not believe |
| 11:06:16 | 19 | that there are major differences between the products that were |
| 11:06:20 | 20 | manufactured, sold, and/or certified for plaintiffs and the |
| 11:06:26 | 21 | product's Defendants should be permitted to manufacture, |
| 11:06:30 | 22 | advertise, offer to sell, and sell." |
| 11:06:39 | 23 |       So is this saying and are you and NEU Security |
| 11:06:40 | 24 | Services and Black Security Products contending in this case |
| 11:06:44 | 25 | that the products that you want to make and sell are |

| | | |
|---|---|---|
| 11:06:49 | 1 | substantially the same as the Gibraltar products? |
| 11:06:53 | 2 | A.   On the four disputed ones, that is correct. |
| 11:06:56 | 3 | Q.   What could you provide in terms of helpful information to |
| 11:07:09 | 4 | Mr. Reynolds, who is here in the court today, so that he could |
| 11:07:12 | 5 | find in the Black Security Products financial records the |
| 11:07:16 | 6 | transactions in connection with the new product that Black |
| 11:07:20 | 7 | Security Products now owns, this M50 P2 cable-based fence? |
| 11:07:26 | 8 | MS. GHAVIMI:  Objection, form. |
| 11:07:29 | 9 | A.   We can get him the canceled checks and invoices from TTI. |
| 11:07:38 | 10 | Q.   And is Black Security Products -- |
| 11:07:39 | 11 | A.   And the contract with TTI. |
| 11:07:41 | 12 | Q.   And is Black Security Products trying to sell that product |
| 11:07:48 | 13 | to any third party? |
| 11:07:51 | 14 | A.   Well, I just testified that it has. |
| 11:07:53 | 15 | Q.   Okay.  As a product line or a product like Gibraltar sold |
| 11:07:58 | 16 | a product line to Betafence, is Black Security Products trying |
| 11:08:02 | 17 | to sell that new certified product to any third party? |
| 11:08:08 | 18 | A.   I don't understand the question.  Are you asking if I'm |
| 11:08:10 | 19 | trying to sell my rights to the product as Gibraltar did to |
| 11:08:13 | 20 | theirs? |
| 11:08:14 | 21 | Q.   I don't know what you just said. |
| 11:08:15 | 22 | A.   I'm sorry.  I don't understand the question.  Are you |
| 11:08:18 | 23 | asking if I'm trying to sell the rights to my product as |
| 11:08:21 | 24 | Gibraltar did to Betafence? |
| 11:08:22 | 25 | Q.   Yes. |

11:08:23  1  A.   No.

11:08:23  2  Q.   At the last hearing, Mr. Neusch, you said it was likely

11:08:39  3  that the "and personally" words at the bottom of your signature

11:08:46  4  on the termination notice were added after the fact by

11:08:50  5  Gibraltar.  Do you remember testifying about that?

11:08:53  6  A.   That is correct, because the version Gibraltar gave me to

11:08:57  7  review never had "and personally" on it.

11:08:59  8  Q.   Okay.  Turn, please, to PX-77 -- Exhibit 77.  Do you

11:09:15  9  recognize 77 as an e-mail to you attaching the termination

11:09:24 10  agreement?

11:09:25 11  A.   That is correct.

11:09:25 12  Q.   Okay.  Look at the attachment there, Mr. Neusch.  Do you

11:09:29 13  see the termination agreement?

11:09:30 14  A.   I do.

11:09:30 15  Q.   And it says under the signature line for you "and

11:09:35 16  personally"?

11:09:36 17  A.   That is correct.

11:09:37 18  Q.   Turn to PX-78, please.  This is the e-mail where you sent

11:09:45 19  it back to Mr. Gibraltar, to Mr. Bryer.

11:09:48 20  A.   Yep.  That is correct.

11:09:49 21  Q.   And turn the page and look at your signed copy of the

11:09:52 22  termination agreement.  Just like the one you received, it says

11:09:55 23  "and personally" below your name.

11:09:57 24  A.   Well, Gibraltar --

11:09:58 25  Q.   Does it?  Just answer my question, please.  Does it say

11:10:01  1   "and personally" underneath your signature just like the

11:10:06  2   version that was sent to you to sign?

11:10:08  3   A.   Yes.  But the version that was sent to me to review did

11:10:11  4   not have it.

11:10:12  5   Q.   We just looked at the version --

11:10:13  6   A.   That was not the one sent to me for review.  If you look

11:10:16  7   at the e-mail where they said "please review this," it was

11:10:18  8   earlier in the day.  Then later they said, here, sign this

11:10:21  9   right away.  It's two different e-mails, and the one did not

11:10:24  10  have "and personally" that they sent for "please review" as the

11:10:28  11  working copy.  That was a soft copy as well.

11:10:31  12  Q.   Mr. Neusch, have you ever endorsed a check, a payment

11:10:39  13  that's to NEU Security Services or Black Security Products --

11:10:43  14  received a check and endorsed it and caused those funds to be

11:10:49  15  directed into one of your personal accounts, your wife's

11:10:53  16  personal accounts or personal account of somebody else other

11:10:57  17  than NEU Security Services or Black Security Products?

11:11:00  18  A.   Not that I recall.

11:11:01  19  Q.   You don't know whether you've ever done that?

11:11:04  20  A.   I don't remember ever doing that, no.

11:11:07  21  Q.   If you had -- and I don't think you're testifying that you

11:11:12  22  can rule that out; is that correct?

11:11:14  23  A.   Well, I'm not aware of ever doing that.  Now, if you have

11:11:18  24  something showing that I did, then I'm mistaken.  But I'm not

11:11:22  25  aware of ever doing that.

11:11:23  1  Q.   If you had, Mr. Neusch, the only way to know whether those

11:11:26  2  funds that were paid to NEU Security Services or Black Security

11:11:30  3  Products ever made it to NEU Security Services or Black

11:11:35  4  Security products would be to look in your personal accounts

11:11:39  5  and see if they were deposited there?

11:11:41  6  A.   Yeah.  Or I would have to give the receipt to accounting

11:11:44  7  and tell them to code it to owner's draw or something.

11:11:49  8  Q.   Turn to PX-96, please.

11:11:53  9  A.   Yeah.

11:11:53  10  Q.   Do you recognize this as the bid by Black Security

11:12:00  11  Products on the Richmond job, the Social Security

11:12:04  12  Administration Building in California?

11:12:07  13  A.   Yes.

11:12:07  14  Q.   And the date on that bid is July the 17th, 2015, correct?

11:12:16  15  A.   Yes.

11:12:16  16  Q.   Okay.  And if you'll turn the page to ending in 1906,

11:12:36  17  three pages in, there's a heading there, Description of the

11:12:44  18  Work, and the two last items, items 3 and 4 are for

11:12:47  19  installation.  Do you see those?

11:12:49  20  A.   Yes.

11:12:49  21  Q.   And the total for the installation is $105,000, correct?

11:12:56  22  A.   Yes.

11:12:56  23  Q.   Now, turn the tab to PX-97.  This is the contract that was

11:13:10  24  awarded by GEMS to Black Security Products the next month,

11:13:13  25  August of a 2015, correct?

11:13:14   1   A.   That's correct.

11:13:15   2   Q.   And this contract amount, if you'll turn to the second

11:13:18   3   page -- sorry -- the fourth page ending in 1915, section 4,

11:13:29   4   contract price, it states there the total contract price of

11:13:32   5   $300,242.12.  Do you see that?

11:13:35   6   A.   Yes.

11:13:36   7   Q.   Is that correct?

11:13:37   8        And if you turn the page to sections -- section 9 at

11:13:42   9   1917, there's approval for a subcontract to NSS.  And the

11:13:51  10   amount of the approval for the subcontract to NSS $105,000 just

11:13:56  11   like it was in the bid, correct?

11:13:57  12   A.   Yes.

11:13:57  13   Q.   Okay.  So the bid that you put in was for $300,000, you're

11:14:09  14   awarded that contract, and you said to GEMS you're going to

11:14:13  15   subcontract $105,000 for the installation to NSS.

11:14:18  16   A.   That is incorrect.

11:14:23  17   Q.   That's what section 9 says, though, right?

11:14:25  18   A.   No.

11:14:25  19   Q.   You got approval to subcontract to NSS 105 -- it says Neu

11:14:30  20   for $105,000.  That's what it says, right?

11:14:34  21   A.   GEMS is the author of this contract.  They put that in

11:14:38  22   there as a possible one and only subcontractor if we were going

11:14:42  23   to subcontract.  Nowhere does it say that we had to subcontract

11:14:45  24   to NSS.  And also GEMS pulled that directly from my proposal.

11:14:50  25   My proposal for $105,000 with installation also included the

| | | |
|---|---|---|
| 11:14:54 | 1 | integration and all the automation and that stuff.  That was |
| 11:14:57 | 2 | subcontracted out from BSP to American Barriers.  That was not |
| 11:15:02 | 3 | inclusive of the subcontract to NSS.  Therefore, that $105,000 |
| 11:15:07 | 4 | was cost coded to multiple items that wasn't also contracted to |
| 11:15:10 | 5 | NSS. |
| 11:15:11 | 6 | Q.   You only had permission to subcontract to NEU Security |
| 11:15:14 | 7 | Services according to this contract, correct? |
| 11:15:17 | 8 | A.   They were acknowledging NEU Security Services.  That's |
| 11:15:20 | 9 | correct. |
| 11:15:20 | 10 | Q.   Turn to Exhibit P-85, please. |
| 11:15:34 | 11 | A.   Okay. |
| 11:15:34 | 12 | Q.   This is the subcontract between Neu Security Services and |
| 11:15:36 | 13 | Black Security Products for the GEMS Richmond job, correct? |
| 11:15:42 | 14 | A.   That's correct. |
| 11:15:43 | 15 | Q.   And if you'll turn to the signature page at 2711, it's |
| 11:15:47 | 16 | signed on behalf of NSS, or Neu Security Services, by you, and |
| 11:15:52 | 17 | it's signed on behalf of Black Security Products by you? |
| 11:15:55 | 18 | A.   That's correct. |
| 11:15:56 | 19 | Q.   Same day? |
| 11:15:57 | 20 | A.   That's correct. |
| 11:15:58 | 21 | Q.   And what's the face value of this fixed price contract? |
| 11:16:03 | 22 | A.   $45,000. |
| 11:16:06 | 23 |         MR. TAYLOR:  No further questions, Your Honor. |
| 11:16:13 | 24 |         THE COURT:  Any cross-examination? |
| 11:16:15 | 25 |         MS. GHAVIMI:  Yes, Your Honor.  But I would also like |

| | | |
|---|---|---|
| 11:16:18 | 1 | to reserve to call Mr. Neusch in our case in chief. |
| 11:16:20 | 2 | THE COURT:  You may. |
| 11:16:21 | 3 | MS. GHAVIMI:  Thank you. |
| 11:16:47 | 4 | **CROSS-EXAMINATION** |
| 11:16:47 | 5 | **BY MS. GHAVIMI:** |
| 11:16:47 | 6 | Q.   Mr. Neusch, looking at that document you were just on, why |
| 11:16:50 | 7 | was the subcontract between NSS and BSP a fixed price? |
| 11:16:54 | 8 | A.   It was a fixed price contract because the contract with |
| 11:16:57 | 9 | BSP and GEMS was fixed price -- from a fixed price. |
| 11:17:09 | 10 | Q.   So because the contract between GEMS and BSP was a fixed |
| 11:17:12 | 11 | price, the contract between NSS and BSP was a fixed price; is |
| 11:17:12 | 12 | that correct? |
| 11:17:13 | 13 | A.   That's correct.  Generally construction it's like flow |
| 11:17:16 | 14 | down contracting.  You have your contract with them and the one |
| 11:17:19 | 15 | you have with your client.  So ... |
| 11:17:21 | 16 | Q.   Okay.  Now I would like to take a step back here and ask |
| 11:17:30 | 17 | you a few questions about the construction business generally |
| 11:17:32 | 18 | just to make sure everybody understands some of these |
| 11:17:35 | 19 | termination -- some of the terms that we're using. |
| 11:17:39 | 20 | Could you explain with respect to these four products |
| 11:17:44 | 21 | that are at issue here, what does "manufacture" mean? |
| 11:17:52 | 22 | A.   Well, that's what I was trying to get at earlier.  Most of |
| 11:17:56 | 23 | the manufacturers in the barrier industry, they don't do |
| 11:17:57 | 24 | everything in-house.  They outsource parts of it.  NEU Security |
| 11:18:01 | 25 | Services has had -- has gotten POs and has had material only |

11:18:06  1  projects where we were named as a manufacturer and we provided

11:18:09  2  a turnkey product as the manufacturer.  It was even on some of

11:18:12  3  our literature on our Web site.  We've been known as the

11:18:14  4  manufacturer on many projects.

11:18:16  5           So the term "manufacturer," that's what I was trying

11:18:19  6  to get at, because you can have sub-manufacturers of an overall

11:18:22  7  system, as Gibraltar was for the steel fabrication.

11:18:26  8  Q.   So does NSS manufacture the entire portion of a wedge

11:18:32  9  barrier?

11:18:34  10  A.   NSS -- when you say "manufacture," NSS will pay the labor

11:18:39  11  and actually do its own part of it and then it will outsource

11:18:44  12  others.  But you can be a manufacturer in the barrier industry,

11:18:47  13  like most of the competitors that I have and Gibraltar have,

11:18:51  14  where they don't do any of the manufacturing.  They outsource

11:18:54  15  100 percent of it turnkey, just like the contractor that built

11:18:58  16  this building probably didn't self-perform any of the work with

11:18:59  17  actual employees, it subcontracted entire portions, but it was

11:19:03  18  still considered the contractor that built the building.

11:19:05  19  Q.   So, in your opinion, Gibraltar is not a manufacturer?

11:19:08  20  A.   Gibraltar does manufacturing.  Gibraltar does a lot of

11:19:12  21  steel manufacturing.  Now that they've tried to take these

11:19:16  22  products from me, they've tried to take on my portion that I

11:19:19  23  was outsourcing and doing and combining -- and combining it

11:19:22  24  with doing what I was doing to try to a make these products

11:19:24  25  themselves.

11:19:24  1  Q.   So could you explain what the -- what you mean when you

11:19:28  2  use the term "fabrication"?

11:19:30  3  A.   Fabrication, manufacturing, it's all kind of used in the

11:19:35  4  same sense.  But as representing yourself as a manufacturer,

11:19:41  5  you can -- like I said, you manufacture multiple different

11:19:46  6  entities to put together a complete system.

11:19:48  7  Q.   So for a wedge barrier fabrication -- let me restate that.

11:19:55  8       What part of the wedge barrier would be fabricated?

11:19:59  9  A.   What part did I fabricate?

11:20:03 10  Q.   No.  What part of a wedge barrier would a third party

11:20:07 11  fabricate?

11:20:08 12  A.   Well, it depends on how I broke it up.  You know, I mean,

11:20:12 13  we could outsource the entire fabrication to one company if

11:20:15 14  they had the capability and means to.  You can break it down

11:20:18 15  into five different subsets of companies you could outsource

11:20:22 16  the manufacturing to.  You know, you have the painting, the

11:20:25 17  galvanizing.  That's always outsourced.  Gibraltar outsources

11:20:29 18  it.  They don't do it in-house.

11:20:31 19       You have the steel fabrication and welding.  All

11:20:33 20  right.  So you put the pieces together and put stick to rod and

11:20:37 21  do the cutting.  And even the cutting of the steel, for

11:20:39 22  example, might be outsourced if the steel is big enough and

11:20:42 23  they don't have a saw inside their shop that can cut it.

11:20:45 24  There's so many subsets of the manufacturing process, what you

11:20:47 25  would outsource is different depending on who does it.  What

S. NEUSCH – CROSS

11:20:51  1  we're arguing about here is who has the right to sell these

11:20:54  2  products as the manufacturer.

11:20:55  3  Q.   When one of these products is installed on a crash test

11:21:00  4  site, what is involved in the installation?

11:21:04  5  A.   Well, there again, it all varies depending on how much

11:21:10  6  prior fabrication you do.  But when we installed the products

11:21:14  7  in question, you know, we did some of the fabricating on-site.

11:21:18  8  We did a lot of the fabricating on-site for some of them and

11:21:21  9  some of them a little bit less, depending on how much Gibraltar

11:21:25  10  did.  But then we also did the install.

11:21:28  11  Q.   Okay.  For three of the four disputed products that are at

11:21:36  12  issue, that we heard the deposition testimony earlier of

11:21:40  13  Mr. Peng from KARCO, the M50 P2 cable crash fence and the M50

11:21:52  14  P1 P2 K12 cable restraint barriers, the three crash tests that

11:21:59  15  Plaintiff is asserting NSS -- and I have the four disputed

11:22:18  16  products listed up here on the screen.

11:22:24  17        So for the first three products -- and I'd like to go

11:22:30  18  through them just so everybody can have a visual.  Could you

11:22:40  19  please tell the Court what this product is.

11:22:43  20  A.   That's the 24-foot restraint barrier that's M50 rated -- I

11:22:49  21  mean, yeah, restraint barrier.  That's correct.

11:22:51  22  Q.   Did NSS perform the installation of this product on the

11:22:55  23  crash test site?

11:22:56  24  A.   Yes.

11:22:56  25  Q.   Okay.  What is this product?

11:23:02  1   A.    It's the 50-foot restraint barrier.

11:23:05  2   Q.    Okay.  What's the difference between this and the one we

11:23:11  3   just looked at?

11:23:12  4   A.    Just width.  The only difference between the two products

11:23:16  5   is the width, because the industry dictates that you have to

11:23:19  6   have a maximum width and minimum width if you want to use

11:23:22  7   variable widths of a product to crash test it.

11:23:25  8   Q.    Are both of these products active vehicle barriers?

11:23:30  9   A.    They both are.  Yes, ma'am.

11:23:32  10  Q.    Could you explain how they are active for the Court.

11:23:36  11  A.    Yes.  They vertically lift out of the ground.  So it's

11:23:41  12  housed in a pan that's in the ground.  And then, either by

11:23:50  13  electric actuation or hydraulic actuation, the entire

11:23:53  14  contraption that houses the cable and the T-post there is

11:23:56  15  lifted up out of the ground into what would be considered the

11:24:02  16  secure position.

11:24:05  17  Q.    Okay.  Did NSS perform the installation for this crash

11:24:08  18  test?

11:24:09  19  A.    Yes.

11:24:10  20  Q.    Okay.  Okay.  And what is this product?

11:24:14  21  A.    That's the finger wedge barrier.

11:24:17  22  Q.    Okay.  Is this also an active vehicle barrier?

11:24:21  23  A.    That is an active vehicle barrier.  Yes, ma'am.

11:24:24  24  Q.    Did NSS perform the installation on this crash test?

11:24:31  25  A.    No, they did not.

| 11:24:32 | 1  | Q.   And what is this product? |
| 11:24:35 | 2  | A.   That's the M50 P2 crash fence. |
| 11:24:39 | 3  | Q.   Okay.  Is this an active vehicle barrier? |
| 11:24:42 | 4  | A.   It is not.  That is a passive vehicle barrier. |
| 11:24:45 | 5  | Q.   Could you explain what a passive vehicle barrier is? |
| 11:24:49 | 6  | A.   A passive vehicle barrier is one that doesn't have any |
| 11:24:52 | 7  | moving parts or actuation to it.  It's generally used not in a |
| 11:24:56 | 8  | roadway, but at like a perimeter of a facility or property |
| 11:25:02 | 9  | line, like a fence. |
| 11:25:03 | 10 | Q.   Okay.  Did NSS perform the installation of this crash |
| 11:25:06 | 11 | test? |
| 11:25:06 | 12 | A.   Absolutely.  Yes, it did. |
| 11:25:08 | 13 | Q.   Okay. |
| 11:25:09 | 14 | A.   You can even see me in some of the pictures from the crash |
| 11:25:13 | 15 | test report. |
| 11:25:14 | 16 | Q.   Okay.  Could you turn to turn to -- and I'm going to hand |
| 11:25:35 | 17 | you Defendants' exhibit binder. |
| 11:25:55 | 18 |      Could you turn to Exhibit 49 -- Defendants' |
| 11:26:04 | 19 | Exhibit 49. |
| 11:26:08 | 20 | A.   Okay. |
| 11:26:09 | 21 |      MS. GHAVIMI:  And, Your Honor, this is an exhibit |
| 11:26:11 | 22 | that was discussed in the KARCO deposition. |
| 11:26:19 | 23 |      THE COURT:  Well, what exhibit is it in the KARCO |
| 11:26:25 | 24 | deposition? |
| 11:26:26 | 25 |      MS. GHAVIMI:  K-11. |

| 11:26:27 | 1 | THE COURT: All right. So K-11 in the KARCO |
| 11:26:31 | 2 | deposition is the same as Defendant's 49; is that correct? |
| 11:26:35 | 3 | MS. GHAVIMI: Yes. |
| 11:26:42 | 4 | Q. Now, I'm going to ask you to look through Defendants' |
| 11:26:46 | 5 | Exhibit 49, 50, 51, and 52. |
| 11:27:00 | 6 | MS. GHAVIMI: And Defendants' Exhibit 50, for the |
| 11:27:04 | 7 | record, is Exhibit K-14 from the KARCO deposition, Defendants' |
| 11:27:10 | 8 | Exhibit 51 is Exhibit K-22 from the KARCO deposition, and |
| 11:27:15 | 9 | Defendants' Exhibit 52 is Exhibit K-17 from the KARCO |
| 11:27:19 | 10 | deposition. |
| 11:27:20 | 11 | THE COURT: Okay. |
| 11:27:22 | 12 | Q. (BY MS. GHAVIMI) Please let me know when you are finished. |
| 11:27:25 | 13 | A. I'm done. |
| 11:27:25 | 14 | Q. Okay. These are all invoices from KARCO to Gibraltar and |
| 11:27:31 | 15 | payments from Gibraltar to KARCO for crash tests? |
| 11:27:37 | 16 | A. Yes. |
| 11:27:37 | 17 | Q. Okay. Do NSS's installation costs for these crash tests |
| 11:27:44 | 18 | appear on any of these invoices? |
| 11:27:48 | 19 | A. No. |
| 11:27:48 | 20 | Q. Okay. And why not? |
| 11:27:55 | 21 | A. Because KARCO doesn't perform the installation. So we |
| 11:28:02 | 22 | perform the installation and we incurred the cost ourselves |
| 11:28:06 | 23 | because it was on a product development to install our product. |
| 11:28:11 | 24 | Q. So because NSS performs the installation itself, NSS does |
| 11:28:17 | 25 | not invoice KARCO for these installation costs? |

| | | |
|---|---|---|
| 11:28:20 | 1 | A.   Absolutely not. |
| 11:28:21 | 2 | Q.   Does NSS invoice Gibraltar for these installation costs? |
| 11:28:26 | 3 | A.   No. |
| 11:28:26 | 4 | Q.   Okay.  Does KARCO provide employees at the crash test site |
| 11:28:38 | 5 | while NSS is installing the products? |
| 11:28:41 | 6 | A.   KARCO has oversight, so they have to inspect the |
| 11:28:46 | 7 | installation to make sure we do it to spec.  And if there's any |
| 11:28:52 | 8 | variances, they have to note it.  If we make any changes, which |
| 11:28:55 | 9 | a lot of changes are made during the installation, they note it |
| 11:28:58 | 10 | so it can be noted on the crash test report and, because it's |
| 11:29:02 | 11 | their property, they have supervision.  But they do not perform |
| 11:29:06 | 12 | any installation, no. |
| 11:29:07 | 13 | Q.   Okay.  If you could turn -- if you could look at |
| 11:29:11 | 14 | Defendants' Exhibit 52 for a moment and turn to the second |
| 11:29:15 | 15 | page. |
| 11:29:19 | 16 | A.   Okay. |
| 11:29:19 | 17 | Q.   Do you see at the bottom of the KARCO invoice, could you |
| 11:29:22 | 18 | read for me the balance due for the total crash test? |
| 11:29:25 | 19 | A.   $1,500.  Sorry.  On the second page? |
| 11:29:35 | 20 | Q.   Yes.  These -- these pages are double-sided, so I'm -- |
| 11:29:39 | 21 | A.   So the third page. |
| 11:29:40 | 22 | Q.   -- the second page, but it's actually the third page? |
| 11:29:43 | 23 | A.   Got you.  $30,850. |
| 11:29:45 | 24 | Q.   Yes.  Okay.  Could you turn to Defendants' Exhibit 54. |
| 11:29:57 | 25 | A.   Okay. |

11:29:57   1   Q.   This is an application for payment to Fort Gillem; is that

11:30:03   2   correct?

11:30:04   3   A.   Yes, ma'am.

11:30:05   4   Q.   Okay.  If you could turn to the back of the exhibit?

11:30:13   5   A.   Okay.

11:30:13   6   Q.   What products were installed on this project?

11:30:22   7   A.   The restraint barrier and the M50 P2 fence.  That's two of

11:30:26   8   the four products in dispute.

11:30:28   9   Q.   Okay.  And do you see where are these products listed on

11:30:31  10   the second page?

11:30:31  11   A.   On the second page, the restraint barrier being an active

11:30:36  12   vehicle barrier, is items one and two.  Material is 131,000.

11:30:42  13   Labor for installing it, 77,800.  Then you have the active

11:30:47  14   wiring and hookup, and then you have the passive barrier, so on

11:30:50  15   and so a forth.  The passive would be the M50 P2 fence.

11:30:55  16   Q.   Okay.  Just so I have it correct, the active vehicle

11:30:59  17   barrier labor you said was listed on line 2?

11:31:04  18   A.   That's correct.

11:31:04  19   Q.   And the amount invoiced for the labor costs for the cable

11:31:11  20   restraint barrier, a product at issue here, was $77,800?

11:31:16  21   A.   Yes, ma'am.

11:31:17  22   Q.   So if you were to install a cable restraint barrier for a

11:31:21  23   third party, you would invoice them the amount of $77,800?

11:31:25  24   A.   Yes.  So if the crash test --

11:31:27  25             THE COURT:  Let me interrupt you-all here for a

| | | |
|---|---|---|
| 11:31:30 | 1 | minute.  We started at 9:30.  It's now 11:30.  We took a |
| 11:31:35 | 2 | 15-minute break.  Where are you-all taking me both with your |
| 11:31:40 | 3 | direct questions and now this cross-examination to any of the |
| 11:31:45 | 4 | elements that would make it more or less likely that I would |
| 11:31:50 | 5 | either grant preliminary injunctive relief or a receivership or |
| 11:31:55 | 6 | not grant preliminary injunctive relief or a receivership? |
| 11:31:59 | 7 | I found the testimony this morning extremely |
| 11:32:03 | 8 | interesting, but I'm having a hard time relating it to any of |
| 11:32:08 | 9 | the decisions that I'm going to make in this case.  So can I |
| 11:32:13 | 10 | have some help from you-all here?  Somebody want to tell me? |
| 11:32:17 | 11 | MS. GHAVIMI:  Your Honor, may I go first? |
| 11:32:19 | 12 | THE COURT:  You may. |
| 11:32:21 | 13 | MS. GHAVIMI:  Your Honor, the plaintiffs are seeking |
| 11:32:23 | 14 | a broad injunction, in our opinion, an injunction against NSS |
| 11:32:29 | 15 | and BSP which are separate companies.  And they're seeking to |
| 11:32:32 | 16 | enjoin them from selling products which our contention is that |
| 11:32:37 | 17 | are not owned by Gibraltar.  We are attempting to prove and |
| 11:32:42 | 18 | demonstrate that our client has rights in these products. |
| 11:32:47 | 19 | NSS -- that, one, BSP should not be enjoined at all, |
| 11:32:54 | 20 | Stephen Neusch should not be enjoined at all, and that NSS has |
| 11:32:59 | 21 | rights in these products by virtue of its contribution to the |
| 11:33:02 | 22 | crash tests, by virtue of no intellectual property |
| 11:33:05 | 23 | restrictions, and by virtue of the fact that the termination |
| 11:33:08 | 24 | agreement did not cover any of these four disputed products. |
| 11:33:13 | 25 | And, second, that we would appreciate if we had a |

11:33:17   1   period of time to make closing arguments to wrap up other

11:33:21   2   evidence that --

11:33:22   3        THE COURT:  Oh, I'm just trying to let the rest of

11:33:25   4   you get -- get in whatever the rest of the evidence you want.

11:33:30   5   I'm going to be talking to you after it's over.  But I hope the

11:33:34   6   closing arguments are more focused than what I've been hearing

11:33:37   7   in the way of testimony because these invoices are not making

11:33:41   8   it more or less likely that I'm going to grant relief or not

11:33:46   9   grant relief because I haven't heard them being tied into the

11:33:50  10   four products that are at issue here.  I just hear a lot of

11:33:54  11   talk about this.

11:33:56  12        But I say this to both of you:  You've spent an hour

11:34:00  13   and 45 minutes when I exclude the break this morning, and I

11:34:04  14   haven't heard anything that's helped me make a decision in this

11:34:08  15   case yet.  So I just tell you-all that.  I know that the

11:34:10  16   lawyers always envision the case differently than the person

11:34:15  17   that's going to have to make the decision.  I did it when I was

11:34:18  18   in private practice.  But I'm just telling you we haven't

11:34:24  19   advanced the ball this morning toward the decision-making

11:34:28  20   process.

11:34:31  21        Now, you want to keep going this way, you're welcome

11:34:37  22   to do it.  But you're not focusing -- nobody is focusing the

11:34:41  23   court on the four products at question and what I should do

11:34:48  24   with them or whether or not there is going to be great harm

11:34:55  25   that -- that befalls the plaintiffs if I don't grant a

11:35:00  1  receivership.  I just hear a lot of talk about the way this

11:35:03  2  business is run and the way the contracts are.

11:35:06  3      And I would just appreciate it if you would focus it

11:35:09  4  a little more on what is at issue in this case.  And what is at

11:35:20  5  issue here I don't believe -- and if I'm wrong, then you

11:35:24  6  haven't done a good job of focusing me to it -- but I don't see

11:35:29  7  how these invoices are in any way dispositive of what I'm going

11:35:37  8  to do with this case.  So I just tell you-all that.

11:35:41  9      I think you could have told me in 10 minutes exactly

11:35:44  10  what was done with this product that KARCO tested and that

11:35:53  11  we're talking about invoices for in a manner that said -- and

11:35:59  12  I'm just giving an example.  I'm not saying this is what the

11:36:03  13  evidence would be -- NSS manufactured an M50 wedge restraining

11:36:08  14  device.  The way they manufactured it was they did this amount

11:36:12  15  of work, they jobbed out this, that, and the other.  Gibraltar

11:36:16  16  did this.  They came up with a finished product that was

11:36:19  17  tested, it was certified, and it was installed at such and

11:36:23  18  such.  Then tell me how that violated the termination

11:36:30  19  agreement.

11:36:30  20      I mean, we're wandering way out there in the reeds,

11:36:33  21  and it's -- it's just fine.  But it's not helping me get to

11:36:37  22  where I want to get, which is to make a decision in this case.

11:36:41  23  So I just tell you that at this point.  The morning has not

11:36:44  24  been helpful to the court.  So you may proceed.

11:36:49  25      MS. GHAVIMI:  Okay.

11:36:54  1   Q.   Mr. Neusch, the four products that are disputed here, did

11:37:02  2   NSS develop them?

11:37:03  3   A.   NSS designed and -- "developed" is a broad term, but NSS

11:37:15  4   designed the restraint barrier in its entirety.  NSS has spent

11:37:21  5   money defending restraint barriers, its own product.  Gibraltar

11:37:22  6   has refused to sell it at times, has said it's not their

11:37:25  7   product, admitted to it.  It is NSS's product I wholeheartedly

11:37:30  8   believe.

11:37:30  9         The wedge barrier I believe to be both part my

11:37:34 10   product and part Gibraltar's product, as I had the overall

11:37:39 11   conceptual design and a lot of the ideas that make the product

11:37:41 12   even sellable today were my ideas.  My dad put in good ideas

11:37:45 13   with the way of making it work and adjusting some things.  He

11:37:48 14   also had design in it, they paid for the crash test on it, and

11:37:51 15   the installation.  We marketed it and sold it and put it in the

11:37:55 16   industry.  We also did the manufacturing for the automated side

11:37:59 17   which requires, you know, just as much work, if not more

11:38:03 18   complicated, than the steel side.  There's a lot of tentacles

11:38:07 19   to that, but I do believe that NSS has rights to the wedge

11:38:11 20   barrier.

11:38:11 21         And on the M50 P2 fence, NSS spent money on the crash

11:38:16 22   test, did the install, did some fabrication at the test

11:38:20 23   facility, and NSS also had the idea to crash it without a

11:38:25 24   terminal post on one end so that we could use any length of

11:38:28 25   need.  Had a lot of good ideas in even doing it because we only

| | | |
|---|---|---|
| 11:38:31 | 1 | had an M50 P1 fence before that we were marketing and our |
| 11:38:36 | 2 | competition had P2.  So I had the idea to crash test the P2 and |
| 11:38:40 | 3 | brought it to my dad.  Me and my dad worked on these products |
| 11:38:42 | 4 | together.  That is where we're at. |
| 11:38:46 | 5 | Q.   Did you believe the four disputed products were included |
| 11:38:51 | 6 | in the termination letter? |
| 11:38:55 | 7 | A.   I've never seen the actual Betafence agreement, and the |
| 11:38:59 | 8 | products in the termination letter that they're terminating our |
| 11:39:04 | 9 | rights to were the ones sold to Betafence.  I know for a fact |
| 11:39:08 | 10 | that the wedge barrier wasn't included in there.  I know that |
| 11:39:11 | 11 | the restraint barrier was initially tried to be included in |
| 11:39:13 | 12 | there.  I called my dad and said, Hey, you can't sell that to |
| 11:39:17 | 13 | Betafence.  That's my product.  I have rights to that product. |
| 11:39:19 | 14 | And he agreed with me, so he had it removed from the Betafence |
| 11:39:23 | 15 | deal.  So I know that one is not in the sale to Betafence.  The |
| 11:39:26 | 16 | M50 P2 fence is probably in the sale because it's part of the |
| 11:39:30 | 17 | cable-based deal of families.  I haven't seen it, but I'm sure |
| 11:39:33 | 18 | it is. |
| 11:39:33 | 19 | Q.   Why do you believe that these four products were not |
| 11:39:36 | 20 | included in the termination letter? |
| 11:39:39 | 21 | A.   I believe that three of the four weren't.  I think that |
| 11:39:42 | 22 | one may have been and probably was.  So why do I believe |
| 11:39:45 | 23 | three -- the three products weren't included in the |
| 11:39:47 | 24 | termination? |
| 11:39:48 | 25 | Q.   Yes. |

11:39:48   1   A.   Because they didn't sell it to Betafence.  And the

11:39:51   2   termination agreement -- the whole point of the termination

11:39:54   3   letter was Betafence wanted me to sign a letter saying that I

11:39:57   4   would not go out and compete with them on their own products

11:40:01   5   that they just spent $8 million to buy.

11:40:03   6        So for my dad to complete his sale, he called me up

11:40:07   7   and said I need you to sign a one-pager saying you're not going

11:40:11   8   to go out and manufacture these products anymore if I sell

11:40:15   9   these.  And, if you're going to, you have to buy them -- if

11:40:19  10   you're going to get them, you have to buy them from Betafence.

11:40:22  11   I said no problem to help them out with the sale.  There was no

11:40:25  12   consideration given to me.  I signed the deal and that was for

11:40:30  13   the cable-based products they sold to Betafence, not the

11:40:33  14   restraint barriers or the wedge barrier.

11:40:36  15   Q.   So you signed the termination letter because you wanted to

11:40:39  16   help your dad sell the products -- the cable-based products to

11:40:43  17   Betafence?

11:40:44  18   A.   That's correct.  Well, my dad was also at the same time

11:40:47  19   designing and developing a competing product that would compete

11:40:51  20   with the one they sold Betafence anyway that he then priced me

11:40:54  21   and was going to sell me anyway.  So it didn't really hurt my

11:40:57  22   business to get rid of those.  And I could still buy them from

11:41:00  23   Betafence if needed.

11:41:01  24   Q.   Can you turn to Defendants' Exhibit 39.

11:41:12  25   A.   Okay.

11:41:12   1   Q.   Can you turn to the second to last page.  I'm looking at
11:41:18   2   addendum A.  It says page 12 on the top right-hand corner.
11:41:21   3   This is a list of exclusive products.
11:41:23   4   A.   Yes.
11:41:23   5   Q.   So this agreement -- this is an agreement.  Is this the,
11:41:27   6   quote/unquote, license agreement that the parties have been
11:41:30   7   referring to?
11:41:33   8   A.   This is the license agreement that we've been referring
11:41:35   9   to, yes.
11:41:36  10   Q.   Did you sign this agreement?
11:41:37  11   A.   No, I did not.
11:41:38  12   Q.   Why not?
11:41:39  13   A.   I didn't agree with the minimum royalties, and I thought
11:41:42  14   it was overreaching and really just onerous for me as far as
11:41:46  15   the amount of costs I would have to pay and then do all the
11:41:49  16   manufacturing and Gibraltar do nothing but sit back and receive
11:41:52  17   a check.
11:41:52  18   Q.   You didn't sign this agreement but, yet, did you negotiate
11:41:55  19   this agreement over a course of time with your father?
11:41:59  20   A.   That's correct.  I negotiated this agreement.  We went
11:42:03  21   back and forth on it a lot.  Yeah.
11:42:05  22   Q.   Okay.  Is it your understanding that the top section of
11:42:12  23   products on addendum A is what was included in the Betafence
11:42:19  24   sale?
11:42:19  25   A.   That is correct.  So the reason that this is broken up

11:42:23   1   into two sections of products, the top section that has USA

11:42:25   2   only, Betafence outside USA is because Gibraltar was selling

11:42:31   3   Betafence this group of projects outside the continental U.S.

11:42:34   4   and selling it exclusively to us inside the U.S.

11:42:38   5        So Betafence then wanted to go from this type of

11:42:40   6   agreement they have with Gibraltar to actually buying the full

11:42:43   7   rights of the product so they didn't have to pay a royalty

11:42:46   8   anymore.  So they were buying that top section of the products.

11:42:48   9   Q.   Is the wedge barrier listed in the bottom section?

11:42:51  10   A.   It is.  The wedge barrier was not sold to Betafence.

11:42:56  11   Q.   Are the cable restraint barriers, two of the -- well, let

11:43:01  12   me just back up.  The wedge barrier is one of the four disputed

11:43:04  13   products at issue here; is that correct?

11:43:07  14   A.   It is.

11:43:07  15   Q.   Okay.  The cable restraint barriers, are those listed

11:43:10  16   here, the two cable restraint barriers that are at issue here?

11:43:15  17   A.   Yes.  It's down on the bottom part.  That wasn't sold to

11:43:18  18   Betafence or part of the termination agreement.

11:43:20  19   Q.   Could you point exactly and read their description for the

11:43:22  20   Court.

11:43:23  21   A.   On this list it says wedge barrier, 8 foot to 14.5 feet.

11:43:29  22   And it says vertical lift barrier, 24-foot, and vertical lift

11:43:33  23   barrier, 50-foot.  That's the restraint barrier that you showed

11:43:34  24   on your slide earlier.

11:43:36  25   Q.   Okay.  Did your father tell you that the M50 P2 cable

11:43:49  1  crash fence was going to be sold to Betafence?

11:43:50  2  A.   We didn't talk about it specifically, but I assumed it was

11:43:52  3  because it was part of the group up top, yeah.

11:43:54  4  Q.   So when you read the termination letter, it's your

11:43:56  5  understanding that it includes -- it does not include -- let me

11:44:02  6  start again.

11:44:03  7       When you read the termination letter, you have

11:44:06  8  understood since you signed it that it only included -- it did

11:44:10  9  not include the three products we just mentioned?

11:44:14  10  A.   It doesn't.  No, it doesn't include those products.  Not

11:44:19  11  at all, no.

11:44:20  12  Q.   So NSS would not be in breach of the termination letter if

11:44:24  13  it were to sell those products under NSS's name?

11:44:27  14  A.   That's correct.

11:44:28  15  Q.   So Gibraltar would not be harmed if NSS were to sell those

11:44:33  16  products because NSS would not be in breach of the termination

11:44:38  17  letter?

11:44:40  18  A.   NSS would not be in breach of the termination letter if we

11:44:44  19  sold the restraint barrier or wedge barrier, no.

11:44:46  20  Q.   Gibraltar would not be harmed if NSS sold the M50 P2

11:44:51  21  cable -- I apologize.

11:44:52  22       Gibraltar would not be harmed if NSS sold the cable

11:44:56  23  restraint barriers and the finger wedge barrier because those

11:44:58  24  were NSS's designs to begin with?

11:45:02  25  A.   Yes.  Gibraltar would not be harmed.

| | | |
|---|---|---|
| 11:45:04 | 1 | Q.   Okay.  Now, the M50 P2 cable crash fence that counsel |
| 11:45:16 | 2 | asked you earlier that BSP crash tested in 2015, is that one of |
| 11:45:23 | 3 | the four disputed products at issue here? |
| 11:45:25 | 4 | A.   No. |
| 11:45:26 | 5 | Q.   So Defendants' interrogatory responses were not incorrect? |
| 11:45:35 | 6 | A.   Yes.  They were not incorrect. |
| 11:45:37 | 7 | Q.   Okay.  And why is it not one of those four disputed |
| 11:45:45 | 8 | products at issue here? |
| 11:45:46 | 9 | A.   The four disputed products are -- it's not one of them. |
| 11:45:51 | 10 | It's one that BSP developed on its own outside of any awareness |
| 11:45:56 | 11 | from Gibraltar, zero input from Gibraltar, and, as my dad |
| 11:46:00 | 12 | testified to in the first hearing or whatever, he never even |
| 11:46:03 | 13 | knew about it until, you know, the end of the year, well after |
| 11:46:06 | 14 | it was crash tested and developed. |
| 11:46:08 | 15 | Q.   So it would not be covered by the injunction requested? |
| 11:46:11 | 16 | A.   No. |
| 11:46:30 | 17 | MS. GHAVIMI:  Okay.  Your Honor, I would like to |
| 11:46:32 | 18 | reserve the rest for my direct. |
| 11:46:33 | 19 | THE COURT:  You may. |
| 11:46:36 | 20 | Mr. Connor? |
| 11:46:37 | 21 | **REDIRECT EXAMINATION** |
| 11:46:37 | 22 | **BY MR. CONNOR:** |
| 11:46:43 | 23 | Q.   Can you pull up exhibit number eight? |
| 11:46:45 | 24 | A.   On your exhibits or mine? |
| 11:46:46 | 25 | Q.   Under the plaintiffs'.  So in the black binder. |

S. NEUSCH - REDIRECT

| | | |
|---|---|---|
| 11:46:50 | 1 | A.   Okay. |
| 11:46:51 | 2 | Q.   Exhibit 8 is the termination agreement that you signed, |
| 11:47:17 | 3 | correct?  You recognize that?  We talked about it earlier. |
| 11:47:19 | 4 | A.   Yes. |
| 11:47:19 | 5 | Q.   Okay.  Now, when you spoke a minute ago about negotiating |
| 11:47:25 | 6 | the terms of the license agreement with Gibraltar -- |
| 11:47:30 | 7 | A.   Yes. |
| 11:47:31 | 8 | Q.   -- you pointed to the list of exclusive products in |
| 11:47:36 | 9 | addendum A to that agreement? |
| 11:47:38 | 10 | A.   Yes. |
| 11:47:38 | 11 | Q.   Okay.  You never negotiated or asked for any changes to |
| 11:47:44 | 12 | that list, did you? |
| 11:47:46 | 13 | A.   No. |
| 11:47:46 | 14 | Q.   Okay.  Would you agree, Mr. Neusch, that we simply have a |
| 11:47:52 | 15 | fight here -- a definitional fight over what's covered by the |
| 11:47:57 | 16 | termination agreement?  Because you testified earlier that |
| 11:48:06 | 17 | you're positive, you're sure, you put in the interrogatory |
| 11:48:10 | 18 | response and you testified to today that neither NSS, Neu |
| 11:48:14 | 19 | Security Services, nor Black Security Products have done |
| 11:48:18 | 20 | anything with those disputed products that are Gibraltar |
| 11:48:21 | 21 | products since the termination agreement. |
| 11:48:24 | 22 | A.   I've never said they're Gibraltar products. |
| 11:48:27 | 23 |         THE COURT:  Now, let me interrupt here.  I'm looking |
| 11:48:30 | 24 | at Plaintiffs' Exhibit Number 8 which is the exhibit you have |
| 11:48:33 | 25 | the witness looking at; is that correct? |

11:48:37   1              MR. CONNOR:  Yes, Your Honor.

11:48:37   2              THE COURT:  All right.  Now, I just want to make sure

11:48:39   3    that this is the termination notice that you want the court to

11:48:48   4    consider, because very faintly in the background one can see

11:48:52   5    "draft" on it.  Page 11, which is the primary signature page on

11:48:57   6    the one I'm looking at, is not signed or dated anywhere.

11:49:08   7              MR. CONNOR:  Yes, Your Honor.

11:49:09   8              THE COURT:  There is a later edition or a later

11:49:13   9    couple of pages, and the very last page has a signature.  So is

11:49:19  10    this the iteration of the agreement you want the court to look

11:49:24  11    at to determine if it has been breached and has it been signed

11:49:30  12    by all of the parties because it doesn't appear to have had

11:49:36  13    that done to it as I look at it.  So tell me about exhibit --

11:49:41  14    Plaintiffs' Exhibit 8.

11:49:42  15              MR. CONNOR:  Sure, Your Honor.  So this is

11:49:47  16    regretfully somewhat confusing.  The termination notice is the

11:49:51  17    one-page document that is signed --

11:49:54  18              THE COURT:  All right.

11:49:54  19              MR. CONNOR:  -- and does not have a "draft" watermark

11:49:57  20    on it.

11:49:58  21              THE COURT:  Okay.

11:49:59  22              MR. CONNOR:  The document that's titled Agreement

11:50:01  23    that is behind it is the unsigned license agreement that --

11:50:06  24              THE COURT:  That was never signed.

11:50:07  25              MR. CONNOR:  That's correct, Your Honor.

| | | |
|---|---|---|
| 11:50:09 | 1 | THE COURT:  Okay.  And then what is the document that |
| 11:50:13 | 2 | comes after that that's part of the exhibit that says NSS |
| 11:50:22 | 3 | agreement with Gibraltar family of companies that does appear |
| 11:50:26 | 4 | to be signed by both Bill Neusch and Stephen Neusch? |
| 11:50:30 | 5 | MR. CONNOR:  That is the 2010 license agreement |
| 11:50:33 | 6 | between the defendant, NEU Security Services, and Gibraltar |
| 11:50:37 | 7 | that you heard some testimony about was the initial agreement |
| 11:50:41 | 8 | that they had under which they operated until around 2013 when |
| 11:50:47 | 9 | they began negotiating the unsigned license agreement. |
| 11:50:53 | 10 | THE COURT:  All right.  So at some point -- well, are |
| 11:50:59 | 11 | you in agreement with Ms. Ghavimi that the list that she showed |
| 11:51:03 | 12 | earlier in her questioning of Mr. Stephen Neusch which did not |
| 11:51:12 | 13 | have a exhibit mark on it is in fact the four products at issue |
| 11:51:15 | 14 | here? |
| 11:51:15 | 15 | MR. CONNOR:  Yes, Your Honor.  That is page 12 in |
| 11:51:18 | 16 | the -- the version we were just looking at that's addendum A |
| 11:51:25 | 17 | that has a title Exclusive Products. |
| 11:51:28 | 18 | THE COURT:  Well, it was in a little bit different |
| 11:51:32 | 19 | form than what I'm looking at here, probably a little bit more |
| 11:51:42 | 20 | understandable form the way she had it depicted.  But then it's |
| 11:51:47 | 21 | your job to show me where those four products are included in |
| 11:51:55 | 22 | the one-page termination agreement. |
| 11:52:03 | 23 | MR. CONNOR:  Yes, Your Honor.  I'll get right to |
| 11:52:04 | 24 | that. |
| 11:52:05 | 25 | MS. GHAVIMI:  Your Honor, I'd just like to correct |

| | | |
|---|---|---|
| 11:52:06 | 1 | for the record that Plaintiffs' Exhibit 8 has three separate |
| 11:52:08 | 2 | documents that were not attached to each other in any way. |
| 11:52:11 | 3 | THE COURT:  No, no.  I understood that.  I understood |
| 11:52:13 | 4 | that.  There's the notice, there's the draft agreement, and |
| 11:52:16 | 5 | then there's the 2010 agreement. |
| 11:52:19 | 6 | MR. CONNOR:  Yes, Your Honor. |
| 11:52:19 | 7 | THE COURT:  And they all came separately.  They were |
| 11:52:21 | 8 | not ever attached to one another.  That's the way I understood |
| 11:52:24 | 9 | it. |
| 11:52:25 | 10 | MS. GHAVIMI:  Okay. |
| 11:52:27 | 11 | MR. CONNOR:  Correct. |
| 11:52:27 | 12 | THE COURT:  All right.  You may proceed. |
| 11:52:28 | 13 | Q.  (BY MR. CONNOR) Mr. Neusch, do you have Exhibit Number 8 |
| 11:52:36 | 14 | in front of you? |
| 11:52:38 | 15 | A.  Yes. |
| 11:52:38 | 16 | Q.  You know what?  I'm going to make this a little bit |
| 11:52:42 | 17 | clearer for the record and ask you to turn to Exhibit |
| 11:52:44 | 18 | Number 78.  We looked at this earlier.  This is the termination |
| 11:53:15 | 19 | notice that you sent after you signed back to Jim Bryer at |
| 11:53:24 | 20 | Gibraltar, correct? |
| 11:53:25 | 21 | A.  That is correct. |
| 11:53:25 | 22 | MR. CONNOR:  Okay.  So this version, Your Honor, |
| 11:53:28 | 23 | Exhibit 78, is a clean and authenticated and I think we can |
| 11:53:37 | 24 | agree version of the termination notice February of 2015. |
| 11:53:40 | 25 | That's exhibit -- Plaintiffs' Exhibit 78. |

| | | |
|---|---|---|
| 11:53:49 | 1 | THE COURT:  Okay. |
| 11:53:50 | 2 | MR. CONNOR:  Now may I proceed, Your Honor? |
| 11:53:52 | 3 | THE COURT:  You may. |
| 11:53:52 | 4 | Q.  (BY MR. CONNOR) Now, I'd like you to turn to exhibit |
| 11:53:56 | 5 | Number 127. |
| 11:54:02 | 6 | A.  So we're not doing Exhibit Number 78.  127? |
| 11:54:20 | 7 | Q.  Yes.  Now, Plaintiffs' Exhibit Number 127, Mr. Neusch, is |
| 11:54:38 | 8 | an e-mail from you to your father and Jim Bryer August 29th, |
| 11:54:44 | 9 | 2013, attaching your last round of revisions to the license |
| 11:54:51 | 10 | agreement, correct? |
| 11:54:52 | 11 | A.  That's correct. |
| 11:54:53 | 12 | Q.  And if you'll turn to addendum A, in that document which |
| 11:55:00 | 13 | is numbered at the bottom right hand corner NSS005006.  Are you |
| 11:55:09 | 14 | there? |
| 11:55:09 | 15 | A.  Yes. |
| 11:55:09 | 16 | Q.  Now, this is the list of exclusive products that we've |
| 11:55:17 | 17 | been talking about and that His Honor just asked to clarify; is |
| 11:55:22 | 18 | that correct?  Do you agree with me? |
| 11:55:23 | 19 | A.  This -- yes. |
| 11:55:25 | 20 | Q.  Okay.  Now, the four disputed products that we have been |
| 11:55:31 | 21 | talking about are on this list.  Would you agree? |
| 11:55:37 | 22 | A.  They're down in the subsection that wasn't sold to |
| 11:55:39 | 23 | Betaface and that we have rights to worldwide. |
| 11:55:42 | 24 | Q.  Well, this is one list, isn't it?  Look at it. |
| 11:55:45 | 25 | A.  That is correct. |

| | | |
|---|---|---|
| 11:55:45 | 1 | Q.   And you sent this back to Gibraltar on August 29th, 2013 |
| 11:55:51 | 2 | and said these are my changes.  You didn't make any changes to |
| 11:55:54 | 3 | this list.  This is the last list you looked at. |
| 11:55:57 | 4 | A.   We never disputed this list, no. |
| 11:55:59 | 5 | Q.   You never disputed this list? |
| 11:56:01 | 6 | A.   No. |
| 11:56:01 | 7 | Q.   And the wedge barrier that's a disputed product in this |
| 11:56:04 | 8 | case is right at the top of the second part of the list where |
| 11:56:12 | 9 | it says M50 P1 wedge barrier, 8-foot and 14 1/2-foot, correct? |
| 11:56:17 | 10 | A.   That is correct. |
| 11:56:18 | 11 | Q.   And the vertical lift barrier just down from that, 24-foot |
| 11:56:26 | 12 | and 50-foot, those are the two disputed products that we've |
| 11:56:30 | 13 | been talking about that are also referred to as the restraint |
| 11:56:33 | 14 | barrier, correct? |
| 11:56:35 | 15 | A.   Uh-huh. |
| 11:56:35 | 16 | Q.   And the last of the four disputed products is the M50 P2 |
| 11:56:42 | 17 | fence, which is the second from the top, correct? |
| 11:56:44 | 18 | A.   That is correct. |
| 11:56:45 | 19 | Q.   So you would agree with me that all four of the disputed |
| 11:56:49 | 20 | products are on addendum A in Exhibit 127? |
| 11:56:55 | 21 | A.   Yes. |
| 11:56:55 | 22 | Q.   Okay.  Now, let's go back to the termination notice now. |
| 11:57:02 | 23 | A.   Okay. |
| 11:57:03 | 24 | Q.   And just so it's clear on the record, what we've been |
| 11:57:05 | 25 | looking at is the license agreement that you had been |

11:57:08  1  negotiating from 2013 until February of 2015, correct?

11:57:12  2  A.   And then in this version of the negotiation by the front

11:57:15  3  e-mail where I sent it back to Gibraltar, I think my biggest

11:57:20  4  complaint was is they tried to put -- wanted to put a

11:57:25  5  noncompete in there and I said that's ridiculous.  That's all I

11:57:28  6  do, is force protection work.  You would have to agree to sell

11:57:31  7  me these products for the noncompete period at better than

11:57:34  8  market price or else it would essentially try to put me out of

11:57:37  9  business if I would ever sign a noncompete.  So they added that

11:57:40 10  in there.

11:57:41 11  Q.   But you didn't try to change the list of exclusive

11:57:43 12  products that was the subject of license agreement, did you?

11:57:46 13  A.   No.

11:57:46 14  Q.   Go back to PX-8, the termination notice.

11:57:49 15  A.   Okay.

11:57:50 16  Q.   Yeah.  The termination notice -- let me know when you have

11:57:55 17  it in front of you.

11:57:56 18  A.   I do.

11:57:57 19  Q.   I'm sorry.  I've been corrected.  Thank you.  Exhibit 708?

11:58:00 20  A.   You left it open from the last time.

11:58:02 21  Q.   Thank you.  Perfect.  You're a step ahead of me?

11:58:06 22            THE COURT:  So which exhibit are we looking at?

11:58:10 23            MR. CONNOR:  We're been looking at Plaintiffs'

11:58:11 24  Exhibit 78, Your Honor.

11:58:12 25            THE COURT:  All right.  And the termination agreement

11:58:14  1  part of that is the one that's numbered Gibraltar 0010920; is

11:58:19  2  that correct?

11:58:20  3          MR. CONNOR:  Correct.

11:58:21  4  Q.   Now, the termination notice refers to the license

11:58:29  5  agreement that we just looked at.  Would you agree with me,

11:58:36  6  Mr. Neusch?

11:58:36  7  A.   The termination, it does refer to that.  It refers to all

11:58:39  8  agreements because it wants to make sure it cancels my right to

11:58:42  9  sell the products that Gibraltar sold to Betafence on my own.

11:58:49  10 Q.   Let me stop -- stop you there, Mr. Neusch, because --

11:58:52  11         MR. CONNOR:   Object to that as nonresponsive,

11:58:54  12 Your Honor.

11:58:55  13 Q.   So this agreement -- let's read the second paragraph, the

11:59:02  14 first sentence together.  "By this notice, Gibraltar

11:59:05  15 immediately terminates any and all licensing or other

11:59:10  16 contractual rights which NSS may have to so use Gibraltar

11:59:15  17 products under this proposed agreement."  And that proposed

11:59:21  18 agreement is the agreement we just looked at, right?

11:59:24  19 A.   Yes.

11:59:24  20 Q.   So by this language in the termination notice, Gibraltar

11:59:30  21 was terminating all of the rights that NEU Security Services

11:59:34  22 would have had under that license agreement and that license

11:59:39  23 agreement covered all of those exclusive products in

11:59:43  24 addendum A, correct?

11:59:44  25 A.   Well, that's not correct because if you go on down, it

11:59:47  1  talks about the products being sold to Beta and, if we wanted

11:59:51  2  to buy those products, we would have to get them from Beta.

11:59:55  3  Also the -- Gibraltar continued selling me these products, so

11:59:59  4  they're sitting here lying to the Court if they try to act like

12:00:02  5  it's anything different.  I have proposals from when we

12:00:05  6  negotiated on the wedge barrier and other products post this

12:00:09  7  date.  So they continued selling me those products.  Those

12:00:12  8  products were never at issue with this termination.  The

12:00:15  9  termination was only meant, as per my father and what he said,

12:00:18 10  to terminate the products that were sold to Betafence.

12:00:25 11  Q.   Mr. Neusch --

12:00:25 12  A.   Yes.  I know they're trying to make their case based on

12:00:30 13  these -- all the products, which would be great.  But it's not

12:00:32 14  true.

12:00:33 15  Q.   Where is the language in the termination notice that says

12:00:38 16  that NEU Security Services was only terminated as to the -- its

12:00:47 17  rights on the products that were sold to Betafence.  It doesn't

12:00:50 18  say that anywhere, does it?

12:00:53 19  A.   It talks about Betafence down at the -- the end of it, and

12:00:57 20  that's what the intent of this termination was.

12:01:00 21          THE COURT:  All right.  Ladies and gentlemen, at this

12:01:01 22  time we're going to be in recess until 1:30.

12:01:04 23      (Recess)

13:29:59 24      (Open Court)

13:29:59 25          THE COURT:  Mr. Connor, you may continue.

| | | |
|---|---|---|
| 13:30:01 | 1 | MR. CONNOR:  Thank you, Your Honor. |
| 13:30:02 | 2 | MR. TAYLOR:  Judge, I need to bring something to your |
| 13:30:04 | 3 | attention.  Mr. Reynolds has a funeral to go to this afternoon, |
| 13:30:08 | 4 | and wanted to put him out of order so he could make that |
| 13:30:11 | 5 | appointment with the Court's permission. |
| 13:30:13 | 6 | THE COURT:  Ms. Ghavimi? |
| 13:30:15 | 7 | MS. GHAVIMI:  No objection, Your Honor. |
| 13:30:15 | 8 | THE COURT:  All right.  You may do that. |
| 13:30:17 | 9 | MR. TAYLOR:  And he had one more question of him and |
| 13:30:20 | 10 | then we're going to put on Mr. Reynolds and we'll reserve the |
| 13:30:21 | 11 | rest until after Mr. Reynolds. |
| 13:30:23 | 12 | THE COURT:  That will be fine. |
| 13:30:24 | 13 | Q.   (BY MR. CONNOR) Mr. Neusch, in going through the books and |
| 13:30:29 | 14 | records of your companies recently, some charges apparently |
| 13:30:35 | 15 | show for repeated expenses through iTunes for about 104, 105 |
| 13:30:44 | 16 | dollars, one after another to the tune of perhaps thousands of |
| 13:30:49 | 17 | dollars on many of the same days.  Do you know what those are? |
| 13:30:57 | 18 | A.   Yeah.  That is -- I actually have a dispute with Apple |
| 13:31:00 | 19 | right now because they like to double-charge whenever you |
| 13:31:02 | 20 | purchase something for an in-app game. |
| 13:31:04 | 21 | Q.   Is that Game of War? |
| 13:31:06 | 22 | A.   Yes. |
| 13:31:07 | 23 | MR. CONNOR:  No further questions, Your Honor. |
| 13:31:09 | 24 | THE COURT:  All right.  Do you intend to recall |
| 13:31:11 | 25 | Mr. Neusch? |

REYNOLDS - DIRECT                                                    91

```
13:31:12   1              MR. CONNOR:  No, sir.

13:31:12   2              THE COURT:  All right.  You may step down.

13:32:23   3         (Witness sworn)

13:32:23   4                      RONALD REYNOLDS,

13:32:23   5    having been first duly sworn, testified as follows:

13:32:23   6                     DIRECT EXAMINATION

13:32:23   7    BY MR. TAYLOR:

13:32:23   8    Q.   Good afternoon, Mr. Reynolds.  You have performed certain

13:32:35   9    court-ordered auditing functions in this case, have you not?

13:32:38  10    A.   Yes.  My staff has.

13:32:40  11    Q.   And the first thing you did, if you'll take a look -- and

13:32:43  12    I'm going to try to go quickly because I know you're in a

13:32:47  13    hurry -- Exhibit Number 92, is that a letter report that you

13:32:50  14    did concerning certain transactions?

13:32:52  15    A.   That is correct.

13:32:53  16    Q.   And if you'll look at Exhibit Number 92 in the book, and

13:32:59  17    I'll look at this one.

13:33:01  18         With respect to this report, did you find that

13:33:04  19    certain transactions were reversed or put on the books and

13:33:09  20    records of the NSS and BSP out of the ordinary course of

13:33:16  21    business?

13:33:16  22    A.   During April 6th, 7th, and 8th, I found that the entries

13:33:23  23    were made, as noted on your letter and on my letter, as it

13:33:28  24    relates to increases and decreases.  And I did determine that

13:33:31  25    they were not in the normal course of business.
```

13:33:34   1   Q.   All right.  And since that time -- and you also found that

13:33:39   2   those were material, did you not?

13:33:41   3   A.   "Material" is an auditing word.  And what I said was, as

13:33:47   4   it relates to the assets and liabilities, we usually use the

13:33:51   5   term 10 percent, and they were not over 10 percent.  But as it

13:33:55   6   relates to retained earnings, it was more than 10 percent, and

13:33:59   7   I said that would be -- in auditing term, would be material.

13:34:01   8   Q.   All right.  Now, since that time you have also done some

13:34:06   9   additional work according to an agreed procedures examination,

13:34:11   10  have you not?

13:34:12   11  A.   Yes.

13:34:12   12  Q.   And then you issued a report, which is Plaintiffs' Exhibit

13:34:15   13  Number 94.  I believe that was issued last Friday; is that

13:34:19   14  correct?

13:34:20   15  A.   I don't know.  I've issued two letters -- two reports.

13:34:24   16  Q.   Yes.

13:34:24   17  A.   One last Friday and one this -- one last Friday and one

13:34:28   18  the previous Friday.

13:34:29   19  Q.   Okay.  Let's take a look at the one you issued on the

13:34:32   20  29th.

13:34:33   21  A.   You want me to ...

13:34:34   22  Q.   That's Exhibit Number 94.

13:34:36   23  A.   Okay.

13:34:37   24  Q.   In terms of your trying to perform functions, were there

13:34:49   25  certain records that were not available to you in order to

13:34:52  1  perform the audit function you were trying to perform?

13:34:56  2  A.   The main record that was not available to us was bank

13:35:01  3  reconciliation, because we felt like that if we had the bank

13:35:05  4  reconciliation, we could make sure that we could tie the

13:35:08  5  activity between the different entities.  And that was not --

13:35:12  6  that was not available.

13:35:13  7  Q.   Did you -- you requested it?  What information were you

13:35:17  8  given as to why it wasn't available?

13:35:19  9  A.   They hired a temporary person to come in and to do the

13:35:23 10  bank reconciliations, and she was having difficulty in -- in

13:35:27 11  performing that function.  And then on last Wednesday they

13:35:34 12  asked if we could do the bank reconciliations, and I said, no,

13:35:38 13  we could not do those.  Not at this time.

13:35:41 14  Q.   Were you -- has -- had the entities filed tax returns for

13:35:45 15  the years 2014 and '15?

13:35:47 16  A.   They told us that they had not filed tax returns, and we

13:35:50 17  could not find documentation of tax returns being filed.

13:35:54 18  Q.   Is that -- would you say that that is ordinary and

13:35:56 19  customary for a going concern, not to file a 2014 return by

13:36:00 20  this time?

13:36:02 21  A.   It's not ordinary.  It's -- most people file their tax

13:36:05 22  returns.

13:36:05 23  Q.   And did they tell you of any plan to file returns or when

13:36:10 24  they would be filed?

13:36:11 25  A.   They did not personally tell me.

REYNOLDS – DIRECT

13:36:13   1   Q.   All right.  With respect to what you found last week --

13:36:18   2   and I don't think it's in your report -- did you find charges

13:36:21   3   to -- numerous charges to iTunes on the books and records of

13:36:25   4   BSP?

13:36:26   5   A.   We were -- we received the bank -- bank activity from

13:36:31   6   January 1st to May 31st for BSP, and there were a number of

13:36:38   7   small charges to iTunes.

13:36:39   8   Q.   Were they repeated over and over, like in a single day,

13:36:43   9   maybe hundreds of charges to iTunes?

13:36:46   10  A.   I don't know whether it was hundreds of charges.

13:36:48   11  Q.   Hundreds of dollars?

13:36:49   12  A.   Okay.  Yeah.  There was probably five or six in one day.

13:36:54   13  Q.   And they were all over $100, more or less?

13:36:57   14  A.   I don't remember the dollar amount right now.

13:37:03   15  Q.   All right.  Didn't you advise us that the charges were in

13:37:05   16  the range of about 105 to 110 dollars per charge?

13:37:08   17  A.   Per your call to me, that may be correct.  I just don't

13:37:11   18  remember the exact dollar amount.  In fact I think it was 104

13:37:16   19  dollars and 50-some-odd cents now that my memory comes back.

13:37:19   20  Q.   In examining the books and records of BSP and NSS, did you

13:37:26   21  find the certain -- that the credit -- personal credit card

13:37:31   22  bills of Stephen Neusch and his wife had been paid by the

13:37:35   23  companies?

13:37:36   24  A.   There were a number of credit card bills that were paid by

13:37:39   25  the company.  But in almost all cases, the credit card bills

REYNOLDS - DIRECT

| | | |
|---|---|---|
| 13:37:45 | 1 | were charged back to their membership draw.  Although there |
| 13:37:50 | 2 | were a number of payments that were credited back to -- to be |
| 13:37:56 | 3 | allocated accounts payable which created a debit balance in a |
| 13:38:00 | 4 | credit account if we want to -- if that answers your question. |
| 13:38:05 | 5 | Q.   Let's take a look at the next to the last paragraph on |
| 13:38:08 | 6 | your report in Exhibit Number 94.  It says, "We reviewed and |
| 13:38:12 | 7 | addressed the negative accounts payable.  The total negative |
| 13:38:15 | 8 | accounts payable of 488,000, these negative accounts are for |
| 13:38:20 | 9 | charge backs.  NSS has no active attempt to collect." |
| 13:38:23 | 10 | Let's address that first.  Okay? |
| 13:38:25 | 11 | A.   Okay. |
| 13:38:25 | 12 | Q.   Now -- |
| 13:38:25 | 13 | A.   Now, that's different than -- |
| 13:38:27 | 14 | Q.   I understand. |
| 13:38:27 | 15 | A.   -- what I just now mentioned. |
| 13:38:28 | 16 | Q.   I understand. |
| 13:38:29 | 17 | A.   Okay. |
| 13:38:29 | 18 | THE COURT:  Wait, wait.  One at a time, please. |
| 13:38:31 | 19 | Q.   (BY MR. TAYLOR) With respect to that sentence, that would |
| 13:38:34 | 20 | have reduced the liability on the books if they -- if they make |
| 13:38:37 | 21 | these charge backs, correct? |
| 13:38:38 | 22 | A.   That is correct.  In essence, by being a negative -- a |
| 13:38:42 | 23 | deficit accounts payable, it becomes a receivable.  And we were |
| 13:38:47 | 24 | told that there has been no effort to collect.  It's like |
| 13:38:51 | 25 | overpaying people, and that's -- it's a deficit. |

13:38:56  1  Q.   Is it appropriate to leave that on your books like an

13:39:00  2  account receivable if there's no effort to collect it?

13:39:03  3  A.   No.

13:39:04  4  Q.   The next sentence says, "Additionally, NSS has a negative

13:39:09  5  balance and unallocated credit cards for $139,000.  Most of

13:39:15  6  this balance should be reclassified to member draw."

13:39:17  7       Do you see that?

13:39:18  8  A.   That's correct.

13:39:19  9  Q.   So were these credit card charges that were made for the

13:39:25  10  benefit of Mr. Neusch and his wife?

13:39:29  11  A.   They were -- they looked to be for them -- specifically

13:39:34  12  for them.

13:39:35  13  Q.   By the way, were you ever provided -- you did request the

13:39:38  14  credit card -- the backup statements for the credit card

13:39:41  15  charges that were made on those credit cards, didn't you?

13:39:44  16  A.   Yes.  And we asked for documentation as for the original

13:39:48  17  information to back up the credit cards.  I don't believe that

13:39:51  18  is available.  We also were told that some of that information

13:39:55  19  may not be there because Gibraltar may have that.

13:39:59  20  Q.   You wanted to get the backup information to justify these

13:40:02  21  credit card charges that were charged to the company, correct?

13:40:05  22  A.   That is correct.

13:40:06  23  Q.   Was it provided to you?

13:40:08  24  A.   No.

13:40:08  25  Q.   And there's still around -- more or less about $140,000

REYNOLDS - DIRECT

13:40:14  1  that you say in unallocated charges; is that correct?

13:40:20  2  A.   The unallocated charges need to be moved to a member draw

13:40:24  3  as a distribution.

13:40:25  4  Q.   All right.  As of -- when you examined the books, they

13:40:28  5  were not classified as member's draw, were they?

13:40:31  6  A.   That is correct.  They're the deficit.  It's a separate

13:40:35  7  account that was on the accounts payable books as a deficit --

13:40:38  8  it's a separate account payable listing which is a deficit -- a

13:40:42  9  debit in an account payable account.

13:40:45  10  Q.   And do you have the backup or were you ever provided the

13:40:47  11  backup or charges that relate to those charges?

13:40:50  12  A.   We only looked at the -- at the payments.

13:40:56  13  Q.   Now, you also reviewed some transactions between NSS and

13:41:03  14  BSP on the Richmond job.  Do you recall that?

13:41:05  15  A.   Yes.

13:41:06  16  Q.   And do you recall reviewing -- I think you included in

13:41:10  17  your report a copy of the contract between NSS and BSP, did you

13:41:15  18  not?

13:41:15  19  A.   That is correct.

13:41:16  20  Q.   And did you notice who executed that contract for NSS?

13:41:21  21  A.   Both of them were signed -- both sides were signed by

13:41:25  22  Stephen Neusch.

13:41:26  23  Q.   And with respect to the performance of that contract,

13:41:32  24  did -- was it indicated to you that NSS was going to perform

13:41:37  25  its obligations for a fixed price of $45,000?

13:41:40  1  A.   We saw the -- we saw the contract amount, and we asked the

13:41:44  2  question as it -- I want to try to answer if I can.  But the --

13:41:48  3  we saw the contract for the small amount.  We were told that

13:41:51  4  that was a fixed fee was -- and it was negotiated by somebody

13:41:56  5  else.  So we went to the contract and saw that the contract was

13:41:59  6  signed both sides by Mr. Neusch.

13:42:02  7        So then we kind of looked at the expenditure side,

13:42:05  8  and we saw that the expenditure side on it was rather excessive

13:42:10  9  as compared to the revenue side.  And we haven't -- we were

13:42:14  10 told that it was a fixed amount, and they could not raise it

13:42:17  11 any more.

13:42:17  12 Q.   Well, isn't the bottom line that NSS realized a large loss

13:42:23  13 as a result of that contract?

13:42:25  14 A.   They lost about -- well, the books -- their books say they

13:42:29  15 have $156,000 in excess expenses over revenue.

13:42:34  16 Q.   And BSP on the other hand booked a profit from that; is

13:42:38  17 that correct?

13:42:38  18 A.   Of approximately $91,000.

13:42:40  19 Q.   Are you aware that -- I take it you are aware that NSS has

13:42:51  20 got several creditors?

13:42:53  21 A.   Yes.

13:42:53  22 Q.   In excess of -- you know, I think you told us on Friday

13:42:58  23 that their current exposure is 5- to 10-million dollars to

13:43:01  24 creditors?

13:43:02  25 A.   Well, on the books I believe -- and I don't see it here,

13:43:06   1   and it's back there in my -- I brought a few notes, but I know

13:43:09   2   I can't bring them up here.  But I think on the books they have

13:43:13   3   about $5 million on the accounts payable books.

13:43:19   4   Q.   And that would be on the books of NSS, correct?

13:43:22   5   A.   That's the books of NSS.

13:43:23   6   Q.   And NSS is a company where they had the large loss on that

13:43:27   7   Richmond job, correct?

13:43:28   8   A.   Yes.

13:43:28   9   Q.   And then they booked the profit over on BSP, correct?

13:43:32  10   A.   Yes.

13:43:33  11   Q.   And BSP, does it have any creditors?

13:43:35  12   A.   I did not see any, but I did not -- I will attest I don't

13:43:41  13   know that I've seen those.

13:43:42  14   Q.   Okay.  Well, let's put it this way:  You did see the books

13:43:46  15   pertaining to NSS as to what their debts were, and it was very

13:43:50  16   large, at least $5 million, on their books?

13:43:53  17   A.   Right at $5 million.  That's correct.

13:43:55  18   Q.   And at the end of 2014, you looked at the financial

13:43:59  19   statements and they were underwater at the end of 2014 as well,

13:44:02  20   weren't they?

13:44:03  21   A.   That is correct.

13:44:03  22          THE WITNESS:  "Underwater" meaning, from a technical

13:44:06  23   term, Judge, where their assets were less than their

13:44:09  24   liabilities.

13:44:10  25   Q.   (BY MR. TAYLOR) Okay.  And so would it be fair to say

REYNOLDS – DIRECT

13:44:12   1   that, at the time that Mr. Neusch entered into this transaction

13:44:16   2   between himself on one side he's wearing his hat with NSS and

13:44:21   3   he's signing a contract that we'll do this for 45,000, and then

13:44:24   4   on the other side where he's got his hat for BSP, that NSS was

13:44:29   5   very insolvent at that point in time?

13:44:32   6           MS. GHAVIMI:  Objection, Your Honor.  Calls for a

13:44:34   7   legal conclusion.

13:44:38   8   Q.   (BY MR. TAYLOR) Let me -- in examining the books and

13:44:40   9   records, did you see that the liabilities greatly exceeded the

13:44:43   10  assets at that time?

13:44:44   11  A.   That's correct.

13:44:46   12  Q.   And would it be fair to say that had -- that had the

13:44:53   13  contract all been done at one entity, there would have been

13:44:54   14  more -- the assets of NSS would have gone up had it all been

13:45:00   15  done in one entity?

13:45:01   16  A.   According to the books that we looked at, that is correct.

13:45:04   17  Q.   All right.  Now, did you take a look at the -- the tattoo

13:45:13   18  shop?  Were there certain transactions that were

13:45:15   19  mischaracterized as to the tattoo shop?

13:45:18   20  A.   Yes.

13:45:18   21  Q.   Would you please advise the Court of that.

13:45:21   22  A.   The -- on the April 6th, 7th, and 8th, when the

13:45:25   23  adjustments were made, the expenditures to the tattoo shop and

13:45:32   24  some other places -- I'll have to go look at my notes -- they

13:45:35   25  were all put back into a loan to the tattoo shop.  We asked for

REYNOLDS – DIRECT

13:45:39  1  a copy of the loan to the tattoo shop, and we found that that

13:45:44  2  was a loan between the tattoo shop and Mr. Neusch.  And so we

13:45:48  3  recommend that -- per our notes, that that number needs to be

13:45:53  4  changed to member distribution as well.

13:45:55  5  Q.  Would it be fair to say, Mr. Reynolds, that based upon

13:45:58  6  your examination of these records, including the credit card

13:46:01  7  charges and the tattoo shop, that there's been a fair amount of

13:46:05  8  commingling between the personal and the business between

13:46:08  9  Mr. Neusch and NSS and BSP?

13:46:11  10          MS. GHAVIMI:  Objection, Your Honor, calls for a

13:46:13  11  legal conclusion.

13:46:15  12          MR. CONNOR:  I disagree.

13:46:17  13          THE COURT:  Well, I don't think it calls for a legal

13:46:19  14  conclusion, it calls for a conclusion.  But I find that

13:46:21  15  Mr. Reynolds is capable of drawing that conclusion.  So I'll

13:46:24  16  overrule the objection and allow the question to be answered.

13:46:27  17  A.  Let me answer it this particular way:  There was a

13:46:29  18  substantial amount of personal activity that was running

13:46:33  19  through the company, which -- there was a substantial amount of

13:46:36  20  activity running through the company, whether coded correctly

13:46:40  21  to a member distribution or to expenditures.  There is that.

13:46:43  22  Q.  All right.  Now, you also said, I think, that Mr. Neusch

13:46:47  23  and his wife were taking about $200,000 a year out in salary;

13:46:52  24  is that correct?

13:46:53  25  A.  That's what the W-2 said.

13:46:54  1   Q.   All right.  And in addition to that, they drew out of

13:46:58  2   capital about a million dollars over a period of like 18

13:47:02  3   months; is that correct?

13:47:03  4   A.   They have taken distribution.  I don't know the exact

13:47:05  5   dollar amount.  I'd have to look it up.  It's in our report.

13:47:08  6   Q.   Okay.  And we're going to offer these reports, and they're

13:47:11  7   already in evidence.  But would you be surprised if it was more

13:47:14  8   than a million dollars during that period of time?

13:47:16  9   A.   No.

13:47:16  10  Q.   All right.  And this was at a time when the company, you

13:47:20  11  have already testified, was basically the liabilities exceeded

13:47:25  12  the assets?

13:47:26  13  A.   Yes.  And I just keep qualifying that this is based upon

13:47:29  14  the records that we have received, their QuickBooks records.

13:47:33  15  Q.   And isn't it fair to say that you haven't received the

13:47:36  16  records that you really wanted to do the examination that you

13:47:40  17  were asked to do?

13:47:41  18  A.   We could not be -- we could not do a complete and accurate

13:47:45  19  report without the bank reconciliations.

13:47:48  20  Q.   And were you ever given the -- the bank records from

13:47:53  21  Mr. Steve Neusch personally?

13:47:56  22  A.   No.  We were told that that was off limits.

13:47:59  23  Q.   And if Mr. Neusch was receiving at his home payments for

13:48:06  24  either NSS or BSP and putting them into his personal account,

13:48:11  25  there'd be no way for you to be able to check that without

13:48:14  1  seeing those personal records, would there?  Off-the-book

13:48:17  2  transactions, so to speak?

13:48:19  3  A.   Well, we did see and there is -- in their documentation

13:48:22  4  there is some payments that are coming from BSP to NSS, but

13:48:28  5  there's not a deposit for the same dollar amount and some vice

13:48:33  6  versa.  Whether that's accounting to be corrected later or not,

13:48:36  7  I don't know.

13:48:37  8  Q.   All right.  So they don't reconcile.  Is that what you're

13:48:41  9  saying?

13:48:41  10  A.   Correct.

13:48:42  11  Q.   What type of business -- what level of business activity

13:48:47  12  did you observe going on in either NSS or BSP over the last 30

13:48:52  13  days?

13:48:57  14  A.   Well, we were out there just reviewing the records of the

13:49:00  15  books that were there, so we were not looking at the activity

13:49:03  16  or who was doing what out there.

13:49:04  17  Q.   Isn't it true that the bookkeeper's a contract employee?

13:49:09  18  A.   That's my understanding.

13:49:10  19  Q.   And now that Mr. Neusch and his wife are both contract

13:49:14  20  employees?

13:49:14  21  A.   That is correct.  They are.

13:49:16  22  Q.   And isn't it true that you do know what amount of money

13:49:20  23  was in the bank accounts at the end of June, don't you?

13:49:23  24  A.   No.  Because I don't have a bank reconciliation.

13:49:26  25  Q.   All right.  What did the books show was -- was their

REYNOLDS – DIRECT

13:49:30  1  balance?

13:49:30  2  A.    There was a deficit balance.

13:49:32  3  Q.    At the end of June?

13:49:34  4  A.    At the end of -- I did it through May 31st.

13:49:37  5  Q.    Okay.  A deficit balance?

13:49:39  6  A.    Uh-huh.

13:49:40  7  Q.    And in terms of your schedules, if you'll take a look at

13:49:47  8  your schedules that you attached to your July 29th report, you

13:49:53  9  have a -- you have one there about "altered transactions with

13:50:00  10 Stephen were primarily re-class -- were re-classed to

13:50:05  11 unallocated credit cards."  Do you see that?

13:50:06  12 A.    Are you on the first page?

13:50:07  13 Q.    On the very first page.

13:50:08  14 A.    Okay.

13:50:09  15 Q.    Work paper 6002.  "Altered transactions with Stephen were

13:50:15  16 primarily reclassified to unallocated accounts."  Do you see

13:50:19  17 that?

13:50:19  18 A.    Correct.

13:50:19  19 Q.    And so were these -- just so we'll understand, was the

13:50:25  20 bookkeeping transactions that were booked originally between

13:50:32  21 the company and Stephen to transfer those to unallocated credit

13:50:38  22 card charges?

13:50:38  23 A.    Correct.

13:50:39  24 Q.    And so that would -- that would in effect have the effect

13:50:42  25 on the books of concealing that this money originally had gone

13:50:45  1  to Mr. -- to Mr. Neusch, correct?  If you just looked at the

13:50:49  2  books and they were unallocated, you wouldn't know that that

13:50:52  3  money went to Mr. Neusch?

13:50:54  4  A.    That would be correct.

13:50:56  5  Q.    If the books were the way they were originally post and

13:50:59  6  they showed that the money was a member's draw or it had been

13:51:03  7  charged to him, that would have been a trail that would have

13:51:06  8  led you to that, correct?  You would have seen that?

13:51:08  9  A.    Correct.  They would have been under distributions under

13:51:10  10 the equity position.  That's correct.

13:51:13  11 Q.    I'm not asking you to talk about motive, but I am asking

13:51:16  12 you to talk about what the records show.

13:51:18  13        So making that change, isn't it true that making that

13:51:20  14 change to unallocated credit cards had the effect of burying

13:51:26  15 where that money went because it's unallocated?

13:51:31  16 A.    It had the effect of -- it did not have an effect on the

13:51:36  17 balance sheet on the equity position.  It had an effect on not

13:51:40  18 showing that the money went to the owners.

13:51:44  19 Q.    Exactly.  And in terms of -- if you look at that, that

13:51:50  20 could -- the way he made those changes, one could think he used

13:51:54  21 that to pay for a legitimate business expense, correct, if it's

13:51:59  22 unallocated?

13:52:00  23 A.    I guess.

13:52:01  24 Q.    But if it's allocated and it goes to member's draw, that's

13:52:05  25 the member taking money out of the company and not paying a

REYNOLDS – DIRECT                                    106

13:52:08   1   creditor, correct?

13:52:10   2   A.    I'm sorry repeat that question.

13:52:12   3   Q.    If it's -- if it's a member's draw, that's not paying a

13:52:16   4   creditor with your money?

13:52:17   5   A.    No.   That's -- that's a distribution out of the

13:52:21   6   proceeds -- that's a cash distribution out of the business to

13:52:24   7   an owner.

13:52:25   8   Q.    And that reduces the amount of money available to pay

13:52:28   9   creditors?

13:52:30   10  A.    That is correct.

13:52:31   11  Q.    The next sentence says, "And many of the altered entries

13:52:38   12  were to the loan to the tattoo shop."

13:52:43   13  A.    The way this particular report is written is that the

13:52:47   14  first page had to do with Stephen Neusch and the activities.

13:52:51   15  And we did an audit program, and so, therefore, down below it

13:52:55   16  said -- one of the questions was:   Were these transactions

13:52:57   17  altered on six through eight and, if so, identify.   And that's

13:53:03   18  what we're identifying that you're talking about now.

13:53:06   19  Q.    Okay.   Let's turn to the second page.   And you have with

13:53:12   20  Christine Neusch a charge of 2,013 for her personal car

13:53:16   21  insurance.   Do you see that?

13:53:18   22  A.    Yes.

13:53:18   23  Q.    Did that need to be reclassified?

13:53:21   24  A.    Yes.

13:53:22   25  Q.    All right.   Well, take a look on -- it's reference work

13:53:49   1   page 7004.  I think it's on the third page.

13:53:52   2   A.   Okay.

13:53:53   3   Q.   $4,000 payment expense to consumables.  Do you see that?

13:53:57   4   A.   Yes.

13:53:58   5   Q.   This payment was for Stephen's credit card bill?

13:54:01   6   A.   Correct.

13:54:02   7   Q.   So a consumable would have been a legitimate business

13:54:05   8   expense?

13:54:05   9   A.   Could be.

13:54:06  10   Q.   And you don't know what his credit card bill was for?

13:54:10  11   A.   We saw the credit card statement.  And on the credit card

13:54:13  12   statement there was charge it to this, charge to this, charge

13:54:17  13   to that as far as a documentation.  And -- but the total of the

13:54:24  14   documentation was actually more than the $4,000 that was

13:54:27  15   written to him, but there was no tie as to what the expense

13:54:33  16   was.

13:54:33  17   Q.   Okay.  If you'll turn to the next page, and that's work

13:54:41  18   paper reference 2003.4.  Is that where you did your analysis of

13:54:46  19   the Richmond job, the first entry there?

13:54:48  20   A.   Yes.

13:54:48  21   Q.   And it says, "Jobs were over the subcontract amount by

13:54:53  22   156,000.  Subcontract between NSS and BSP was signed by Stephen

13:55:00  23   for both parties."

13:55:01  24   A.   Correct.

13:55:01  25   Q.   You see that?

REYNOLDS - DIRECT

| | | |
|---|---|---|
| 13:55:02 | 1 | A.    Uh-huh. |
| 13:55:03 | 2 | Q.    It says -- let's go down to 8002.  "Records of BSP do not |
| 13:55:07 | 3 | agree with NSS.  Records of BSP have a number of missing |
| 13:55:11 | 4 | transactions.  Have not received the bank reconciliations for |
| 13:55:14 | 5 | NSS and BSP in a timely manner." |
| 13:55:17 | 6 | A.    Correct. |
| 13:55:18 | 7 | Q.    And was -- wasn't for lack of asking for it, though, was |
| 13:55:25 | 8 | it? |
| 13:55:25 | 9 | A.    It was the first thing we asked for on July the 13th. |
| 13:55:28 | 10 | Q.    How long have you been working on this? |
| 13:55:30 | 11 | A.    July 13th. |
| 13:55:31 | 12 | Q.    All right.  And still couldn't get that reconciliation? |
| 13:55:35 | 13 | A.    They hired a temp to try to do it and the temp was not |
| 13:55:38 | 14 | able to get the bank reconciled. |
| 13:55:41 | 15 | Q.    Oh.  This is -- moving along to entry 2003.3. |
| 13:55:51 | 16 | A.    When you say entry -- |
| 13:55:53 | 17 | Q.    Well, I don't know what you call it.  It says "work paper |
| 13:55:55 | 18 | reference." |
| 13:55:55 | 19 | A.    Okay.  You need to know that there is a work paper for |
| 13:55:58 | 20 | every single one of these documentations, and that's the work |
| 13:56:01 | 21 | paper reference of which we have a schedule that's in the -- |
| 13:56:05 | 22 | that's in the Dropbox for everybody to see. |
| 13:56:09 | 23 | Q.    Okay.  Work paper reference 2003.3. |
| 13:56:12 | 24 | A.    Okay.  Which page? |
| 13:56:13 | 25 | Q.    And that's page -- the pages aren't numbered, but it looks |

REYNOLDS - DIRECT

13:56:17   1   like it's page 4.

13:56:18   2   A.   Okay.

13:56:18   3   Q.   Are you with me yet?

13:56:20   4   A.   No.  Is it under ...

13:56:24   5   Q.   It says WW --

13:56:26   6   A.   Well, look over on the left.  We broke down the program,

13:56:28   7   and is it under Roman numeral IV? Roman numeral V?

13:56:33   8   Q.   It says, "Review posting to cost of goods sold."  And I

13:56:36   9   need to show you this piece of paper.  It will be faster.  This

13:56:40   10  is an entry that I circled.  You see that one?  I've circled

13:56:47   11  it?

13:56:48   12  A.   Oh, okay.  Okay.  I've got it.

13:56:58   13  Q.   All right?

13:57:00   14  A.   Yes.  2003.3.

13:57:03   15  Q.   And this has to do with the cost of goods sold on the --

13:57:07   16  on the Stratcom job, the $700,000?

13:57:17   17  A.   Yes.  This is not the Richmond job.

13:57:19   18  Q.   No.  This is the Stratcom job.

13:57:21   19  A.   Okay.

13:57:21   20  Q.   You'll note that the first sentence you said there is NSS

13:57:24   21  did not pay Gibraltar.  Do you see that?

13:57:26   22  A.   Uh-huh.

13:57:27   23  Q.   So the books and records do not show that -- the records

13:57:32   24  show that NSS got the $700,000 for the materials?

13:57:36   25  A.   In 2014 it was posted on the books as a payable and

REYNOLDS - DIRECT

13:57:41  1  expense.  And in 2015, I think January 1st and May the 15th, it

13:57:47  2  was posted -- it was taken off the books.

13:57:50  3  Q.   All right.  And what does that mean?

13:57:53  4  A.   Pardon?

13:57:54  5  Q.   What does that mean, it was taken off the books?

13:57:57  6  A.   The entry was reversed.

13:57:58  7  Q.   Okay.  Now, NSS did get the money from Stratcom, the

13:58:02  8  714,000.  That's undisputed?

13:58:04  9  A.   I don't know that.  I didn't look that up.

13:58:07  10  Q.   Well, I'm telling you that is undisputed.  Mr. Neusch has

13:58:10  11  admitted that.  But what you found is that NSS did not pay

13:58:14  12  Gibraltar for that material.  That's the first sentence.

13:58:17  13  A.   That is correct.  That's what we found.

13:58:19  14  Q.   There were a number of times when you asked for records

13:58:57  15  and you were told, well, Gibraltar has that?

13:58:58  16  A.   Yeah.  We were -- we were told that Gibraltar had a number

13:59:03  17  of the records and -- particularly because of the cancellation

13:59:06  18  of the lease.  And we were asked, would you make a request to

13:59:13  19  Gibraltar for those particular records?  I said I would.  But

13:59:17  20  we didn't get that list until Wednesday evening of this last

13:59:21  21  week as to what Gibraltar has.  And on our -- further back when

13:59:27  22  you look at our punch list, our questions and our status, we

13:59:33  23  put where -- where they said that Gibraltar had the records.

13:59:39  24  Q.   And did Gibraltar cooperate with you in providing --

13:59:42  25  A.   I didn't ask them.

REYNOLDS – CROSS

13:59:44   1   Q.   Okay.  But how long did it take you to get that list from

13:59:47   2   NSS and BSP as to what Gibraltar had?

13:59:50   3   A.   I don't know, but it was -- it was not quickly.  But I was

13:59:54   4   asked to make that request, I said I would make the request,

13:59:58   5   and I -- but I did not get it until the evening of July -- of

14:00:02   6   Wednesday -- this last Wednesday.

14:00:07   7          MR. TAYLOR:  Your Honor, I think these documents are

14:00:09   8   already into evidence, and I will pass Mr. Reynolds at this

14:00:12   9   time.

14:00:13   10          THE COURT:  Ms. Ghavimi?

14:00:19   11                    **CROSS-EXAMINATION**

14:00:19   12   **BY MS. GHAVIMI:**

14:00:19   13   Q.   Good afternoon, Mr. Reynolds.  I just have a couple of

14:00:22   14   things.  Were you present on site at the NSS offices the entire

14:00:28   15   time?

14:00:28   16   A.   No, I was not.

14:00:29   17   Q.   Was it your employee, Mr. Bill Sullivan?

14:00:32   18   A.   Yes, it was.

14:00:32   19   Q.   Okay.  Do you recall being -- when you were told about

14:00:36   20   Gibraltar having NSS records?  Do you --

14:00:40   21   A.   I don't remember.  That's -- that's what I was explaining

14:00:43   22   to him.  I don't remember when I was told.  I remember that you

14:00:47   23   and I discussed would we make the request, and I said I would

14:00:50   24   make the request.  But I didn't receive your response -- or he

14:00:55   25   didn't receive your response until Wednesday afternoon.

REYNOLDS - CROSS

14:00:57  1  Q.   Do you recall when we first discussed it that it was

14:01:00  2  mentioned that anything prior to 2015 would -- any records

14:01:06  3  prior to 2015 would be at Gibraltar?

14:01:08  4  A.   I don't remember the date.

14:01:10  5  Q.   Okay.  Did -- do you recall when Mr. Sullivan made the

14:01:15  6  request to me to provide a list?

14:01:20  7  A.   No, I don't.

14:01:21  8  Q.   Okay.  Was it the very first -- okay.  You don't know?

14:01:26  9  A.   No.  It was not the very first day.  Our request list

14:01:29  10 changed or was added as we were going forward and found

14:01:33  11 additional things.  So, no, it was not at the very beginning

14:01:36  12 that we asked that.  It was -- it was later on.

14:01:39  13 Q.   Okay.  And also do you recall the -- I just want to go

14:01:47  14 over the discussion of Stephen Neusch's personal bank

14:01:49  15 statements.  Do -- do you recall being told that

14:01:52  16 Stephen Neusch's personal bank statements were off limits to

14:01:56  17 the plaintiffs but that they would be given and were given to

14:01:59  18 Mr. Sullivan?

14:02:01  19 A.   No.  I was under the impression that his personal bank

14:02:06  20 statements were off limits to even us and Black Security's was

14:02:14  21 for eyes only.  That's what I understood.

14:02:18  22 Q.   Did Mr. Sullivan tell you that Mr. Neusch's personal bank

14:02:22  23 statements were in fact given to him?

14:02:25  24 A.   Were not given to him?

14:02:26  25 Q.   They were.

REYNOLDS - CROSS

14:02:27 1  A.   No.  I did not see that his personal bank statements were

14:02:30 2  given to him.

14:02:31 3  Q.   Okay.  And when --

14:02:32 4  A.   I don't have them in my records that I remember seeing,

14:02:35 5  but I'll be glad to go back and look at that.

14:02:38 6  Q.   Okay.  And when -- when you visited the offices, did NSS

14:02:41 7  employees and everyone there make a concerted effort to provide

14:02:47 8  you all the records that were available?

14:02:49 9  A.   Oh, I think that -- you personally I think did everything

14:02:54 10 that you could to try to move it along based upon your skill

14:02:58 11 set of accounting and what we were trying to do.  And so I had

14:03:04 12 no qualms other than I was very -- I personally was disturbed

14:03:11 13 that we could not get the bank reconciliations, and that was

14:03:15 14 our first request.  So everything else you tried real hard

14:03:19 15 to -- you brought in a temp to do it.  So I don't have any

14:03:24 16 qualms with what you tried to provide for us.

14:03:26 17 Q.   And so the -- did the temp work for a week and a half on

14:03:30 18 doing the bank reconciliations?

14:03:33 19 A.   The bank reconciliations could have been done in four

14:03:37 20 hours.

14:03:37 21 Q.   Okay.  Was there a miscommunication about a week into

14:03:41 22 between Mr. Sullivan and the temp about the bank

14:03:43 23 reconciliations?

14:03:43 24 A.   Well, the temp went in and started changing QuickBooks

14:03:46 25 because of the way QuickBooks does the bank reconciliation, and

W. NEUSCH – DIRECT                                                        114

```
14:03:52   1   we had to stop her because you can't change the records in the
14:03:55   2   QuickBooks that -- I mean, you're under court order not to
14:03:58   3   change them.  So we had to stop her and get her to repeat it
14:04:01   4   back and get it -- start all over.  But she still was not able
14:04:04   5   to do it.
14:04:05   6   Q.   Okay.  And then was she -- was she told to do the bank
14:04:11   7   reconciliations in Excel?
14:04:12   8   A.   Yes.  We told her to do the bank reconciliations in Excel
14:04:16   9   because we wanted to get them out of the changing the
14:04:19  10   QuickBooks, the postings.
14:04:21  11   Q.   Okay.
14:04:23  12            MS. GHAVIMI:  Nothing further.
14:04:24  13            THE COURT:  Mr. Taylor?
14:04:26  14            MS. TAYLOR:  Nothing further, Judge.
14:04:27  15            THE COURT:  All right.  Mr. Reynolds, you may step
14:04:30  16   down.  Thank you.
14:04:30  17            THE WITNESS:  Thank you.
14:04:32  18            MR. CONNOR:  Plaintiffs call Mr. Bill Neusch,
14:04:35  19   Your Honor.
14:05:49  20       (Witness sworn)
14:05:49  21                        WILLIAM NEUSCH,
14:05:49  22   having been first duly sworn, testified as follows:
14:05:49  23                      DIRECT EXAMINATION
14:05:49  24   BY MR. CONNOR:
14:05:49  25   Q.   Good afternoon, Mr. Neusch.
```

W. NEUSCH – DIRECT

14:05:50  1  A.    Good afternoon.

14:05:51  2  Q.    I took a couple of minutes because I wanted to make sure

14:05:54  3  that you had the termination notice and then the license -- the

14:05:58  4  unsigned license agreement and specifically addendum A in front

14:06:02  5  of you.

14:06:02  6       Let's start there, and then we'll talk about the

14:06:04  7  products specifically and we'll move as fast as we can through

14:06:07  8  this.

14:06:08  9  A.    Yes, sir.

14:06:08 10  Q.    So you heard a lot of testimony already today, Mr. Neusch,

14:06:14 11  about what the termination agreement, Exhibit 78 there in front

14:06:19 12  of you, means.  Tell us in your own words, Mr. Neusch, what was

14:06:29 13  happening that led up to this agreement?

14:06:37 14  A.    Okay.  Prior to the agreement, NSS's sales of Gibraltar

14:06:40 15  products I believe -- I could be a year off, but I believe it

14:06:45 16  was 2010 or '11, that they were 2.8 million.  The next year it

14:06:52 17  went down to 900,000.  The next year it went down to 800,000.

14:06:56 18  The next year it was almost none.  So with that we had entered

14:07:01 19  into the licensing agreement that had a minimum royalty.  So if

14:07:07 20  you want to keep selling our products, you have to produce a

14:07:10 21  minimum royalty.  That wasn't being paid.

14:07:15 22       When I sold the products to Beta and we entered this

14:07:19 23  termination agreement it was terminating rights to all our

14:07:23 24  products.  We would still sell products to Stephen just like

14:07:30 25  we'd sell to other people, but it terminated his rights to

14:07:36   1    sell, distribute, and all those products.

14:07:40   2           There was a -- that was in February.  We didn't get

14:07:45   3    crossways -- February of 2015.  We didn't get crossways.  I

14:07:52   4    didn't realize all that was going on until December, around

14:07:59   5    December 20th of 2015.  During that time we -- I gave him a

14:08:06   6    credit of $300,000.  We credited the minimum royalty payments

14:08:13   7    that we had booked on our receivables he had booked on his

14:08:18   8    payables.  I gave him that credit specifically in relation to

14:08:23   9    this termination agreement.

14:08:25  10    Q.   So that was consideration for his entering into this

14:08:28  11    termination agreement?

14:08:29  12    A.   Correct.

14:08:29  13    Q.   Okay.

14:08:31  14    A.   And the fact that he lost rights to all the products, not

14:08:34  15    just what we sold Beta.  In that we had that discussion

14:08:40  16    multiple times because he brought up to my attention, well, you

14:08:45  17    gave me that credit, but they're still on your books.  I went

14:08:48  18    to Jim Bryer more than once and said, Jim, you're supposed to

14:08:54  19    credit NSS $300,000.  He didn't do it right away.  I actually

14:08:58  20    had to go to him at Stephen's request at least twice.  And Jim

14:09:05  21    can testify to that.  So that was discussed over that whole

14:09:09  22    time period.

14:09:10  23           We changed -- as Gibraltar on our highway cable

14:09:15  24    barrier, we had done 100 percent of our own sales and marketing

14:09:20  25    of that product.  It's been very successful.  And Gibraltar

W. NEUSCH – DIRECT

| | | |
|---|---|---|
| 14:09:23 | 1 | Materials with AVB products -- and I explained this to |
| 14:09:28 | 2 | Stephen -- that -- |
| 14:09:30 | 3 | Q.   Active Vehicle Barrier? |
| 14:09:32 | 4 | A.   Active Vehicle Barriers, these products that we're |
| 14:09:37 | 5 | discussing. |
| 14:09:37 | 6 |       -- that we had been successful.  You know, his sales |
| 14:09:40 | 7 | were not enough.  You know, I sold off to Beta, you know, the |
| 14:09:45 | 8 | cable-based products.  But I said we're taking in-house all the |
| 14:09:49 | 9 | sales of the Gibraltar AVB, all these products, ourselves. |
| 14:09:55 | 10 | That was why he was upset.  I hired Joseph Hauss, his |
| 14:10:00 | 11 | brother-in-law, and he expressed how that hurt him and upset |
| 14:10:04 | 12 | him, how I had hired Kevin Smith and now I was giving my effort |
| 14:10:09 | 13 | to sell these products.  That was all before December 20th of |
| 14:10:13 | 14 | 2015. |
| 14:10:14 | 15 | Q.   And so that's during the period between February of 2015 |
| 14:10:19 | 16 | and December of 2015? |
| 14:10:20 | 17 | A.   That is correct.  It took a big effort.  I can show the |
| 14:10:24 | 18 | records.  We hired multiple salespeople. |
| 14:10:30 | 19 | Q.   So you were taking in-house the sales and marketing |
| 14:10:33 | 20 | function that NEU Security Services had been performing under |
| 14:10:36 | 21 | this exclusive license agreement? |
| 14:10:38 | 22 | A.   That is correct.  Because we had terminated in that |
| 14:10:40 | 23 | termination agreement their rights to all the products.  The |
| 14:10:43 | 24 | termination agreement was specifically to the licensing |
| 14:10:47 | 25 | agreement we had been operating under. |

W. NEUSCH – DIRECT

14:10:49  1  Q.    And that was to terminate all of their rights to all

14:10:54  2  exclusive products?

14:10:55  3  A.    All of them.

14:10:56  4  Q.    And those exclusive products are the ones listed on

14:11:00  5  addendum A in Exhibit 127 to your right there?

14:11:03  6  A.    Yes, sir.

14:11:10  7  Q.    And are all four of the disputed products on that list?

14:11:13  8  A.    Yes, sir.

14:11:13  9  Q.    Okay.  Did Mr. Stephen Neusch ever mention to you or

14:11:18  10  suggest to you in any way that he had the understanding that

14:11:23  11  you heard him testify about today that the termination

14:11:26  12  agreement was limited to the cable-based products that

14:11:29  13  Gibraltar sold to Betafence?

14:11:31  14  A.    Never.

14:11:31  15  Q.    Mr. Neusch, how will Gibraltar be harmed if there is no

14:11:40  16  injunction in this case?

14:11:43  17  A.    As I've testified previously, not today -- and

14:11:50  18  Joseph Hauss I believe testified to this as well -- that in the

14:11:53  19  marketplace we currently today have integrators that will not

14:11:59  20  talk to us because they see us connected to NSS and Stephen.

14:12:03  21  Same last names.  NSS obviously used to distribute those same

14:12:08  22  products we're now trying to sell.  Because of their

14:12:11  23  reputation, we have people that will not even allow us to make

14:12:16  24  an appointment with them to sit down and explain the situation.

14:12:19  25  Q.    And these integrators, are these competitors of NEU

W. NEUSCH – DIRECT

14:12:22   1   Security Services?

14:12:23   2   A.   Yes.

14:12:24   3   Q.   Potential customers?

14:12:25   4   A.   Who are potential customers of Gibraltar.  So that's one

14:12:28   5   reason we're being harmed.

14:12:32   6          Another reason we're being harmed is the competition.

14:12:35   7   Obviously if I have competition of my own product, that's going

14:12:39   8   to drive prices down.  And then I have a duty to Beta, who I've

14:12:45   9   sold these products to, now that Stephen is claiming he has

14:12:49  10   rights to.

14:12:49  11   Q.   Now, which -- let's talk about that duty to Betafence that

14:12:53  12   you have.  Of the four disputed products, which ones were sold

14:12:57  13   to Betafence in early 2015?

14:13:00  14   A.   The M50 P2 fence, the passive barrier.

14:13:06  15   Q.   The other three products were not?

14:13:08  16   A.   Correct.

14:13:09  17   Q.   Okay.  So the wedge barrier and the cable restraint

14:13:16  18   barriers are still owned by Gibraltar; is that correct?

14:13:21  19   A.   Correct.

14:13:21  20   Q.   And, just to be clear, the M50 P2 cable crash fence was

14:13:29  21   owned by Gibraltar until March of 2015 and is now owned by

14:13:33  22   Betafence?

14:13:34  23   A.   Correct.

14:13:35  24   Q.   And if you would please, Mr. Neusch, Exhibit Number 80 ...

14:13:39  25          MR. CONNOR:  I would like to note for the Court, if I

14:13:42  1   may, that Exhibit Number 80 is the contract between Betafence

14:13:49  2   and Gibraltar and it's marked as "attorneys' eyes only,"

14:13:52  3   Your Honor.  If I may request the Court to seal that document?

14:14:04  4            THE COURT:  Well, here's what your problem is in

14:14:05  5   court.  If I draft an opinion on this and I rely on Exhibit

14:14:08  6   Number 80, it's not going to be sealed.  I'll just tell you

14:14:13  7   that because I'm not going to draft an order that talks about a

14:14:16  8   sealed document.  So the question is, I don't mind it remaining

14:14:22  9   sealed for purposes of this hearing if you're giving it for

14:14:27  10  background.  But if it's going to be a crux in the decision,

14:14:31  11  then it's going to come out.  I just want you to know that.

14:14:36  12            MR. CONNOR:  Thank you Your Honor.

14:14:36  13  Q.   Exhibit Number 80, do you have that in front of you,

14:14:39  14  Mr. Neusch?

14:14:40  15  A.   Yes, sir.

14:14:41  16  Q.   That's asset purchase agreement between Betafence and

14:14:44  17  Gibraltar, correct?

14:14:45  18  A.   Yes, sir.

14:14:45  19  Q.   And that was executed when?  Is it March 2015?

14:14:50  20  A.   Yes, sir.

14:14:50  21  Q.   And under that agreement, Gibraltar conveyed to Betafence

14:14:57  22  the cable-based products, including one of the four disputed

14:15:00  23  products, the cable crash fence, correct?

14:15:02  24  A.   Correct.

14:15:03  25  Q.   And Betafence you already testified, or I think

14:15:10  1  Mr. Stephen Neusch testified, that consideration for that sale

14:15:14  2  was in the millions of dollars?

14:15:17  3  A.   Correct.

14:15:17  4  Q.   And is part of the reason that these products are so

14:15:22  5  valuable is that they have these certifications that we've been

14:15:26  6  hearing about this morning?

14:15:27  7  A.   Yes.   Most of these jobs specify they have to have a

14:15:31  8  certification.

14:15:32  9  Q.   Okay.

14:15:33  10  A.   So it's a very limited pool of products that meet that

14:15:37  11  certification and have certification.

14:15:39  12  Q.   And we heard a lot about the certifications, so I just

14:15:42  13  want to summarize.   Did Gibraltar crash test and receive

14:15:46  14  certifications on each of these four disputed products?

14:15:50  15  A.   Yes, sir.

14:15:51  16  Q.   Okay.   Who designed each of these four disputed products?

14:15:56  17  A.   I did.

14:15:56  18  Q.   Did you have any help from Mr. Stephen Neusch?

14:16:00  19  A.   On the -- nothing that's covered by our patents that he

14:16:05  20  gave help on, on any of the products.   He claims that the cable

14:16:11  21  restraint barrier, or we call it the vertical lift barrier, was

14:16:16  22  his design.   What he brought me was a Patriot Barrier product.

14:16:22  23  If you look at that product, it's exactly the same as our

14:16:27  24  vertical lift barrier with the exception it raises a beam up

14:16:31  25  out of the ground.   Ours raises an array of three cables that's

W. NEUSCH – DIRECT

14:16:37   1   covered under our patent.

14:16:39   2   Q.   Now, the Patriot is a competitive product.

14:16:42   3   A.   It's a competitive product.  So Stephen's input, he claims

14:16:45   4   that was 100 percent his design.  Well, his design was here's a

14:16:51   5   competing product, Dad.  We need something to compete against

14:16:54   6   this product.

14:16:55   7   Q.   So you --

14:16:56   8   A.   Yes.  I used cables instead of a beam.  So if you want to

14:17:01   9   call it in the design world prior art or his, you know,

14:17:05   10  contribution to the design, it was showing me what our

14:17:08   11  competitor was doing.

14:17:09   12  Q.   And the United States Patent Office has granted you

14:17:12   13  patents -- at least one patent on your cable-based products?

14:17:18   14  A.   Yes.  We have patents.  We have patent pendings on all

14:17:22   15  these products.

14:17:22   16  Q.   So all four of these disputed products are the subject of

14:17:26   17  applications that you filed?

14:17:27   18  A.   Yes.

14:17:28   19  Q.   And are you the sole named inventor on each of those?

14:17:32   20  A.   Yes.

14:17:32   21  Q.   Okay.  Now, let's a tick off the fourth to the bottom and

14:17:39   22  round this out.

14:17:40   23       Has Gibraltar sold all four of these products?

14:17:44   24  A.   Yes.

14:17:45   25  Q.   Okay.  And has --

14:17:48    1    A.    When you say sold, you mean we offer them for sale and

14:17:51    2    have sold them?

14:17:52    3    Q.    Yeah.

14:17:53    4    A.    Yes.

14:17:53    5    Q.    And the three products that were exclusive to -- or the

14:17:59    6    products that were exclusive to NEU Security Services, they

14:18:04    7    were the only ones you'd sell to during the period of that

14:18:07    8    exclusive license agreement; is that correct, in the

14:18:10    9    United States?

14:18:10   10    A.    Ask that question again.  I'm sorry.

14:18:12   11    Q.    Sure.  I trailed off there.

14:18:14   12          During the period of the exclusive license for the

14:18:18   13    exclusive products that are on Exhibit Number 127 there, NSS

14:18:24   14    was your only customer in the United States because they had an

14:18:29   15    exclusive, correct?

14:18:31   16    A.    Yes.  On the -- three of the products they had exclusive

14:18:37   17    worldwide, and on the cable-based product they had exclusive

14:18:42   18    just in the United States because Beta had it in the rest of

14:18:45   19    the world.

14:18:46   20    Q.    Outside the U.S.?

14:18:48   21    A.    Outside the U.S.

14:18:49   22          THE COURT:  Now, in order that I understand what

14:18:52   23    you're talking about, when I look at the addendum A, it

14:18:56   24    describes that.  And so roughly the first half of the sheet it

14:19:01   25    says U.S. only, Betafence outside U.S. is just what you've

W. NEUSCH – CROSS

| | |
|---|---|
| 14:19:05 | 1 |
| 14:19:10 | 2 |
| 14:19:15 | 3 |
| 14:19:19 | 4 |
| 14:19:26 | 5 |
| 14:19:29 | 6 |
| 14:19:32 | 7 |
| 14:19:37 | 8 |
| 14:19:40 | 9 |
| 14:19:41 | 10 |
| 14:19:45 | 11 |
| 14:19:51 | 12 |
| 14:19:52 | 13 |
| 14:19:58 | 14 |
| 14:20:02 | 15 |
| 14:20:06 | 16 |
| 14:20:07 | 17 |
| 14:20:08 | 18 |
| 14:20:13 | 19 |
| 14:20:18 | 20 |
| 14:20:18 | 21 |
| 14:20:21 | 22 |
| 14:20:25 | 23 |
| 14:20:25 | 24 |
| 14:20:25 | 25 |

1  referred to as the cable products; is that right?  And then the

2  remainder which says worldwide are the other products?

3          THE WITNESS:  Correct.  Worldwide would cover the

4  finger wedge barrier, the two cable restraint barriers.  So

5  these four products, that would be all in the worldwide column.

6          THE COURT:  And the cable restraint barriers are what

7  are referred to on addendum A as vertical lift barriers?

8          THE WITNESS:  Correct.  It's called pop-up.

9          THE COURT:  And the finger wedge barrier is referred

10  to as the wedge barrier, and the cable crash fence is referred

11  to as the second item, the P2 fence; is that correct?

12          THE WITNESS:  That is correct.

13          THE COURT:  Okay.  You may proceed.

14  Q.  (BY MR. CONNOR) So that Betafence agreement, you conveyed

15  the M50 P2 cable crash fence and that cable-based line of

16  products?

17  A.    Uh-huh.

18  Q.  And you have a duty to Betafence, as you mentioned a few

19  minutes ago, to defend what you sold to them; is that --

20  A.    Yes, sir.

21  Q.  -- fair?

22          MR. CONNOR:  Pass the witness, Your Honor.

23                      **CROSS-EXAMINATION**

24  **BY MR. ROGERS:**

25  Q.    I want to make sure you have all of Defendants' Exhibits

14:21:10   1  up here.

14:21:11   2  A.   I do not.  Are you going to be using any of the

14:21:17   3  plaintiffs' exhibits?

14:21:18   4  Q.   I think I'm only going to use defendants'.

14:22:44   5  A.   Okay.

14:22:44   6  Q.   Good afternoon, Mr. Neusch.

14:22:46   7  A.   Good afternoon.

14:22:51   8  Q.   I want to ask you about each of the four products.  But

14:22:54   9  before we get there, I want to ask you first one question:  The

14:22:57  10  consideration that you're referring to earlier --

14:23:02  11  A.   I apologize.  I didn't hear you.

14:23:05  12  Q.   Can you hear me?  Can you hear me now?

14:23:08  13  A.   That's better.

14:23:09  14  Q.   The consideration that you say was provided to your son

14:23:13  15  Stephen Neusch for his signing of the termination notice you

14:23:19  16  referred to a credit on royalties; is that correct?

14:23:27  17  A.   That is correct.

14:23:27  18  Q.   And you referred to that credit not being given right

14:23:29  19  away, but you had to remind someone several times to do it; is

14:23:32  20  that correct?

14:23:36  21  A.   Yes.  Jim Bryer, my CFO.

14:23:36  22  Q.   And this credit on royalties that was the consideration

14:23:39  23  for your son Stephen Neusch signing the termination notice

14:23:43  24  agreement, that was a credit on royalties that were due under

14:23:50  25  an unsigned license agreement; is that correct?

14:23:53  1   A.    The very license agreement that he signed to terminate.

14:23:57  2   That agreement that we had been operating under.

14:24:01  3   Q.    Okay.  But the underlying -- you said that it was an

14:24:06  4   obligation to pay royalties; is that correct?  And you gave a

14:24:09  5   credit on that obligation?

14:24:11  6   A.    Yes.  We had billed him for the royalties, he had booked

14:24:15  7   the royalties, and then I gave him a credit.  We took those --

14:24:20  8   we showed them as a receivable, we removed those as a

14:24:24  9   receivable, and subsequently he removed those as a payable.

14:24:27  10  Q.    Okay.  But he never agreed to pay any of those royalties

14:24:31  11  because he didn't agree to the license agreement.  It was never

14:24:34  12  signed, correct?

14:24:34  13  A.    It was never signed.  It actually states that in the

14:24:38  14  termination agreement.  We acknowledge that.  But he did agree,

14:24:46  15  and that's what we were operating under.  So we operated under

14:24:50  16  that agreement for a period of time, and that's what he signed

14:24:53  17  to terminate.

14:24:54  18  Q.    Okay.  But you say --

14:24:55  19  A.    Why would you terminate something you didn't have any

14:24:58  20  agreement to do?  There's nothing to terminate if there is no

14:25:02  21  agreement.

14:25:03  22  Q.    Well, that's my point.  You were attempting to terminate

14:25:06  23  something that was never agreed to.  He never signed --

14:25:09  24  Stephen Neusch, on behalf of NSS, never signed the unsigned

14:25:14  25  license agreement because he didn't agree to the royalties.  He

14:25:19  1  never would agree to them, would he?  It was too much?

14:25:23  2  A.   He operated under it, and he never said that.  We had nine

14:25:27  3  versions of that agreement going back and forth between him and

14:25:32  4  Jim Bryer over that period of time.  We operated under that

14:25:37  5  agreement.

14:25:37  6        You know, sometimes he argues, "well, according to

14:25:41  7  our agreement," and sometimes, like you are referring to now,

14:25:45  8  "well, it wasn't signed, so it wasn't an agreement."  So

14:25:48  9  sometimes he's arguing it is an agreement and we need to abide

14:25:51  10  by it and sometimes he's arguing it's not.

14:25:54  11        But we operated under that agreement.  We discussed

14:25:57  12  that agreement.  He never told me he wouldn't signed it because

14:26:06  13  of that.  It's just the can kept getting kicked down the road

14:26:09  14  as far as him signing it, and he kept -- like I said nine,

14:26:12  15  there were nine different versions with Jim Bryer.

14:26:13  16  Q.   Okay.  So the consideration that Gibraltar provided to NSS

14:26:21  17  for signing the termination notice agreement was a credit on

14:26:26  18  royalties that were due under a license agreement that was

14:26:31  19  never signed, correct?

14:26:33  20  A.   Correct.

14:26:34  21  Q.   Okay.  So let's talk about the four products.  The top

14:26:43  22  two, can we just refer to those as the vertical lift barriers,

14:26:47  23  the 24-foot and the 50-foot?

14:26:49  24  A.   Right.  I never understood why you called those two

14:26:52  25  different ones when the wedge has two different ones as well.

W. NEUSCH – CROSS

14:26:56  1  But yes.

14:26:57  2  Q.   Well, there's -- let's talk about what these designations

14:27:01  3  are.   There's M50.

14:27:06  4  A.   Are you asking me what M50 means?

14:27:08  5  Q.   Well, I'm going to tell you, and you tell me if I'm right.

14:27:12  6  How about that?

14:27:13  7  A.   Okay.

14:27:13  8  Q.   M50, that's a medium-sized truck.   This is a crash test

14:27:15  9  certification, correct?   This is a crash test with a

14:27:17  10  medium-sized truck traveling at approximately 50 miles per

14:27:22  11  hour, correct?

14:27:22  12  A.   Yeah.   That's ASTM designation.   "M" stands for

14:27:28  13  medium-duty truck, 15,000 pounds.   "50" is the speed, 50 miles

14:27:33  14  per hour.

14:27:33  15  Q.   Okay.   And in order to get your vertical lift barrier

14:27:37  16  crash test certified under this designation, it's when a

14:27:40  17  medium-sized truck traveling at approximately 50 miles per hour

14:27:45  18  hits it, and "P1" means after that hit it penetrates a little

14:27:51  19  less than 3.3 feet.   Correct?

14:27:53  20  A.   The front leading edge of the bed can't penetrate more

14:27:57  21  than that 3.3 feet.

14:27:58  22  Q.   Okay.   And that's a 24-foot, correct?

14:28:02  23  A.   Correct.

14:28:02  24  Q.   And that's a photograph of it, correct?

14:28:14  25  A.   Yes, sir.

14:28:14  1  Q.   And tell us -- tell me if I got this correct.  This is a

14:28:24  2  gate, right, that you can lift up and down, vertical lift?  Is

14:28:28  3  that what that refers to?

14:28:30  4  A.   It's a vertical lift barrier.  As I mentioned before,

14:28:34  5  there's a Patriot.  If you look at it, it looks just like

14:28:36  6  that -- two hydraulic cylinders on top, two buttresses.  They

14:28:41  7  use a beam in between.  We used our -- when we applied our

14:28:44  8  patent, we used our patented cable system to arrest the

14:28:47  9  vehicle.

14:28:48  10  Q.   Okay.  And different from a fence that would cover, say, a

14:28:50  11  perimeter, this is designed as a gate to open and close to

14:28:54  12  allow vehicles to pass or not pass, correct?

14:28:56  13  A.   Correct.  It's an active vehicle barrier.  You know,

14:29:01  14  Stephen mentioned his technology to that was the actuation of

14:29:09  15  it.  Well, it's two hydraulic cylinders.  There's nothing

14:29:15  16  proprietary about two hydraulic cylinders.  Same on the wedge.

14:29:19  17  We tested it with a hydraulic cylinder.  There's absolutely

14:29:19  18  nothing proprietary about a hydraulic cylinder.  So that was

14:29:23  19  his testimony of his part of the invention earlier today.

14:29:27  20  Q.   I appreciate all that, but I don't think I asked you a

14:29:31  21  question about that.

14:29:31  22  A.   I'm sorry.  You're correct.  I'll refrain.  Sorry.

14:29:35  23  Q.   All right.  So this is 24 feet P1.  A truck can hit it at

14:29:40  24  50 miles per hour, and it will only penetrate about 3 feet,

14:29:45  25  right, when it passes this certification?

14:29:47  1  A.    Correct.

14:29:47  2  Q.    And this is the 50-foot, correct?

14:29:52  3  A.    Correct.

14:29:53  4  Q.    Twice as wide.  Do you see it's not a P1 certification.

14:29:58  5  This is P2, right?

14:30:00  6  A.    Correct.

14:30:00  7  Q.    And that means when a 50-mile-per-hour truck hits it, it

14:30:04  8  can penetrate up to about 20 feet and still pass the

14:30:08  9  certification?

14:30:09  10  A.    Seven meters.

14:30:10  11  Q.    Right.  And it makes sense, doesn't it, because it's twice

14:30:14  12  as wide of a gate?

14:30:15  13  A.    Correct.

14:30:15  14  Q.    So you're going to get further penetration with the same

14:30:17  15  truck hitting it, right?

14:30:18  16  A.    Correct.

14:30:19  17  Q.    Okay.  This is the next product.  This is the finger wedge

14:30:27  18  barrier, correct?

14:30:28  19  A.    Correct.

14:30:28  20  Q.    And this is a barrier -- this is like a gate, right?  You

14:30:32  21  want to stop a vehicle from entering a certain --

14:30:37  22  A.    It's an active roadway vehicle barrier.

14:30:40  23  Q.    Okay.  And the barrier lifts up and has these little

14:30:44  24  fingers here, right?  That's what you refer to as the fingers

14:30:47  25  of the finger wedge, right?

14:30:49  1  A.   Well, you're pointing at the cables.  The fingers are

14:30:52  2  actually on top.

14:30:53  3  Q.   Well, I can try to point to the backside.

14:30:56  4  Okay.  Understood.

14:31:03  5       And this is a crash fence, correct?

14:31:05  6  A.   Correct.

14:31:06  7  Q.   So unlike the others that are made to block a truck from

14:31:09  8  entering a certain roadway, this can be like a perimeter fence,

14:31:14  9  right?

14:31:14  10  A.   Correct.  A passive perimeter barrier.

14:31:17  11  Q.   Okay.  And this -- this is a 50-mile-per-hour truck --

14:31:22  12  this certification would be a 50-mile-per-hour truck hitting

14:31:26  13  this fence and penetrating less than about 20 feet in order to

14:31:29  14  pass the certification, right?

14:31:31  15  A.   Correct.

14:31:31  16  Q.   Okay.  So now that we've kind of got the products

14:31:43  17  straight, I want to go back and talk about the vertical lift

14:31:46  18  barriers.  We're going to talk about both at the same time, the

14:31:51  19  24-foot and the 50-foot.

14:31:56  20       I want you to turn to Defendants' Exhibit 13.

14:32:16  21  A.   I didn't hear the number.

14:32:17  22  Q.   Defendant's Exhibit 13 in the notebook in front of you.

14:32:21  23  A.   Thirteen.  Okay.

14:32:25  24  Q.   And I'm going to put up a highlighted version here on the

14:32:28  25  screen to direct you to the particular portions I'm talking

14:32:31    1    about, but you can refer -- you can refer to your notebook so

14:32:34    2    you have it closer in front of you or the screen, whichever you

14:32:38    3    prefer.

14:32:38    4    A.    It would be easier here.  So I'm here.

14:32:41    5    Q.    Yeah.  Let me know when you're there.

14:32:43    6    A.    I'm here.

14:32:44    7    Q.    And you want to turn to page 3.  There's very --

14:32:51    8    A.    The same as on the screen.

14:32:52    9    Q.    You're on page 3?

14:32:54   10    A.    Yes.

14:32:55   11    Q.    Okay.  So this is Plaintiffs' response to Defendants'

14:32:57   12    interrogatories.  It's dated July 15th, 2016, and I want you to

14:33:02   13    look at number one here.  And this -- this answer to number one

14:33:06   14    says, "Plaintiffs sold and conveyed to Betafence the

14:33:11   15    cable-based products and transferred their intellectual

14:33:13   16    property covering the vertical lift barriers to Betafence in

14:33:19   17    March 2015."  That's not correct, is it?

14:33:23   18    A.    Yeah.  That is a mistake because they did not get the

14:33:26   19    cable restraint barrier.

14:33:32   20    Q.    So let's turn --

14:33:34   21    A.    I don't ever remember testifying to that because I've been

14:33:37   22    aware of that the whole time.

14:33:39   23    Q.    It's just a mistake in the response, isn't it?

14:33:42   24    A.    It's a mistake.  Let me read it so I can verify.

14:33:45   25    Q.    I think it's just a mistake, but let me know.

14:33:48   1   A.   Transfer the intellectual property, well that patent

14:34:01   2   covers the vertical lift barrier.  So it's not a mistake.  This

14:34:05   3   is saying the intellectual property that I transferred to Beta

14:34:11   4   does cover the vertical lift barrier because the vertical lift

14:34:15   5   barrier's patent is a continuation of the '433 patent.

14:34:19   6   Q.   Okay.  So in this preliminary injunction proceeding, your

14:34:26   7   family of companies, the Gibraltar family of companies as

14:34:28   8   plaintiffs, is requesting that this Court enter an injunction

14:34:33   9   to stop NSS or any other of the defendants from selling the

14:34:38   10  vertical lift barriers, correct?

14:34:40   11  A.   Correct.

14:34:40   12  Q.   But you've sold away the patent rights to someone who is

14:34:44   13  not a plaintiff in this case who has not filed any patent

14:34:51   14  infringement claims, correct?

14:34:56   15  A.   Okay.  Those products still belong to me.  I gave the

14:35:01   16  patent to them, but the products themselves are still mine for

14:35:07   17  my exclusive rights to sell.  Okay.  So you're a patent

14:35:14   18  attorney, if I understand right.  You understand you don't have

14:35:17   19  to own the patent to be able to sell the product.

14:35:23   20  Q.   Do you have -- when you sold the patent -- when Gibraltar

14:35:27   21  sold the patent you're referring to, what you're referring to

14:35:32   22  as covering these vertical lift barriers --

14:35:34   23  A.   I sold them --

14:35:35   24  Q.   Let me finish my question.

14:35:37   25  A.   Okay.

14:35:37  1  Q.   -- did Gibraltar get a license back?  And you said

14:35:41  2  exclusive rights.  Did you get an exclusive license back from

14:35:44  3  Betaface?

14:35:46  4  A.   We specifically addressed I was keeping those products.

14:35:52  5  So it is -- they bought -- you're acting like the only thing

14:35:57  6  they bought was a patent.  They bought the rights to very

14:36:01  7  clearly specified products.  We spell it out.  I kept the

14:36:05  8  rights to other products.  But when they bought the rights to

14:36:08  9  those products, I gave them the patent that went along with

14:36:11  10 that.  Well, that patent also is a continuation to this product

14:36:15  11 that I kept.

14:36:17  12         It was understood.  They don't have any issues.  I

14:36:20  13 don't have any issues.  The vertical lift barrier is my

14:36:26  14 product.  The patent that is a continuation for this product,

14:36:32  15 I -- it started with the cable fence that they -- that's what

14:36:35  16 they did purchase.  They purchased that product, and with the

14:36:39  17 product we gave them the patents.

14:36:42  18 Q.   Let me ask you to turn to page 5 in the same document and

14:37:17  19 take a look at the answer to Interrogatory Number 7.  And in

14:37:25  20 this answer the question -- the question is asking for an

14:37:31  21 explanation as to the reasons for removing vertical lift

14:37:37  22 barriers from inclusion in the asset purchase agreement between

14:37:40  23 Betaface and the Gibraltar companies.  Well, first of all,

14:37:47  24 let's set the premise.

14:37:48  25 A.   I didn't hear you.  You said, first of all, what?

14:37:50  1  Q.   Let's set the premise.  Vertical lift barriers were

14:37:54  2  removed from the sale agreement, except the patent was sold?

14:37:57  3  Is that -- were vertical lift barriers removed from the

14:38:02  4  Betafence sale?

14:38:03  5  A.   Yes.  Originally in one of the drafts it was included in

14:38:09  6  that product to go to Beta.  Then I talked to Beta, and they

14:38:13  7  agreed to give it back to us, and so it's now our product.

14:38:19  8  Q.   When you say "give it back," it wasn't sold and then given

14:38:26  9  back.  It was just never sold, right?

14:38:28  10  A.   Well, we had a letter of intent.  So from the letter of

14:38:31  11  intent to execution of the final contract, there is drafts back

14:38:35  12  and forth between the two parties.  In the original draft, the

14:38:41  13  vehicle -- the vertical lift barrier was included to go to

14:38:44  14  Beta.  I talked to Beta.  They agreed to take that out so we

14:38:49  15  could keep that product.  And so in the final draft that we

14:38:53  16  signed and executed, the vertical lift did not go to Beta.  We

14:38:57  17  kept that product.

14:38:58  18  Q.   Okay.  So the answer to this interrogatory then says, "The

14:39:02  19  reason vertical lift barriers does not appear in the asset

14:39:05  20  purchase agreement is because the plaintiffs Gibraltar wanted

14:39:08  21  to maintain the right to manufacture and sell its vertical lift

14:39:12  22  barriers, and Betafence agreed."  That's the answer, correct?

14:39:18  23  A.   Correct.  That's exactly what I just explained.

14:39:19  24  Q.   Well, that's at least partially true.  Gibraltar did not

14:39:24  25  sell the vertical lift barriers to Betafence.  Isn't the real

14:39:28  1  reason why you agreed -- isn't the real reason why the vertical

14:39:31  2  lift barriers were not included in the Betafence agreement, why

14:39:35  3  they were removed from the Betafence agreement, was because you

14:39:38  4  agreed with your son Stephen Neusch that the vertical lift

14:39:42  5  barrier was his idea and design?

14:39:45  6  A.    That is not true.  Stephen came to me.  He was negotiating

14:39:48  7  a job with a vertical lift barrier.  I believe it was in

14:39:51  8  California.  I don't know.  But my recollection was, you know,

14:39:57  9  Dad, why are you giving that one to Beta?  That was my idea.

14:40:02  10  again, I explained the idea earlier.  He showed me the Patriot

14:40:07  11  product.  He said, That was my idea.  Why are you selling that

14:40:10  12  to Beta?  I said, I can ask if they don't mind.  I'm not going

14:40:16  13  to hurt my deal with Beta.  I said, I'll ask Beta and see if

14:40:21  14  they'll give it back.

14:40:22  15        But the reason -- it was cable based, and if you look

14:40:28  16  at our agreement with Beta, there is a lot of language about

14:40:31  17  whether the products are cable or not because we were in the

14:40:35  18  middle of developing a beam-based product.  So in our

14:40:39  19  noncompete with Beta, I was clarifying cable-based products

14:40:46  20  versus noncable-based.  So, originally, that was included in

14:40:51  21  there.

14:40:51  22        So when I went to Beta, I said -- you know, I

14:40:54  23  explained to them the vertical lift, and I told them we had

14:40:59  24  sold, well, three functioning and we also sold two panels, so

14:41:07  25  five variations of that barrier.  So it wasn't big in the

14:41:11  1  marketplace.  They agreed to give it back, no change in our

14:41:16  2  price or in our contract.  It was just they agreed.  No

14:41:21  3  problem.  So they gave us that product.

14:41:24  4          When I say gave it back, it was originally in the

14:41:27  5  draft that they would get that.  I got it back.  Stephen, as I

14:41:32  6  said, was negotiating on a project.  I didn't promise him I

14:41:36  7  would get it back.  I said I'll ask, and I was able to do that.

14:41:40  8  Q.   So you removed the vertical lift barriers from the draft

14:41:47  9  of the Betafence agreement after Stephen came to you and

14:41:54 10  objected and asserted it was his idea and design, correct?

14:41:58 11  A.   He definitely mentioned it was his idea.

14:42:02 12  Q.   Okay.  And you removed it from the Betafence agreement?

14:42:05 13  A.   He was negotiating on a job.  It was not just that -- he

14:42:09 14  never claimed that that was his barrier.  He hadn't claimed

14:42:12 15  that these products were his until after I found out he was

14:42:16 16  embezzling from me and everything blew up.  This all -- we've

14:42:21 17  worked for years and none of these claims about these being his

14:42:25 18  products or he has rights to him that has never come up until

14:42:29 19  basically this lawsuit started.

14:42:31 20          Well, I take it back.  The first I heard that he had

14:42:37 21  any intention of claiming rights to these products was a

14:42:41 22  threatening letter sent by your firm threatening to sue me

14:42:48 23  prior to me filing the lawsuit.  That's what instigated this --

14:42:52 24  threatening to sue me and claiming rights to those products.

14:42:55 25  That was in, I want to say, February of this year.  Prior to

14:42:59  1  that letter, he had never claimed any rights to these products.

14:43:05  2  Q.  So you agree that you removed the vertical lift barriers

14:43:08  3  from the Betafence agreement after Stephen objected and

14:43:12  4  asserted that it was his idea and design.

14:43:17  5       But let's cut to the chase.  You removed it --

14:43:20  6  A.  It wasn't that it was his design.  He had input.  It was

14:43:24  7  his idea to do it.  It was his idea to -- Dad, there's a

14:43:30  8  Patriot barrier in the marketplace.  Let's make a competing

14:43:33  9  product.  Okay?  That was his input.  It was, you know, a

14:43:40  10  weekend.  I mean, if you just look at the two products, you put

14:43:43  11  them up side by side, you know, that's his input, was copy the

14:43:49  12  Patriot.  That's -- you know, I did it with cables using our

14:43:54  13  patented technology.

14:43:54  14  Q.  Let's just cut to the chase.  You know that it's Stephen's

14:43:58  15  view of what went on when he objected and you removed the

14:44:01  16  vertical lift barriers from the Betafence agreement was to

14:44:04  17  preserve Stephen Neusch, NSS, and BSP's rights to the product.

14:44:12  18  A.  I'm under oath before God.  I never envisioned that he

14:44:18  19  thought he owned that product and could make that product

14:44:21  20  without me.  It was so that I could sell him that product in

14:44:26  21  the future, not that he could go manufacture it himself.

14:44:31  22  Q.  Well, let me have you take a look at Defendants'

14:44:39  23  Exhibit 25, and let's see -- let's see what you had to say.

14:44:53  24  First confirm for me, Defendants' Exhibit 25 you have it in

14:44:56  25  front of you.  That's your letter to Stephen, correct?

W. NEUSCH – CROSS

14:44:59  1  A.   Yes.

14:45:00  2  Q.   And in this letter to your son Stephen, the highlighted

14:45:07  3  portion, you said, "The vertical lift barrier was your idea and

14:45:11  4  design."  And you even ask, "What do you think I owe you for

14:45:15  5  the vertical lift?"  That's your statement, correct?

14:45:20  6  A.   Correct.  This is in response to a letter he sent.  So if

14:45:24  7  you put this in context, he was claiming that that was his

14:45:31  8  idea, his design.  I wasn't trying to argue with him and, you

14:45:34  9  know, cut hairs.  So, you know, and to be honest with you, at

14:45:40  10  that time and up until just recently, I had forgotten all about

14:45:45  11  the Patriot barrier.  It was brought to my attention the design

14:45:49  12  was based around the Patriot barrier.  I looked at it and then

14:45:54  13  I remember there it is.  If you pull up the Patriot barrier,

14:45:59  14  it's identical.  Look.  It's the same barrier.  That didn't

14:46:04  15  come to my attention until just recently, and that refreshed my

14:46:07  16  memory of his input into the design.

14:46:10  17         So this was in response to a letter where he was

14:46:15  18  expressing hurt feelings and he specifically brought up in

14:46:22  19  that, you know, the vertical lift barrier.  And this is my

14:46:30  20  response to that.

14:46:33  21  Q.   Let me ask you to turn to Defendants' Exhibit 26.

14:46:37  22  A.   Just to clarify, this letter and the letter he wrote

14:46:40  23  previous to this was in a meeting --

14:46:43  24  Q.   I don't have a question for you on that letter.

14:46:45  25  A.   -- with my brother who is a pastor trying to reconcile the

| | | |
|---|---|---|
| 14:46:48 | 1 | parties. |
| 14:46:50 | 2 | Q.   Okay.  I appreciate it, but let me ask the questions and |
| 14:46:52 | 3 | you can give the answers. |
| 14:46:53 | 4 | A.   I was trying to explain the context of the letter. |
| 14:46:56 | 5 | Q.   I understand.  Let me ask you to turn to Defendants' |
| 14:46:59 | 6 | Exhibit 26. |
| 14:47:01 | 7 | A.   Yes, sir. |
| 14:47:14 | 8 | Q.   So this is -- this is the draft.  This is the letter of |
| 14:47:17 | 9 | intent, correct?  If you talk about the structure -- |
| 14:47:19 | 10 | A.   No. |
| 14:47:20 | 11 | Q.   Hold on. |
| 14:47:21 | 12 |      If you talk about the structure of how the Betafence |
| 14:47:24 | 13 | sale agreement came about, you first started out with a letter |
| 14:47:28 | 14 | of intent and then you ended up -- eventually ended up with a |
| 14:47:31 | 15 | final executed Betafence sale agreement, correct? |
| 14:47:35 | 16 | A.   Correct. |
| 14:47:35 | 17 | Q.   And in this letter of intent, the vertical lift barrier |
| 14:47:39 | 18 | was included, correct?  I'll show you where it is.  This is the |
| 14:47:51 | 19 | January 26th, 2015 letter of intent.  The date is at page 5. |
| 14:47:56 | 20 | And then let's turn to page 7.  And there's two places in here |
| 14:48:03 | 21 | I want to direct your attention to that talk about the vertical |
| 14:48:06 | 22 | lift barriers.  The first is at page 7 where there's |
| 14:48:11 | 23 | definitions of what Gibraltar's business is that you're |
| 14:48:14 | 24 | proposing to sell to Betafence. |
| 14:48:18 | 25 |      And it says, "Gibraltar business means the commercial |

14:48:20  1  activities of the seller relating to cable-based anti-ram crash

14:48:24  2  fence product, including ..."  And it's got two categories,

14:48:37  3  cable-based gates and cable-based vertical lift barriers.

14:48:38  4  Correct?

14:48:38  5  A.   And it goes on.

14:48:39  6  Q.   Well, associated things relating to those two.

14:48:42  7  A.   Right.

14:48:42  8  Q.   But these are the two categories of things you're selling,

14:48:46  9  right?

14:48:47  10  A.   Well, there's three categories.  There's the fence,

14:48:50  11  there's the gates, and the vertical lift barrier.

14:49:08  12  Q.   Well, it says the fence products including cable-based

14:49:09  13  gates and cable-based vertical lift barriers.

14:49:09  14  A.   Fence products as the M50 P2, that's the passive

14:49:12  15  perimeter.  And then we go to the active.  But yeah.  I'm not

14:49:16  16  trying to argue.  I'm just clarifying.

14:49:18  17  Q.   Minor point, right.  I agree.  So then let's turn to

14:49:22  18  page 12.  And this is -- there's 15 products total listed.  On

14:49:30  19  your page you can see all 15.  But what's shown on the screen

14:49:34  20  is, in particular, 14.  That's the vertical lift barrier,

14:49:37  21  correct?  It's one out of 15 products specifically called out

14:49:42  22  in this letter of intent, correct?

14:49:44  23  A.   Correct.

14:49:44  24  Q.   So I'm going to tell you the next three exhibits I'm going

14:49:58  25  to work through so we can speed this up.  I'm going to look at

14:49:59   1    Defendants' Exhibit 28, 29, and 30.  And this is the

14:50:04   2    correspondence going back and forth leading to the removal of

14:50:08   3    the vertical lift barriers.  So during the time period between

14:50:13   4    the January 26th, 2015 signing of the letter of intent and the

14:50:16   5    March 13th, 2015 sale, you worked with Betafence to remove the

14:50:22   6    lift barriers from the sale, correct?

14:50:25   7    A.   Correct.  I made a request, and they agreed.

14:50:28   8    Q.   Well, the request started with Stephen, didn't it?

14:50:34   9    A.   Stephen came to me, and then I made a request to Beta.

14:50:54  10    Q.   NSS, correct?

14:50:55  11    A.   Correct.

14:50:55  12    Q.   In fact, we're going to look at one that's exactly the

14:50:58  13    same day.  So this first one we're looking at is Defendants'

14:51:01  14    Exhibit 28, and this is -- tell me if I've got this right.

14:51:09  15    This is Jim Bryer at your office sending an e-mail on

14:51:12  16    February 4th, 2015 -- remember that date -- to Ramon Tico --

14:51:18  17    you can tell me if I pronounce that correct, Ramon at

14:51:21  18    Betafence -- copying you and stating that you, Mr. Neusch,

14:51:27  19    wanted to set a time for discussing NSS, the vertical lift

14:51:32  20    barrier, and the attached document, correct?

14:51:39  21    A.   I'm sorry.  You made a lot of statements.  Are you just

14:51:43  22    asking if that's the basis of this letter?  Yes.  I would say

14:51:46  23    that's correct.

14:51:46  24    Q.   So let's look at the attached document.

14:51:50  25                What is the attached document that you want to talk

14:51:56  1   to Betaface about?  You can look on the next page.  It's a

14:52:03  2   Department of Defense list of certifications for anti-ram

14:52:08  3   vehicle barriers, correct?

14:52:09  4   A.   Correct.

14:52:10  5   Q.   And next page is the page of certifications the page --

14:52:14  6   page 5 of 12 of certifications.  And this shows the

14:52:19  7   certifications for NSS for the vertical lift barriers, correct?

14:52:24  8   A.   Correct.

14:52:25  9   Q.   And then the last page is the NSS certification for the

14:52:35  10  24-foot vertical lift barrier, correct?  Well, not the last

14:52:38  11  page.  It's the second to the last.  Do you see that?

14:52:42  12  A.   Are you talking about page 9.  Page 9 before that?

14:52:55  13          THE COURT:  I think he's talking about the one that

14:52:57  14  is numbered 9.  In my copy of the exhibit the page that's

14:53:03  15  numbered 9 says data sheet one, test vehicle information.

14:53:09  16  Q.   (BY MR. ROGERS) I think the exhibits must be out of order.

14:53:11  17  If you look at Bates number in the lower right-hand corner, it

14:53:15  18  should go --

14:53:15  19  A.   When it's up there, I can find it.  I've got it.

14:53:18  20  Q.   Okay.  So just to make sure we're literally on the same

14:53:21  21  page, Bates Number Gibraltar 151 --

14:53:31  22  A.   This is the report that NSS had KARCO change.

14:53:37  23  Q.   You mean Gibraltar's employee had KARCO change?

14:53:42  24  A.   Well, that employee was paid by me, but I think I saw him

14:53:47  25  twice.  He worked out of Stephen's office under Stephen's

14:53:51  1  direction by our agreement.  So he was directed by Stephen, and

14:53:54  2  he also was doing business for NSS.  I never directed him to

14:53:58  3  have these reports changed, didn't know anything about it.

14:54:24  4  Q.    That's the same day Gibraltar sent the notice of

14:54:26  5  termination to NSS, correct?

14:54:28  6  A.    I'm sorry.  What document are you looking at now?

14:54:32  7  Q.    Well, I'm referring to the document we just got done with.

14:54:36  8  It was a February 4th, 2015 e-mail.  And I'm asking, you

14:54:41  9  recognize, I think you already did testify, that you understand

14:54:44  10  that was the same day that the notice of termination was sent

14:54:47  11  from Gibraltar to NSS?

14:54:49  12  A.    I'm taking your word for it.  I don't have either of those

14:54:53  13  documents in front of me.  The last one you had me looking at

14:54:56  14  was a cert letter.  I don't dispute that.  I just don't have

14:55:00  15  them in front of me.

14:55:01  16  Q.    Does that refresh your memory?

14:55:05  17  A.    That is February 4th, 2013.

14:55:07  18  Q.    2015?

14:55:09  19  A.    I'm sorry.  '15.  It's blurry on this computer screen.

14:55:13  20  Q.    So the next exhibit, let's look -- moving forward in time.

14:55:20  21  Defendant's Exhibit 29, a couple of weeks later.  Now we're on

14:55:28  22  February 23rd, 2015.  This is after you sent the notice of

14:55:33  23  termination and actually got this signed agreement back on the

14:55:38  24  termination notice from NSS.  And this e-mail here, it's

14:55:54  25  Betafence, Ramon, Ramon Tico, an e-mail to Jim Bryer at your

14:55:58   1  office, copying you, and referring to items that came out of a

14:56:02   2  conference call we had over the weekend, including vertical

14:56:05   3  lift barrier taken out of the deal.

14:56:07   4          That was your -- he's referring to your weekend

14:56:10   5  telephone conference, correct?

14:56:12   6  A.   Yes, sir.

14:56:13   7  Q.   And, finally, in this list, Defendants' Exhibit 30, are

14:56:27   8  you there?

14:56:30   9  A.   I'm sorry?

14:56:33   10  Q.   You got it?

14:56:34   11  A.   What exhibit are you in now?

14:56:35   12  Q.   Defendant's Exhibit 30.  You've got it in your notebook in

14:56:38   13  front of you and you can see it on your screen.

14:56:41   14  A.   I just didn't hear the 30.

14:56:43   15  Q.   The highlighted particular portions, this is Jim Bryer at

14:56:46   16  your office sending an e-mail on March 5th, 2015 to

14:56:50   17  Charlotte Callens at Betafence, copying you, and stating that

14:56:53   18  "The vertical lift barriers from the letter of intent should be

14:56:56   19  removed from the sale document per Bill's discussion with

14:57:02   20  Ramon."

14:57:02   21          So you remember that?  You had a conversation then

14:57:04   22  with Ramon at Betafence and you-all agreed to remove the

14:57:08   23  vertical lift barriers, correct?

14:57:10   24  A.   Yes, sir.

14:57:10   25  Q.   So let's look at Defendants' Exhibit 16.  This is the

W. NEUSCH - CROSS

| | | |
|---|---|---|
| 14:57:31 | 1 | final signed version of the Betafence agreement. |
| 14:57:33 | 2 | A.    Sorry.  Exhibit what? |
| 14:57:37 | 3 | Q.    Sixteen.  Let me know when you're there. |
| 14:58:00 | 4 | A.    I'm sorry.  Is there a question on the table? |
| 14:58:02 | 5 | Q.    Yes.  Let me know when you're there, when you're at the |
| 14:58:05 | 6 | exhibit. |
| 14:58:05 | 7 | A.    Okay.  I'm here. |
| 14:58:06 | 8 | Q.    Okay.  Let me ask you to turn to page 1 in this document. |
| 14:58:15 | 9 | It's actually the third page in.  And this is where we see how |
| 14:58:28 | 10 | the vertical lift barriers were removed. |
| 14:58:30 | 11 |         You've got this definition of the seller's business. |
| 14:58:34 | 12 | This harkens back to the letter of intent and the way it was |
| 14:58:36 | 13 | defined.  And this time the seller's business is defined to |
| 14:58:40 | 14 | relate to cable-based anti-ram crash fence products, just like |
| 14:58:43 | 15 | before, including cable-based gates.  But it takes out vertical |
| 14:58:47 | 16 | lift barriers, correct? |
| 14:58:49 | 17 | A.    Are you asking if it specifically addresses vertical lift |
| 14:58:56 | 18 | barriers? |
| 14:58:56 | 19 | Q.    I'm asking you to confirm that vertical lift barriers was |
| 14:59:00 | 20 | removed from this agreement, and this was one of the ways it |
| 14:59:03 | 21 | was removed.  It was taken out of the definition of the |
| 14:59:05 | 22 | seller's business? |
| 14:59:05 | 23 | A.    It was definitely removed from this agreement.  I can |
| 14:59:09 | 24 | testify to that.  And it's not in that paragraph.  Correct. |
| 14:59:15 | 25 | Q.    And then the other way it was removed is in the list of |

W. NEUSCH – CROSS

14:59:22  1  products.  Just like that e-mail that we saw before, the

14:59:28  2  15 products now is turned into 14.

14:59:31  3  A.  Can you tell me what page you're looking at?

14:59:35  4  Q.  It doesn't have a page number on it.  It's schedule C

14:59:37  5  products.  But the fastest way to get there is to look at the

14:59:40  6  Bates numbers in the lower right-hand corner and look for Bates

14:59:44  7  Number 12422.

15:00:02  8  A.  I'm there.

15:00:03  9  Q.  So during this same time period that you were working with

15:00:09  10  Betaface to remove the vertical lift barriers from the sale,

15:00:13  11  you sent the termination notice to NSS on February 4th, 2015,

15:00:17  12  correct?

15:00:17  13  A.  Correct.

15:00:18  14  Q.  And you attached that termination notice as an exhibit to

15:00:21  15  the sales agreement.  Do you remember that?  I'll show it to

15:00:29  16  you.  If you can move forward to --

15:00:30  17  A.  I would assume so.

15:00:32  18  Q.  -- Bates Number 12426.

15:00:34  19           THE COURT:  One of you talk at a time.  Don't

15:00:36  20  interrupt him.  And, Mr. Rogers, don't you interrupt him.

15:00:39  21           MR. ROGERS:  Yes, sir.

15:00:43  22           THE COURT:  Now, restate your question because I

15:00:44  23  didn't get it.

15:00:45  24  Q.  (BY MR. ROGERS) Okay.  You attached the termination notice

15:00:50  25  as an exhibit to the sales agreement at schedule 3.12.1,

W. NEUSCH - CROSS

| | | |
|---|---|---|
| 15:00:56 | 1 | correct? |
| 15:00:57 | 2 | A.   Yes.  I'm not seeing that because you didn't tell me where |
| 15:01:00 | 3 | to go, but I agree. |
| 15:01:02 | 4 | Q.   Okay. |
| 15:01:02 | 5 | A.   There it is on the screen. |
| 15:01:04 | 6 | Q.   If you want to see it in front of you -- |
| 15:01:06 | 7 | A.   No.  That's fine. |
| 15:01:07 | 8 | Q.   -- it's 12426. |
| 15:01:11 | 9 | And you've not only attached this as an exhibit, you |
| 15:01:14 | 10 | referenced it in the agreement itself.  Let's take a look at |
| 15:01:21 | 11 | that and you can look at page 12401.  Let me know when you're |
| 15:01:39 | 12 | there. |
| 15:01:39 | 13 | A.   I see it. |
| 15:01:40 | 14 | Q.   So you've referenced this termination -- this NSS |
| 15:01:46 | 15 | termination in the Betafence agreement.  Then you assigned it. |
| 15:01:54 | 16 | A.   I didn't hear the last. |
| 15:01:55 | 17 | Q.   You assigned -- you assigned this contractual agreement -- |
| 15:01:59 | 18 | Gibraltar assigned this contractual agreement to Betafence. |
| 15:02:04 | 19 | Let me ask it a different way.  I'm going to read the language |
| 15:02:09 | 20 | from section 3.12.4, and you tell me whether I read it |
| 15:02:13 | 21 | correctly.  It's from the last line of page 15, Bates Numbers |
| 15:02:19 | 22 | Gibraltar 12401 and it goes to 12402 across the page. |
| 15:02:28 | 23 | And this says, "NSS has willingly assented to the NSS |
| 15:02:33 | 24 | termination notice and thereby expressly waived all claims to |
| 15:02:39 | 25 | right in the products, the benefit of which waiver shall accrue |

W. NEUSCH – CROSS

15:02:44   1   to the buyer" -- that's Betafence -- "at the agreement date" --

15:02:50   2   that's March of 2015 -- "and which rights to enforce shall be

15:02:54   3   the responsibility of the buyer after the agreement date."

15:02:57   4          Did I read that correctly?

15:03:01   5   A.   Are you -- you're in paragraph 3.12.2?

15:03:06   6   Q.   3.12.4.

15:03:09   7   A.   Okay.  Yes.  This says, "NSS or other persons has not

15:03:22   8   challenged the valid lawful termination of the past NSS

15:03:25   9   arrangement and has not threatened to do so.  Specifically, NSS

15:03:30   10   has willingly assented to the NSS termination notice and

15:03:36   11   thereby expressly waived all claims to rights in the products,

15:03:42   12   the benefit of which waiver shall accrue to the buyer at the

15:03:48   13   agreement date and which rights to enforce shall be responsible

15:03:51   14   of the buyer after the agreement date."

15:03:54   15   Q.   And I'll agree that you read that correctly.

15:04:03   16          Now, it makes sense that Gibraltar would assign all

15:04:06   17   of its rights to enforce the termination notice agreement to

15:04:08   18   Betafence because the only products that were contemplated by

15:04:16   19   NSS's waiver of rights in that agreement was to sell products

15:04:19   20   that was the Gibraltar cable-based products sold to Betafence,

15:04:22   21   correct?

15:04:23   22   A.   You're going to have to ask that question again.

15:04:31   23   Q.   It makes sense, doesn't it, that Gibraltar would assign

15:04:35   24   all of its rights to enforce the termination notice to

15:04:37   25   Betafence because the only products that were contemplated by

15:04:40  1  NSS's waiver of rights to sell products was the Gibraltar

15:04:44  2  cable-based products sold to Betafence?

15:04:48  3  A.   I would have to get my attorneys to analyze a whole

15:04:52  4  contract to come to a legal conclusion.  The intent was it was

15:04:56  5  just related to the products that Beta was purchasing on their

15:05:03  6  side.  The termination agreement applies to us on the products

15:05:07  7  that I retained and applies to Beta on the products they

15:05:11  8  retained.  It terminated his agreement to any rights to

15:05:14  9  Gibraltar products.  Beta's interest obviously is only in the

15:05:18  10  products they're purchasing.

15:05:20  11  Q.   Isn't it true that you -- you told your son Stephen Neusch

15:05:24  12  before he signed the termination notice for NSS that you were

15:05:29  13  removing the vertical lift barriers from the Betafence sale,

15:05:32  14  and the sole purpose of you asking him to sign the termination

15:05:36  15  notice was so that you could assure Betafence that NSS would

15:05:41  16  not continue to make and sell the Gibraltar cable-based

15:05:44  17  products that were being sold to Betafence?

15:05:48  18  A.   There was zero connection between the vertical lift

15:05:51  19  barrier and Stephen signing the termination.  In fact, I think

15:05:55  20  that was all done after, if I'm not mistaken, the termination

15:06:00  21  agreement was signed.  I don't have the dates, but -- but there

15:06:05  22  wasn't a connection between those two at all.

15:06:13  23  Q.   Well, how about at least one of the connections being the

15:06:16  24  date, February 4th, 2015, the same day that you sent a

15:06:25  25  termination notice to NSS?  That same day you're asking for --

15:06:35  1  for Betafence to set aside some time to talk about NSS and the

15:06:40  2  vertical lift barriers.

15:06:41  3  A.  Uh-huh.  But he signed and terminated without any

15:06:44  4  guarantee that Beta would agree to that.  I told Stephen I

15:06:49  5  would ask.  So based on those dates, my assumption -- I don't

15:06:54  6  remember the details -- was we had that conversation all at

15:06:58  7  the -- you know, at the same time.  But there was no guarantee.

15:07:02  8  I said I'll ask Beta.  If I can get it back, I'll try.  I said,

15:07:07  9  You saw the correspondence I sent them trying to make the case

15:07:10  10  that we'd like the vertical lift back.  But the vertical lift

15:07:15  11  had nothing to do with him signing the termination agreement,

15:07:18  12  if you're trying to connect those two, because there wasn't.

15:07:21  13  Q.  Oh, I'm connecting them.  It's just a coincidence it was

15:07:25  14  the same date?

15:07:26  15  A.  He terminated on February 14th.  He agreed and signed it.

15:07:34  16  We obviously discussed the termination agreement.  Jim Bryer

15:07:40  17  drafted it.  We also discussed that he'd like to keep selling

15:07:46  18  the vertical lift barrier.  So he wants me to make that so he

15:07:52  19  can buy it from me and not have to deal with Beta.  So I got it

15:07:56  20  back from Beta.  That process started on that date, but they

15:08:01  21  didn't agree to it until later.  You have the documents showing

15:08:05  22  that.  So it wasn't tied.  There was no tying.

15:08:09  23  If you're implying that the only reason he signed the

15:08:12  24  termination agreement was so he could have the vertical lift,

15:08:17  25  there's no connection whatsoever.

15:08:20  1   Q.   Isn't it true that before Stephen Neusch -- your son

15:08:25  2   Stephen Neusch signed the termination notice agreement on

15:08:28  3   behalf of NSS, you told him that Gibraltar had removed the

15:08:36  4   vertical lift barriers from the Betafence sale and that his

15:08:39  5   signing of the termination notice would not interfere with his

15:08:43  6   continued sales of the vertical lift barrier that was his idea

15:08:47  7   and design?

15:08:48  8   A.   Absolutely not.  If you look, the dates of me asking are

15:08:56  9   after he signed the termination, and there was no guarantee

15:08:59  10  they'd do it.  I told him I would ask.  That's all I could do.

15:09:02  11  I told him I'm not going to jeopardize my deal with Beta and

15:09:06  12  I'm not going to give them consideration for it.  And they

15:09:09  13  agreed to do it with no consideration.  They took it out.  But

15:09:12  14  there was no guarantee that they would even agree to it.  And

15:09:15  15  that didn't happen until after that.  And your whole

15:09:18  16  conversation that you portrayed did not happen, not even in

15:09:23  17  theory or principle or in general.

15:09:26  18  Q.   Let me ask you to continue looking at Defendants'

15:09:33  19  Exhibit 16, and take a look at --

15:09:36  20  A.   Did you say one-five?

15:09:38  21  Q.   Sixteen.  One-six.

15:09:39  22  A.   Okay.

15:09:40  23  Q.   And I'll direct you.  Since it's internal in the document,

15:09:44  24  look at the Bates number pages again, 12423.

15:09:51  25  A.   I'm sorry twelve-thousand what?

W. NEUSCH - CROSS

15:09:53  1  Q.    12423.

15:10:03  2  A.    I apologize for having such a hard time hearing.  I

15:10:10  3  literally am hard of hearing.  A doctor can verify.

15:10:16  4  Q.    I'm trying to speak into the microphone, but I stray away

15:10:19  5  every once in a while.  So I understand completely.

15:10:24  6  A.    I lost track.  Say what the page number is.

15:10:26  7  Q.    12423 -- it's schedule 2.2.1, the transfer of patent

15:10:34  8  assets.

15:10:35  9  A.    I have it.

15:10:36  10  Q.    All right.  In the Betafence sale agreement, the

15:10:43  11  transferred assets -- the transferred patent assets are one

15:10:47  12  patent in two applications, correct?

15:10:51  13  A.    Correct.

15:10:51  14  Q.    And you testified earlier that all four of these products

15:11:11  15  are covered by patents, correct?

15:11:13  16  A.    Correct.  Well, patent pendings.  There are some that have

15:11:22  17  already been granted.  We have a patent on the fence.  On the

15:11:25  18  cable restraint barrier, there's some that they've accepted,

15:11:28  19  but it's still pending.  And then the wedge is pending.

15:11:32  20  Q.    The wedge -- the wedge patent application, we'll talk

15:11:39  21  about that in a minute, that's pending.  And that's still owned

15:11:42  22  by Gibraltar, correct?

15:11:43  23  A.    Correct.

15:11:44  24  Q.    It's Neusch Innovations LP, correct?

15:11:48  25  A.    Neusch Innovations.

W. NEUSCH - CROSS

154

15:11:50  1  Q.   Neusch Innovations, LP.  That's one of the Gibraltar

15:11:53  2  family of companies.  That's the company that owns the IP.

15:11:56  3  That's the company that owns the finger wedge barrier patent

15:11:59  4  application, correct?

15:12:02  5  A.   Correct.

15:12:02  6  Q.   Okay.  But the application for the patent is just an

15:12:13  7  application.  The application that you say covers the vertical

15:12:17  8  lift barriers, you sold that, right?  You sold it to Betafence?

15:12:22  9  It's right here.

15:12:25  10  A.   Yes.  The patent was -- went along with all that they

15:12:30  11  bought.  So when you say I sold it, we -- it's a continuation

15:12:34  12  of the -- of the patent on the fence.  They got the fence, so

15:12:39  13  we had to give them the continuing patent.  So they got the

15:12:42  14  patents.  It's very clear.  You just discussed where it was

15:12:46  15  taken out.  I still have the rights to the vertical lift

15:12:51  16  barrier.

15:12:52  17  Q.   But you don't have any patent that covers the vertical

15:12:56  18  lift barrier, correct?

15:12:58  19  A.   Okay.  I guess it's a technicality, yes.  Beta owns that

15:13:07  20  patent application.

15:13:09  21  Q.   The patents and patent applications sold to Betafence are

15:13:25  22  one patent listed in the top row -- well, the top rows are

15:13:32  23  headings.  The first row listing patents are patent

15:13:36  24  applications.  That's a patent, correct?  And the next two are

15:13:40  25  patent applications?

15:13:42  1   A.   Correct.

15:13:42  2   Q.   We can refer to them -- you've got the '433 patent and the

15:13:49  3   '457 application and the '916 application.  You understand

15:13:55  4   that?

15:13:55  5   A.   Correct.

15:13:55  6   Q.   And here's what you refer to them as in the Betafence

15:14:00  7   agreement.  The '457 application is for a sliding gate, and the

15:14:04  8   '916 application, it says pop-up gate.  That's the vertical

15:14:10  9   lift barrier, correct?

15:14:12  10  A.   Correct.

15:14:13  11  Q.   And what does that say there?  What does that mean where

15:14:17  12  it says specification includes pop-up gate?  What's that

15:14:21  13  referring to?

15:14:22  14  A.   Pop-up, vertical lift, cable restraint barrier are all

15:14:27  15  three terms of the same product.  It's just a different way of

15:14:30  16  describing it.

15:14:31  17  Q.   Okay.  What I'm distinguishing -- and I understand that.

15:14:35  18  I agree.  Pop-up gate, vertical lift, restraint barrier, same

15:14:38  19  thing.  We're talking about the first two disputed products

15:14:41  20  that I wanted to talk to you about.

15:14:43  21          Is this a signal -- is this a signal to Betafence

15:14:50  22  that even though we Gibraltar took the vertical lift barriers

15:14:55  23  out of the agreement, that you've still got a patent

15:14:59  24  application to Betafence that you can go after and get

15:15:02  25  exclusive rights to vertical lift barriers?

W. NEUSCH – CROSS

| | | |
|---|---|---|
| 15:15:06 | 1 | A.   I don't understand the question.  Can you repeat it? |
| 15:15:08 | 2 | Q.   What's the purpose of this statement where it says |
| 15:15:11 | 3 | "specification includes pop-up gate" when Gibraltar -- |
| 15:15:14 | 4 | A.   I believe what it means -- |
| 15:15:15 | 5 | Q.   Well, hold on. |
| 15:15:17 | 6 | -- when Gibraltar sells the '916 application to |
| 15:15:21 | 7 | Betaface, what is the purpose of telling them that the |
| 15:15:24 | 8 | specification includes pop-up gate? |
| 15:15:27 | 9 | A.   I believe what it means -- and that patent application is |
| 15:15:31 | 10 | a continuation of our existing patent that's already been |
| 15:15:35 | 11 | issued '433, the top one.  So when -- this is a new version of |
| 15:15:42 | 12 | that patent and a vertical lift barrier pop-up, but you want |
| 15:15:46 | 13 | them to be as broad as possible to cover as many possible |
| 15:15:49 | 14 | scenarios or products.  So I'm assuming the word includes, you |
| 15:15:57 | 15 | know, identifying the pop-up as a part of that patent |
| 15:16:01 | 16 | application.  And, again, that's a part of the continuation of |
| 15:16:05 | 17 | the patent that's already been issued, the '433. |
| 15:16:12 | 18 | Q.   Let's take a look at Defendants' Exhibit 14, the '916 |
| 15:16:18 | 19 | patent application. |
| 15:16:36 | 20 | A.   I'm there. |
| 15:16:37 | 21 | Q.   Did you tell Betaface at any time that you made multiple |
| 15:16:44 | 22 | attempts -- multiple attempts in this '916 application to try |
| 15:16:49 | 23 | to get claims issued on the vertical lift barrier that had been |
| 15:16:53 | 24 | repeatedly rejected to the point that you had given up and |
| 15:16:56 | 25 | withdrew all of the claims directed to a vertical lift barrier? |

W. NEUSCH - CROSS

15:16:59  1  A.    Once I design a product, I talk to my patent attorney and

15:17:03  2  tell them all the unique features.  From that point on I'm not

15:17:09  3  involved.  If there is any correspondence, it goes to

15:17:14  4  Jim Bryer.  He's our in-house counsel.  So I'm not aware of --

15:17:19  5  what you just proclaimed, I'm not aware of.  I didn't know of

15:17:26  6  any that were rejected or accepted.  I've been told that some

15:17:30  7  of the items in this patent have been accepted.  It's still

15:17:33  8  pending.  That's what I've been told.  I couldn't even tell you

15:17:36  9  what the specifics are.

15:17:38  10  Q.    Well, let's take a look at the application.  Take a look

15:17:42  11  at figure 10.  I've got it up on the screen.  You've got it in

15:17:46  12  front of you.  That's the --

15:17:49  13  A.    This has zero value, though, to Beta.  So I don't, you

15:17:55  14  know ...

15:17:56  15  Q.    Zero value to Beta?

15:18:00  16  A.    This patent application.

15:18:01  17  Q.    Okay.  I don't disagree with that.  Let's take a look at

15:18:06  18  figure 10.  That's the -- that's the sliding gate, right?  The

15:18:10  19  arrows show it.  You've got two choices on this gate, right?

15:18:14  20  You can slide it, or you can vertically lower and raise it,

15:18:19  21  correct?

15:18:22  22              THE COURT:  What is --

15:18:24  23              THE WITNESS:  Figure 10 is not a sliding gate.

15:18:26  24              THE COURT:  Pardon me.  What exhibit are you

15:18:28  25  referring to?

| | | |
|---|---|---|
| 15:18:30 | 1 | MR. ROGERS:  This is Defendants' Exhibit 14, which is |
| 15:18:33 | 2 | the '916 application that's referred to as having -- in the |
| 15:18:37 | 3 | Betafence agreement as having specification, including a pop-up |
| 15:18:46 | 4 | gate. |
| 15:18:47 | 5 | Q.   Figure 10, do you have it in front of you, Mr. Neusch? |
| 15:18:50 | 6 | A.   Yes.  I apologize.  I misspoke.  This is the sliding gate. |
| 15:18:54 | 7 | Q.   Okay.  And then go to figure 15. |
| 15:19:09 | 8 | A.   This is the vertical lift barrier. |
| 15:19:10 | 9 | Q.   There it is.  That's the vertical lift barrier.  And take |
| 15:19:21 | 10 | a look at page 4 in the specification, in particular, the |
| 15:19:25 | 11 | highlighted portions I've got. |
| 15:19:28 | 12 | A.   Can you tell me where I can find that page? |
| 15:19:30 | 13 | Q.   The Bates number, if you look at lower right-hand corner, |
| 15:19:34 | 14 | is 12445.  But the page 4 is at the top center of the page. |
| 15:19:44 | 15 | And the way to look at things in these applications -- |
| 15:19:47 | 16 | A.   I'm there. |
| 15:19:48 | 17 | Q.   -- is by paragraph number. |
| 15:19:50 | 18 | And so what I have highlighted here is just the |
| 15:19:55 | 19 | references to the vertical lift.  It's got it all over the |
| 15:19:57 | 20 | place, "vertical lift," "vertical lift."  And then paragraph 56 |
| 15:20:03 | 21 | it describes it.  But what I really want to show you is the |
| 15:20:09 | 22 | claims.  And it's on the last -- the second to the last page of |
| 15:20:15 | 23 | the document.  You've got claims in there.  There's 8, 10, 12 |
| 15:20:22 | 24 | and 17 that are claiming the vertical lift barrier. |
| 15:20:28 | 25 | A.   Okay. |

W. NEUSCH - CROSS

15:20:29  1   Q.   My next question is going to be related to the fact that

15:20:51  2   these claims are all withdrawn.  But I understand you're not

15:20:54  3   involved in the process, so you wouldn't know?

15:20:56  4   A.   On all our patents I'm not involved in the process.  Once

15:21:01  5   I turn it over to my patent attorney, I'm no longer involved.

15:21:05  6   I own over a dozen patents of different products.  Once I give

15:21:13  7   it to the attorney, I don't get involved in the specific

15:21:15  8   claims, which one is rejected or not.  So I couldn't tell you.

15:21:22  9   Q.   Well, you can you see here that the filing date is

15:21:24  10  August 16th, 2010.  I'm pointing to the front page of the

15:21:29  11  '961 [sic] application, Defendants' Exhibit 14.  And it was

15:21:33  12  published on March 17th, 2011.  So you know at this time of the

15:21:38  13  publication your patent attorney was attempting to get claims

15:21:42  14  issued on the vertical lift barrier.

15:21:46  15       So my question is:  At any time between the August

15:21:49  16  16th filing of this '961 [sic] application when you filed those

15:21:54  17  claims seeking to get patent coverage on the vertical lift

15:21:59  18  barrier and eventually up to the time when I'll assure you

15:22:03  19  they've all been withdrawn -- all of these claims have been

15:22:07  20  withdrawn after being rejected -- at any time did you ever tell

15:22:11  21  the patent office that the vertical lift barrier was your son

15:22:13  22  Stephen Neusch's idea and design.

15:22:16  23  A.   I never talked to the patent office.

15:22:20  24  Q.   Did you ever tell Betafence that the vertical lift barrier

15:22:24  25  was your son Stephen Neusch's idea and design?

15:22:27  1  A.   I've never told anybody that it's Stephen Neusch's because

15:22:30  2  it's not.

15:22:31  3  Q.   Did you tell Betafence that the vertical lift barrier was

15:22:34  4  being removed from the sale from Gibraltar to Betafence because

15:22:37  5  it was your son Stephen Neusch's idea and design?

15:22:42  6  A.   I did not.

15:22:51  7      Let me -- I want to make sure I'm accurate there.  I

15:22:53  8  just realized you said, because it was his idea.  I may have

15:22:57  9  used those words --

15:22:58 10  Q.   I don't have a pending question.

15:23:00 11      THE COURT:  I'm going to let him finish.

15:23:04 12  Q.   (BY MR. ROGERS) Okay.  Go ahead.

15:23:05 13  A.   I just want to be accurate.  Your last statement I said I

15:23:10 14  did not.  I've said all along Stephen came to me with the idea

15:23:13 15  of the vertical lift.  I may have related that to Beta.  I did

15:23:17 16  not in any way imply that Stephen had any right to the vertical

15:23:21 17  lift barrier.

15:23:27 18  Q.   So you took the vertical lift barrier out of the sale to

15:23:31 19  Betafence for Gibraltar, not for NSS?

15:23:38 20  A.   We've discussed this.  Because he came to me, we had a

15:23:41 21  discussion, I said I'll try.  I was successful.  Never was it

15:23:48 22  discussed that he owned it or had rights to it.  The plan going

15:23:53 23  forward would be, if he sold one, I would manufacture it for

15:23:57 24  him.

15:24:10 25  Q.   Did you tell him that if he signed that notice of

W. NEUSCH – CROSS

| | | |
|---|---|---|
| 15:24:14 | 1 | termination, that that gave you -- your family of companies the |
| 15:24:21 | 2 | right to get an injunction against him from selling this |
| 15:24:25 | 3 | vertical lift barrier? |
| 15:24:26 | 4 | A.   I never dreamed in my wildest expectations that he would |
| 15:24:29 | 5 | claim rights to any of my products. |
| 15:24:32 | 6 | Q.   So I want to shift now and talk about the finger wedge |
| 15:25:04 | 7 | barrier.  All right? |
| 15:25:05 | 8 | THE COURT:  Well, I think before we shift, this is as |
| 15:25:07 | 9 | good a breaking point for the afternoon recess as any.  We'll |
| 15:25:10 | 10 | be in recess for 15 minutes. |
| 15:25:12 | 11 | (Recess) |
| 15:42:01 | 12 | (Open Court) |
| 15:42:01 | 13 | THE COURT:  Mr. Rogers, you may continue. |
| 15:42:04 | 14 | MR. TAYLOR:  Judge are we still planning on arguing |
| 15:42:06 | 15 | this today, because that was my -- |
| 15:42:08 | 16 | THE COURT:  You know, there was a time when we were |
| 15:42:10 | 17 | planning on two hours to the side. |
| 15:42:15 | 18 | MR. TAYLOR:  Yes. |
| 15:42:15 | 19 | THE COURT:  No.  We are not going to argue it today. |
| 15:42:17 | 20 | I want to get all of the evidence in this record as quickly as |
| 15:42:20 | 21 | we can.  Then we will talk about when we're going to argue it. |
| 15:42:26 | 22 | But I want adequate time for you-all to argue the case, and |
| 15:42:32 | 23 | we're not going to have it unless we terminate the evidence |
| 15:42:35 | 24 | right now.  So I would like to get the rest of the evidence |
| 15:42:39 | 25 | done, and then we'll talk about how much time you need to argue |

W. NEUSCH - CROSS

15:42:42  1   it and then we'll schedule argument.  You may proceed.

15:42:51  2   Q.    (BY MR. ROGERS) Good afternoon, Mr. Neusch.

15:42:51  3   A.    Good afternoon.

15:42:52  4   Q.    I want to shift and talk about -- we're shifting away from

15:42:56  5   the vertical lift barriers and now moving to the finger wedge

15:43:00  6   barrier.  And I'm going to have you take a look at Defendants'

15:43:03  7   Exhibit 167, which is the finger wedge patent application you

15:43:09  8   referred to before.

15:43:14  9         Oh, but first -- I'm sorry.  Let me ask you first to

15:43:16  10  turn to Defendants' Exhibit 25, the same one we looked at

15:43:22  11  before, your letter.  Let me know when you're there.

15:43:32  12  A.    I'm here.

15:43:32  13  Q.    So in your letter to your son Stephen Neusch, we've

15:43:36  14  already talked about your reference to the vertical lift

15:43:43  15  barrier as his idea and design.  But in the next sentence you

15:43:46  16  address the finger wedge barrier and you say -- you're talking

15:43:50  17  to Stephen -- "Yes, you had good ideas on the wedge, but I

15:43:55  18  didn't use your detailed drawings even though it bothered you."

15:44:00  19  And then you even ask, "What do you think I owe you for the

15:44:04  20  wedge?"  Is that correct?

15:44:06  21  A.    Correct.  On both those he owes me over $10 million.  So

15:44:13  22  if he felt like he had some value, okay, what is it?  Like a

15:44:18  23  100,000? 200,000?  I'll write it off the 10 million you owe me

15:44:22  24  and we can put this to bed.  It was just a way of trying to a

15:44:33  25  move forward.

W. NEUSCH - CROSS

15:44:33  1  Q.   What are the drawings you're referring to as the detailed

15:44:41  2  drawings that you didn't use?

15:44:43  3  A.   Yes.  Stephen did drawings of a finger wedge, and then I

15:44:49  4  took those drawings and did not use them.  I gave those

15:44:54  5  drawings to my patent attorney.  He said that none of our

15:44:58  6  patents have -- anything in his drawings have nothing to do

15:45:04  7  with our patent claims.  But I didn't use his drawings.  Mine's

15:45:09  8  very different than his.

15:45:10  9  Q.   But you gave them to your patent attorney to use?

15:45:13  10  A.   After this -- I don't know when it was.  Within the last.

15:45:20  11           THE COURT:  Stop.  Stop.  I didn't hear you.

15:45:23  12           MR. CONNOR:  I'm going to object.  This question is

15:45:24  13  calling for a disclosure of attorney-client communication

15:45:28  14  between Mr. Neusch and his patent attorney.  I would like to

15:45:31  15  caution the witness in that regard, Your Honor.

15:45:33  16           THE COURT:  All right.  Caution the witness.  Have

15:45:36  17  you already cautioned him, or do you want to caution him?

15:45:39  18           MR. CONNOR:  I think the message got across,

15:45:41  19  Your Honor.

15:45:42  20           MR. ROGERS:  I'm not asking for any communications.

15:45:45  21           THE COURT:  Go ahead.

15:45:45  22  Q.   (BY MR. ROGERS) My question is:  Did you give those

15:45:46  23  drawings -- you did.  You gave those drawings, Stephen

15:45:50  24  Neusch's -- your son Stephen Neusch's detailed drawings on his

15:45:54  25  good ideas -- is that what you said? -- good ideas on the

W. NEUSCH - CROSS

| | | |
|---|---|---|
| 15:45:58 | 1 | finger wedge.  You gave that to your patent attorney? |
| 15:46:03 | 2 | A.   To -- because of this dispute, and I wanted to make sure |
| 15:46:07 | 3 | that we didn't use any of his ideas in what we filed for a |
| 15:46:13 | 4 | patent.  He assured us that none of Stephen's drawings violate |
| 15:46:18 | 5 | my patent.  I'm sorry.  I didn't listen to you. |
| 15:46:36 | 6 | Q.   So now let me ask you to turn to Defendants' Exhibit 17, |
| 15:46:43 | 7 | and we'll refer to this as the '678 application.  It's what |
| 15:46:48 | 8 | you've referred to, I believe, as the finger wedge patent |
| 15:46:50 | 9 | application; is that correct? |
| 15:47:00 | 10 | A.   I am there now, so what's the question?  Excuse me. |
| 15:47:03 | 11 | Q.   This is your application for the finger wedge patent, |
| 15:47:12 | 12 | correct? |
| 15:47:13 | 13 | A.   Yes, sir. |
| 15:47:13 | 14 | Q.   I want you to look in the patent -- I want you to look at |
| 15:47:52 | 15 | a few specific areas.  The first one I want you to look at is |
| 15:47:55 | 16 | page 2.  If you're going by Bates numbers, it's |
| 15:47:58 | 17 | Gibraltar 12382.  There's a number 2 at the top, so it's |
| 15:48:04 | 18 | page 2 -- |
| 15:48:05 | 19 | A.   I'm there. |
| 15:48:06 | 20 | Q.   -- of the application publication. |
| 15:48:08 | 21 | And look at the part that I've got with the arrow |
| 15:48:11 | 22 | drawn. |
| 15:48:20 | 23 | A.   Yes. |
| 15:48:20 | 24 | Q.   That's referring to element three.  It's called a support |
| 15:48:23 | 25 | member or a finger member.  Couple of different places you can |

W. NEUSCH – CROSS

| | | |
|---|---|---|
| 15:48:42 | 1 | see in the drawing from the side view, figure 4, item 30. |
| 15:48:50 | 2 | A.   Yes. |
| 15:48:50 | 3 | Q.   Now, you say you didn't use Stephen's ideas when you filed |
| 15:48:54 | 4 | this patent application, correct? |
| 15:48:58 | 5 | A.   I said that none of his ideas we filed for a patent on. |
| 15:49:03 | 6 | We did have some ideas.  I've testified -- not today, but I |
| 15:49:06 | 7 | testified earlier I used some of those ideas.  It's nothing |
| 15:49:10 | 8 | related to what we filed for a patent. |
| 15:49:12 | 9 | Q.   Okay.  So let's look at the ideas -- Stephen's ideas that |
| 15:49:15 | 10 | you filed for a patent application on? |
| 15:49:17 | 11 | A.   I just said I did not use Stephen's ideas to file a patent |
| 15:49:22 | 12 | on. |
| 15:49:23 | 13 | Q.   Okay.  Let's look at some areas where your son |
| 15:49:27 | 14 | Stephen Neusch asserts that you filed a patent application on. |
| 15:49:30 | 15 | And, in particular, paragraph 21. |
| 15:49:35 | 16 | A.   Okay. |
| 15:49:36 | 17 | Q.   What I'm pointing to here where you specifically say that |
| 15:49:40 | 18 | the finger members, the fingers in the finger wedge barrier, |
| 15:49:44 | 19 | are I-beam structures.  That's an idea that your son |
| 15:49:49 | 20 | Stephen Neusch gave to you, correct? |
| 15:49:51 | 21 | A.   Correct.  The use of the I-beam -- it's actually a W-beam, |
| 15:49:59 | 22 | but I know what he means.  But the use of that was Stephen's |
| 15:50:04 | 23 | idea.  That's a structural member. |
| 15:50:07 | 24 | Q.   There's a difference between a W-beam and an I-beam, isn't |
| 15:50:12 | 25 | there? |

W. NEUSCH – CROSS

15:50:12  1   A.   It's the same shape.  The W stands for wide, so the top of

15:50:20  2   the "I" is wider, but it's basically the same shape.  Some

15:50:22  3   people call it an H-beam.

15:50:23  4   Q.   But the significance of it is the distinction between an

15:50:28  5   I-beam or W-beam, whatever you want to call it, and what was

15:50:31  6   prior.  Tubes were used prior, correct?

15:50:34  7   A.   I'd never done a wedge barrier prior to this.

15:50:37  8   Q.   Precisely.  And Stephen Neusch provided to you the

15:50:45  9   significant -- the idea -- the significant benefit of using the

15:50:49  10  I-beams because of their benefits and the strength-to-weight

15:50:53  11  ratio.  Do you remember that?

15:50:54  12  A.   I do remember that.

15:50:55  13  Q.   And then --

15:50:56  14  A.   And I do remember that suggestion.  I don't ...

15:51:01  15  Q.   And then you put that into your patent application where

15:51:05  16  you're named as the sole inventor on the application, correct?

15:51:09  17  A.   I haven't read this application, but I'd be shocked if

15:51:12  18  he's filing for a patent on using an I-beam.

15:51:18  19  Q.   The front page of this patent has you listed as the only

15:51:23  20  inventor, correct?

15:51:23  21  A.   That is correct.

15:51:24  22  Q.   Your son's nowhere in this patent application, is he?

15:51:28  23  A.   That is correct.

15:51:29  24  Q.   This is all your invention in here, right?  That's what

15:51:33  25  you told the patent office?

15:51:34  1   A.    That is correct.

15:51:35  2   Q.    Same page, page 2, Bates Number 12382, the part where I

15:51:57  3   have -- the part where I have as asterisk.  Let's talk about

15:52:09  4   element 44.  That's compartment 44.  That's where the drive

15:52:13  5   mechanism is located.  Your patent application with you named

15:52:17  6   as the sole inventor talks about how important the location of

15:52:20  7   that is, the location being on the asset side of the barrier.

15:52:25  8          Can you tell the Court the difference between the

15:52:27  9   asset side and the threat side of the wedge barrier and the

15:52:33  10  distinction?

15:52:33  11  A.    Uh-huh.  The threat side would be the side that the

15:52:37  12  vehicle is coming from.  The asset side is the side that you're

15:52:41  13  trying to protect.

15:52:42  14  Q.    And so in your patent application with you listed as the

15:52:47  15  sole inventor, in this paragraph 23, it talks about the

15:52:53  16  location of the drive mechanism 36 provides protection to the

15:52:58  17  mechanism, for example, from explosives when the wedge barrier

15:53:04  18  is in the deployed position.  It's critical under your patent

15:53:10  19  application and what you're claiming here is your invention --

15:53:14  20  A.    Correct.

15:53:14  21  Q.    -- to put this compartment that has the components in it

15:53:18  22  on the asset side of the barrier.

15:53:21  23          That's Stephen Neusch's idea that he gave to you,

15:53:24  24  isn't it?

15:53:25  25  A.    I do not recall that he gave me that.  I believe -- well,

15:53:34  1   I know that that was discussed post-invention, post-having a

15:53:40  2   wedge barrier, as a very valuable element.  I don't recall

15:53:48  3   Stephen originating that idea.  You know, if he can show me

15:53:55  4   some paperwork or something, I just don't recall.  I very

15:54:00  5   specifically remember one of the reasons I put it in the back

15:54:05  6   was so I had room for it because there wasn't room in the

15:54:08  7   fingers.

15:54:13  8          And then we also put -- which was Stephen's idea, we

15:54:17  9   put concrete between the fingers.  That was Stephen's idea.

15:54:21  10  That's what I recall.  But because of that, because of the

15:54:25  11  concrete, the only room we had in front of the -- on the attack

15:54:31  12  side was just in the fingers themselves and there wasn't room

15:54:34  13  to put actuation.  I'm going by memory.  This was six years,

15:54:39  14  seven years ago.  But I believe it was actually my idea that

15:54:44  15  put it in the back because I had to run to actuate it.  Later

15:54:48  16  we saw that as a -- as a plus -- you know, as in lots of

15:54:53  17  inventions you realize, hey, there's actually other benefits to

15:54:56  18  this product -- being that now, once it's in the open position,

15:55:02  19  it wasn't vulnerable to attack.

15:55:05  20         I know that was discussed.  I know that was part of

15:55:07  21  Stephen's sales when he sold the barrier in the marketplace.  I

15:55:11  22  honestly don't think that was his idea during the design.  I

15:55:16  23  believe that was me trying to find a place to actually fit the

15:55:19  24  actuation.  It had nothing -- that element at the time I was

15:55:24  25  looking at it, you know, it was -- it was benefit that we

W. NEUSCH - CROSS

| | | |
|---|---|---|
| 15:55:28 | 1 | created.  But I believe the reality was, if you look at the |
| 15:55:35 | 2 | actuator, there is no way you can get it underneath the wedge. |
| 15:55:38 | 3 | It's a 12-inch foundation.  It's a shallow foundation. |
| 15:55:43 | 4 | The I-beams that you refer to and the six-by-six |
| 15:55:47 | 5 | tubing across the top is six inches deep, so that leaves a |
| 15:55:51 | 6 | six-inch-by-six-inch space that's actually used in the cables. |
| 15:55:55 | 7 | There is no place to put the actuation. |
| 15:55:58 | 8 | Q.   And so since it was your idea instead of your son |
| 15:56:03 | 9 | Stephen's, that why you put it in your patent application with |
| 15:56:06 | 10 | you listed as the sole named inventor? |
| 15:56:09 | 11 | A.   I just said it was my idea to put it back there, I |
| 15:56:12 | 12 | believe. |
| 15:56:12 | 13 | Q.   Do you remember testifying something different in your |
| 15:56:14 | 14 | deposition? |
| 15:56:15 | 15 | A.   I don't recall that. |
| 15:56:16 | 16 | Q.   Well, let me read to you from your deposition, and I'm |
| 15:56:24 | 17 | reading from page 34, lines 8 through 13. |
| 15:56:38 | 18 | MR. ROGERS:  Your Honor, this deposition transcript |
| 15:56:40 | 19 | is not in the exhibit list. |
| 15:56:42 | 20 | THE COURT:  All right. |
| 15:56:42 | 21 | MR. ROGERS:  So I'm passing up a copy. |
| 15:56:46 | 22 | Q.   So the question in the deposition starting at line 8: |
| 15:56:51 | 23 | "And did Stephen design the location" -- |
| 15:56:52 | 24 | THE COURT:  What page? |
| 15:56:54 | 25 | MR. ROGERS:  I'm sorry? |

| | | |
|---|---|---|
| 15:56:55 | 1 | THE COURT:  What page? |
| 15:56:56 | 2 | MR. ROGERS:  Page -- page 34, lines 8 through 13. |
| 15:57:11 | 3 | THE COURT:  You know, you keep showing me these |
| 15:57:13 | 4 | appendixes that Mr. Reynolds attaches to his report and these |
| 15:57:18 | 5 | depositions that are four to a page, and you're going to have a |
| 15:57:23 | 6 | younger judge try your next case.  It's getting harder and |
| 15:57:25 | 7 | harder to read.  No.  I got it here. |
| 15:57:28 | 8 | MR. ROGERS:  I have to wear glasses and use the |
| 15:57:32 | 9 | magnifying glass. |
| 15:57:33 | 10 | THE COURT:  I generally have to take mine off to |
| 15:57:35 | 11 | read. |
| 15:57:36 | 12 | MR. ROGERS:  It's a struggle because we're trying to |
| 15:57:38 | 13 | save trees, but I understand. |
| 15:57:46 | 14 | Q.  "QUESTION:  And did Stephen design the location of the |
| 15:57:48 | 15 | motor -- the electric motor?" |
| 15:57:50 | 16 | Your answer:  "He may have.  When I spoke with the |
| 15:57:53 | 17 | general, that may be.  That may have been his idea to put it in |
| 15:57:58 | 18 | that box behind the barrier.  Again, we did not file a patent |
| 15:58:02 | 19 | on that." |
| 15:58:04 | 20 | Well, you did file a patent on that. |
| 15:58:07 | 21 | A.  Okay. |
| 15:58:07 | 22 | Q.  And it was Stephen's idea, wasn't it? |
| 15:58:10 | 23 | A.  I don't recall that being -- the box being a part of that |
| 15:58:18 | 24 | patent.  But, again, that was -- I turned it over to my patent |
| 15:58:23 | 25 | attorney, so ... |

W. NEUSCH – CROSS

15:58:24 1  Q.   Earlier when we were talking about the box, the
15:58:31 2  location -- the important location, as you put in your patent
15:58:35 3  application to have it on the asset side, you started talking
15:58:38 4  about the concrete.  You agree that's another one of Stephen's
15:58:44 5  ideas, to put concrete between the fingers.  But you didn't
15:58:47 6  patent that, right?
15:58:49 7  A.   That was Stephen's idea.  I've already proven there might
15:58:54 8  be some things in the patent I'm not aware of.  So ...
15:58:57 9  Q.   Well, we're going to see it.  Stephen talked to you --
15:59:01 10 isn't it true -- isn't it true that when Stephen gave you the
15:59:04 11 idea to put the concrete between the fingers, he talked to you
15:59:08 12 about the significant benefit of it, the purpose of it, to
15:59:11 13 allow for heavier vehicle traffic over the wedge barrier when
15:59:15 14 the wedge barrier is in the down location.  Do you recall that?
15:59:20 15 A.   I've said from beginning it was Stephen's idea to put
15:59:24 16 concrete in the wedge.  He brought me RSSI's finger wedge.  In
15:59:31 17 fact, his drawings copied RSSI's finger wedge.  Stephen moved
15:59:37 18 the plate back a little bit, but it was very similar to the
15:59:40 19 RSSI.  You know, so that was the basis of the -- the idea of
15:59:51 20 the finger wedge was not unique to Stephen.  Again, we have a
15:59:54 21 competitor that has a finger wedge.  We had their design.
15:59:58 22 Stephen brought that to me.  I do remember it was his idea to
16:00:02 23 put concrete, you know, in the wedge, but I don't recall the
16:00:15 24 discussion specifics to its values and points.  It was many
16:00:22 25 years ago.

| | | |
|---|---|---|
| 16:00:23 | 1 | Q.    Okay.  Well, there it is.  Take a look at figure 2. |
| 16:00:31 | 2 | That's your concrete in between the finger wedges, correct? |
| 16:00:35 | 3 | A.    Correct. |
| 16:00:35 | 4 | Q.    Take a look at page 3.  It's 12383, page 3 of the patent |
| 16:01:00 | 5 | application, the part I have highlighted.  Twelve-inch depth |
| 16:01:07 | 6 | that you put in your patent application, that's another of |
| 16:01:10 | 7 | Stephen Neusch's ideas, isn't it, that he gave to you? |
| 16:01:14 | 8 | A.    Okay.  Your -- that is a huge general shallow foundation. |
| 16:01:24 | 9 | My shallow foundation bollard is a 12-inch foundation, my post |
| 16:01:30 | 10 | and beam is a 12-inch foundation, my wedge is a 12-inch |
| 16:01:35 | 11 | foundation.  That's just a shallow foundation because of |
| 16:01:38 | 12 | utilities. |
| 16:01:40 | 13 |         None -- you know, there's others that make shallow |
| 16:01:44 | 14 | foundations.  That's not unique to Stephen.  That has nothing |
| 16:01:47 | 15 | to do with -- now, we're the first ones to -- with a 12-inch |
| 16:01:55 | 16 | deep only pass.  So we may have made a claim to that.  But the |
| 16:02:00 | 17 | idea of doing a shallow foundation is not new.  It was my |
| 16:02:04 | 18 | technology that actually made it work in that shallow of a |
| 16:02:08 | 19 | foundation.  So that was very unique, and very -- nobody has |
| 16:02:14 | 20 | that shallow of a foundation in the industry.  I have the |
| 16:02:18 | 21 | shallowest wedge barrier foundation in the industry. |
| 16:02:20 | 22 | Q.    And you want to get a patent on that, right?  It's so |
| 16:02:24 | 23 | important? |
| 16:02:24 | 24 | A.    What? |
| 16:02:24 | 25 | Q.    You want to get patent on that, right?  It's so important? |

16:02:28  1  A.   Again, I don't want to get into the actual claims of the

16:02:31  2  patent.

16:02:34  3  Q.   All right.  So you didn't use Stephen Neusch's detailed

16:02:41  4  drawings, but you've got in your patent application --

16:02:44  5  A.   Can I?

16:02:45  6  Q.   -- his --

16:02:46  7  A.   Finish.

16:02:47  8  Q.   -- finger member being made of an I-beam with the benefits

16:02:51  9  of strength-to-weight ratio, correct?

16:02:54  10  A.   I'd like to clarify something.  I wanted to let you finish

16:03:00  11  talking.  I don't think I used the word detailed drawings.  He

16:03:03  12  gave me conceptual drawing.  There's no details.  There's no

16:03:09  13  weld details.  There's no fabrication details.  He gave me a

16:03:12  14  one-page conceptual drawing.

16:03:14  15  Q.   So you didn't use the conceptual drawings that your son

16:03:35  16  Stephen Neusch gave to you, but you did include in your patent

16:03:39  17  application specifically the finger members being shaped as an

16:03:42  18  I-beam for the benefits of strength-to-weight ratio, correct?

16:03:47  19  A.   You showed me where it said I-beam.  I didn't read what

16:03:52  20  the purpose of that I-beam was in there for.

16:03:55  21  Q.   You know what the purpose is, correct?  I-beams provide

16:03:58  22  stronger strength-to-weight ratio, which is something --

16:04:00  23  A.   Did we claim that in the patent?

16:04:02  24  Q.   -- it's very important for a finger wedge to activate

16:04:05  25  quickly to be able to lift it.  The less weight, the stronger

W. NEUSCH – CROSS

16:04:08   1   the strength, the greater benefit.  Correct?

16:04:11   2   A.   Is that part of the patent claim?  Is that what you're

16:04:14   3   asking me?

16:04:15   4   Q.   No.

16:04:16   5   A.   All right.  I'm sorry.  Can you repeat the question?

16:04:19   6   Q.   You included in your patent application the disclosure of

16:04:22   7   the ideas that Stephen Neusch gave to you to form the finger

16:04:28   8   members of your finger wedge barrier as an I-beam, correct?

16:04:35   9   A.   Yes.  I've already testified that it was Stephen's idea to

16:04:38   10  use the I-beam.

16:04:39   11  Q.   And the concrete between the fingers?

16:04:46   12  A.   Yes.

16:04:47   13  Q.   And the location?

16:04:49   14         THE COURT:  I think I've got the idea.

16:04:52   15         MR. ROGERS:  Okay.

16:04:56   16  A.   The location of the box I did not agree to.

16:05:02   17  Q.   You said it may have been his idea.  You just don't

16:05:05   18  remember, right?

16:05:05   19  A.   Correct.  I told you I can't remember the details.  I

16:05:11   20  remember it based on trying to get –– as I explained earlier,

16:05:15   21  it's about fitting the actuator.  That's my recollection.

16:05:21   22  Q.   Okay.  So take a look at the front page of this patent,

16:05:24   23  Defendant's Exhibit 17, the first page.  You filed this

16:05:28   24  application on October 28th, 2015, correct?

16:05:31   25  A.   Correct.

16:05:34   1   Q.   I'm pointing at it to help speed us up.  And it's based on

16:05:39   2   a provision filed exactly one year earlier, October 28th, 2014,

16:05:43   3   correct?

16:05:43   4   A.   Correct.

16:05:43   5   Q.   You know that NSS was selling this finger wedge barrier

16:05:51   6   before that date, correct?

16:05:52   7   A.   Before the 2014 date?

16:05:58   8   Q.   Even before that.  Over a year before October 28th, 2014,

16:06:03   9   you knew that Stephen Neusch or NSS was selling this finger

16:06:08  10   wedge barrier, correct?

16:06:10  11   A.   I don't recall when they first offered it to sell.

16:06:14  12   Q.   Let's take a look at Defendants' Exhibit 20.

16:07:00  13   A.   Okay.

16:07:00  14   Q.   Let me know when you're there.

16:07:03  15   A.   Okay.

16:07:03  16   Q.   When you get to 20, go ahead and flip back to 19.  I'll go

16:07:07  17   through that real quick and move on to 20.  Let me know when

16:07:09  18   you're to DX-19.

16:07:10  19   A.   I apologize.  I was looking at this.  Can you repeat the

16:07:14  20   question?

16:07:14  21   Q.   Yes.  Please turn to Defendants' Exhibit 19.

16:07:16  22   A.   Nineteen?  Okay.

16:07:27  23   Q.   Are you familiar with this project, the U.S. Treasury,

16:07:32  24   Birmingham, Alabama, where NSS was selling the finger wedge

16:07:34  25   barrier?

16:07:36  1    A.    I know there was a U.S. Treasury in Alabama that we

16:07:42  2    provided wedge barriers on to NSS.

16:07:44  3    Q.    You know this was -- this sale was dating back as far as

16:07:47  4    July 16th of 2013?

16:07:50  5    A.    This date is January of '14 but.  Let me -- I realize I

16:07:57  6    said something wrong.  We did not provide the wedges on that

16:08:02  7    project.  Stephen had those done by Aaron Ling I believe on

16:08:08  8    that project.  I just want to correct the record.

16:08:10  9    Q.    Okay.  But you're familiar with the project?  You're

16:08:14  10   familiar with this project, aren't you?

16:08:17  11   A.    When you say "familiar with it," there's -- Stephen did

16:08:22  12   some of our wedges for this project.

16:08:25  13   Q.    And you see the date here, July 16th, 2013?

16:08:30  14   A.    I'm not seeing the 13 date.  Where are you seeing that?

16:08:35  15   Q.    Right where I'm pointing my finger.  The bottom of the

16:08:38  16   page -- bottom of the second page.

16:08:43  17   A.    I see that, yes.

16:08:44  18   Q.    So let's take a look -- let's take a look at the NSS

16:08:51  19   drawings from that project, Defendant's exhibit 20.

16:09:10  20        THE COURT:  Mr. Neusch, did I understand you to say

16:09:12  21   that Gibraltar -- no Gibraltar company had any part in the

16:09:17  22   construction at the United States Treasury in Birmingham,

16:09:23  23   Alabama, that that was done by NSS and Gibraltar was not

16:09:27  24   involved at all?

16:09:29  25        THE WITNESS:  Well, there's a royalty payment.  That

16:09:31  1  was done under our last agreement.

16:09:33  2          THE COURT:  But you weren't involved in the contract

16:09:35  3  or any of the construction?

16:09:37  4          THE WITNESS:  I never am.  I just manufacture.

16:09:40  5          THE COURT:  No, no.  I thought I understood you to

16:09:42  6  say that someone else actually did the manufacturing and that

16:09:45  7  Gibraltar wasn't even involved in the manufacturing in the

16:09:47  8  Alabama Treasury job.

16:09:49  9          THE WITNESS:  That is correct.

16:09:51  10          THE COURT:  All right.

16:09:52  11          THE WITNESS:  NSS outsourced it to Aaron Ling of Bad

16:09:55  12  Day Fabrication.

16:09:55  13          THE COURT:  So, Mr. Rogers, why do we need to spend

16:09:58  14  any more of our precious time on this job?

16:10:03  15          MR. ROGERS:  Because this job shows the detailed

16:10:05  16  drawings that he was referring to in his letter that he used in

16:10:07  17  the patent application.

16:10:08  18          THE COURT:  Well, just ask him that question instead

16:10:09  19  of going over this page and after page when he says that they

16:10:13  20  weren't involved in it.  Just ask him if he ever saw the

16:10:17  21  drawings before and did he use them.

16:10:18  22          MR. ROGERS:  I understand.

16:10:18  23          THE COURT:  We've taken way too much time to get

16:10:22  24  where I want to get today, and we're not there yet.

16:10:22  25          MR. ROGERS:  This is my last set of questions.

| 16:10:25 | 1 | Q. | Defendant's Exhibit 20, are you there? |

16:10:25  1  Q.   Defendant's Exhibit 20, are you there?

16:10:31  2  A.   Exhibit 20?

16:10:32  3  Q.   Defendant's Exhibit 20?

16:10:38  4  A.   Okay.

16:10:38  5  Q.   Take a look four pages in.  You see the drawing?

16:11:03  6  A.   Four pages in?  I'm looking at a different drawing than

16:11:07  7  you are.

16:11:07  8  Q.   Well, mine is two-sided, so it may be eight pages in.  See

16:11:11  9  if you can find that page?

16:11:12  10         THE COURT:  There's a difference between page and

16:11:14  11  sheet.  So let's make sure we're using the same language.

16:11:33  12  A.   Okay.  I believe we're on the same page, no pun intended.

16:11:37  13  Q.   I think the ninth page in.  Do you see it?  Do you see the

16:11:41  14  drawings that are up on the screen?

16:11:42  15  A.   Yes.

16:11:42  16  Q.   Do you see the date of that drawing?

16:11:44  17  A.   Do I see what?

16:11:45  18  Q.   Do you see the date of that drawing where I have it

16:11:49  19  highlighted?  It's October 28th, 2013, correct?

16:11:58  20  A.   October 28th, '13, yes.

16:12:00  21  Q.   Yes.  This NSS drawing of the finger wedge barrier dated

16:12:07  22  October 28th, 2013, is that the detailed drawing that you're

16:12:11  23  referring to in your letter to your son Stephen Neusch saying

16:12:15  24  you didn't use that drawing when you filed your patent

16:12:19  25  application on this?

16:12:20   1   A.    This is not that drawing that we were talking about

16:12:24   2   earlier.

16:12:30   3   Q.    This is the drawing from your patent application.  That's

16:12:33   4   the drawing from NSS.

16:12:37   5   A.    Okay.  You said the drawing that Stephen did.  I thought

16:12:40   6   you were referring to the one where he gave me the idea where

16:12:45   7   the concrete was in the middle and all that.  His drawing that

16:12:50   8   I did not use is not this drawing.

16:12:54   9   Q.    You said it was just a conceptual drawing, not a detailed

16:12:58   10   drawing?

16:12:58   11   A.    Correct.

16:12:59   12   Q.    But even though in your letter --

16:13:00   13   A.    That's not this drawing.  This drawing doesn't look

16:13:03   14   anything like what he gave me.

16:13:05   15   Q.    See the date on this drawing, October 28th, 2013?

16:13:13   16   A.    Yes.

16:13:13   17   Q.    You used this drawing, didn't you?  This is the detailed

16:13:17   18   drawing from your letter that you're referring to, and that's

16:13:20   19   the reason why you filed your patent application exactly one

16:13:24   20   year later, on October 28th, 2014, correct?  That's not a

16:13:32   21   coincidence in the dates, is it?

16:13:34   22   A.    This is -- this drawing -- I'm still not clear what you're

16:13:38   23   asking.  It's one year apart, yes.  You're correct.  I don't

16:13:42   24   understand the question.  This drawing here, this is my wedge

16:13:46   25   design.  This is not the drawing Stephen did.

16:13:50   1   Q.   This is your design?

16:13:51   2   A.   Yes, sir.

16:13:53   3   Q.   This is not the detailed drawing you were referring to in

16:13:57   4   your letter?

16:13:59   5   A.   Okay.  What letter and what detailed drawings?  I may be

16:14:02   6   confused.  I thought we were talking about the drawing Stephen

16:14:06   7   gave me back at the very beginning.  What letter are you

16:14:11   8   referring to?  No.  That's what I thought you were talking

16:14:16   9   about.  This absolutely is not that drawing.

16:14:18   10   Q.   And it's just a coincidence?

16:14:20   11   A.   It's not even close.  This is -- I have that drawing.  Be

16:14:24   12   glad to give it to the Court because it's nowhere close to

16:14:27   13   this.

16:14:27   14   Q.   Okay.  I appreciate your time today.

16:14:29   15           MR. ROGERS:  No further questions.

16:14:37   16           THE COURT:  Mr. Connor?

16:14:45   17                    **REDIRECT EXAMINATION**

16:14:45   18   **BY MR. CONNOR:**

16:14:45   19   Q.   Mr. Neusch, the drawings we were just looking at, are

16:14:50   20   those shop drawings or fab drawings?

16:14:55   21   A.   I just closed it.  Those are conceptual drawings.  I mean,

16:15:01   22   that's all not -- fab drawings are very specific with gussets

16:15:05   23   and every part and piece and how they weld together.  Those

16:15:09   24   aren't fab drawings, so that's a rendering of the system.

16:15:12   25   Q.   A few minutes ago you mentioned that NEU Security Services

16:15:19  1  had contracted out with Aaron Ling.

16:15:24  2  A.    Correct.

16:15:24  3  Q.    What was name of Aaron Ling's business?

16:15:28  4  A.    Bad Day Fabrication.

16:15:29  5  Q.    And did Bay Day Fabrication make some of the structural

16:15:35  6  components for wedge barriers --

16:15:38  7  A.    Yes.

16:15:38  8  Q.    -- for NEU Security Services?

16:15:40  9  A.    For that Birmingham, Alabama project, they did the

16:15:44  10  structural wedge barriers.

16:15:45  11  Q.    Okay.  And did you know that that was going on at the

16:15:48  12  time?

16:15:51  13  A.    I don't recall the timing of when I found out.  I do

16:15:55  14  remember I got upset at Stephen because we had no NDA with Bad

16:16:03  15  Day Fabrication, and then he turned around and subbed it to

16:16:06  16  somebody else and we had no NDA with them.  And as part of our

16:16:10  17  licensing agreement, I had to approve any outsourcing because I

16:16:15  18  needed to protect our intellectual property.  And so he did

16:16:19  19  that with -- he didn't follow our license agreement.  We had

16:16:22  20  that discussion, you know.  But that's I believe when I first

16:16:29  21  heard that he was fabricating those wedges.

16:16:31  22  Q.    Did Bad Day Fabrication have access to Gibraltar's

16:16:37  23  detailed shop drawings to build your design of the wedge?

16:16:42  24  A.    After the fact Stephen sued Aaron Ling on that project.

16:16:48  25  Aaron Ling blamed Gibraltar because Aaron called my guy

16:16:52  1  Curtis Turner and had to get the fabrication drawings for the

16:16:56  2  wedge for him to fabricate.  So we got blamed for giving bad

16:17:04  3  fabrication drawings for that project.

16:17:08  4  Q.    So fabrication drawings from Gibraltar were used by Bad

16:17:12  5  Day to make the wedge barriers for NEU Security Services?

16:17:15  6  A.    That's correct.

16:17:16  7  Q.    When you were discussing with Stephen Neusch the

16:17:24  8  termination agreement that you provided to him on the 4th of

16:17:30  9  February 2015 and that he returned to you signed on the 24th of

16:17:34  10  February 2015, 20 days later, at any point in time before he

16:17:40  11  signed and returned that agreement to you, did you and Stephen

16:17:44  12  Neusch discuss excluding the cable restraint barrier or pop-up

16:17:49  13  gate from the scope of the termination agreement?

16:17:52  14  A.    No.

16:17:54  15  Q.    Was Stephen Neusch involved in any of your negotiations

16:18:05  16  with Betafence?

16:18:11  17  A.    When you say "any," that's a broad term.  Stephen went

16:18:14  18  with me to meet with Beta back when we entered into the

16:18:21  19  original license agreement.  He was not involved in any of my

16:18:25  20  discussions once we sold them the rights.  Now, I know that

16:18:31  21  Beta obviously had concern with Stephen, and I know Stephen had

16:18:34  22  a meeting with Beta during that time.  But it had nothing to do

16:18:39  23  with my agreement with Beta, and I wasn't involved with that

16:18:42  24  discussion.

16:18:43  25  Q.    After the Betafence -- after the termination agreement in

| | | |
|---|---|---|
| 16:18:50 | 1 | February of 2015, were you willing -- was Gibraltar willing to |
| 16:18:55 | 2 | continue selling any -- these disputed products to NEU Security |
| 16:19:00 | 3 | Services? |
| 16:19:01 | 4 | A.   Yes. |
| 16:19:02 | 5 | Q.   It was the end of the exclusive between the companies? |
| 16:19:06 | 6 | A.   Correct. |
| 16:19:10 | 7 | MR. CONNOR:  No further questions, Your Honor. |
| 16:19:11 | 8 | THE COURT:  Mr. Rogers? |
| 16:19:12 | 9 | MR. ROGERS:  No further questions. |
| 16:19:14 | 10 | THE COURT:  All right.  You may step down. |
| 16:19:31 | 11 | MR. CONNOR:  Judge, we rest. |
| 16:19:34 | 12 | MS. GHAVIMI:  Your Honor, I call Stephen Neusch to |
| 16:19:36 | 13 | the stand. |
| 16:19:37 | 14 | THE COURT:  You may.  Mr. Neusch, you've previously |
| 16:19:47 | 15 | been sworn.  You're still under oath. |
| 16:19:57 | 16 | **STEPHEN NEUSCH,** |
| 16:19:57 | 17 | having been first duly sworn, testified as follows: |
| 16:19:57 | 18 | **DIRECT EXAMINATION** |
| 16:19:57 | 19 | **BY MS. GHAVIMI:** |
| 16:19:58 | 20 | Q.   Mr. Neusch, why would Gibraltar have possession of copies |
| 16:20:01 | 21 | of NSS files? |
| 16:20:03 | 22 | A.   Because they moved them out of the shop and into their |
| 16:20:09 | 23 | location for storage when we vacated the fabrication facility |
| 16:20:17 | 24 | that we had.  My dad didn't want to fund the excessive rent and |
| 16:20:22 | 25 | said to find a place with lower rent.  So we moved.  And |

S. NEUSCH – DIRECT

16:20:27   1   obviously on our own we couldn't pay the rent there in the

16:20:31   2   fabrication facility, so they sent trucks and employees up and

16:20:34   3   loaded up all the documents and took them to their shop.

16:20:37   4   Q.   And those documents that Gibraltar loaded up and took to

16:20:41   5   their shop would be from the time period between 2013 and the

16:20:45   6   middle of 2015; is that correct?

16:20:47   7   A.   I wasn't there.  I was actually at Fort Carson when that

16:20:51   8   happened.  But I -- that's what I've been told by accounting.

16:20:56   9   Q.   Okay.  So any old credit card receipts that would support

16:21:00   10  a credit card charge from that time period would be located in

16:21:04   11  those files?

16:21:05   12  A.   That's correct.

16:21:06   13  Q.   Okay.  And did you use a -- your personal credit card for

16:21:12   14  both work and personal expenses?

16:21:16   15  A.   Yeah.  That's correct.  You know, when he was up doing his

16:21:20   16  whole spiel about me taking all this money out and then trying

16:21:23   17  to recode it, it was ridiculous because my personal card was

16:21:29   18  the credit card that was used for business transactions and had

16:21:32   19  many business transactions, as you can see, back in 2012 and

16:21:36   20  2013 and all that.  That's how it was coded.  If it was a

16:21:38   21  personal expense, it would get coded personally.  If it was a

16:21:43   22  business expense, it would get coded to business.

16:21:46   23          And so the accounting had not reconciled my credit

16:21:49   24  card charges for last period that they'd been doing, so it was

16:21:51   25  like $120,000 worth of charges going back like six months or

S. NEUSCH – DIRECT

16:21:55  1  so, the one everybody was talking about earlier.  They had not

16:21:58  2  coded that, so there's going to be business charges in there

16:22:00  3  and there's going to be personal charges in there.

16:22:01  4      So I directed Teresa to put that in an account to be

16:22:07  5  allocated so someone would go through and allocate this to

16:22:11  6  business, whether it be a job or overhead, and this to

16:22:13  7  personal.  This whole idea that, oh, we're changing this so we

16:22:18  8  can hide money or take money is ridiculous.

16:22:21  9  Q.   But if you had credit card receipts that would support the

16:22:25  10  requests that the auditor had, you would give them to him,

16:22:29  11  wouldn't you?

16:22:30  12  A.   That's correct.

16:22:31  13  Q.   I'd like to move on to discuss BSP.

16:22:33  14  A.   Well, hold on.  As the auditor admitted, the $4,000 charge

16:22:38  15  they were talking about that was pretty recent that was coded

16:22:41  16  to expense, we did give him the backup showing where he

16:22:42  17  actually admitted more of it -- it was actually a higher dollar

16:22:46  18  amount that was business.  We only coded $4,000 of it to

16:22:50  19  business.

16:22:50  20  Q.   Okay.  Thank you.

16:22:51  21      What kind of products does BSP sell?

16:22:54  22  A.   Force protection products.

16:22:55  23  Q.   And who are BSP's customers?

16:22:59  24  A.   Primarily the federal government, both ...

16:23:03  25  Q.   Does BSP fill a niche market?

16:23:06   1   A.   Yeah.  It's the force protection, anti-terrorism market is

16:23:11   2   really niche.  It's the bollards you see outside this federal

16:23:14   3   courthouse here.  We've actually done federal courthouses,

16:23:17   4   quite a few them, like Moakley Federal Courthouse, et cetera.

16:23:20   5   And that was just force protection anti-ram products.

16:23:23   6   Q.   Because of the products that you sell, do your customers

16:23:27   7   often come to you with requests for you to make bids on

16:23:31   8   projects?

16:23:31   9   A.   Yes.  BSP, actually, most all of our business is on

16:23:37  10   request.  We don't even solicit or advertise.

16:23:41  11   Q.   Okay.  And so what's your percentage of success in

16:23:45  12   obtaining a contract from a bid?

16:23:46  13   A.   It's been very high with BSP.  Like I said, you know,

16:23:50  14   we -- we get called for specific specialty products.

16:23:54  15   Especially some of the products, some of our biggest sale

16:23:59  16   products have been the ones that aren't offered otherwise in

16:24:02  17   the industry.  We have an actual product that can fill a need

16:24:05  18   that no one else has, you know, with a certain amount of our

16:24:09  19   gates.  So we've been getting a lot of work based on that.

16:24:12  20   Q.   Okay.  So how many active projects or ongoing projects

16:24:17  21   does BSP have right now?

16:24:19  22   A.   Currently, I think we have half a dozen.

16:24:25  23   Q.   Okay.  How many projects has BSP completed since 2014 --

16:24:29  24   beginning of 2014?

16:24:30  25   A.   Well, BSP didn't start operating or doing anything until

| 16:24:35 | 1 | July of 2015.  But since it's completed, I think, three |
| 16:24:40 | 2 | projects. |
| 16:24:40 | 3 | Q.   Okay.  So do you feel that the recent terrorist attacks |
| 16:24:46 | 4 | have increased the demand for the type of products that BSP |
| 16:24:50 | 5 | sells? |
| 16:24:51 | 6 | A.   Absolutely. |
| 16:24:52 | 7 | Q.   So if you were enjoined from selling the four disputed |
| 16:24:56 | 8 | products as well as any of the -- any of the products that |
| 16:25:01 | 9 | Gibraltar claims that it owns, would BSP suffer harm? |
| 16:25:07 | 10 | A.   Well, BSP, if it couldn't sale force protection products, |
| 16:25:11 | 11 | it would be out of business. |
| 16:25:13 | 12 | Q.   If BSP -- |
| 16:25:14 | 13 | A.   So, yeah, I would say it would be harmed. |
| 16:25:16 | 14 | Q.   If BSP were not able to sell force protection products, |
| 16:25:21 | 15 | would it lose market share? |
| 16:25:22 | 16 | A.   Well, the market share has -- yeah.  It would lose that. |
| 16:25:25 | 17 | Q.   Are there a limited number of companies that sell these |
| 16:25:28 | 18 | force protection products? |
| 16:25:30 | 19 | A.   Yes.  That's why they call it a niche market.  Not very |
| 16:25:34 | 20 | many people do it.  That's why my dad is so desperate to get in |
| 16:25:38 | 21 | it and claim everything as his and take over my portion. |
| 16:25:40 | 22 | Q.   Okay.  I'd like you to turn to Defendants' Exhibit 61. |
| 16:25:46 | 23 | A.   Okay. |
| 16:26:05 | 24 | Q.   Is this a contract that BSP has entered into for the |
| 16:26:08 | 25 | sale -- sale or installation of force protection products? |

S. NEUSCH – DIRECT                                                    188

16:26:11   1   A.   Yes.

16:26:12   2   Q.   Could you read to me the amount that's listed on the first

16:26:15   3   page for the contract.

16:26:16   4   A.   $128,852.06.

16:26:20   5   Q.   Okay.  I'd like you to turn to Defendants' Exhibit 62.  Is

16:26:25   6   this another contract that BSP has entered into for the sale or

16:26:29   7   installation of force protection products?

16:26:31   8   A.   Yes.

16:26:31   9   Q.   Could you read to me the amount of the total contracts?

16:26:35  10   A.   $281,535.

16:26:38  11   Q.   Okay.  I'd like you to turn to Defendants' Exhibit 63.

16:26:44  12   A.   That was 63.  I don't have -- here it is.  Sorry.  Okay.

16:26:53  13   Q.   Is this an invoice for payment on a contract that BSP has?

16:26:59  14   A.   Yes.

16:27:00  15   Q.   Okay.  Could you read to me the amount of the original

16:27:06  16   contract sum.

16:27:07  17   A.   $392,000.

16:27:08  18   Q.   Could you turn to the next page.  Could you read to me for

16:27:15  19   what product this contract is selling and installing?

16:27:20  20   A.   This product -- this project is selling -- wait.  We're on

16:27:29  21   63?

16:27:29  22   Q.   Yes.  NSS 4834 is the bottom of the page.

16:27:33  23   A.   The restraint barrier and -- yeah.  Restraint barrier.

16:27:42  24   Q.   So I see where it says on line four M50 cable restraint

16:27:49  25   barriers, scheduled value $280,000; is that correct?

S. NEUSCH – DIRECT                                                189

16:27:53   1    A.    Yes.

16:27:54   2    Q.    Installation, the line below, about $60,000; is that

16:27:58   3    correct?

16:27:58   4    A.    Yes.

16:27:59   5    Q.    So is a typical contract for sale that BSP enters similar

16:28:06   6    to the prices of these few contracts we've just discussed?

16:28:11   7    A.    Yeah.  We have a lot of pending ones, and we've even been

16:28:15   8    promised award on more that are this amount, if not more.

16:28:18   9    Q.    Okay.  So at any one time, BSP may be involved in half a

16:28:22   10   dozen contracts, each worth around $300,000?

16:28:25   11   A.    That's correct.

16:28:26   12   Q.    So if BSP were enjoined, is bond of a million dollars

16:28:31   13   reasonable because BSP could lose one or more contracts in the

16:28:35   14   next year as a result of this injunction and being prevented

16:28:38   15   from selling products and would result in losses that would

16:28:43   16   total one or more of the total value of these contracts?

16:28:47   17   A.    I think a million dollars is low, but yeah.

16:28:49   18   Q.    Okay.  I'd like to move on to Defendants' Exhibit 65.

16:29:13   19   A.    Okay.

16:29:14   20   Q.    Is this a contract that NSS had for installation of --

16:29:23   21   sale and installation of products at a San Diego private office

16:29:31   22   building?

16:29:32   23   A.    It's FBI.  It's FBI San Diego, and it was for force

16:29:36   24   protection products.  That's correct.

16:29:38   25   Q.    Could you read to me the amount of this project --

16:29:41  1  contract?

16:29:42  2  A.    $985,000.

16:29:44  3  Q.    Okay.  Could you turn to the next page.  What products

16:29:50  4  were involved in this contract?

16:29:54  5  A.    Wedge barriers and M50 P2 fence.

16:29:57  6  Q.    Okay.  Could you turn to Exhibit 66.

16:30:05  7  A.    Okay.

16:30:06  8  Q.    Is this a contract that BSP entered into between -- I'm

16:30:11  9  sorry -- NSS for sale and installation of force protection

16:30:19  10  products at Fort Gillem, Georgia?

16:30:21  11  A.    Yeah.  It's an NSS contract where we provided the

16:30:25  12  restraint barriers and M50 P2 fence for Fort Gillem.

16:30:29  13  Q.    Could you read to me the amount of this contract.

16:30:32  14  A.    500,000 -- $514,000.

16:30:37  15  Q.    Okay.  So if NSS were enjoined from being able to sell any

16:30:45  16  one of these four products, it could potentially lose a

16:30:50  17  contract in the amount of a million dollars?

16:30:53  18  A.    That's correct.

16:30:53  19  Q.    So if NSS were enjoined from selling all four of these

16:30:57  20  products -- let me rephrase.

16:30:59  21        If NSS were enjoined from being able to manufacture,

16:31:02  22  advertise, offer for sale, or sell any of the four disputed

16:31:07  23  products, it could be harmed in an amount of greater than a

16:31:12  24  million dollars because it could potentially lose more than one

16:31:16  25  contract in any one year; is that correct?

S. NEUSCH – DIRECT

16:31:18  1   A.   That's correct.

16:31:19  2   Q.   Okay.  I just want to go through and explain something

16:31:44  3   that we have discussed before.  If you could turn to

16:31:47  4   Plaintiffs' Exhibit -- Defendants' Exhibit 35.

16:32:00  5   A.   Okay.

16:32:01  6   Q.   Is this the e-mail that you received from your father on

16:32:03  7   the morning of February 4th, 2015 that attached a soft copy of

16:32:08  8   the termination letter for you to review?

16:32:11  9   A.   This is the e-mail, yes.

16:32:13  10  Q.   What's the time of that e-mail?

16:32:16  11  A.   It is 10:54 a.m.  Well -- yes.  That Bill Neusch sent it

16:32:26  12  to me.

16:32:27  13  Q.   Okay.  Could you turn to the last page of this exhibit

16:32:31  14  where it says NSS 34 Bates number at the bottom.

16:32:35  15  A.   Yes.  It's a copy of the termination agreement that does

16:32:39  16  not have "and personally" on the bottom.

16:32:43  17  Q.   So what you're saying is underneath your -- the place for

16:32:46  18  your signature of Stephen Neusch, comma, President, NSS, the

16:32:50  19  words "and personally" are not here?

16:32:52  20  A.   No, they were not.  As I testified to earlier, the copy

16:32:55  21  they gave me for review did not have that included.

16:32:58  22  Q.   And did you have a telephone conversation with your father

16:33:01  23  after receiving this e-mail and soft copy of the termination

16:33:04  24  letter?

16:33:06  25  A.   Yeah.  We talked about it, and he even came to my office

S. NEUSCH – DIRECT

16:33:10   1   once and talked about it, too.  But we talked about it in that

16:33:14   2   conversation.  He was, like, you know, this really isn't going

16:33:17   3   to affect you because the only products they're really buying

16:33:19   4   is the M50 P1 fence and the ones that he had certifications

16:33:24   5   for.  Everything else that's engineered, it doesn't really

16:33:26   6   matter because it's engineered.  So that shouldn't hurt you in

16:33:27   7   any way.  He was trying to, I guess, soften the blow of selling

16:33:29   8   those away.  And so he explained that to me.

16:33:33   9            Also I have e-mails from Jim Bryer explaining this

16:33:36   10  was requested of me to sign by Betafence, and it's just a

16:33:39   11  one-pager to memorialize to get the sale done for Betafence.

16:33:45   12  So this was obviously Betafence's idea and creation to have me

16:33:50   13  do this termination letter so he could complete his sale and

16:33:53   14  make $8 million.

16:33:54   15  Q.   Okay.  So could you turn to Exhibit 36.

16:33:57   16  A.   Yep.  Okay.

16:33:58   17  Q.   So does this e-mail confirm your understanding that

16:34:01   18  Betafence was reviewing the termination letter?

16:34:04   19  A.   Yes.  They were the ones that were pushing the -- pushing

16:34:09   20  this one down the road.

16:34:10   21  Q.   Do you see the timing of this e-mail?

16:34:12   22  A.   Yes.  This is at 11:38 the same day, an e-mail from

16:34:17   23  Jim Bryer to Betafence regarding the termination letter.  So

16:34:20   24  they took the one they sent me to review, the soft copy that

16:34:24   25  did not have "and personally" and obviously sent it to

S. NEUSCH – DIRECT

| | | |
|---|---|---|
| 16:34:27 | 1 | Betafence. |
| 16:34:28 | 2 | Q.   And could you turn the page.  Is that a copy of the |
| 16:34:34 | 3 | termination letter? |
| 16:34:35 | 4 | A.   It is.  And there again, not with "and personally" on |
| 16:34:39 | 5 | there. |
| 16:34:39 | 6 | Q.   Okay.  If you could just turn to Exhibit 37. |
| 16:34:44 | 7 | A.   Okay. |
| 16:34:44 | 8 | Q.   And is this the copy of the e-mail that Jim Bryer sent you |
| 16:34:49 | 9 | with your father's signed copy of the termination agreement |
| 16:34:52 | 10 | asking you to sign it? |
| 16:34:54 | 11 | A.   That is correct. |
| 16:34:56 | 12 | Q.   And what's the -- what's the time of that e-mail? |
| 16:34:59 | 13 | A.   It's the same day at 4:53 p.m. |
| 16:35:03 | 14 | Q.   And could you turn over to the next page.  Is the words |
| 16:35:07 | 15 | "and personally" listed there? |
| 16:35:08 | 16 | A.   They are. |
| 16:35:09 | 17 | Q.   Okay. |
| 16:35:10 | 18 | A.   So sometime between them giving it to Betafence and |
| 16:35:14 | 19 | sneaking it back to me, they added "and personally" by |
| 16:35:18 | 20 | Betafence or at the direction of.  But this is all they |
| 16:35:20 | 21 | produced, so ... |
| 16:35:21 | 22 | Q.   Okay.  Now, you heard Mr. Reynolds state that he's |
| 16:35:38 | 23 | determined that NSS did not pay Gibraltar for the Stratcom -- |
| 16:35:44 | 24 | Stratcom materials.  Do you remember that? |
| 16:35:46 | 25 | A.   That's correct. |

S. NEUSCH – DIRECT

16:35:47  1  Q.   Okay.  Was there a payable recorded on NSS's books to

16:36:07  2  Gibraltar for the Stratcom materials?

16:36:10  3  A.   There was a payable of 300-something thousand recorded,

16:36:17  4  because the deal I had with Gibraltar was the inventory there

16:36:21  5  at their yard was mine to use at the cost that they had

16:36:25  6  recorded for the raw material plus like, I think, 10 percent

16:36:30  7  handler or it may have just been the royalty.  I don't

16:36:33  8  remember, but it was like plus 10 percent or something.

16:36:36  9        So we created -- because Gibraltar had us create the

16:36:40  10  invoice, they didn't have a record of it in their system.  We

16:36:45  11  created one.  We put it in our system for -- just so everyone

16:36:49  12  is clear, the Stratcom invoice also has product that's not

16:36:53  13  Gibraltar's.  It's got -- that wasn't owned by Gibraltar.  It

16:36:58  14  was owned by NSS and our inventory at their yard because they

16:37:02  15  let us use their yard to store our stuff and our inventory,

16:37:06  16  too.  So that is not included on the invoice that we recognize

16:37:10  17  from a Gibraltar.

16:37:11  18        And then I know there's multiple variations of the

16:37:14  19  invoice that we had in our system from Gibraltar going back and

16:37:17  20  forth trying to settle what was Gibraltar's and what was ours

16:37:21  21  and what amount should be charged.  So I know I've seen a

16:37:24  22  bunch.  But, ultimately, I know that later on Gibraltar had

16:37:28  23  their accounting in their office always reconciling, and the

16:37:31  24  drive by Jim Bryer and Bill Neusch was constantly to make sure

16:37:34  25  that the Gibraltar payables -- I mean, Gibraltar receivables

S. NEUSCH – DIRECT                                        195

16:37:38  1  match the NSS payables.  I have e-mails to it.  They've said it

16:37:42  2  100 times.  They wanted our books reconciled with each other.

16:37:46  3          They had Donna Lilley tasked with that in our office.

16:37:50  4  She made changes to our books and told our accountants what to

16:37:53  5  add and what to take away.  That's the reason you also see the

16:37:55  6  royalties that I didn't agree with in there.  But then also I

16:37:59  7  remember getting in a fight about that -- I have e-mails to

16:38:01  8  it -- but getting in a fight about the payable for Stratcom.  I

16:38:05  9  was, like, there needs to be a payable for the amount of

16:38:08  10  product that we're using of Gibraltar's in there.  They're

16:38:10  11  like, no, we don't have these in our books.  They're not in our

16:38:13  12  books.  There's no invoice for those.  Those can't be there.

16:38:17  13  That all -- that all happened, and we have the information on

16:38:19  14  that.

16:38:20  15  Q.  So what you're saying is that the credit that appeared for

16:38:28  16  the payable --

16:38:31  17  A.  -- was directed by Gibraltar because they wanted the books

16:38:34  18  to reconcile.

16:38:35  19  Q.  So --

16:38:35  20  A.  And what I'm also saying is the idea that Gibraltar didn't

16:38:38  21  receive any money for the -- the Stratcom invoice is wrong.

16:38:42  22  Gibraltar received full benefit of the $722,000 that came in.

16:38:47  23  Q.  Okay.  I'm going to ask you about that.

16:38:49  24  A.  Okay.

16:38:49  25  Q.  So if you could turn to Exhibit 55.  And turn to the

S. NEUSCH – DIRECT                                    196

16:39:05  1  second page.

16:39:09  2  A.    Okay.

16:39:10  3  Q.    Is this a printout of NSS's Wells Fargo checking account

16:39:16  4  from September 2014?

16:39:18  5  A.    Yes.  And the top highlighted one is obviously the money

16:39:21  6  that came into the Wells Fargo account from Stratcom for

16:39:24  7  $724,000.

16:39:25  8  Q.    Okay.  And did you e-mail your father and Jim Bryer a cash

16:39:30  9  flow projection that showed this money coming in?

16:39:33  10  A.    Yes.  Gibraltar was in possession of cash flow projections

16:39:40  11  and also our books that had the receivable for $724,000 shown

16:39:44  12  on it.  And they were told when it was coming in and when we

16:39:47  13  could expect it and then where the money would go from there.

16:39:50  14  Q.    And you can see that cash flow projection on NSS95 which

16:39:54  15  is a couple of pages over.

16:39:57  16  A.    Ninety-five?

16:39:57  17  Q.    In that exhibit.  So flip.

16:40:01  18  A.    Oh, Bates number.  Okay.  Yeah.

16:40:06  19  Q.    Okay.  And then the very next page NSS96, is this an

16:40:10  20  e-mail chain between you and Jim Bryer and your father where

16:40:16  21  Gibraltar is directing where -- where NSS should deposit money

16:40:22  22  and how much?

16:40:22  23  A.    That's correct.  It's an e-mail communication between me

16:40:25  24  and Jim Bryer where he's telling me amounts of money he wants

16:40:29  25  deposited and to which one of his bank accounts for the

S. NEUSCH – DIRECT

197

16:40:32  1  temporary loan.

16:40:34  2          So as I was saying before, this came in, you know,

16:40:39  3  not by itself.  There was other receivables that came in as

16:40:43  4  cash flow.  So we got the $724,000 with others that would come

16:40:45  5  up to a net amount of receivables.  We obviously at the time,

16:40:49  6  the reason Gibraltar was funding us, we had more payables than

16:40:53  7  receivables.  So it was, one, they wanted -- everything was

16:40:57  8  always they wanted their loan, their temporary loan, paid down

16:41:00  9  first because they were the most unsecured on that.  They've

16:41:03  10  had many meetings with their attorneys, plenty of paperwork

16:41:06  11  regarding this.  They wanted to make sure that Wells Fargo

16:41:10  12  couldn't step in front of their bonded receivables, and they

16:41:12  13  were constantly working to keep Wells Fargo at arm's length so

16:41:16  14  they couldn't step in front of their receivables.

16:41:18  15          So they always wanted their cash flow part paid

16:41:21  16  first.  So, as you can see, that's always been a big push of

16:41:24  17  Jim Bryer's.  And then the remaining amount of money of the

16:41:26  18  receivables that came in on that date -- not just Stratcom, but

16:41:31  19  the other ones -- we talked about which payables we wanted it

16:41:33  20  apply to.  So the money went to pay back a short-term loan from

16:41:39  21  Gibraltar and went to pay payables that Gibraltar would have

16:41:41  22  been responsible for and would have paid had we not had X

16:41:46  23  amount come in from receivables on bonded projects and bonded

16:41:49  24  payroll.

16:41:50  25  Q.   Okay.  If you can please turn to NSS 62, the Bates number.

S. NEUSCH – DIRECT                                    198

16:41:54  1   Turn over a couple of more pages.

16:41:57  2   A.    Okay.

16:41:57  3   Q.    Actually, no.  I'm sorry.  Turn to Defendants' Exhibit 56.

16:42:04  4   A.    Okay.

16:42:05  5   Q.    And I'm at NSS62.  It's the specific page.

16:42:12  6   A.    Okay.

16:42:12  7   Q.    Is this a listing of NSS's I believe it's sweep account?

16:42:21  8   A.    Yes.  So the way our bank account -- Wells Fargo set it

16:42:25  9   up, it's a theft protection thing.  So you have one bank

16:42:28 10   account that your money sits in and the one you write checks

16:42:31 11   out of.  And then it moves from the bank account that it's held

16:42:35 12   in to match the exact amount of checks being written so that

16:42:39 13   someone can't use the checking number to write a false check or

16:42:42 14   something like that or drain your bank account.  So this is

16:42:43 15   essentially the same thing.  It's just two checking account

16:42:47 16   numbers.  But this is where the money went out.  This is the

16:42:49 17   checking account where the money went out.  You can see the

16:42:51 18   detail on that.

16:42:53 19   Q.    And we're going to follow that.

16:42:54 20   A.    Okay.

16:42:55 21   Q.    So do you see underlined check number 19203 for $240,000?

16:43:01 22   A.    Come again?  What?

16:43:04 23   Q.    Look up on the screen.

16:43:05 24   A.    I'm looking right here.

16:43:06 25   Q.    Okay.  Check 19203, $240,000?

S. NEUSCH – DIRECT

| | | |
|---|---|---|
| 16:43:10 | 1 | A.   Yes.  I see it. |
| 16:43:11 | 2 | Q.   Okay.  That went out on September 5th? |
| 16:43:14 | 3 | A.   I see it. |
| 16:43:15 | 4 | Q.   Okay.  Turn to Exhibit 59 and have that in front of you. |
| 16:43:20 | 5 | A.   Okay. |
| 16:43:25 | 6 | Q.   And I believe it's on the second page.  Do you see a bill |
| 16:43:35 | 7 | payment check, Number 19203 to Foundation Fence? |
| 16:43:45 | 8 | A.   Yes. |
| 16:43:45 | 9 | Q.   Okay.  Do you see check number 19243 in the last column |
| 16:43:52 | 10 | over there? |
| 16:43:52 | 11 | A.   Yes. |
| 16:43:53 | 12 | Q.   $341,000? |
| 16:43:55 | 13 | A.   I do. |
| 16:43:55 | 14 | Q.   Okay.  Look at Exhibit 59, the first page.  Do you see a |
| 16:44:03 | 15 | check on the 17th, 19243, to Gibraltar materials? |
| 16:44:08 | 16 | A.   On which exhibit? |
| 16:44:09 | 17 | Q.   Fifty-nine. |
| 16:44:11 | 18 | A.   Yes, I do. |
| 16:44:19 | 19 | Q.   Does it say "loan from FFI"? |
| 16:44:23 | 20 | A.   Yes. |
| 16:44:24 | 21 | Q.   Okay.  Right below it do you see check number 19244 to |
| 16:44:33 | 22 | Foundation Fence, loan from FFI, for $350,000 |
| 16:44:34 | 23 | A.   Yeah.  I see them all relayed over to Foundation Fence. |
| 16:44:42 | 24 | Q.   Okay.  So all of the money that Gibraltar was directing |
| 16:44:44 | 25 | you to pay out that came in from Stratcom went to Gibraltar? |

16:44:48  1  A.    Yes.   The physical money that came in from Stratcom went

16:44:52  2  to Gibraltar and the benefit of Gibraltar -- I've said this 100

16:44:55  3  times.   Also my father and them testified I think in one of the

16:44:58  4  previous hearings that they had no idea about this money.

16:45:01  5  Well, subsequently, I also testified not only did they not know

16:45:06  6  about the money, they had a meeting -- they called their

16:45:08  7  attorneys in to have a meeting to go over all of the bonded

16:45:12  8  jobs, where in that meeting they had a copy of the actual

16:45:15  9  invoice knew about it.

16:45:16  10          And my dad's actual statement was when they talked

16:45:20  11  about, well, did you pay the materials on that job, he said no.

16:45:22  12  As you can see, it went to the cash flow of the bonded jobs.

16:45:25  13  My dad's actual comment was, Well, yeah, six of one, half a

16:45:29  14  dozen of the other, it's going to get the jobs done.   They had

16:45:32  15  known about it.   He knew about it.   He likes to hide behind

16:45:36  16  memory issues to act like he never knew about it.

16:45:38  17  Q.    Okay.   Could you turn to Exhibit 57.

16:45:41  18  A.    Yes.

16:45:42  19  Q.    Is this first page and the second page part of the request

16:45:57  20  that was sent to the government?

16:46:00  21  A.    Yeah.   That is the billing question.

16:46:02  22  Q.    Okay.

16:46:03  23  A.    And as you can --

16:46:05  24  Q.    Did you --

16:46:06  25  A.    Go ahead.

16:46:07   1   Q.   Did NSS send this to Gibraltar in mid-2015?

16:46:11   2   A.   Yeah.  It was sent to them for that meeting with his

16:46:14   3   attorneys so they could strategize about bonded money.  They

16:46:19   4   had it in their possession, so that's why I'm saying their

16:46:21   5   testimony saying they never saw it is ridiculous.

16:46:24   6   Q.   Let's look at Exhibit 60.

16:46:29   7   A.   Okay.

16:46:30   8   Q.   Is that the e-mail you're referring to with the meeting

16:46:33   9   with the attorneys?

16:46:33   10   A.   Yes.  That's the e-mail where I sent him the invoice.  As

16:46:36   11   you can see, Jim Bryer is there, Bill Neusch is there, their

16:46:40   12   attorneys are all on there.

16:46:42   13   Q.   Okay.  And attached to this e-mail, is that this request

16:46:46   14   for payment?

16:46:47   15   A.   That is correct.  That is the Stratcom bill.

16:46:50   16   Q.   And it was at this meeting that the Stratcom invoice was

16:46:55   17   discussed?

16:46:56   18   A.   Yeah.  It was at this meeting where -- because we went

16:46:59   19   through it job by job, and that's the reason they had me send

16:47:03   20   them this.  And they talked about where this bill, was it paid?

16:47:07   21   Yes.  Where did the money go?  Here's where the money went.  It

16:47:10   22   was all explained.  Were the materials paid for?  No.  The

16:47:10   23   material is still sitting at the job.  It went to the benefit

16:47:12   24   of Gibraltar paying back their loans and bonded work.  And my

16:47:17   25   dad knew that, and he was okay with it.  His exact words were

S. NEUSCH - CROSS

16:47:19   1   "that's fine" to his attorneys and everyone else.

16:47:22   2   Q.   So Gibraltar's statements now that --

16:47:24   3   A.   Now they're trying -- because they're adversarial to me

16:47:28   4   and trying to overreach and take products and put me out of

16:47:31   5   business, they're claiming everything they can as fraud or bad

16:47:34   6   misdealings and using bad memory or lies.

16:47:48   7          MS. GHAVIMI:  If I could have one moment, Your Honor.

16:48:08   8          No further questions, Your Honor.  Pass the witness.

16:48:11   9                    **CROSS-EXAMINATION**

16:48:11   10  **BY MR. CONNOR:**

16:48:12   11  Q.   You just went through a number of contracts with us, and I

16:48:16   12  think you said that they showed that Black Security products is

16:48:27   13  currently selling, has sold, has bid, and won contracts on some

16:48:32   14  of four disputed products; is that correct?

16:48:38   15  A.   Just one.  The restraint barrier, as I testified to

16:48:42   16  earlier.

16:48:42   17  Q.   So when you testified this morning that Defendants have

16:48:47   18  not manufactured or sold any of these products after February

16:48:50   19  the 4th, 2015, after the termination agreement, that's not

16:48:55   20  true, is it?

16:48:58   21  A.   No.  Read my testimony.  My exact words were there's one

16:49:01   22  project with the restraint barrier that I know that the

16:49:04   23  contract, you know, is either getting executed now or already

16:49:09   24  has been executed.  But it has one project with a restraint

16:49:13   25  barrier.  That's the same one we looked at here.  My testimony

S. NEUSCH – CROSS

16:49:16   1   is the same.

16:49:17   2   Q.   So of all those contracts you just walked us through,

16:49:20   3   there's only one that has anything to do with any of these

16:49:22   4   disputed products?

16:49:23   5   A.   For BSP.  She went through others for NSS that also have

16:49:26   6   to do with those disputed products.

16:49:26   7   Q.   So both BSP, Black Security Products, and NEU Security

16:49:29   8   Services are actively marketing, selling, bidding on contracts

16:49:35   9   and winning contracts on these disputed products right now?

16:49:39   10  A.   No.  We're waiting to see what happens with this lawsuit.

16:49:44   11  Q.   So you haven't bid on any jobs with the disputed products?

16:49:48   12  A.   Okay.  We're going back over --

16:49:49   13  Q.   Just answer my question, Mr. Neusch.

16:49:51   14  A.   I've already answered this question.  I'll answer it

16:49:53   15  again.

16:49:53   16          THE COURT:  No.  I want to hear it.  Yeah.  Give me

16:49:55   17  the answer.  Have you bid on any jobs on any of the four

16:49:58   18  disputed products?

16:50:01   19          THE WITNESS:  The restraint barrier is one of the

16:50:04   20  disputed products that we are getting a contract completed on.

16:50:09   21  But, to be technical to answer your a question, I believe that

16:50:13   22  project was bid before the 2015 February date.  So it's not in

16:50:18   23  violation of the termination agreement.  We have not bid, as

16:50:21   24  our complaint says, from the termination agreement date past

16:50:25   25  that any of those four products.

S. NEUSCH – CROSS

| | | |
|---|---|---|
| 16:50:28 | 1 | Q.  (BY MR. CONNOR) So if the Court agrees with Gibraltar and |
| 16:50:35 | 2 | says you cannot do that, you must comply with the termination |
| 16:50:39 | 3 | agreement, all that business that you talked about would be |
| 16:50:43 | 4 | unaffected.  All those contracts wouldn't make a hill-of-beans |
| 16:50:49 | 5 | difference, would it? |
| 16:50:50 | 6 | A.  Well, we have a ton of pending contracts with the |
| 16:50:53 | 7 | restraint barrier, the other ones.  Yeah.  We're waiting to see |
| 16:50:55 | 8 | what happens here in this lawsuit because they brought this |
| 16:50:58 | 9 | action against me.  I didn't bring the action against them. |
| 16:51:01 | 10 | Q.  So you've heard testimony and you've testified about the |
| 16:51:04 | 11 | license agreement that you and Gibraltar were operating under |
| 16:51:08 | 12 | until it was terminated in February of 2015? |
| 16:51:11 | 13 | A.  That's correct. |
| 16:51:12 | 14 | Q.  Okay.  And Gibraltar says it was terminated.  You've heard |
| 16:51:15 | 15 | that.  And that exterminated all license rights that you had, |
| 16:51:19 | 16 | although you and Mr. Neusch say you could still buy the |
| 16:51:23 | 17 | products.  And you've said the termination agreement, based on |
| 16:51:27 | 18 | your understanding, only related to the cable crash fence, |
| 16:51:30 | 19 | correct? |
| 16:51:31 | 20 | A.  That's correct. |
| 16:51:32 | 21 | Q.  Okay.  So are you saying that Gibraltar did not have the |
| 16:51:36 | 22 | right and still doesn't have the right to terminate your |
| 16:51:42 | 23 | license to the Gibraltar products that you were operating |
| 16:51:47 | 24 | under? |
| 16:51:48 | 25 | A.  That is correct.  The -- okay.  Rephrase the question. |

16:51:52   1   That was a very long question.  Can I get a shorter version.

16:51:56   2   I'm kind of confused.

16:51:59   3   Q.   Do you understand my question, sir?

16:52:02   4   A.   I just said I didn't.  It was very long.  I'm not

16:52:06   5   following.

16:52:06   6   Q.   Okay.  Are you -- is it your position that Gibraltar

16:52:13   7   cannot terminate the license rights that it had granted to NEU

16:52:18   8   Security Services for these other three products?

16:52:26   9   A.   Well that is what we're saying.  They didn't have sole

16:52:30  10   right to tell us we can't do anything with them.

16:52:34  11   Q.   So is that a yes?

16:52:36  12   A.   That's correct.

16:52:37  13   Q.   So right now the status quo, Mr. Neusch, is that you're

16:52:48  14   not bidding on any jobs that would -- that you would spec the

16:52:57  15   disputed products on, you're not manufacturing the disputed

16:53:01  16   products, and you're not selling them; is that correct?

16:53:03  17   A.   No.  That's not correct.  We are selling them.  We're

16:53:06  18   about to start manufacturing the restraint barrier.  As a

16:53:09  19   matter of fact, the wedge barrier Gibraltar refused to sell me

16:53:13  20   because I was going to have them fabricate the wedge barrier on

16:53:17  21   the Hawaii job.  Jim Bryer sent me an e-mail saying they no

16:53:18  22   lodger want to sell me any of that, which would be in violation

16:53:21  23   of their supposed contract.  But the -- and it got me that

16:53:24  24   contract canceled.

16:53:25  25           I have since not done anything because we've been

16:53:29 1  sideways and in this lawsuit.  He told me at the beginning of

16:53:32 2  this year that they would not provide me the finger wedge

16:53:35 3  barrier, and then we got in this lawsuit.  So I have not bid

16:53:40 4  any finger wedge barriers.

16:53:44 5  Q.   Thank you for your time, Mr. Neusch.

16:53:46 6       MR. CONNOR:  No further questions, Your Honor.

16:53:49 7                    **REDIRECT EXAMINATION**

16:53:49 8  **BY MS. GHAVIMI:**

16:53:49 9  Q.   Mr. Neusch, if BSP were enjoined from selling a cable

16:53:55 10 restraint barrier, the current contract for $392,000 where BSP

16:54:02 11 is obligated to install the cable restraint barriers, would BSP

16:54:07 12 be in breach of that contract?

16:54:09 13 A.   If BSP was told that they could not provide that barrier

16:54:16 14 on that project, yeah, we would be in breach of that contract.

16:54:19 15 Q.   Okay.  All of the contracts that we discussed regarding

16:54:24 16 NSS occurred in the past; is that correct?

16:54:26 17 A.   That's correct.

16:54:27 18 Q.   So if NSS were unable to go out and bid on projects

16:54:32 19 because it were unlawfully enjoined, it could lose out on the

16:54:37 20 value of any one contract of a million dollars; is that

16:54:42 21 correct?

16:54:42 22 A.   Yeah.  If what you're getting at is that, if they can't

16:54:46 23 sell the product, then it wouldn't be able to get the contract.

16:54:49 24 That is correct.

16:54:50 25 Q.   So right now NSS could potentially go out and bid on

16:54:54   1   projects for any one of these four products and obtain a

16:55:00   2   contract for a value of half a million dollars if it were

16:55:04   3   permitted to sell these product; is that correct?

16:55:06   4   A.   It could obtain a contract for a million dollars.

16:55:10   5   Q.   But because of the current lawsuit and the potential of

16:55:14   6   being enjoined, it's unable to do so?

16:55:17   7   A.   Well, if it gets enjoined, it won't be able to do so.

16:55:21   8   But, yeah, we're trying to figure out -- let a third party,

16:55:25   9   i.e., the Judge, decide whose product or what rights someone

16:55:30  10   has.  You know, obviously, this whole thing is kind of murky.

16:55:34  11   Q.   If BSP were enjoined from selling these four products,

16:55:37  12   would it affect its ability to sell other products and get

16:55:42  13   contracts on those other products?

16:55:43  14   A.   What was the question?

16:55:44  15   Q.   Isn't it true that many contracts require the inclusion of

16:55:52  16   at least one of these four disputed products as well as

16:55:55  17   products that are not here, and so BSP could potentially lose

16:56:00  18   out on a contract because it is unable to include one of these

16:56:04  19   four products in that bid?

16:56:06  20              MR. CONNOR:  Objection.  Leading.

16:56:07  21   A.   I understand.  I understand what your question was.

16:56:09  22              Yes.  A lot of times a contract, you know, has

16:56:12  23   multiple products.  So you would lose the entire contract if

16:56:15  24   you couldn't sell one of the multiple products.  For example,

16:56:18  25   this courthouse has bollards outside, wedge barriers, and drop

S. NEUSCH – RECROSS

| | | |
|---|---|---|
| 16:56:22 | 1 | arms.  So if the wedge barrier –– that finger wedge barrier and |
| 16:56:24 | 2 | the rest of the bollards are something I get somewhere else, I |
| 16:56:26 | 3 | would lose the entire scope of the contract, not just the |
| 16:56:29 | 4 | portion that pertains to one of these four products. |
| 16:56:31 | 5 | Q.   How many of the BSP bids that it has bid in the last year |
| 16:56:36 | 6 | have included one of these four products and products that are |
| 16:56:39 | 7 | not one of these four products? |
| 16:56:43 | 8 | A.   Well, BSP or NSS? |
| 16:56:45 | 9 | Q.   BSP. |
| 16:56:47 | 10 | A.   Well, BSP, the pricing it does for, like, a wedge barrier, |
| 16:56:54 | 11 | it just costs us a heck of lot more because we have to get the |
| 16:56:58 | 12 | wedge barrier from someone else instead of build our own, |
| 16:57:01 | 13 | right, so it costs a lot more not to be able to use those.  But |
| 16:57:05 | 14 | I don't know.  I'm not looking at our bids.  I'd have to go |
| 16:57:08 | 15 | back though and look at our sales and what our bids are. |
| 16:57:11 | 16 | MS. GHAVIMI:  No more questions. |
| 16:57:13 | 17 | THE COURT:  Mr. Connor. |
| 16:57:15 | 18 | **RECROSS–EXAMINATION** |
| 16:57:15 | 19 | **BY MR. CONNOR:** |
| 16:57:15 | 20 | Q.   You can buy those products from RSSI or Delta Scientific |
| 16:57:20 | 21 | or any other of the supplies other than Gibraltar? |
| 16:57:25 | 22 | A.   Well, to elaborate on my dad's argument that I have |
| 16:57:30 | 23 | somehow tarnished their name because I compete, he competes |
| 16:57:35 | 24 | with Delta Scientific and RSSI, and they don't like him because |
| 16:57:39 | 25 | we used to sell those products against them.  So, no, RSSI |

S. NEUSCH - RECROSS

16:57:43  1  would not sell me that product because of my relation -- or

16:57:45  2  previous relation to Gibraltar.

16:57:48  3          The same with Delta Scientific.  We also got in a

16:57:50  4  lawsuit with them because they got mad, one, because their

16:57:53  5  wedge barrier didn't work which is one of the reasons I wanted

16:57:56  6  to make my own, i.e., bringing this one to my father.  But they

16:58:00  7  won't sell me either, as he knows.  So the same argument he

16:58:02  8  makes that, aw, man, these integrators won't talk to us, good

16:58:06  9  luck.  The manufacturers won't talk to me.

16:58:08  10  Q.    Mr. Neusch, we heard testimony that NEU Security Services

16:58:12  11  is 5- or 10-million dollars in the hole today?

16:58:19  12  A.    The testimony, I believe, was that it has 5- to 10-million

16:58:23  13  dollars in payables.

16:58:24  14  Q.    In negative equity is what Mr. Reynolds said.  Do you

16:58:28  15  remember that?

16:58:28  16  A.    I could have sworn he said payables.

16:58:31  17  Q.    Is -- do you take responsibility for that?

16:58:34  18  A.    I'm the manager of NSS, so I take a lot of responsibility

16:58:39  19  for the outcome.  But, obviously, things happen with a business

16:58:43  20  that are beyond your control.  There's lawsuits.  I mean, if

16:58:46  21  you want to get into that whole story, my dad --

16:58:48  22  Q.    Are you responsible for the current financial condition of

16:58:52  23  NEU Security Services, sir?

16:58:54  24  A.    I think -- okay.  Like I was just responding to, there is

16:58:59  25  a lot of stuff that happened at NSS that is outside of my

16:59:03  1  control.  Okay?  So there is also things that I contributed.

16:59:08  2  With any business owner, there's decisions I made that I may

16:59:11  3  have made wrong.  There's decisions I made that I made

16:59:13  4  correctly.  Ultimately, do I think that I'm the reason that NSS

16:59:19  5  is this much in the hole?  No.

16:59:22  6           MR. CONNOR:  That's all, Your Honor.

16:59:29  7           MS. GHAVIMI:  Your Honor, we rest.

16:59:31  8           THE COURT:  All right.  You may step down.

16:59:36  9           All right anything further in the way of evidence

16:59:38 10  from the plaintiff?

16:59:39 11           MR. CONNOR:  No, Your Honor.  We rest.

16:59:40 12           THE COURT:  All right.  Anything further in the way

16:59:43 13  of evidence from the defendant?

16:59:44 14           MS. GHAVIMI:  No, Your Honor.

16:59:44 15           THE COURT:  All right.  Then the evidence portion is

16:59:47 16  closed on the request for temporary receivership and temporary

16:59:55 17  injunction.

16:59:55 18           Now, I'm going to want to hear you argue this in not

16:59:58 19  a general way, but in a specific way.  We're not going to do it

17:00:06 20  this afternoon.  How much time do you think you would need to

17:00:09 21  argue this phase of the case, which is only the temporary

17:00:14 22  relief?  I'll start with the plaintiff just because that's a

17:00:19 23  convenient default.

17:00:23 24           MR. TAYLOR:  Your Honor, I'd say for our side, a

17:00:25 25  total of 45 minutes, maybe 30 to open and 15 to close.

```
17:00:28   1              THE COURT:  Ms. Ghavimi?

17:00:30   2              MS. GHAVIMI:  One hour.

17:00:32   3              THE COURT:  Well, I don't have a problem with giving

17:00:40   4    you an hour to the side.  And I'm not sure it's necessary, but

17:00:48   5    in my trying to work out time, there's not a whole lot of

17:00:51   6    difference between 45 minutes to the side and an hour to the

17:00:55   7    side.  And the plaintiff can, of course, reserve part of the

17:00:59   8    plaintiff's hour to argue.

17:01:01   9              Now, here is what we've got to look at is when we're

17:01:05  10    going to do it.  I have an exciting week ahead of me.  At one

17:01:11  11    point this week I'm going to take up the question of the

17:01:15  12    regents' rules on firearms in the classroom at the University

17:01:19  13    of Texas, and I've got a lengthy argument that I hope will get

17:01:32  14    a little shorter.  So I would be, at the earliest, the end of

17:01:44  15    the week getting to argument.

17:01:49  16              What does your situation look like on Friday

17:01:52  17    afternoon?  Could you do it then?

17:01:56  18              MR. CONNOR:  Absolutely, Judge.

17:01:58  19              THE COURT:  Ms. Ghavimi?

17:02:06  20              Well, you can talk out loud.  It's all right to tell

17:02:09  21    me.

17:02:09  22              MR. ROGERS:  I can't be here Friday.  Ms. Ghavimi can

17:02:12  23    do the argument, but I'd hope you'd accommodate my schedule.

17:02:18  24              THE COURT:  Well, what is your situation on Monday?

17:02:22  25              MR. ROGERS:  That works.
```

| | | |
|---|---|---|
| 17:02:27 | 1 | THE COURT:  I can entertain you Monday afternoon. |
| 17:02:29 | 2 | Is the plaintiff also available on Monday? |
| 17:02:31 | 3 | MR. TAYLOR:  Yes, Your Honor.  We would be available. |
| 17:02:37 | 4 | THE COURT:  All right.  Let's set this to argue on |
| 17:02:40 | 5 | Monday, August the 8th at 2 o'clock.  Does that work for |
| 17:02:51 | 6 | everybody? |
| 17:02:53 | 7 | MR. ROGERS:  Yes, Your Honor. |
| 17:02:54 | 8 | THE COURT:  Now, I believe that I have adequate |
| 17:02:58 | 9 | briefing on this.  Do you-all -- are you-all satisfied with |
| 17:03:02 | 10 | your briefing that we've had previously.  If you're not, I |
| 17:03:10 | 11 | don't want additional briefing, but I will take a letter brief |
| 17:03:14 | 12 | with any additional citations you want me to look at.  But I |
| 17:03:20 | 13 | don't need written argument because I'm going to hear from you |
| 17:03:25 | 14 | on Monday.  But I will consider any additional case law you |
| 17:03:31 | 15 | want to call to my attention now that both parties have rested |
| 17:03:39 | 16 | and you know what the bulk of all of the evidence looks like. |
| 17:03:42 | 17 | So does the plaintiff want additional letter |
| 17:03:47 | 18 | briefing? |
| 17:03:51 | 19 | MR. TAYLOR:  Only on something that might have come |
| 17:03:53 | 20 | up today that hadn't come up before.  I need to discuss this |
| 17:03:56 | 21 | with him.  But we'll do it according to your schedule and |
| 17:04:00 | 22 | submit it in a letter. |
| 17:04:01 | 23 | THE COURT:  All right.  Here's what we will do.  If |
| 17:04:04 | 24 | you want to submit anything further to me, make it in the form |
| 17:04:08 | 25 | of letter briefs without argument, with just additional |

17:04:12  1  authority you want me to look at, and have it in no later than

17:04:17  2  5 o'clock Thursday afternoon.  That way I'll have it Friday and

17:04:23  3  over the weekend and Monday.

17:04:26  4          The reason I put a time down, I never would in the

17:04:30  5  past ever say a particular time.  I'd just say by Friday.  And

17:04:34  6  then we came up with computer filing, which lawyers, adhering

17:04:41  7  to the concept of nature abhors a vacuum, immediately reached

17:04:46  8  out and the day now ends at 11:59 instead of 5 o'clock for me.

17:04:51  9  So, I want it by 5 o'clock Thursday anything else you want to

17:04:55  10  present me, and I will consider -- I will look at that ahead of

17:04:59  11  time and consider it during argument.

17:05:02  12          Don't get too involved in coming up with an argument

17:05:09  13  that you think will fill an hour.  You're likely to get a bunch

17:05:12  14  of questions from me, and I'm not likely to add that on to an

17:05:16  15  hour argument.  So you'll have an hour to present, and that

17:05:23  16  will include any questions that I may ask you as we go along in

17:05:27  17  that.

17:05:28  18          I am going to want to, as I've said before, you to

17:05:33  19  direct me in your arguments to the specific parts of the

17:05:41  20  evidence that is in the record that we have made that in the

17:05:46  21  plaintiffs' case support the request for temporary relief, the

17:05:50  22  elements of it, where the plaintiff believes that they have

17:05:58  23  adduced adequate evidence to support a preliminary injunction

17:06:10  24  and a temporary receivership.  Although one does not

17:06:14  25  necessarily go with the other, I might grant part relief and I

17:06:19  1  might grant not.  So you want to look at it that way.

17:06:22  2          And then I want to hear, of course, from the

17:06:28  3  defendant on exactly what evidence is there that either

17:06:35  4  supports their defense or the weaknesses in the plaintiffs'

17:06:40  5  case on why the plaintiff has not gotten there with what the

17:06:48  6  plaintiff wants.

17:06:52  7          So that's what I'm after.  The elements are well set

17:06:56  8  forth in the case law and the rules, so you know what you're

17:06:59  9  going to have to do.

17:07:01  10         So while I've got you here, anything else we need to

17:07:03  11 take up today?

17:07:05  12             MR. TAYLOR:  No, Your Honor.

17:07:07  13             MS. GHAVIMI:  No, Your Honor.

17:07:07  14             THE COURT:  All right.  Well, thank you-all, and I

17:07:09  15 will see you back here at 2 o'clock on Monday, the 8th.  And I

17:07:15  16 will look forward to any additional letter briefing by

17:07:18  17 5 o'clock on Thursday.

17:07:21  18         At this time the court's in recess.

17:07:23  19      (End of transcript)

          20

          21

          22

          23

          24

          25

ARLINDA L. RODRIGUEZ, OFFICIAL COURT REPORTER
U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)

1  **UNITED STATES DISTRICT COURT      )**

2  **WESTERN DISTRICT OF TEXAS          )**

3      I, Arlinda Rodriguez, Official Court Reporter, United

4  States District Court, Western District of Texas, do certify

5  that the foregoing is a correct transcript from the record of

6  proceedings in the above-entitled matter.

7      I certify that the transcript fees and format comply with

8  those prescribed by the Court and Judicial Conference of the

9  United States.

10     WITNESS MY OFFICIAL HAND this the 4th day of August 2016.

11

12                          /S/ Arlinda Rodriguez
                            Arlinda Rodriguez, Texas CSR 7753
13                          Expiration Date:  12/31/2016
                            Official Court Reporter
14                          United States District Court
                            Austin Division
15                          501 West 5th Street, Suite 4152
                            Austin, Texas 78701
16                          (512) 391-8791

17

18

19

20

21

22

23

24

25